**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
TAMPA DIVISION

| | |
|---|---|
| In re: | ) Case No.: 8:09-bk-15972 |
| NATIONAL GOLD EXCHANGE,, | ) Chapter 11 |
| Debtor. | ) **MOTION TO CONVERT TO CHAPTER 7** |

The Creditor, Caligula Corp., by and though its attorney, Paul DeCailly, and states unto this Honorable Court in support of its motion to Convert to Chapter 7 pursuant to 11 USC §1112.

**FACTS**

On July 24, 2009, National Gold Exchange, Inc. filed a petition for voluntary chapter 11 and on July 30, 2009 Caligula Corporation filed a motion to appoint a chapter 11 trustee or in the alternative, to convert the case to Chapter 7. [Doc. No. 34]. On August 3, 2009 the Court held a Final Evidentiary Hearing on Sovereign Bank's (herein "the Bank") Motions to Excuse Turnover, and Motion to Convert or Appoint a Chapter 11 Trustee, and Caligula Corporation's Motion to Appoint Chapter 11 Trustee or Convert the case to chapter 11.

During the hearing, Sovereign Bank put on witnesses that detailed facts that painted a picture of a business that was being intentionally run into the ground by its owners and management. The following are undisputed facts that outline the Debtor and its managements' conduct prior to filing for relief.

**UNDISPUTED FACTS**

When the Bank arrived on site at NGE's for an announced audit, they observed a business premises in disarray, specifically:

> Well, on the first day, there were matters that came up that were somewhat disconcerting at the bank. First, when they walked in, just visually, they were stunned at the disarray of the facility. There were multitudes of computers and servers; there were hundreds of exposed wires floating through the facility.

(FEH Trans, p. 35, 14-20). Furthermore, the Debtor could not produce the most basic of reports: "then most alarming was that the company could not produce what is called a perpetual inventory, which is a real-time report" (FEH Trans. p.35 20-22). In fact, "[t]hey were not able to produce any books and records due to, what was reported by the company, a thunderstorm the day before, which took down the server." (FEH Trans. p.35-36). The Bank found it disturbing that the Debtor's records were vulnerable to something as routine as a thunderstorm.

The problems had just begun, as the examiners began to investigate it was suddenly disclosed that the premises were shared by another coin dealer, Gainesville Coin, which just so happened to be owned by family members of the Debtors majority shareholders. (FEH Trans p. 36-37). The examiner also found evidence of unusual activity regarding Mark Yaffe, specifically the examiners found several un-cashed checks to Mark Yaffe, including a check for $250,000.00; furthermore they discovered that Mark Yaffe had written checks to himself for over $2,000,000.00 during the first 6 months of 2009. (FEH Trans. p. 57, 5 -14).

The Bank, prior to the examiners arriving on site, had arranged for private investigators to set up surveillance on the NGE location, and just prior to the arrival of the examiners, employees were seen taking boxes out of the building and placing them in the trunks of their personal vehicles. (FEH Trans. p.57 21-24). The Hillsborough County Sheriff's Department

Motion- 2

stopped the employees, and it was later discovered that the boxes contained grading supplies and labels. The Bank also conducted some off-site internet investigation and found that both NGE and Gainesville Coin were selling the exact same coins on their websites. (FEH Trans. p. 87-88).

As part of the audit, the Bank also attempted to reconcile and confirm accounts receivables, and discovered large accounts receivable for entities called Rifkin Management, and the Tudor Trust. Upon further investigation, they discovered that the "Tudor Trust" did not exist; however investigators did trace the phone number and address to a Beverly Sverker, who just so happens to be a paid consultant employed by the Debtor. (FEH Tans. P.132 – 144). The Bank Examiners also discovered that there were over $2,700,000.00 of coins missing, and when they inquired of Mark Yaffe where the inventory was, he indicated that the missing coins were in West Palm Beach, FL at a Coin show. When the coins from the show returned there was only $210,000.00 worth of coins, and when asked where the remaining coins were, Mark Yaffe told the examiner that they coins had been sold at the show. When pressed for the invoices reflecting the sales, Mark Yaffe could not provide them immediately. Several hours later, Mark Yaffe provided invoices, however, there were no other documents, such as shipping documents, or acknowledgments forms signed by customers when they received the coins, and Mark Yaffe indicated that there were no other documents. Upon inspection of the invoices, there were three invoices, all to the Tudor Trust, which the bulk of the coins were listed. These invoices were consignments to the Tudor Trust, and those consignments were valued at $1,800,000.00. (FEH Trans p. 159 – 164).

The examiner tried to verify the location of the coins as well as the customer, the Tudor Trust, and spoke to a female claiming to be the office manager of Charles Gray, Inc, who verified that the coins were in their possession, and that the Tudor Trust was a client of Charles

Gray, Inc. The female identified herself as Suzana Burke, and the examiner identified that same person has an employee of the Debtor, Beverly Sverker. (FEH Trans. p. 167 – 172). During the audit, the Bank's examiners inventoried, several high value coins, one of which was valued at $550,000.00. When the Bank executed its writ of replevin, that coin was missing, and when pressed about its whereabouts, Mark Yaffe told the examiner that the coin had been sold "last week" but could not identify the name of the purchaser. (FEH Trans. p.175 – 176).

The record is filled with references of co-mingling inventory of the Debtor with other companies who seemed to be operating out of the same location. There are were also several documents indicating that Mark Yaffe had done some pre-bankruptcy planning, and had another gold business set up to which to transition his operations to upon the filing of the Bankruptcy. (FEH Trans, p.220-222). There were records that indicated that some coin values were inflated with the presumed intent of procuring bank loans. (FEH Trans. p. 222, 17-21).

**ADDITIONAL FACTS – POST PETITION**

After filing for Bankruptcy, Mark Yaffe created Phoenix Gold Corporation, which is now the "plan proponent." However, the principles of the Debtor have, to date, refused to submit themselves for questioning under oath. The Debtor failed to appear at the Section 341 meeting of creditors, its principle have refused to schedule or submit to rule 2004 examination, and have indicated through their attorneys, that if compelled to testify that they would refuse to testify pursuant to their Fifth Amendment right not to be compelled to incriminate themselves. There have been allegations that over a million dollars has passed thought Mark Yaffe's personal accounts, and that there have been behind the scenes payments to unsecured creditors, pre-confirmation, made either by Mark Yaffe, or his shell company, Phoenix Gold Corp.

A Chapter 11 plan of reorganization has already been proposed, and rejected. The Plan Proponent has been given an opportunity to propose an amended plan and disclosure statement, which, at this time, has no viable chance of being confirmed. The Court has lifted the automatic stay on the collateral that belongs to the bank, and to date, the Debtor has yet to submit to questioning at a meeting of creditors, or even file schedules and statements that comply with the Bankruptcy Code, and rules of procedure.

## **ARGUMENT**

Conversion of a Chapter 11 case is governed by 11. USC 1112(b), which provides in relevant part that:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best Interests of creditors and the estate, the court shall convert a case under this Chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.
> (2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)—
>
> > (i) for which there exists a reasonable justification for the act or omission; and
> >
> > (ii) that will be cured within a reasonable period of time fixed by the court.
> > * * *
> (4) For purposes of this subsection, the term 'cause' includes—
> * * *
>
> (D) unauthorized use of cash collateral substantially harmful to 1 or more

> creditors;
>
> * * *
>
> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
>
> * * *
>
> (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

The threshold issue, thus, is whether "cause" exists to convert or dismiss. Section 1112(b)(4) lists sixteen nonexclusive grounds that constitute cause. *In re AmriCERT, Inc.*, 360 B.R. 398, 401 (Bankr.D.N.H.2007) ("The list [contained in 1112(b)(4)] is not exhaustive, and a case may be dismissed for other causes, such as bad faith or if the petition does not serve a bankruptcy purpose."). Furthermore, prepetition conduct of a debtor can be considered to determine whether cause exists under §1112(b)(4) to convert. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988). (See also *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, (3rd Cir. 2004); *In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1415 (10th Cir. 1996); *In re Trident Associates Ltd. Partnership,* 5,2 F.3d 127 (6th Cir. 1995)).

Prior to the 2005 Amendments to the Code, the Court was vested with some discretion when considering a motion to convert, however, contained in the comprehensive overhaul of the Code in 2005, (herein the "BAPCPA") was the stripping of that discretionary language and it was replaced with mandatory language that requires conversion [or dismissal] upon the showing of cause by the Movant. *In re 3 Ram, Inc.*, 343 B.R. 113, 118 (Bankr.E.D.Pa.2006); also see *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr.D.S.C.2007). If the Movants establish "cause", then the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion. Congress explained the exception, stating it only applies if: "(1) the debtor or a party in interest objects and establishes

that there is a reasonable likelihood that a plan will be confirmed within the time periods set forth in section 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time." H.R.Rep. No. 109-31(I) at 94 (April 8, 2005), reprinted in 2005 U.S.C.C.A.N. 88, 2005 WL 832198. In this matter, there exists cause under several of the enumerated examples outlined by the code.

### A. 11 USC 1112(b)(4)(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.

The Supreme Court has said "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936). "[T]here must be `a reasonable possibility of a successful reorganization within a reasonable time.'" *United Say. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). "Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991). *In re Brown,* 951 F.2d 564, 572 (3d Cir.1991). The inquiry here is twofold. First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the status of the case.

Since the filing of this case, there has been the appointment of a chapter 11 Trustee who has taken control of the Debtor entity. The Trustee has not operated the business, but rather taken a role similar to that of a Chapter 7 trustee by simply marshaling assets, storing them, and taken

Motion- 7

some small steps towards liquidating minuscule assets such as furniture, and some hockey tickets.

On February 26, 2010, the Court entered an order lifting the automatic stay on motion by Sovereign Bank, and has allowed the Bank to take possession of its collateral including music machines valued at $9,811,400.00 and its coins with an estimated value of $20,000,000.00 according to the January 2010 Monthly operating report. (*Exhibit 2*). This liquidation, if the values are accurate, and Sovereign Bank is able to sell the inventory and Music Boxes, the banks would continue to hold a secured claim on the remaining assets held by the trustee, specifically the receivables collected per Sovereigns recorded UCC-1 Statement to cover the deficiency of over $6,000,000.00 from the estate. (*Exhibit 3*). As stated on the record by Counsel for the trustee, this estate is now administratively insolvent.

The Trustee has had ample opportunity to evaluate the business affairs of the Debtor, and to determine causes of action under 11 USC 545, 546, 547, 548, 549, and 550 which would produce enough proceeds to make a meaningful distribution to the remaining creditors in this case. Including an investigation into the missing $500,000.00 coin, which disappeared just prior to filing of this case, the missing inventory from the "Palm Beach Coin Show", the $2,000,000.00 taken out of the business by Mark Yaffe prior to putting the Debtor into Bankruptcy. The passage of time in pursuing these actions continues to diminish the estate and delay some finality for Creditors.

**B. 11 USC 1112(b)(4)(G) failure to attend the meeting of creditors convened under section 341 (a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;**

11 USC 341 mandates that a meeting of Creditors be convened by the United States Trustee. The code states: "Within a reasonable time after the order for relief in a case under this title, the

United States trustee shall convene and preside at a meeting of creditors." 11 USC 341(a). Furthermore, 11 USC 343 mandates that the Debtor Attend the meeting, and specifically states, "The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title." Debtor's duty to attend meeting of creditors and submit to examination is mandatory. *In re Fulton,* 52 B.R. 627( Bkrtcy.D.Utah 1985).

The meeting of creditors in this matter was originally scheduled for August 28, 2009, but that was rescheduled to September 16, 2009. The debtor failed to appear at the rescheduled meeting. Instead of the Debtor, Larry Hyman appeared on behalf of Phoenix Gold Corporation, a non-interested party in this matter. Mr. Hyman indicated that he was retained as a financial advisor for the Debtor; however, the truth is he was hired by Mark Yaffe to advise Phoenix Gold Corporation. (341 Trans, p. 7 -8). Mr. Hyman was not hired by the Chapter 11 Trustee, nor approved by the Court to act on behalf of the Debtor. (341 Trans. p. 19, 8-14). Mr. Hyman was unable to answer the simplest of questions, such as when the Debtor Corporation was formed, (341 Trans. p.8, 9-11), nor was he knowledgeable of the Debtors pre-petition operations. (341 Trans, p. 8, 12-14). Mr. Hyman did not know the state of the Debtors financial affair prior to the filing of the petition or testify as to the status of the Debtors liabilities pre-filing. (341 Trans. p.8, 17-19). Mr. Hyman could offer little information regarding the Debtors operations, its records, or its relationship with other financial institutions. (341 Trans. p.63 – 66).

Clearly, the Debtor failed to appear for the mandatory meeting of creditors. Mr. Yaffe's attempt to circumvent the requirements of the Bankruptcy Code after he himself decided to put National Gold Exchange, Inc. into chapter 11 should not be rewarded by allowing this case to go forward under Chapter 11 of the code. Currently, Mark Yaffe is making mockery of this court and has masterfully manipulated the process to shield himself from the criminal liability for his

Motion- 9

actions. Bankruptcy Court is a place for the "honest debtor" to find sanctuary, not the un-indicted criminal.

### C. 11 USC 1112(b)(4)(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

*(i) Current plan proponent has no standing to propose a plan.*

"The question of standing generally challenges whether a party is the proper one to request an adjudication of a particular issue." *E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 984 (11th Cir.1990) (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). 11 USC 1109 dictates who has the right to be heard in cases filed under Chapter 11 of the code. The Statute states in pertinent part:

> (b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

The code does not define "party in interest" however the courts have held that "[t]he test to determine whether a party has a protected interest under section 1109(b) is whether the party has a sufficient stake in the outcome of the chapter 11 proceedings so as to require representation. *In re Torrez*, 132 B.R. at 934." *In re E.S. Bankest, L.C.* 321 B.R. 590, 44 Bankr.Ct.Dec. 88, 18 Fla. L. Weekly Fed. B 119 (S.D. Fl 2005).

Phoenix Gold Corporation was formed on August 4, 2009; ten days after the Debtor filed this case. (*Exhibit 4*). It cannot be argued that Phoenix Gold has a stake in the outcome in this case. Furthermore, the attorneys for Phoenix Gold take every opportunity to tout the current success of the company in such a short period of time. They tell a tale of how Mark Yaffe started this company with a $600,000 loan from his father, a retired postal worker. Phoenix

holds no claim, no note, no paper what so ever that would give it "interested party" status. The fact that Mark Yaffe owns it should give rise to only suspicion but certainly not standing to propose a plan.

The Court entered an order giving an equity security holder until September 9, 2009 to file a proposed plan and disclosure statement. (*Exhibit 5*). We are five months past that deadline, and yet, no equity security holder has proposed a plan or disclosure statement. The Court extended that time frame to November 18, 2009 to file a plan and disclosure statement (*Exhibit 6*), and still no valid plan and disclosure statement has been filed.

Given the fact that only a non-interested party has filed a plan in this case in seven months begs the question, has an "interested party" as defined by the code and its supporting case law proposed a plan, and the answer is no.

*(ii)    The current plan is not confirmable on feasibility grounds.*

Section 1129(a)(11), the "feasibility" requirement, mandates that a court shall confirm a plan only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

In essence, this section of the Code "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain." *In re Proud Mary Marina Corp.*, 338 B.R. 114, 123 (Bankr.M.D.Fla.2006). "Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." *In re Mulberry Phosphates, Inc.*, 149 B.R. 702, 708 (Bankr.M.D.Fla.1993)

While the success of the plan does not need to be guaranteed, the reviewing court should be able to glean from the totality of the circumstances a reasonable assurance of success. See *Mulberry Phosphates, Inc.,* 149 B.R. at 709; see also *Proud Mary Marina Corp.,* 338 B.R. at 123 (quoting *In re New Midland Plaza Assocs.,* 247 B.R. 877, 884 (Bankr.S.D.Fla. 2000)). "To provide such reasonable assurance, a plan must provide a realistic and workable framework of reorganization." *Proud Mary Marina Corp.*, 338 B.R. at 123 (quoting *In re Made in Detroit, Inc*., 299 B.R. 170, 176 (Bankr. E.D.Mich.2003).

In determining if a plan is feasible, a court can consider such factors as the earning power of the business, its capital structure, and economic conditions. *In re Sovereign Oil Co*., 128 B.R. 585, 586 (Bankr.M.D.Fla.1991). In addition, past performance of the debtor can add clarity to a plan's feasibility. See id. at 587; see also *In re Malkus*, 2004 WL 3202212, at 2004 Bankr. LEXIS 2120, at 10 (Bankr.M.D.Fla. November 12, 2004)("A debtor's past performance is one of the most important measures of whether a debtor's plan will succeed.")

"Continued service by prior management may be inconsistent with the interests of creditors, equity security holders, and public policy if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor, 5 Collier on Bankruptcy, ¶ 1129.02, at 1129-18 (15th ed. 1983).

The current plan proposes to essentially turn over the mantel of command from Mark Yaffe to Mark Yaffe, it proposes equity in a house, that does not exist, from a house built on Sovereign Banks' and other creditors' backs though the funneling of money from the Debtor to Mark Yaffe to his contractor. This conversion of funds was followed by years of deception by Mark Yaffe in an attempt to cover up the theft of collateral and money.

The notion that the very thief that took the money from creditors, now proposes to pay back 100% to the Creditors through his new sham company is unthinkable, and it is astounding that the case has been allowed to proceed this far under Chapter 11 of the Code. To say that creditors might lack confidence in the proposed future management is an understatement, based upon the past performance of Mark Yaffe and the current state of the Debtor's affairs.

*(iii) Bad Faith (Lack of Clean Hands)*

When evaluating the issue of clean hand, the Hon. John Olsen from the Bankruptcy Court, in the Southern District of Florida stated:

> This Court has previously discussed the concept of "unclean hands" and the implications and application of this theory. See *In re Delfino*, 351 B.R. 786, 798-790 (Bankr. S.D. Fla. 2006). As reiterated now, the rule that one who comes into equity must come with clean hands "expresses rather a principle of inaction than one of action. It means that equity will refuse its aid in any manner to one seeking its active interposition if he has been guilty either of illegal or inequitable conduct respecting the subject-matter of the litigation." *Carmen v. Fox Film Corporation,* 269 Fed. 928, 932 (2d Cir. 1920), cert. denied, 255 U.S. 569 (1921) (Internal citations omitted). The principle is stated in Pomeroy's Equity Jurisprudence (3d Ed.), Vol. 1, § 398, as follows:
>
> Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days that, while the court in chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscionable or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and **enforce justice**, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies.

*In re Todd*, Case No. 06-16898-BKC-JKO (Bankr. S.D.Fla. 7/16/2008) (Bankr. S.D.Fla., 2008). (*Emphasis Added*).

The hands of Mark Yaffe are forever stained with the dirt of fraud, deceit, and larceny, but he is allowed to proceed in this action hiding behind the veil of a sham corporation. The plan proposed is a pie in the sky promise designed specifically to protect the Debtor's Principle Mark Yaffe from having to answer questions about his conduct. To further his goal of walking through this process without adherence to even the most basic tenants of the Code, Mark Yaffe has taken it upon himself to pay certain creditors behind the scenes. It is purported that he has made aggregate payments of 1.9 million dollars to creditors in this case post petition. (2/10/2010 hearing Trans. p. 73).

The totality of the circumstances of this case screams conversion: failure to file proper schedules, a non-interested party proposing a plan, failure to attend a meeting of creditors, payoffs to creditors for votes, the avoidance of 2004 examinations of the principles of the Debtor, the threatened assertion of the 5th Amendment privilege against self incrimination, and the intermigleling of the Debtor and Phoenix Gold while there is a Chapter 11 Trustee is in place. This is only the post-petition conduct. Pre-petition we have missing coins valued over half a million dollars, complete lack of ordinary business documents such as inventory lists, lack of accounting documents, incomplete books and records, employees taking items out the back door to their cars, and the co-mingling of assets with other entities within the same premises without any clear delineation of what inventory belongs to the Debtor and the other entities.

The Plan Proponent and its principle come before this court with unclean hands, and therefore should not be allowed to wrestle control of the Debtor back from a trustee. The Court has lifted the stay and authorized the sale of substantially all the remaining assets of the estate, there exists no further reason for a Chapter 11 Trustee, when a chapter 7 trustee can accomplish what needs to be done in a more expedient and cheaper means.

## **CONCLUSION**

The Court stated on August 3, 2009 after an all day Final Hearing on various Motions:

> As far as the factual background here, while the Debtor doesn't concede anything and wishes an opportunity to prosecute this case as a typical Chapter 11, **the bottom line is that the evidence of misconduct and mismanagement is substantial.** Mr. Cloutier's testimony, I thought, was most illuminating on that in his description of his experience from the ground floor, as he tried to walk through and find out where the inventory was, the receivables. I'm not going to write a decision on this but it would be one that would be interesting reading, if I did, about the Tudor Trust and whether Suzana Burke is really Beverly Gray Sverker, if I've got those names correct. And I can picture 36 Tudor Street. It's not an office building. The entity Charles Gray, Inc. -- which has the initials CGI, as opposed GCI and ICG, I don't know if that's coincidence or not. But all of that, I don't need to go through line by line, because it's fairly overwhelming in terms of that this case either calls for conversion or appointment of a Chapter 11 Trustee, and that's what it comes down to. From my perspective, I've got to make a very difficult judgment call on what's in the best interest of the creditors and the estate here. Clearly, **there's ample grounds to convert this case today**.

(FEH Hearing Trans, p. 279 – 280). It is clear the Court knew back in August this case should be in a chapter 7, but elected to try to avoid litigation. It is the avoidance of that very litigation that is going to deprive the creditors of an equitable distribution from the Estate. Now the Debtor is administratively insolvent, there has been little progress on a feasible plan proposed by a party with standing. The majority of the estate assets are about to be liquidated, and Mark Yaffe has avoided every attempt by creditors to ask him valid and relevant questions about the operation of the Debtor pre-petition, and also an opportunity to inquire as to how he is going to do things differently if he were allowed, somehow, to take control again.

Now Mark Yaffe is in delay mode, requesting a return to mediation with the very creditor who has obtained relief from stay, requesting a disclosure hearing rather than proceeding to confirmation, and the introduction of the Caligula-Bilzerian sideshow into this case. All designed to delay this matter even further. It is admirable that this court has gone so far out on a

Motion- 15

limb to try and do the impossible, but the time has come to reign this case is and convert it to a chapter 7. Conversion to Chapter 7 will allow for meaningful inquiry into the debtors affairs in a transparent manner. The level of secrecy involved does not give rise to confidence that in the end the creditors will receive any meaningful distribution.

Finally, it should be stressed that this Court appointed a chapter 11 trustee based upon the evidence produced at the final hearing back in August of 2003. The appointment of that trustee was intended to stop the dissipation of estate assets by Mark Yaffe and to try and ascertain the financial condition of the Debtor. It is clear that Mark Yaffe, in addition to manipulating the Court, and the Creditors, has also manipulated the Trustee for his own personal gain. He has been masterful in stringing everyone along while using estate assets to continue in his business, un-supervised by the Court and the Trustee, and has even managed to obtain more credit from other creditors. If the Court would recall, it was Caligula who brought to light that there was a 2nd mortgage on Mark Yaffe's home, but he denied that, but now, it appears that the 2nd mortgage is back, and given that Mark Yaffe has been granted un-official immunity from testifying, one is only allowed to speculate that the "new" second mortgage is a product of an open line of credit secured by the assert he pledges to sell to help pay off creditors. This, just another example of why this case is ripe for conversion. Creditor will no longer have to place their confidence in a thief, and be left to hope and pray that he is sincere in his motivation, but what is his motivation? He has been allowed to continue on – business as usual unabated, without any supervision by this court or the trustee. While a chapter 7 trustee might not be able to rein Mark Yaffe in, he or she can certainly try but at a lower cost to the estate and the creditor.

WHEREFORE the Creditor, Caligula Corporation asks this Court to convert this matter to a case under Chapter 7 of the Code, and order an interim chapter 7 trustee be immediately appointed.

Dated this 21st day of January, 2010

                                          By:/s/ Paul DeCailly
                                             Paul DeCailly
                                             DeCailly, P.A
                                             3111 W. Dr. MLK Jr. Blvd, Ste 100
                                             Tampa, FL 33607
                                             (813) 286-2909

                                             Attorney for Creditor

### Certificate of Service

I HEREBY CERTIFY that a true and accurate copy of the forgoing Motion has been served upon the parties listed on the attached exhibit by the Court CM/ECF system or by first class mail with first class postage affixed on March 3, 2010