**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

```
- - - - - - - - - - - - - - - x
IN RE:                        :
                              :
NATIONAL GOLD EXCHANGE, INC.  :    Case No. 09-15972-8W1
                              :
            Debtor            :         Chapter 11
                              :
- - - - - - - - - - - - - - - x
```

Sam M. Gibbons
U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
Held August 3, 2009

**TRANSCRIPT OF HEARING**

1-FEH On Emergency Motion To Excuse Turnover Of Property
Of The Estate By Sovereign Bank (Doc. #10); Debtor's
Response (Doc. #22); 2-FEH On Debtor's Emergency Motion
For Turnover Or Property Of The Estate & Determination Of
A/P Payments (Doc. #23).....

*[NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

**BEFORE THE HONORABLE MICHAEL G. WILLIAMSON**
**United States Bankruptcy Judge**

*PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING*
*TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE*
*APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS*

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

.....3-Debtor's Application To Employ Saady & Saxe, P.A. As Special Counsel Nunc Pro Tunc (Doc. #17); 4-Debtor's Application To Employ Drummond, Wehle & Ross, LLP As Special Counsel (Doc. #26); 5-Debtor's Motion For Extension Of Time To File Debtor's Case Management Summary (Doc. #31); 6-Motion To Appoint Trustee, Or In The Alt. Motion To Convert To Chpt. 7 By Caligula Corp. (Doc. #34); 7-Amended Motion To Shorten Time For Motion To Appoint Trustee Or Convert To Ch. 7 By Caligula Corp. (Doc. #39); 8-Motion To Convert Case To Ch. 7, Or, Alt., Appoint A Trustee, Or Alt. Appoint An Examiner By Sovereign Bank (Doc. #47)

# A P P E A R A N C E S

| | |
|---|---|
| For Creditor A Mark Precious Metals (Phone appearance) | MINDY MORA, Esquire<br>Bilzin Sumberg Baena<br>Price & Axelrod<br>200 S. Biscayne Blvd.<br>Suite 2500<br>Miami, Florida 33131-5340<br>305-374-7580<br>mmora@bilzin.com |
| For the Debtor | RICHARD J. MCINTYRE, Esquire<br>McIntyre Panzarella Thanasides<br>6943 E. Fowler Ave.<br>Tampa, Florida 33617-1714<br>813-899-6059<br>Rich@mcintyrefirm.com |
| As Special Counsel for Debtor | DANIEL L. SAXE, Esquire<br>Saady & Saxe P.A.<br>205 Crystal Grove Blvd.<br>Lutz, Florida 33548-6452<br>813-909-8855<br>saadyandsaxe@saadyandsaxe.com |
| For Sovereign Bank | ROBERT A. SORIANO, Esquire<br>DONALD H. CRAWFORD, II, Esquire<br>Greenberg Traurig, PA<br>625 E. Twiggs Street<br>Suite 100<br>Tampa, Florida 33602-3925<br>813-318-5700<br>sorianor@gtlaw.com<br>crawfordd@gtlaw.com |
| For the U.S. Trustee | J. STEVEN WILKES, Esquire<br>U.S. TRUSTEE'S OFFICE<br>Timberlake Annex<br>501 E. Polk Street<br>Suite 1200<br>Tampa, Florida 33602<br>813-228-2000 |

4

**A P P E A R A N C E S**
(Continued)

For Creditor                PAUL DECAILLY, Esquire
Caligula Corporation        DeCailly, PLC
                            3111 W. Martin Luther King Blvd.
                            Suite 100
                            Tampa, Florida 33607-6232
                            813-286-2909
                            pdecailly@pdlaw.net

For ScotiaMocatta,          DARREN D. FARFANTE, Esquire
and Republic                DONALD R. KIRK, Esquire
National Business           Fowler White Boggs Banker PA
Credit                      PO Box 1438
                            Tampa, Florida 33601-1438
                            813-228-7411
                            dfarfante@fowlerwhite.com
                            dkirk@fowlerwhite.com

**I N D E X**

WITNESSES                                                    PAGE

ELIZABETH SOUSA
Direct Examination by Mr. Soriano.................. 23
Cross-Examination by Mr. Saxe...................... 60
Redirect Examination by Mr. Soriano............... 108
Voir Dire Examination by Mr. McIntyre....... 113, 117
Cont. Redirect Examination by Mr. Soriano.... 115, 122

MICHAEL FERRELLI
Direct Examination by Mr. Crawford................ 130

ROBERT FLOHR
Direct Examination by Mr. Crawford................ 137

RAYMOND CLOUTIER
Direct Examination by Mr. Crawford................ 145

ALBERT ROBINSON
Direct Examination by Mr. Soriano................. 193

KEVIN KWAN
Direct Examination by Mr. Soriano................. 239

**I N D E X**

EXHIBITS                                              PAGE

Sovereign Bank's Exhibit No. 29.............. 115, 229
Sovereign Bank's Exhibit No. 30................... 121
Sovereign Bank's Exhibit No. 31................... 123
Sovereign Bank's Exhibit No. 32................... 124
Sovereign Bank's Exhibit No. 37................... 143
Sovereign Bank's Exhibit No. 26................... 165
Sovereign Bank's Exhibit No. 28................... 192
Sovereign Bank's Exhibit Nos. 1-13............... 252

**REPORTER'S NOTE**

Quotation marks used herein are for readability purposes and may not reflect actual quoted materials or statements.

**P R O C E E D I N G S**

(Whereupon, the proceedings commenced at 9:39 a.m.)

THE COURTROOM DEPUTY:  (Placing call for phone appearance.)  Yes, Ms. Mora, this is Marti calling from Judge Williamson's courtroom for your appearance in Case No. 09-15972, National Gold Exchange, Incorporated.

MS. MORA:  Thank you, Marti.

THE COURT:  Okay, very well.  Ms. Mora, if you could go ahead and make your appearance, and then I'll take appearances from those appearing in the courtroom.

MS. MORA:  Thank you, Your Honor.  I'm appearing on behalf of A Mark Precious Metals.  This is Mindy Mora on behalf of Bilzin Sumberg.

THE COURT:  Thank you, very much, Ms. Mora.  And in the courtroom.

MR. MCINTYRE:  Good morning, Your Honor. Richard McIntyre for Debtor, along with Dan Saxe, Special Counsel for the Debtor.

THE COURT:  Okay.  Thank you, Mr. McIntyre, and Mr. Saxe.

MR. SORIANO:  Good morning, Your Honor, and my colleague Donald Crawford on behalf of

Sovereign Bank.

THE COURT: Okay. Thank you, Mr. Soriano.

MR. FARFANTE: Good morning, Your Honor. Darren Farfante. Also with me is Donald Kirk. We represent two creditors, ScotiaMocatta, and also Republic National Business Credit.

THE COURT: Okay. Thank you, Mr. Farfante and Mr. Kirk.

MR. WILKES: J. Steven Wilkes, Your Honor, on behalf of the United States Trustee.

THE COURT: Mr. Wilkes, thank you.

MR. DECAILLY: Good morning, Your Honor. Paul DeCailly appearing on behalf of unsecured creditor, Caligula Corporation.

THE COURT: Okay, thank you. Very well, the Court has before it a final hearing on the emergency motion to excuse turnover. We had an initial hearing on that, I believe it was last week, at which time I scheduled this hearing and indicated that any other motions that were filed in the interim would be heard today, if necessary, on an evidentiary basis.

The motions that I'm aware of that have been filed -- and I omitted to mention the Debtor's emergency motion for turnover which went along with

the motion to excuse.

There's also pending the application to employ Mr. Saxe's firm, the application to employ Drummond, Wehle & Ross, as special counsel, Debtor's motion for extension for time to file the case management summary.  But more importantly, a motion to appoint a Trustee which has been filed by Mr. DeCailly on behalf of Caligula Corporation, and last night the Bank Sovereign filed the motion to -- it's not on the calendar, actually.

THE COURTROOM DEPUTY:  It's on the one that they have, Judge.

THE COURT:  Okay.  It's the motion to appoint a Trustee, which I've had an opportunity to review.

MR. SORIANO:  Right, and I realize that we did file it and it might not be heard today.  It is also to convert or, in the alternative, a Trustee or an Examiner.

THE COURT:  Okay, very well.  Let me hear from the parties and how you would like to proceed as far as my calendar today.  I do have another motion for summary judgment, which is scheduled for 1:30 which is not going to be as straightforward as the one I just handled, but it's not going to take

all afternoon either.  So I do have time in the afternoon.  Mr. McIntyre?

MR. MCINTYRE:  Well, Your Honor, as you know, this is a case that was filed on Friday of last week and it was filed in kind of a harried way.  I wasn't even in town at the time that it was filed.  With that said, I think we're at a crossroads today, or shortly, as to which way the Court is going to handle this case.

Our client has been in business for a long time.  Our client has never had any creditors that have not been repaid.  And our client is part of a kind of business that's an old world kind of business where people dealt in an informal way for an extended period of time involving large amounts of money.  And so when you overlay the bankruptcy law onto our client's business, it is going to be difficult to figure out who gets what under the law.

And that will be complicated by the fact that without notice, and without casting aspersions, but the bank came in and took everything out of our client's business.  Where it might have been a little more difficult to figure out things, you know, who had what and who had what rights, if you came in and saw everything the way it was when the

business was operating, you have now the situation where the deck has been shuffled a little bit and we'll have to work our way through that.

With that said, to me, I see the case going two ways. Either the bank takes all the assets, they liquidate the assets, they can't do as good a job liquidating them as my client can.

There'd be a -- it will be a self-fulfilling prophecy that there'll be a shortfall in the collateral paying off the bank, and there will be certain people that will claim they have security interests, consignment claims and the like.

They'll fight with the bank over whether they get priority or not and at the end of the day there will be a very small recovery for a large number of people, and a large number of people will not get paid at all. That's one view of the world.

Now, what my client would like to do is something different. What my client wants to do is he wants to remain in control of the estate. We're willing to put into place procedural safeguards so that we don't spend all of our money litigating the allegations that have been raised at this point.

They will need to be dealt with, both from an offensive standpoint and a defensive standpoint,

because it's our position that the estate has been -- has suffered damages and that there have been breaches of agreements with the estate that will need to be addressed by way of setoff and/or affirmative claims. But that those things, if they eclipse the reorganization of the Debtor, will be counter-productive.

And what our client would like to do is as follows. Sort of like the Cutter Power case, only on a quicker path. We could have a plan filed within a week. We're at a disadvantage because we don't have our books and records and we don't have our assets to inventory, although I do understand some of those things are being brought back at this point in time.

But the plan -- the rough outline of the plan would go as follows. The client would essentially liquidate -- because that's his business. Liquidate, for the largest amount possible, the coins that are the property of the estate. The music boxes, which are very large, very expensive, high-end, small-market items, but they can -- that are worth a tremendous amount of money.

And that to the extent that it's possible, based upon the profits -- and I would view profits

being the difference between a release price and what he can ultimately obtain for the sale of the various items of collateral -- possibly acquire new collateral, new assets to sell as well, allowing his business to continue.  He also, as part of his business, grades coins, and so he has a source of revenue there as well.

The goal here is to maximize the recovery, not only to the bank, but to the unsecured creditors.  And to do that, to enable him to do that, he is willing to pledge the equity in his home.  His home is listed for 25 million dollars.  It's listed on the market right now.  It's a large home in Avila.

There, as you may or may not know, is a lack of activity in the real estate market in Avila because people just aren't buying mega homes right now because of the economy.

That said, his mortgage is $10 million, and we believe that there's approximately 15 million, you know, maybe closer to 13 after transactional costs, but a substantial amount of equity in the property in this market.

And if this case, if he can be put in a position where he can reorganize his business, we

believe that as the reorganization goes, to the extent that the mortgage is backing up the obligations of the estate, that mortgage may be worth quite a bit more than $13 million over time.

THE COURT:  You're saying the mortgage -- the mortgage that would be given pursuant to the plan by the individual, the --

MR. MCINTYRE:  Mr. and Mrs. Yaffe.  Yes, Your Honor.

THE COURT:  Mr. and Mrs. Yaffe, okay.

MR. MCINTYRE:  They have never --

THE COURT:  And who holds -- who holds the first mortgage on the house?  Is it a third party institutional lender?

MR. MCINTYRE:  I believe it's an institutional lender but Your Honor, I honestly don't know.

THE COURT:  Okay.

MR. MCINTYRE:  We'll find out.  And this was -- the property was purchased, my understanding, a significant time ago, in the early 2000 timeframe.

But all that said, the concept here is, you know, his position is:  Look, I've never not paid anybody -- a double negative.  But I've never left anybody unpaid.  My business is a business

based on trust.  The things that have been done to my business right now have hurt that.

And it's his intention to rebuild his business, make sure everybody gets paid what they're entitled to be paid, and to move forward in a way that benefits everybody.  And for that, his house is obviously exempt.  Like I said, they're willing to make a part of the plan.  I can have that plan filed by next Monday.

We'll have a little bit of an issue with schedules and statement of financial affairs.  And the logistical issue is simply as I said, getting back possession of our books and records so that we can put those things together.  And if that can be done quickly, then I believe we can have the books and records -- I mean we can have the schedules and statement of financial affairs put together quickly.

My goal would be to minimize the front-end litigation expense of the accusations.  They can be dealt with in the plan, they can be dealt with post-confirmation, but I don't believe anybody could say that a plan of that kind would be framed in bad faith because I think it's obvious on its face that it would result in a higher distribution to all of the creditors, including the secured creditor, the

bank in this case, than a simply liquidation in this market of this kind of asset.  And so we're happy to proceed with the bank talking about what it's found today.

With regard to the motion, the motion to appoint a Trustee, if the Court wants to entertain that today, that's fine.  We haven't had a chance to prepare.  I only thought of it last night, late at night, that that was even going to be on for hearing.  And I'm not complaining about that, I'm simply saying we haven't prepared any defense to that.

Frankly, my position has been to figure out how to get the plan confirmed to reorganize this Debtor and maximize distribution.  Mr. Saxe is going to be the man litigating the claims with the bank, both offensively and defensively.  And to me, those are sideshows until the Court has an opportunity to figure out how you best discharge this case.

And one of the things we are sensitive to is the concept of how do you preserve the collateral, how do you protect the collateral from dissipation and we're certainly -- we're certainly willing to do whatever is necessary to assure the Court that there can be no problems with that, so

that it's locked down in a secure fashion.

My thought, and I spoke with Mr. Yaffe, is that he can sell coins mostly based on description. The people that buy his kind of coins don't necessarily have to touch, see, and feel them. They know what they are. And so you can work from lists. Although, to the extent they need to be inspected, that they could be retained somewhere where they're secure, and they could be inspected at that facility.

So with that said, Your Honor, it would be our intention to move forward with the applications, get those granted. And with regard to our emergency motion to turn over property of the estate, I'm not so concerned with how the property is turned over.

The books and records, clearly we want the bank to have their copies, but we want to get those back so we can discharge our obligations to the Court.

With regard to valuable things that could -- that could be misappropriated, I don't have a problem securing those in a way that's mutually agreeable to the parties. Although, what we want to avoid is a quick decision that results in a de minimis distribution to the majority of the

parties in interest.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you, Mr. McIntyre.

MR. SORIANO:  Thank you, Your Honor.  In many situations, that approach would be logical and, frankly, we actually discussed this with the Debtor prior to initiating our litigation.

We put out a proposal, offered to enter into a forbearance agreement that would have some of the safeguards that counsel is describing.  And, frankly, the Debtor refused to do it.  That kind of caused us to take the steps that we took.

Now, I do want to say one thing.  In terms of books and records, we haven't removed any books and records.  We've copied -- made copies of certain things, but everything that -- in fact, you will hear testimony today that if anybody has removed books and records, it appears to have been the Debtor, but we have not.

I think it's interesting, the offer on equity in the house.  That is different.  We do have guarantees and, given all of the value of the inventory and the house, it's possible that we could get paid from the guarantees.

But you're going to hear testimony

today -- and it's just so troubling, it's so incredibly troubling, that I just don't think that we could ever allow the Debtor back in -- at least not willingly.  I mean, if Your Honor decides that that's the best thing to do, that's obviously the Court's decision.

But from the bank's perspective, to voluntarily agree to something like that, given the kinds of evidence you're going to hear today, I think would be real troubling, and we just couldn't do it.  And, you know, we think the collateral -- well, we don't know, there may be very, very little collateral based on our analysis.

And I also need to stress, you'll hear how we progressed with suspicions, an unannounced audit, the replevin and then the post -- after you let us back into the bankruptcy, gradually learning more and more information which is still just the tip of the iceberg.

It's a very complicated situation to track.  There were transactions going every which way, foreign wires.  It looks like assets sold, pledged to various entities, it's very complicated.

And Mr. McIntyre said, and he's right, it's going to be extremely difficult to unwind it,

but I just don't think the Debtor, having created this nest, is going to be the proper person to unwind it.  There are plenty of people out there who can liquidate coins.  And the bank is prepared, still, to go forward with that route.

So we'd like to put on our case.  I think Your Honor will know better how we feel, and why we feel the way we feel after hearing evidence.  I do think it's kind of noteworthy that no representative of the Debtor is here today.  I'm sort of surprised at that, given the importance of this hearing, but be that as it may.

One thing I would like to do, sort of as a clean up matter.  There are a number of exhibits we put in the exhibit book.  Some of them are fairly straightforward.  The loan documents for example, I think if you go through Exhibits 1 through 13, they're all related to loans and guarantees, and I would hope to avoid court time, if counsel would stipulate to the admissibility of those.

There's also a letter that, Exhibit 14, that I sent to counsel for National Gold Exchange when we proposed the forbearance agreement, and the response.  That's 14 and 15, that those would also be able to be admitted without having to go through

the process.

And I suppose Item 16 as well, the motion for emergency hearing by Gainesville Coins, Inc., which was filed by Mr. Saxe in the State Court. Some financial exhibits, statements of the Debtor are also in here.

And so maybe if we could agree to the admissibility of those ahead of time?  We haven't had a chance -- obviously, we're all doing this sort of on the run, so I haven't had a chance to show all this to opposing counsel, but they can agree or we could do it the long way.

THE COURT:  Okay.  Well, if they want to stipulate, that's fine.  Otherwise, just move for introduction and I'll hear if there's any objections.  As far as the bank's loan documents, I for one don't want to spend any time, unless it's absolutely necessary, going through all those exhibits.

MR. SORIANO:  I don't intend to at all. I mean, really, there aren't really that many questions.  It's just making a record.

THE COURT:  Sure.

MR. SORIANO:  The foundation for the default.

THE COURT:  Okay.  Why don't you go ahead and proceed with your evidence.  We'll hear any objections as we go along.

MR. SORIANO:  Okay.

THE COURT:  And I think we -- as far as what's before me today, it was my intention at the last hearing, to deal with matters on an emergency basis on the merits as best as we could today.  And so I will consider both the creditor's motion filed by Mr. DeCailly and the bank's motion which was filed last night, the motion to convert or to appoint a Trustee or Examiner.

And realizing there's been short notice, but given the nature of the collateral and the type of case, I do think it's essential that we have evidence and some conclusion as to which direction this case is going to go in.

Mr. McIntyre is entirely right in his description of where we stand here today.  And so we'll proceed forward on the merits.

MR. SORIANO:  Okay.  Thank you, Your Honor.

THE COURT:  You may proceed.

MR. SORIANO:  For my first witness I'd like to call Elizabeth Sousa.

THE COURT:  Okay.  Ms. Sousa, if you could come and stand at the lectern so that you can be sworn.

THE COURTROOM DEPUTY:  Just step right there.  Please state your name and address for the record.

THE WITNESS:  Sure.  Elizabeth Sousa. 200 Heroux Boulevard, Unit 2206, Cumberland, Rhode Island, 02864.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered by the courtroom deputy.)

THE COURT:  Ms. Sousa, if you could have a seat over here in the witness stand, and adjust the microphone so that you can be heard.

ELIZABETH SOUSA

being first duly sworn, was examined

and testified under oath as follows:

DIRECT EXAMINATION

BY MR. SORIANO:

Q     Ms. Sousa, by whom are you employed?

A     Sovereign Bank.

Q     And what is your position?

A     I am a market manager in the specialized unit.

Q    And what is that?  What unit is that?

A    It's a group within Sovereign that has many different businesses.  My responsibilities include the Precious Metals Group, the Resort Lending Group and the Aviation Group.

Q    And what are your responsibilities in your position?

A    Currently, I have several lenders who report in to me, I have a trading group that reports in to me, and I prepare a lot of reports for executive management regarding the portfolios.

Q    Okay.  Would you tell the Court your education after high school?

A    Sure.  I graduated Boston College with a degree in Liberal Arts and I have an MBA from the University of Rhode Island.

Q    And your employment history after graduating from college?  I guess from getting your graduate school degree?

A    I had worked for various institutions including Fleet Financial Group and then Bank Boston and came over to Sovereign with a divestiture in 2000.

Q    Now, at some point did you become familiar with National Gold Exchange's relationship with Sovereign?

A    Yes.  It was an account that was handled by one

of my colleagues, Michael Smith, for numerous years. Michael Smith reported to my former boss, Al Brown, up until his departure in January of this year.  We knew of the company, we knew that it was a long time customer of the bank and it was a coin company and owned by the Yaffes.

Q    And what was the loan relationship with the bank?  Can you describe for the Court what that was?

A    Sure.  There was a working capital facility in place that was foreign-based driven and there were two term loans that were given with collateral of the music box collection.  And it's my understanding that the facilities were put into place in '07 to support the company's growth.

Q    When you say "the facilities" are you talking about the term loans?

A    All of the facilities.  The bank originally had, at one time, smaller loans.  And as the relationship grew, the bank approved increases to that facility.

Q    I see.  And what was the maximum amount of revolver?

A    I believe it's around 33 million.

Q    Were there any other agreements, financial agreements between the Debtor and the bank?

A    The facility also had a interest rate swap

associated with it.  And in response to that swap, there was an excess availability requirement in the borrowing base to cover that exposure.

Q   And what was that excess availability requirement?

A   I believe there were various amounts, that it had to step up to.  Most recently, it had to be a million five beginning, I believe, January of this year.

Q   Okay.  And would you describe to the Court the borrowing base formula and some of the restrictions in the borrowing base?

A   Sure.  The inventory was broken out into three components, depending on where the inventory was.  It was, I believe, 60 percent that was in-house.  It was, I believe, 50 percent that was located at approved graders.

Q   Let me just stop you there, for a second, for the Court's benefit.  What are graders?

A   My understanding is that various coin companies buy inventory that they deem is raw, that is not -- not assessed a grade or a rating.  I understand that the grading system goes up to 70.  And I believe as customer buy, I guess in this market, on a sight unseen that they rely on the description and the grader and this grade that's assigned to it.

Q   Okay.  Does that have some relationship to the

value of the value of the coin?

A    Yes.  That's my understanding.

Q    So I'm sorry, I interrupted you.  You said 50 percent advance rate on inventory at the graders?

A    Correct.

Q    And there's one other category.

A    Yes, there's one other category.  There is, I believe, a 55 percent advance rate against inventory that is -- call it on approval or on consignment with customers of National Gold, whom I believe is looking at it to see if this is something they would like to purchase.  And both off-premise locations had caps to them.

Q    And what were those caps?

A    I believe it's $4 million maximum availability for either off-premise grouping.  And then there was advance rate tied to receivables.  And the receivable advance rate was 85 percent of eligibility.  And eligibility is defined to exclude anything intercompany, anything affiliated, anything contra; which means if somebody owes you money, you have to reduce it by that amount.

Q    Okay.  Any other caps like, for example, foreign accounts receivable?

A    There's -- the company has foreign customers

and there was a limit of a million dollars in the eligibility of that receivable -- those type of receivables.

Q    What was the historic profits of the business?

A    Historically, the company, I believe, showed profits between a million two to just under $2 million.

Q    Now, was that a net of salaries to insiders?

A    That was net of both salaries to insiders, both interests to the bank, as well as to the shareholders who have subordinated notes.  But it's before distributions to the shareholders, which typically were a large portion of those profits.

Q    Okay.

THE COURT:  That's per year, correct?

THE WITNESS:  Per year, uh-huh.

BY MR. SORIANO:

Q    Do you  know what the salaries were for the insiders of the company?

A    I believe it was 650 each.

Q    Okay.  And approximately -- you said there were subordinated loans to insiders.  What were the amount of those loans?

A    They varied, but they were approximately $17 million.

Q    And what would be the approximate annual

interest?  Do you know on that?

A    Just over a million dollars.

Q    So salaries, were there just two individuals collecting salaries?  You said 650.  We should probably identify the individuals for the Court.

A    Sure.  Again, the shareholders would be Mark and Alan Yaffe.  And it is my understanding that both took a salary of 650.

Q    Okay.  So they had the two salaries of 540. They had -- what were the interests on the subordinated loans?  You may have said that, I'm sorry.

A    About a million -- just over a million dollars. I'm not clear as to whose name the notes were in.

Q    Uh-huh, okay.  And so what were the -- do you recall the profits distributed to the shareholders for, let's just say, the last two years?

A    I believe last year, I think the company made about a million six last year, on significantly higher sales, and distributed, I think, around -- somewhere around a million three, a million four, perhaps.

Q    Okay.  Now, did at some point the bank indicate to NGE that it wasn't interested in renewing the relationship with it when the loan matured?

A    Yes.  The Sovereign Bank was one of the banks that, you know, had some issues with liquidity and

capital back in 2008, and subsequently was sold to its shareholder Santander  And they wanted to shrink its balance sheet and looked at different businesses and different loans that they would not like to continue long term.

So in -- I believe around the fall, prior to Santander coming in, there was a decision corporate-wide to not continue to extend lending into areas that the bank was not located.

Q    You mean geographically?

A    Geographically located.  And I believe, that that was communicated to Mr. Yaffe.  And when the facility came up in June of 2010, I believe, that the bank would not be bidding on its renewal.

Q    Okay.  When the bank made its decision, what was the state of the business company?

A    Well, in the fall of 2008, there was an approval for a waiver, because the company's 2007 financial statements were very late due to inventory issues cited by the CPA firm.

Q    And what were those issues?

A    There was no footnotes.  Apparently, over $4 million of inventory was said to be located at the premises in a safe that the CPAs or its employees were not aware of, and that the owner of the company was not

present in the physical.  So the CPA firm could not attest to those numbers.

Additionally, there were -- they had to research -- there was a confirmation the CPA did with these graders -- inventory located at these graders. There was one grader in particular, NGC, who reported almost $9 million more of inventory than was on the books and records that the CPA was looking at.

So the CPA had to do follow-up confirmations and visit the facility, it's my understanding, to get comfortable with the number.  So due to all of this investigating by the CPA firm, the financials were very late that year.

Q   Okay.  Did there come a time when there was some additional problems that came to your attention about NGE?

A   In January, as I said, there's restructurings. Santander changed management and changed a lot of how things were done at the bank beginning January.  And we had to report more frequently to them as to what was going on in the portfolio and the status of whether it was refinancing or sales of companies within the groups. And it was reported that NGE had entertained -- was attempting to entertain several proposals from institutions for refinancing and that had fallen

through.

Q    And approximately what time is this?  Are you saying this is January or was this --

A    This is early 2009.

Q    Okay.

A    Additionally, I believe beginning in May, there seemed to be some signs of strain on liquidity, as there were numerous overdrafts.  And from my understanding of how things operationally worked, the company had a scanner on their desk that they could receive the checks in from customers.  They would scan it in like a credit card, and those funds would immediately apply to the company's lockbox.

The bank would then -- had an arrangement where it would sweep against those funds and reduce the lockbox.  And it appears that the company needed -- whether it was wires in or these immediate proceeds -- to fund checks that were being presented to the bank.

So it's a little unnerving on a large company -- at this time the bank had received financials, as well, that showed the company did nearly $300 million in sales.

Q    That sounds like a good -- that sounds like a good year.

A    It's a good year, except the earnings were

actually down that year.  And there was also an unusual loss, a loss on gold futures of $881,000 reported in the financials, which we had not seen in previous financials. So it seems as though that the company was on a -- continued on its growth path, but we weren't quite sure how it was funding it.

Q    Okay.  And there have been times we've talked about this letter from David Hammer.  Did you become of a letter the bank received at some point in time?

A    Yes.  During July, probably around the 8th or 9th, I was informed that the bank had received -- the bank and, from my understanding, that the regulators and the attorney general received the letter, and the chairman of Santander also was cc'd on this letter -- that one of our clients had engaged in some type of fraudulent activity using our funds to build a home. And yes, so I did see the letter.

Q    Okay.  And how did -- how did the bank react to that letter?

A    The bank was concerned.  The unit had suffered quite a few frauds in the past two years, so it was a suspicion that there could be more fraud in the group. The regulators were inquiring if we were investigating. So there was pressure from the regulators.  So there was -- there was a concern.

Q    Uh-huh.  So what did the bank do at that point, once that concern was raised?

A    The legal counsel of the bank reviewed the documents.  And in 2008, after the waiver for the inventory and related late financial statements, the bank had included the ability to do unannounced spot checks, which was something the bank was doing with its customers due to the high level of fraud in the unit.  So we decided to utilize that right, and we scheduled an unannounced physical inventory on the 10th of July.

Q    Have you done these kinds of unannounced inventories with other customers of the bank?

A    Yes.  We've done unannounced with other customers.

Q    Okay.  So who conducted that exam?

A    The exam group sent some personnel.  As I said, Santander does things a little different than we were accustomed to.  Everything is done in a team approach with different areas of the bank.  So there were field examiners there.  There were operational risk management there to assist, and the lender who was recently assigned to the account was also there.

Q    Okay.  Did you give the Debtor any advance notice of the inventory?

A    Yes.  Friday morning before they arrived, the

former account officer made a courtesy call, on the bank's instruction, to let them know that, and ask, you know, for cooperation.  And it's my understanding there was no issue letting them in.

Q    Were the -- was the team supposed to report to you about what their -- the results of their examination?

A    They were supposed to report to me, as well as to their -- again, there's different lines.  So, again, everything's done as a big team approach.

Q    Okay.  So did they report to you and start telling you what was going on with the exam?

A    Yes, yes.

Q    And what did -- what did they report?

A    Well, on the first day, there were matters that came up that were somewhat disconcerting at the bank. First, when they walked in, just visually, they were stunned at the disarray of the facility.

There were multitudes of computers and servers, there were hundreds of exposed wires floating through the facility.  And then most alarming was that the company could not produce what is called a perpetual inventory, which is a real-time report, so that if a customer calls you and says, "Hey, I'd like to buy ten coins," you could look on your system and say, "Okay, I have them."

They were not able to produce any books and

records due to, what was reported by the company, a thunderstorm the day before, which took down the server. And again, if you are company that big, with that many transactions, it is a little alarming that you could be knocked out by lightning and not be able to maintain books and records.

Q    Uh-huh.  Were there any other things that were brought to your attention that were troubling to the bank?

A    In lieu of having this report and they would like to, at least, start counting.  Although they didn't have anything to check it against, they started -- they wanted to start counting.  And it's my understanding that the company has different types of inventory.

They have the small volume but higher end coins that are serialized, and then they have the bulk rare coins that numerous in count but small in value.  And they only gave them the rare coins to most of the day, which I was told probably totaled $20,000 which was, you know, less than ten percent of what they expected.

Q    So what --

A    One percent, sorry.

Q    What did they expect to be there?

A    Well, the foreign based that had sent to the bank for 6-30 information was about 20-something million.

Q    Okay.  We've talked at times about Gainesville Coins, and was there any report on that entity?  To you?

A    Yes.  According to the bank's records, there was an affiliate, Gainesville Coin, who the company was selling a tremendous amount of coins to.  In fact, we were under the impression that Gainesville was the largest customer of National Gold.

Q    And did you know who owned Gainesville Coins?

A    We believe it was the children of Alan Yaffe and another individual.  The bank had approved it as a approved location on the borrowing base because it was the bank's understanding that National Gold consigned coins to them and they sold it, I guess it, on the -- to their retail customer base and settled up on a monthly basis.  So there was, supposedly, no exposure.

When the loan was closed, you know, the records did not indicate that Gainesville was actually located at the same place as National Gold.  The aging that the customer -- that the customer provides to the bank also uses a Gainesville address and a Gainesville number for verification so --

Q    When you say "number", you mean a telephone?

A    Telephone number.

Q    Uh-huh.

A    Telephone number.  So the bank knew that there

was a company which reported in the financials as having sold, I believe, $40 million dollars of inventory in '08, but it did not know that it -- that they were there. There was another exam done, I believe, around March 30th of 2009, and there was no mention that Gainesville was in that facility.

Q    So they discovered when they went in on July 10th that in fact it was?

A    Yes.  One of the -- it's my understanding that one of the examiners went to go pick up some inventory of coins to count and they stopped him and indicated that that belonged to Gainesville.  So that was how we found out.

Q    Okay.  Did your examiners report to you on the quality of the cooperation you were getting in connection with the examination?

A    They felt that they were being stalled, was what they relayed to me, that every time they asked for when this inventory report was going to be provided, and it would be in an hour, maybe in fifteen minutes, and hours and minutes continued to slip by with not much information.

THE COURT:  Let me ask a couple of follow-up questions.  You indicated that the borrowing base as of June 30 of 2009 was 20 million?

THE WITNESS:  The inventory component in-house was expected to be around 20 million.

THE COURT:  Okay.  That's the 60 percent that you would allow borrowing up to.

THE WITNESS:  Yes.

THE COURT:  In-house inventory.  So those are gold coins you would have expected to find on the premises?

THE WITNESS:  Correct.

THE COURT:  And in June of '09 or there about, you learned that Gainesville was located on the same premises or at least had people there.

THE WITNESS:  Yes.

THE COURT:  Were you aware that Gainesville was family-owned?

THE WITNESS:  We were aware that Gainesville was family-owned, but we did not know they were on the premises until we got there on the 11th -- the 10th, I'm sorry, of July.

THE COURT:  Okay.  And what's the significance of them being on the premises?

THE WITNESS:  What the examiners reported back was that there was no clear segregation.  There was nothing identified as to whose inventory was whose.  There were numerous safes along the

different walls.  You couldn't tell whose safe was whose, who was shipping what.

And again, the other thing that the bank found out subsequently was that there was a lien on the assets of Gainesville by SunTrust.  So the bank was concerned that perhaps our collateral is now another institution's collateral.

THE COURT:  Okay.

BY MR. SORIANO:

Q    And previously, when the examiners went in, were they ever told that some of the coins located on the premises at NG belonged to another party?

A    No.

Q    So this is Friday, and you're still, I believe, at this point -- I didn't ask this, but you're in Rhode Island?

A    Yes.

Q    Is that where you are?

A    Right.

Q    That evening, did anything come to your attention that was troubling?

A    Yes.  Given the lack of information, the bank also offered to provide any technical assistance to help produce records or correct servers, and the company did not take us up on that offer.

So the bank became increasingly alarmed and asked that I go down, as well as Mike Murino, who heads up the workout group to go and assist in this information gathering.

Q    Before you went down, did you learn about the bank having retained a private investigator?

A    There was -- as I said, there was an operations management group that was down there.  And typically when you do a physical, if you don't finish a physical you need to, you know, have a stoppage of inventory so that there's no movement or reconciliations that need to be done later.  And I wasn't clear as to how this operations group was going to handle that.

You could seal the building.  You could hire security guards.  You could hire P.I.'s.  I wasn't quite sure as to what steps were taken under that group.  However, when I was driving home that night from the bank, I received a call from executive management who indicated that he had been told that 15 minutes after the bank employees left the premises, that numerous NGE employees returned to the company Friday night.

Q    Do you know how long -- were you told how long they stayed there?

A    It's my understanding they were there until, I think it was 3:00 o'clock in the morning.

Q    So I think you said that the next day you were instructed to go down -- to come down here to look at NGE.  Did you do that?

A    Yes.  Yes, I did.

Q    And when you -- did you go to the premises on that -- the next day?

A    I did.  I went to the premises.  And that day they had produced a report, an inventory report --

Q    This is the perpetual inventory report?

A    We believed it could be a perpetual inventory report of the inventory that was to be there.  And the report, from what the examiners indicate, contained significantly less inventory than what was reported on 6-30.  Approximately -- I think it was approximately either $8 million or $9 million less than.

And, again, that's not uncommon, if the company was doing a tremendous amount of sales.  The discussions with Mr. Yaffe indicated that things were soft and things were a little slow.  So in order to validate the sales, we needed to see the accounts receivable aging.

Q    When was the first time you could ask for that, or your team?

A    That day.  Yes, the 11th.

Q    Okay.

THE COURT:  Okay, that's July 11th?

THE WITNESS:  Yes.

THE COURT:  That's Saturday?

THE WITNESS:  Yes.

BY MR. SORIANO:

Q    Did you receive it that day?

A    No, we did not.  It took an additional five or six days to receive that report.

Q    Okay.  Was there anything significant that you learned on that Saturday when you were at the premises?

A    In looking at various inventory numbers, there were expected to be -- I think it was approximately $4 million of these high-end pieces, coin pieces.  And there was significantly less.  And the examiner was told that they were at a coin show, that there was coin show, I believe, in West Palm and that that would be returned on Monday and we would be welcome to count that.

Additionally, looking at the inventory, there were large numbers of these bulk coins that were in the May borrowing base, not in the June borrowing base, and not in this July.  And for example they were, you know, 28,000 thousand units of coins of Sacajawea.  So again, it was just unusual to see so many of these large bulk coins go in and out.

So they were -- the examiners also found, I guess, duplications, and double countings, and errors.

And again, it just made the bank increasingly uncomfortable with the accuracy of the information that was provided.

Q   Did you learn anything about Independence Coin Grading, Inc. on that date?

A   Yes.  Actually, the year end financial statements also indicated that a grading company that National Gold utilized, which was previously reported to be owned by a related party, was purchased -- or acquired, I guess is the terminology -- acquired by one of the shareholders in November of '08.  And we believed that to be IGC.

THE COURT:  You said that was previously reported to be owned by a related company?

THE WITNESS:  A related party.  We believe it to be the in-laws.

THE COURT:  Okay.  So you had always known about some relationship with --

THE WITNESS:  With the grading company.

THE COURT:  With the grading company?

THE WITNESS:  Yeah.  The financial statements that I looked at did not disclose what entity it was but --

THE COURT:  It just said that it's owned by a related company?

THE WITNESS:  A grading company, uh-huh.

THE COURT:  A grading company owned by a related company?

THE WITNESS:  Uh-huh.

THE COURT:  I see, okay.

BY MR. SORIANO:

Q    So did you discover who that grading company was?

A    We began looking through where the inventory had been located and what service -- what grading companies the company utilized.  We identified it to be IGC.  We found out that IGC was basically in the back parking lot behind the company.

THE COURT:  You said "IGC".  Do you mean ICG?

THE WITNESS:  Sorry.

THE COURT:  Are we talking about the grading company?

THE WITNESS:  The grading company, yes. I'm sorry, I get confused with all these acronyms.

THE COURT:  Okay.  It's Independent Coin Grading.

THE WITNESS:  Coin Grading.

MR. SORIANO:  It really is ICG.

THE WITNESS:  ICG.

MR. SORIANO:  I think we've referring to it so often among ourselves as IGC, it was just --

THE WITNESS:  Sorry, ICG, correct.

THE COURT:  I just want to be clear.

THE WITNESS:  That's correct.

THE COURT:  Thank you.

BY MR. SORIANO:

Q    And you say it's located right behind it?

A    Right behind it.  Originally the company, to the bank's knowledge, from what I understand, was originally located in Colorado somewhere.  And it moved to Florida, I'm not sure when.

And during our visit on July 11th, Mike Murino asked, in my presence, Mr. Yaffe, about why did IGC move from Colorado to Florida?  Is it because something to with the National Gold Exchange or something to do with your company?  And he said, "No, I don't know why they moved."

He also went on -- Mr. Murino went back to him and said, you know, "Are you sure you don't know why -- you have no idea why it moved?"  And Mr. Yaffe reported, "Well, maybe it's because there's no income state taxes in Florida."

Q    So at this point, Mr. Yaffe hasn't identified --

A    No.

Q    -- to you that he has an interest in this entity?

A    Correct.

Q    And you didn't know this entity -- well, that he had an interest in it.  You knew of -- did you know of this company?

A    Again, the financial statements said "a grading company."  Through elimination of where the inventory had been located, we made the assumption that it was this particular.  And this particular company's name, it appeared it had changed names, as well.

It was under another name in Colorado, a Independent Rare Coin Auditors, or something to that effect.  And the name seemed to, somehow, change to this new name and it was looped.

Q    And did that have some -- do you attach some significance to that?

A    Again, I don't know when the company moved from Florida.  And, again, I don't know if it was the company's intent to utilize them more, or not.

Q    Could you tell how much they were using them to do grading?

A    The only thing it reported, it was grading fees that the company had utilized.  Historically, again, I

think that NGE paid approximately $180,000 in grading fee services. And I'm told -- I'm not sure, but I'm told maybe it's $10 a coin to grade.

Q   Now, I think you said that you received that perpetual inventory. Did you indicate -- yes, you did, how much it had gone down from the prior?

A   Uh-huh.

Q   We talked about you'd asked for the A/R report; didn't have it at this point in time. Counting in-house inventory, we've already talked about that. And did you -- now, there's another grader that NGE uses quite a bit, correct, in the Florida area?

A   Correct. Yeah, the Numismatic Guaranty Corp. is utilized, which is the grading company that in 2007 had the unusual amount of inventory that was confirmed later on by the CPA.

We asked to be able to inventory that. We were told, "No problem, on Monday you can go in there and inventory it." And it's my understanding that when the examiner went down to Sarasota on Monday morning, they were denied access.

Q   Based on the -- I guess, now the June 30 borrowing report, how much inventory did you expect to find at the grader in Sarasota?

A   Between $6 million to $7 million.

Q   Now, did there come a time when you sat down with NGE to discuss some of the concerns you had?

A   Again, we reiterated, you know, that we just wanted to be comfortable with our collateral and the information provided to the bank.

Q   Uh-huh.

A   That the delays in getting the information was very alarming to the bank.

Q   And did you offer to enter into some kind of understanding with them about how to deal with that?

A   Again, once we understood that -- the nature of the grading company, and that it was one used by the company, we were increasingly uncomfortable relying on those grades or valuations.

So we also noticed that there was in the 6-30 borrowing base an error pertaining to Gainesville.  It was included as a receivable, which is not allowed, and when adjusted for, it created a borrowing base shortfall or a default on the agreement.

Q   Okay.

A   So with that default, we considered again working with the company to create a forbearance agreement that we would like to -- you know, we put down our points that we'd like to try to negotiate into an agreement.

Q    Can you tell the judge some of those main points?

A    Sure.  We had wanted the company to not include inventory graded by their own grader due to potential conflict of interest.  We asked them to quickly repay as soon as possible the term loan against the music box collection.  We asked them to continue to seek the refinancing.  We asked them to hire potentially a forensic accountant to help us understand some of these transactions.

We asked them to work on clearly segregating Gainesville, whether that be putting a wall up in the middle of the place or moving out something.  Something so that we could get comfortable.  We wanted monthly physical inventories.  Something that we could get comfortable with while they were trying to refinance.

Q    And what was the response to that request?

A    They didn't want to discuss it.

Q    Now, this is around -- that would be around July 14th?  Does that sound right to you?

A    Uh-huh.

Q    That was prior to the bank filing to get a pre-judgment writ of replevin.  Between the time the bank decided to move forward with that in that meeting, did you learn any new facts about the company, the examiners,

while they were in there?

A    Sure.  Again, while they were -- one of the things that was alarming was that, again, we were told that a significant amount of inventory -- I think it was 2.7 million -- was at a coin show.  On that Monday morning only 200,000 was returned.

Q    And what was the explanation given for that?

A    That there was large consignment sales done. And when the examiners went to try to confirm some of these sales, they also noticed duplicated invoices and, again, more of this difficulty in accounting. Furthermore, when they went to confirm some of this, there was a -- a large one to a Tudor Trust which --

MR. SAXE:  Objection, Your Honor.

THE COURT:  Please speak from the podium.

MR. SAXE:  Your Honor, I've forborne technical objections in the spirit of moving this along.  I know the Court wants to get to the basic facts.

My problem here is I believe the testimony is going to be that certain representatives of Sovereign Bank made telephone calls to unidentified individuals in Massachusetts and also phone calls to people in Ft. Lauderdale area, clear hearsay, possibly double hearsay statements.  I can't -- they

haven't even really identified these people.

THE COURT:  I understand.  What's your response?

MR. SORIANO:  The response is that none of this is designed to prove the truth of the matter.  It's designed to explain why the bank felt insecure in its position and took some of the actions it did.

THE COURT:  Well, I'm not -- we're here on a Trustee motion so I don't think the bank's insecurity is the issue here at this point.  It's whether we should appoint a Trustee to prevent the continuation of management based on allegedly bad acts, and this presumably is one of them, at least it's cited in your papers.

MR. SORIANO:  True, it is.  And I guess the other thing would be that certainly I'm guessing that these are the normal course of activities that a bank would do in order to confirm accounts receivable, consignment arrangements.

That would be how you would -- that's the only way you could do it.

THE COURT:  I don't think that one's close, but I'm going to sustain the objection.  This is obviously hearsay.

BY MR. SORIANO:

Q    Without getting into the details of the transactions, what did you surmise based on what the examiners reported to you about certain transactions?

A    From what the examiners were able to find, there were fictitious companies --

MR. SAXE:  Objection, Your Honor.  With all due respect, Your Honor, ignoring the hearsay and then seeking to get the substance of what the hearsay was about is equally improper.

MR. SORIANO:  Well, Your Honor, I'm asking what was reported to her, and then we can actually do the person who did the reporting.  We will have them as a witness, as well.

THE COURT:  I think you'll have to do that.  I mean, counsel has in his words forborne from objecting to hearsay just to expedite things. We're now getting closer to, I guess, issues that are more critical and I think these objections are well founded.

MR. SORIANO:  Okay.

BY MR. SORIANO:

Q    Were you able to -- were the examiners able to go to the grader down in Sarasota and do an inventory eventually?

A    They were allowed back in the first time on Tuesday after 1:00 o'clock.  The examiner called Mr. Yaffe to see if he could give his permission to allow us in, as we had expected to go in initially.  And Mr. Yaffe, I understand, said he had say with us, that it was up to the grader.

We were allowed in on Tuesday after 1:00, and inventory was counted, and all of the inventory that had been reported, we believe -- based on the company spokesman and records that we had for that particular grader -- was there.

Q    And so how much was that?

A    About 6 million.

Q    At this point -- at some point, you decided -- the bank decided to proceed with its pre-judgment writ of replevin.  Why did it make that decision?  You had conversations, you tried to work it out.  What made you decide finally to go that route?

A    Based on the examiners continued to work on that 7-11 borrowing base that the company had supplied to us.  And due to various errors and other exclusions that they determined, the borrowing base reported a $5 million shortfall.

Q    Any other concerns that would lead you to take that route, as opposed to just suing them or --

A   Again, would be the only thing that was deemed a bit unusual was that the information that was provided showed 18 million in sales during this period and -- based on eight days of -- eight business days.  And if things were so slow, it seemed unusual that they were on track to do approximately 45 million in sales, when for the three months of 2009, they only did 60.

So again the bank was increasingly uncomfortable with the information provided to us by the examiners, the inventory, the receivables, and they questioned if there was a more significant erosion of its borrowing base.

Q   Okay.  So having proceeding to obtain the writ of replevin, the writ got executed, what did the bank discover when it got into the premises?  Anything new?

A   During the writ, they found in books and records, I guess, information pertaining to an affiliate that had never been disclosed to the bank.

Q   What was the name of that affiliate?

A   Eldorado Gold.  And this affiliate had been included in the banks borrowing base, so National Gold was borrowing against this affiliate.  It was never disclosed in the financials, as well.  It was listed as having sold to them approximately $5 million in 2008.

Q   And how did you discover they were an

affiliate?

A    There was records that were found that named Michael Yaffe, there were various documents that had -- that tied it to Alan Yaffe and Shirley Yaffe.

Q    Okay.  Did you find any other documents showing any other activity that was of concern?

A    Yes.  We found -- in addition to an affiliate, we found records that indicated some type of lending relationship and some type of wire transactions with other institutions.

Q    What were those other institutions?

A    One of them was A Mark, and there was a repurchase agreement and a listing of activity on this said purchase agreement.

Q    Now, why would you consider that unusual?

A    Well, we provided financing to this customer and all of the assets were pledged to Sovereign.  So another institution, one might think that there's potential double-counting to obtain the same collateral for two different institutions.

There was also promissory notes found from Republic National Business Credit.  And it would be selling -- it was like selling a coin and taking an advance against that coin.  And there was wire log that had approximately 40-something million in wires through

this account.

Q    Was the account with the Republic National Business Credit?

A    Yes.

Q    Did you find any unusual activity in connection with Mark Yaffe individually?

A    We also found notes that were pledging the music box collection to other individuals, various pieces.  And we also found large uncashed checks to Mr. Yaffe.  There was a $250,000 check.

And upon further look from the bank, we found that in the first six months of this year he had wrote checks totaling over $2 million to himself that was deposited in a Bank of America account.

Q    Did you learn anything more about ICG?

A    We found records pertaining to Mr. Yaffe potentially owning it as early as 2003 through a company, Black Diamond.

Q    Did you find any property of ICG at the location?

A    During the replevin -- I'm sorry, just prior to the Replevin, there was numerous people we believed to be Gainesville employees running out of the back of the building with boxes and throwing them into their cars. And actually, when I arrived, there was a line of sheriff

cars blocking off these employee cars.

And those boxes were seized and placed on a cart. And it was told that it wasn't NGE's material, that it belonged to Gainesville. And in that cart, there were grading supplies which included the cases that the coins go in. There were pre-made labels, 300 and something of them, pertaining to a presidential coin at this 70 grade, which is my understanding the highest grade that you could have. There were inventory that had a invoice to IGC --

Q   ICG.

A   ICG. Sorry, ICG. But it was at the address of National Gold Exchange. And I saw that myself, and I asked one of the employees. And what they told me was that the grading company used NGE to receive inventory because the security was better there than at the place behind. Which, again, further leads us to worry about having other people's inventory commingled with ours.

Q   Okay. The bank has been able to do a certain amount of investigating both pre-replevin, post-replevin, post-bankruptcy. Do you have a sense of what the bank's collateral position is today?

A   No. It is -- we know that -- we suspect that it's much more significant than the $5 million. There has been identified, from what I understand, double and

triple counting.  There has been a question on the valuation of the coins, so we're still gathering information, but we expect it to be significant.

Q    The Debtor wants to propose to the bank that it be able to liquidate your collateral for your benefit. Is that something that you'd want to see happen?

A    No.

Q    Why not?

A    Again, based on, you know, a very -- what appeared to be a loosey-goosey type of accounting or a handshake, it makes us uncomfortable that we could not get the information, that they could accurately track it, that it's not -- oh, that's right, I just thought of something.

We had our dispute with the grading company as to what is ours, and we were informed when we actually went to replevin --

Q    Which grading company is that?

A    That, I'm sorry, NGC.  We were informed that, although we counted 6 million, that most of it belongs to somebody else.  And it has been segregated and, I believe, challenged by A Mark.  So we're not quite sure of what our inventory is.  And if Gainesville is their largest customer, how do we know that we're actually getting the best value for our goods.

Q    And just so I can help the judge understand that, because I know that's probably a little confusing, if I may, I'm going to lead a little bit just to clarify. But you'd previously gone down to the grader in Sarasota, and were told, I think so testified, that the inventory was around $7 million?

A    Uh-huh.

Q    Then you said something happened when you went back and it changed?  It was --

A    Yes.  When the same examiner went back down there to actually take the goods, it was first brought to his attention that, "I'm sorry, not all of it is yours, that it is commingled with other parties."  And it was decided to be segregated, but not removed.

And during a meeting with Mr. Yaffe and his attorney, he indicated that that very grader gave him a personal loan of $400,000 against a music box.

MR. SORIANO:  No further questions.

THE COURT:  Mr. Saxe.

MR. SAXE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SAXE:

Q    Good morning, Ms. Sousa.

A    Good morning.

Q    Is it Miss?

A     Yeah, that's my -- Miss is fine, thank you.

Q     Okay.  I'm Daniel Saxe.  We've met before.

A     Right.

Q     I'd like to ask you a few follow-up questions. Mike Smith was the account rep for NGE for many years; is that correct?

A     Correct.

Q     I believe you mentioned his name on direct exam and he reported to an Al Brown, and he just left in January of '09?

A     Uh-huh.

          THE COURT:  Are you talking about Mr. Smith?

          MR. SAXE:  Mr. Smith, yes.

          THE COURT:  Okay.

          MR. SAXE:  Thank you, Judge.

BY MR. SAXE:

Q     Before he left, did you talk to him about the 14-year term of the relationship with NGE between Sovereign and NGE?

A     Could you be more specific?

Q     Yeah.  Did he tell you that NGE never missed a monthly payment that was due on its loan to Sovereign in the entire 14-year time that it worked with Sovereign?

A     My understanding -- the only payments that were

actually due was whatever amortization was on the term loan.

Q    How much was that a month?

A    I'm sorry?

Q    How much was that a month?

A    I'm not sure.

Q    Is it fair to say -- does it refresh your recollection if I tell you it could be as much as $170,000, $180,000 a month?

A    I wouldn't know.

Q    Okay.  And during that time, NGE never bounced a check, did it?

A    During what time?

Q    During the 14 years, up until recently?

A    Up until, I believe, May.

Q    Right.  Prior to that time, they had never bounced a check?

A    That's correct.

Q    On the Sovereign operating account?

A    Uh-huh.

Q    Now, you say that the bank notified NGE that they were no longer going to continue the relationship because of Santander, and the new bank had made a decision not to be in this business any more?

A    No.  What I said was originally they identified

it as being the out of market customer, that they would not look to be bid on the refinancing when it came up.

Q    Okay.  And the term of the relationship was up in June of 2010, is that right?

A    Correct.

Q    Did Mr. Smith tell you that he had told NGE that there was no way the bank was going to wait until June of 2010 to end this relationship?  They wanted it done within a few months?

A    No.

Q    Would it surprise you to learn that he might have said that?

A    Would it surprise me to learn that?  I can't speak for Mr. Smith.

Q    And the bank received an unsolicited letter from David Hammer.  And it's mentioned in the ex parte pre-judgment writ of replevin, the motion, and you testified to it a little bit earlier?

A    Uh-huh.

Q    Prior to this letter, has there been any communication between Sovereign Bank and Mr. Hammer, that you are aware of?

A    Not that I'm aware of.

Q    And you stated that a copy of the letter, as you saw it, was sent to Thrift Supervision, as well as

the U.S. Attorney's office?

    A    Yes.

    Q    And also to the president or CEO of Santander?

    A    The chairman of Santander and the president -- I believe addressed to the president of Sovereign and cc'd to the chairman of Santander.

    Q    Was any inquiry made about Mr. Hammer or why he might be sending an unsolicited letter like that to the bank?

    A    Yes.

    Q    Who made that inquiry?

    A    I believe internal counsel.

    Q    And as a result of that inquiry, did the bank become aware that Mr. Hammer was representing a company called Caligula Corporation and the litigation pending here in Hillsborough County?

    A    Yes.

    Q    And did the investigation reveal that Caligula Corporation, it was alleged, was a front company for Paul Bilzerian?

    A    I believe so.

    Q    Did that trouble the bank at all?

    A    Well, from my understanding, the fact that Mr. Yaffe utilized that company was a little upsetting, as well.

Q    So you knew about Paul Bilzerian?

A    No.  I said once this -- once this was investigated as to who the suit was with, yes.

Q    Okay.  And were you aware that Mr. Bilzerian and Mr. Hammer were both found in contempt by a Federal District Court in Washington, D.C.?

A    I believe you mentioned it to me.

Q    So you were aware of that?

A    Subsequently.

Q    Were you aware at the time that the investigation was done or only when I spoke to you about it the first time?

A    I think only when you spoke to me.

Q    Okay.  And were you aware that Mr. Hammer is up on charges with the Florida Bar for grievances?

MR. SORIANO:  Your Honor, I don't -- I know I got a lot of leeway, but this doesn't seem very relevant, and certainly doesn't seem appropriate.

THE COURT:  I think the point has been made.  I'm going to sustain the objection.  We're going too far down that road.

BY MR. SAXE:

Q    Now, Mr. Hammer wrote the bank that he was concerned that Mr. Yaffe had sold approximately

$12 million to $15 million worth of NGE inventory to complete construction on his personal mansion.

During your investigation, you didn't find $12 million to $15 million worth of inventory used to work on Mr. Yaffe's house, did you?

A    I can't say that.

Q    But you didn't find anything?

A    I can't say so.  We're still investigating.

Q    Okay.  And Mr. Hammer also told you that Mr. Yaffe kept two sets of books, didn't he?

A    I believe that was in the legal letter.

Q    And you didn't find two sets of books, did you?

A    We didn't really find a complete first set.

Q    You didn't find two sets of books, did you?

A    We didn't really find a set.

Q    And there was mention of an Austrian client that came to inspect coins left on consignment and Mr. Yaffe temporarily borrowed coins from an associate.  You found no evidence of that either, did you?

A    The inventory then, you couldn't tell if it was his or Gainesville's.  So we couldn't tell if it was somebody else's.

Q    So essentially none of the allegations made in the Hammer letter bore fruit when you conducted the bank's investigation, right?

A    We can't say that yet.

Q    Because you don't know?

A    Because we don't know.

Q    Now, you say in your motion papers that that was a red flag, Mr. Hammer's letter.  But the real reasons that the bank had concerns were things having to do with what you described as liquidity issues.  Do you recall that?

A    Yes.

Q    Okay.  Because its credit line with Sovereign had been maxed out and I think you even testified some on direct that it was apparently that NGE could only meet its daily financial obligations through immediate customer collections and that was troubling to you?

A    Uh-huh.

Q    Now, you were aware, from NGE financials, that NGE sales were about 136 million in 2006, weren't you?  From the financial statements?

A    Uh-huh.

            THE COURT:  Excuse me.

            MR. SAXE:  And then they were 190 --

            THE COURT:  Hold on.  Go ahead and answer audibly.

            THE WITNESS:  Yes.

            MR. SAXE:  I'm sorry.  I didn't mean to

step on your answer.

THE WITNESS:  That's okay.

BY MR. SAXE:

Q    Okay.  And there were 191 million in 2007?

A    Uh-huh.

Q    And 285 million in 2008?

A    That's correct.

Q    So the sales were increasing appreciably, while the credit stayed the same; isn't that right?

A    Well, in 2007 the bank had increased its facility from, I believe, just under 25 to the 33, plus the $5 million term loan.  So there was a significant amount of debt taken on by the company.  We didn't see any evidence of -- other than this pledge of music boxes -- any equity coming in from the owners.

Q    But the question was that the volume about doubled during that timeframe, didn't it?

A    Yes.

Q    And this is during one of the worst recessions in modern history, isn't it, in the United States?

A    In my recollection, I would think so.

Q    And this raised red flags about their financial condition?

A    Yes.

Q    Now, you mentioned in the papers that were

filed by the bank that in May 2009 NGE was issuing checks without funds in its account and that that was troubling to the bank.  Do you remember that?

A     Yes.

Q     Okay.  Because the checks were bouncing?

A     The proceeds, as explained, as I understand it, he needed to receive wires and the collections that came in in the lockbox, that he swept himself, in order to cover checks.  And what was also a little disheartening to find that a company that had purchases of over 200 million didn't keep a payable aging.  So I'm not quite sure how they knew what was out there.

Q     So you didn't like the way they did business?

A     I didn't say that.  I just said I didn't know how they could account for it.

Q     But the fact is that NGE had been taking the benefit of the float, if you will, for years and years, and years, right?

A     They may have or they may have had more liquidity, because with growth, you need to be able to fund your additional growth requirements.  And without bank financing, I'm not quite sure how the company did it.

Q     But the fact is that NGE would frequently issue a check and wait for other checks to get deposited by

midnight that day in order to pay for the checks that were issued, right?

A    I'm not quite sure.  As I said, I'm not quite sure how operationally it had been handled.

Q    Sitting here today, you have no reason to believe that what I just told you is inaccurate, right?

A    I don't know.  I can't say.

Q    Okay.  And the only thing that changed when the checks bounced is that the bank decided that they were no longer going to permit NGE to deposit checks up to midnight; it was going to be moved back to 3:00 o'clock in the afternoon?

A    I don't believe it was about depositing checks. I believe he could deposit checks at all times.  The issue, I believe, arose because if he needed the proceeds that swept against the line, there is a 3:00 o'clock cutoff for advances.

So he needed to re-advance from the money he just put in.  But again, as you said, a company at 300 million should have some profits that it should be able to utilize.  It just appears he's cutting it way too close.

Q    That may be, but what they used to do was have until midnight to do that sweep, right?

A    No.  Again, I believe that -- again, I'm not

sure that -- the advance never went through midnight, because there's not a physical person in the bank who could be there at 3:00 o'clock.

Q    Isn't it true that the reason the checks bounced is because the bank changed its policy and moved the deadline from midnight back to 3:00 o'clock?

A    No.  Because even after that, he still bounced checks.

Q    My question was, isn't it true that the policy was moved from midnight to 3:00?

A    I don't know.  As I said, I can't -- I don't know directly as to what the policies were.

Q    Didn't you subsequently find out that that's why the checks bounced?  It's not because Mr. Yaffe or NGE was having difficulty with paying bills?

A    No.

Q    Those checks bounced in Europe because the timeframe had been moved back and the bank never told NGE it was doing that?

A    No.  I also saw where Mr. Yaffe put stop payments himself on almost $2 million of checks at the same period.

Q    Now, you testified about this $881,000 loss as part of the reason for the bank's concern?

A    Yes.

Q   Okay.  That's called hedging, is that right, as you understand it?

A   I'm not sure what it was.  That's what we're trying to understand.

Q   Well, it was a situation where, for lack of a better term, Mr. Yaffe was playing against the market and taking a gamble about where gold futures were going to be, right?

A   I don't know.  That sounds like spec'ing.

Q   Okay.  And this was in the third quarter of 2008 that this occurred, right?

A   I'm not sure.  The financials will show what was done during the year.

Q   Well, it occurred well before the bank did its audit in July of 2009, didn't it?

A   I'm sorry?

Q   It occurred well before the bank did its audit in 2009, did it not?

A   According to the financials, it occurred in 2008.

Q   Yes.  And between the 2008 hedging and the 2009 audit, there had been a number of investigations and inspections by the bank of NGE, right, on its normal auditing process?

A   Correct.

Q    And that was never raised as a red flag or an issue before, was it?

A    There were, from my understanding, at the -- the one issue, as I said, was regarding the inventory. And I believe the bank in 2008 did a physical with the company because they were a little concerned with that unusual inventory being locked in a safe. I'm not sure what safe that was.

But the borrowing base in, I believe December of '08, January and February, all found, you know, minor errors that if corrected would have triggered a default.

Q    Okay. I'm sorry. You must not have heard my question. My question was that when this event occurred in 2008, nobody from the bank contacted NGE to say that they were having a major problem with the $881,000?

A    Yes, they did. Mike Smith contacted Mr. Yaffe, and I believe also received the transactions with that broker.

Q    And when Mr. Smith contacted Mr. Yaffe, wasn't he told that, in fact, it was a net wash because Mr. Yaffe was able to buy that gold at reduced prices? So since he was able to buy cheaper and he lost on the other side, it basically washed out?

A    I don't know what the conversation was. I understand that my head trader couldn't make head or

sense of what those transactions were.  So again we still didn't have a handle on what type of activities and what type of -- and, again, if you say that he's guessing on gold, I guess I don't understand why it was reported as a normal business practice.  It doesn't sound like a normal business.

Q    But the bank never contacted NGE at the time and complained about, or said they having a problem?

A    Yes, they did.  They did.

Q    That was the Mike Smith conversation?

A    That's correct.

Q    You just don't remember the part the part of that conversation where Mr. Yaffe told him that it worked out because he was able to buy the gold cheaper, is that right?

A    Again, all I understand is that the bank has not received a satisfactory explanation to those transactions.

Q    Now, when the audit was done in July of 2009, the real reason was the David Hammer letter, wasn't it?

A    No.  Actually, the audit was at the request of Mr. Yaffe.  The physical inventory was done by the bank, and since he needed to get the A/R aging, Mr. Yaffe knew that he had an exam already scheduled for August and he asked that we -- since we were there, continue and

complete the audit.

Q   Okay.  But the original visit was unannounced?

A   That's correct.

Q   Except for the phone call, that day, that the bank is coming?

A   That's correct.

Q   Now, the bank had never done that before in 14 years, had they?

A   No, they did not.  But it was agreed upon in the third amendment, and that was when they waived the financial statement lateness due to the inventory issues.

Q   I'm not saying you didn't have contractual right to do it, Ms. Sousa.  I'm just saying it had never, ever been done before?

A   That's correct.

Q   And never, ever had the bank descended upon NGE's office with seven or eight or nine auditors to conduct such an investigation, had they?

A   It did not have the right prior to the third amendment.

Q   And never before had the bank sent a team of P.I. -- by the way,  how many people were sent over?  Was it eight or nine or ten?

A   I'm not sure, because I know I was asked to go.  And, as I said, that the Sovereign approach under

Santander is different.  And we are unfortunately learning and evolving as the bank is taken over by its new parent.

Q    So the bank had never staked out a customer's premises before in this kind of fashion, having cars parked outside and following people around and photographing people?

A    I can't attest to what the bank has done in other cases.

Q    To your knowledge, had they ever done that before?

A    I don't know.

Q    And prior audits had only taken -- withdrawn. Prior audits, they typically sent one auditor over, right?

A    I reviewed the last few and I believe there was just one.

Q    Yeah.  And they would call and say, "We're coming over to audit your books.  Could you please make them available to us, as well as whatever inventory we need, so we can do it in two or three days and be gone?"

A    That is when the -- under that guise, the examination is scheduled well in advance.  And it's my understanding that the reason for numerous people, again, was to be able to get in and out of there with as least

disruption as possible.

Q   My question was, what they typically did was to let NGE know so that the information and the collateral could be brought together and shown so that the bank would move in and move out, because the bank wants to move quickly and doesn't want to disrupt NGE's business any more than necessary, right?

A   I'm sorry, what's the actual question?

Q   So that the bank can move quickly and because they don't want to interrupt NGE's business?

A   It's just as I said, typically it's just standard, you given them notice.  And from my understanding, the company didn't always have all its information ready.

Q   And you know this how?

A   From the examiners.

Q   Did you speak to the examiner, the one examiner who typically did NGE's audits?  Is that what you're testifying now?

A   Yes.

Q   Okay.  Did Sovereign Bank ever write to NGE with any complaint about inventory or documents being provided in previous audits that you're aware of?

A   I'm not sure.

Q   And part of the reason for coordinating was so

that the bank could ensure that all of the collateral, all of the reports were made available so there would be no confusion and no problems in getting at it, isn't that true?

A    No.  The reports that we looked for are stuff that is normal in the course of business that any company, especially of their magnitude should have available.  You should know what you're inventory is and you should know what your receivables are.

Q    Well, when you came to NGE's offices, you during the middle of the month, and didn't the bank know that this is a time when a lot of business is being done and typically Sovereign would come at the beginning or end of a month?

A    No.  Because typically, July is a big vacation month, so it usually it's slow for business.

Q    Typically, Sovereign would come at the beginning or the end of the month, right?

A    No.  It's whenever the examiners are available. It's not done by beginning or end of the month.

Q    Are you telling the Court that you have knowledge that Sovereign Bank typically would come other times, to your knowledge, other than the beginning of the month and the end of the month?

A    I understand that a -- that the exams are

scheduled based on the availability of the examiners.  I do not believe that it's linked to the beginning or end of the month.

Q    And when you came for this exam, you were told that personnel were away at a coin show.  I think you testified to that on direct, right?

A    That -- no, we were told, from what I understand, when the inventory -- after the inventory was counted, and it was found to be short, that is when we were told that there was inventory.

Q    Okay.  Away at a coin show?

A    Uh-huh.

Q    And you testified that it was counted again when it came back?

A    That -- yes.

Q    Okay.

A    That the 200,000 was counted again.

Q    Now, as far as you testified concerning commingling, concerns for commingling of coins, because that could adversely impact the bank's collateral, right?

A    Correct.

Q    And that you had concerns about ICG?

A    Uh-huh.

Q    And Gainesville?

A    Uh-huh.

Q   Now, ICG is basically, as I understood your testimony, a grading company that gets coins from people, they grade them and then return them.  I don't think that that would adversely impact the bank's collateral, would it?  Because they're grading other people's coins or maybe NGE coins?

A   I guess we don't understand why, if you have a facility, it would be sent to my borrower and have the potential for getting mixed up.  Because, as we said, the place was in disarray.

Q   I'm now asking about any concern you had that ICG may have had or commingled collateral of the bank.

A   Their inventory located at my borrower is commingling.

Q   Well, ICG was a separate location, was it not, down the hall?

A   I said in my testimony that I found inventory belonging to ICG at NGE.

Q   Okay.  Did you ask anybody if that was because work was being performed on it?

A   No.  I asked and what I was told was that it is routine for the grading company to have its inventory sent to National Gold Exchange, because the security was better there.

Q   Okay.  With respect to Gainesville coins, you

had described this as a related entity because it shares its business location with NGE, and I believe you testified you thought it was owned by Alan Yaffe's sons. Do you know how long Gainesville Coins was at that location?

A     No, I do not.  And what I testified to was that it is an affiliate, as was in the financial statements or has been in the financial statements, as being a affiliate, that it was owned by the sons of one of the owners, and that is a primary customer of the bank -- I'm sorry, NGE.

Q     But my question was, when Sovereign would audit, would actually visit the premises of NGE to perform its audit and review work, Gainesville coins was there for years, wasn't it?

A     We don't know.  We only became aware when the examiner was doing the inventory during the unannounced that they were there.  We had no knowledge that they were there.

Q     Well, you were aware Gainesville was there, because they were identified as an approved location in the loan documents, weren't they?

A     That's correct, but that location was not at the NGE location.  And the aging, again, is a Gainesville address.

Q    What other location are you aware that Gainesville coins would be located at?

A    The original documents -- the Articles of Incorporation are not -- the Articles of Incorporation have one address, the UCC filing we saw from SunTrust had another address, which happens to be the same address as the invoices for Eldorado, the other affiliate.  And the aging has yet another address in Gainesville so --

Q    Well, the Gainesville address, the physical address, you knew was at the same location as NGE, didn't you?

A    No.  We did not know that.

Q    Did you ever check with the Florida Secretary of State's website to see what the address was of this company?

A    I'm sorry?

Q    The Florida Secretary of State has a website where you can on -- other ways to check the records to see what the address is of the company, Gainesville Coins?

A    Why would I do that?

Q    To see that it's located at the same address as NGE?

A    Why would I do that?  Why wouldn't the customer tell me that the affiliate that -- is located in the same

building.

Q    Is it possible that the customer believed that when the examiner had visited the site multiple times between the time that Gainesville was incorporated and July of 2009, that they would observe with their own eyes that Gainesville was there, and if they had any questions, as auditors, they would ask?

A    No.  Because, again, there's nothing clearly identified as being Gainesville.  There is no separate vaults identified as Gainesville.  There's no separate computers.  When we did a look over the computers that belonged to NGE, it's all commingled.  We can't make heads or tails.

Q    Well, the auditors made heads or tails within the first day or two of being there, didn't they?  Didn't they have some --

A    Yes.

Q    -- stickers that identified Gainesville computers?

A    I put the stickers on.

Q    And everybody agreed that those were Gainesville computers?

A    That was during the replevin, not when we first got there.

Q    And during the replevin, you also identified

within a day or so Gainesville Coins' collateral, did you not?

A    No, we did not.

Q    Isn't it true that there was an agreement between your auditors and Gainesville Coins that certain of their collateral was identified and kept aside and the balance was NGE's?

A    I'm not aware of that.

Q    You're not aware of it or it didn't happen?

A    I'm not aware of it.

Q    Okay.  So you're not aware if Gainesville Coins was speaking to your auditors at the site and the auditors understood that this was Gainesville Coins' inventory and the other would be NGE?

A    From my recollection on replevin, we asked for an inventory listing so that we could -- we were not provided.  We asked for information about Gainesville; we were not provided.

We asked, in order to ship, that they needed to provide us clear documentation in order to not intervene with their operations.  And, again, you need to speak to the examiner as to how that went.

MR. SAXE:  Move to strike as unresponsive, Your Honor.

THE COURT:  Sustained.

BY MR. SAXE:

Q   Ms. Sousa, what I'm asking is, wasn't there an arrangement?  If you don't know, that's fine.  But the auditors in Gainesville Coins understood which coins and inventory was Gainesville and which was not?

A   I can't -- I don't know that.

Q   Okay.  Isn't it true that the bank actually reached out to SunTrust at one point, which does hold a security interest in Gainesville inventory?

A   I'm not aware of that.

Q   Do you remember anyone from the bank ever tell you that Sovereign reached out to SunTrust and told them to be careful because there could be concerns about --

A   No.

Q   -- mixing of collateral.

A   Nope.

Q   That didn't happen, or you don't know?

A   I don't believe it did.  I have not -- I have not heard of that happening.

Q   Are you aware that -- did you have any subsequent conversations with SunTrust Bank in which they told you that they were satisfied that they had identified the collateral that secures their loan to Gainesville?

A   I'm sorry?

Q    Did you have any subsequent conversation or communication with SunTrust in which they informed the bank that they were satisfied that the collateral that they had securing their loan was Gainesville Coins?

A    Well, if I didn't know that there was any conversation then I wouldn't have a subsequent conversation.

Q    Okay.  So you don't know whether that happened or not?

A    No.

THE COURT:  Mr. Saxe, if you would hold for a second.

MR. SAXE:  Yes.

THE COURT:  Marti?  (Conferring with courtroom deputy.)  All right, Mr. Saxe, you may continue.

MR. SAXE:  Thank you, Judge.

BY MR. SAXE:

Q    Isn't it true that the bank had never previously expressed any concern whatsoever to either Gainesville or NGE about this commingling issue that formed such a significant basis in your ex-parte motion for a writ of replevin?

A    I'm sorry, could you repeat the question?

Q    Yeah, that was kind of a long question.  In the

writ of replevin, one of the arguments that the bank strongly made was a concern over commingling of inventory with Gainesville Coins; is that right?

A    That's correct.

Q    Okay.  Had there ever been, previous to the writ of replevin application, any concern directed to NGE, or Gainesville for that matter, of a concern for commingling?

A    I believe, again, I can't speak for Mike Smith.

Q    That you're aware of?

A    That what -- what I'm aware of is that we didn't know that they were at the same location, so we wouldn't have had concern about commingling.  And it was our understanding they were at a different location and that there was this consignment agreement in place.

Q    As of today, this morning, you have no evidence of any commingling, that you can identify certain coins in Gainesville's possession or NGE's, do you?

A    Actually, there was -- the examiner had noticed the exact same coin on both websites, right down to the smudge mark.

Q    Okay.  That's a coin on a website?

A    He had done numerous coins and there is a sample in the evidence book.

Q    That's one coin from a website?

A    From each of their websites.

Q    From each of their websites?

A    Each of their websites.

Q    That led Sovereign to believe that it might be a situation where the same coin is being held as collateral for each company

A    We have not finished our inventory and we do not know what inventory is there or not there yet, so I can't answer that question.

Q    Okay.  So you simply don't have, other than what you've testified to, any evidence, sitting here today testifying, about commingling of inventory between Gainesville and NGE?

A    I have no idea where my inventory is and we're still trying to reconcile that.

Q    Same question with respect to the bank, Sovereign Bank and ICG.  You have no evidence of commingling, do you?

A    Yes, I do.  As I said, I saw a property of ICG at NGE.

Q    That you can come hear today and identify that these particular coins or this particular inventory has been commingled?

A    I saw, again, on their location numerous invoices and bags of coins that were labeled IGC with the

address of NGE.

Q   Okay.  Do you have any evidence in court here, today, of the, quote, numerous invoices that you were just referring to.

A   I'm not sure.

Q   Are they in the evidence book?

A   I don't believe so.

Q   There was a reference by you to a company, Eldorado, that you claimed that you just found out during this most recent -- withdrawn.  At the time you went back to complete your audit, correct?

A   No.  It was during the replevin.

Q   Okay.  During the replevin.  Now, did you see that that company was incorporated in 2007?

A   I don't recall what the date was.

Q   But it wasn't incorporated by Mark Yaffe, was it?

A   It was incorporated -- again, I don't know who -- the address, again, was that same receipt recorded as the corporation that, I believe, Gainesville was.  The records show that one of the Yaffes' sons was president and Alan Yaffe's name was linked to the Vonage account that was used by the company.

MR. SAXE:  Move to strike as unresponsive, Your Honor.

THE COURT:  Overruled.

BY MR. SAXE:

Q    My question was simply, you didn't see Mark Yaffe's name on the incorporation or as an officer or director of the company, did you?

A    Mark Yaffe?  No.

Q    Or Alan Yaffe?

A    Again, there was information relating to Shirley Yaffe, Alan Yaffe.  And during the examination, during the confirmation of receivables, which is done in the bank on a routine basis in the ABL Group, the phone contact was listed as a, I believe, a Harvey Gordon. When they called that number it was an Eric Levinson, who is an employee of NGE.

Q    What facts do you have that lead you to believe that Eric Levinson is an employee of NGE as you've described it?

A    From the examiners.  They've spoken to him.

Q    Did you see any checks or payroll records or some other such information indicating that he is a paid employee of NGE?

A    Payroll records?  No.

Q    Did you see any other written evidence indicating that he is an employee of NGE?

A    No.

Q    Any IRS filings or tax reporting or any other such thing?

A    No.

Q    But it's entirely possible, isn't it, that he has no relationship with NGE at all.  He works for Eldorado.  Isn't that possible?

A    He is physically located at NGE.

Q    And from that, you assume that he was working for NGE?

A    The examiners have spoken to him while he was there under NGE matters.

Q    But he didn't say, "I work for NGE," as far as you know?

A    I don't know.

Q    So you made an assumption based upon the fact that he was at the address, the same address as NGE, and that's what your testimony is based on?

A    Yes.

Q    In your summons and complaint, there's an allegation that the June 30th, 2009 NGE borrowing base certificate falsely states NGE held an $881,000 receivable from its related party, Gainesville Coins.

And you argue that the loan agreement it's -- under the loan agreement, it's at best a consignment and more likely it should not have been included in the

borrowing base at all because it's a related entity.  Do you recall that?

A    Yes.

Q    Okay.  Now, The loan documents don't prohibit deals with related parties or related entities.  They prohibit and restrict dealings with affiliated entities, do they not?

A    Yes.

Q    And those affiliated entities are very particularly identified and described in the loan documents that the bank prepared, correct?

A    The affiliates, again -- the bank utilized what the CPA identified as being an affiliate which was Gainesville.

Q    But the definition of affiliated entity is contained in the loan documents prepared by the bank, is it not?

A    I believe so.

Q    Okay.  And affiliated enemy -- enemy, I'm sorry.  Entity, is described either as having some kind of an ownership interest in that entity -- which is not here, correct?

A    Correct.

Q    Or, some kind of control over the day-to-day operations of the entity through an officer or a

director, that type of thing.  And you don't any evidence indicating that that's the case either, do you?

A    I'm not sure.

Q    You're not sure or you don't know?  Or you don't?

A    I'm not sure.

Q    Okay.  So there is no restriction in dealing with a related entity; it's the restrictions concerning an affiliate, right?

A    I'm not sure if -- there, again, is a whole litany of exclusions in the receivables definitions.  And I believe, again, the bank also has the right at its discretion with those receivables.

Q    But here the objection in the complaint that was filed with --

A    Yes.

Q    -- was that it was a related entity.  And I think what I'm hearing you testify is that there is no restriction that you're aware of in the loan documents?

A    No, I didn't say that.  Again, I'm not sure what the specifics in the exclusions are but again, as an affiliate -- because, again, the understanding that the bank has and allowed for with Gainesville was that goods were placed on consignment.  And that was specified in the loan agreement.

So the fact that the company changed how it wants to do things with Gainesville, they should have approached us and said, you know, "Hey, we're changing how we account for things now and we request not utilize them as a consignment or inventory location, we would like to include them in our receivables.

Q   But I'm talking about the allegations in your complaint, Ms. Sousa, and that was that this 881,000 was improper and therefore should not have been there and therefore it put --

A   That's correct, because again --

Q   Excuse me.  It put the borrower in default. Isn't that the bank's position?

A   The arrangement with Gainesville and the company, again, was of the consignment arrangement.  The affiliate -- it was deemed as an affiliate because, according to information to the bank, that National Gold Exchange supplied nearly all of its inventories.  That's what's in the financials, all of its inventories, hence control.

So the bank -- in the bank's view, National Gold Exchange did control Gainesville because it was the supplier for nearly all of its inventory which is why we deemed it as an affiliate.

Q   Well, control by the company in your loan

documents is defined as, "The company possesses directly or indirectly power either to vote 10 percent or more of the securities having ordinary voting power of the election of directions, (2) direct or cause the direction of management or policies of such person or, (3) common control over the company.

So my question before was, are you aware of any evidence indicating that Gainesville had -- that Gainesville was controlled -- any evidence as to that?

A    Yes, I do.  When I went and asked which computers belonged to Gainesville, Alan Yaffe walked me one by one and identified which servers were Gainesville. He knew exactly where they were and what was done.  And also during that period, his computer was found to be erasing.

Q    Okay.  So the fact that Mr. Alan Yaffe pointed out to you what computers he thought were Gainesville, that indicates common control?

A    He knew which computers were Gainesville.  And I believe also in discussions with the examiners it was Mr. Yaffe, Alan Yaffe, who was working with them with respect to Gainesville.

MR. SAXE:  Move to strike.  There's no question pending, Judge.

THE COURT:  Granted.

BY MR. SAXE:

Q   Ms. Sousa, in the summons and complaint, there's an allegation -- I believe you've testified to it again today -- that from the July 2009 borrowing base, there was a false inclusion of amounts for foreign entities in excess of the million dollar limit.  Do you recall that testimony?

A   I believe so.

Q   Okay.  And that the total foreign receivables were about 1.1 million with the borrowing ability of 85 percent, and the bank would have loaned about $935,000 against that.  Is that consistent with your recollection of what was in the complaint?

A   I don't know the specifics.

Q   Okay.  In any event, the overage is $100,000 we're talking about here, right?  If it's over the million cap and it's a million one, it's $100,000 over?

A   Yes.

Q   So worst case, it's about $8,500?

A   Yes.

Q   Now, typically isn't it true that what would happen is that this would be viewed as a mistake and would have been picked up the bank's collateral management department and then simply backed out?

A   Not necessarily.

Q    But isn't that typically what would happen?

A    No, not necessarily.  Again, if there's a -- if there's evidence of default, again, the lender would see if the borrower could cure that default.

Q    Isn't it true that in the past, before these problems as you've described them were happening, that's exactly what the bank did?

A    I can't say that.

Q    Because you don't know sitting here today?

A    I don't know.

MR. SAXE:  Excuse me, Your Honor.  I'm trying to scan through two sets of notes, here.

BY MR. SAXE:

Q    You testified that when your folks left the site during one of the audits, NGE employees were still there until 3:00 o'clock in the morning?

A    No.  I think I testified that after they left they returned.

Q    They returned and stayed until at least 3:00 in the morning?

A    Uh-huh.

Q    And you know that because the P.I.'s were out there --

A    I knew that because a executive at the bank informed me that he was informed.

Q    Okay.  Did you think that there was anything nefarious or improper about employees being there until 3:00 in the morning?

A    It's a little strange that the examiners left and then folks came back on a Friday night.

Q    Is it strange?  Because weren't you aware that the business operations of NGE had effectively been shut down by this visit from the bank and that they were trying everything they could to keep it going, and if they had to get in and work in the middle of the night, that's how they were going to do it?

A    I find it strange that they didn't mention it to anyone there.

Q    Do you think they had some reporting requirement to the bank that they were in there working?

A    Again, the bank -- if they were going to be there late, the bank could have finished whatever it was working on.

Q    Did the bank ask to be there at 1:00, 2:00 in the morning?

A    The bank had said that they would be there as long as they needed to be.

Q    Did anyone from NGE ever tell the bank that they had to leave at a particular time?

A    I don't know.

Q    Now, you mentioned -- withdrawn.  You mentioned that the bank initially had simply wanted to assure itself that its collateral was safe and that's all they were after.  Isn't it true that the bank was intending to file the summons and complaint and a writ of replevin almost immediately?

A    No.

Q    Isn't it true that they were so scared by the David Hammer letter that they decided that they were going to come in and get a writ of replevin and get a summons and complaint filed, and everything else was just waiting to get that done?

A    No.

Q    And getting information and ammunition to support it.  Isn't that true?

A    No.

Q    Now, you talked about a meeting where the bank said there was a few things that it wanted and that NGE simply didn't want to talk about it?

A    Uh-huh.

Q    Okay.  That's not really true, is it?  I mean, NGE sat in a meeting and they said to the bank, "We'll do everything we can to cooperate and be of assistance to you and hopefully work this out without having to go to drawn swords."  Isn't that essentially what was said to

the bank?

A    This was regarding their proposed forbearance agreement, and my recollection is that you listened to our points that we'd like to have included and you are not prepared to discuss them.  You need to go through the loan documents and discuss things with the company.

Q    Well, that's because there was an existing contract in the form of loan documents that the bank had prepared, under which Sovereign and NGE had operated for many, many years; isn't that true?

A    There was also an issue of default.  And from my recollection you disputed that they were in default.

Q    Including the Gainesville Coins commingling. That was one of the big items of default, wasn't it?

A    I think you just said that you wanted to review the default more carefully.

Q    That was one of the big items of default that the bank thought it had at that time, right?

A    For errors in the borrowing base.

Q    Okay.  And you wanted some of the collateral to be sold for the music boxes, isn't that right?

A    We wanted, if possible, a quickened amortization of the term loan.

Q    You wanted Mr. Yaffe to sell those machines so that the note could be paid off, isn't that true?

A   Uh-huh.

Q   And you knew that this was not a good market to be trying to sell those things, especially en masse, so to speak, right?

A   I really don't know much about music boxes.

Q   So then you have basis to have an opinion that it would be unreasonable to try to liquidate all of these things at the same time because it would have an adverse impact on the price?

A   Well, it was my understanding that he sold some music boxes to repay the first loan.

Q   And just to be clear, it's not your testimony here today that Mr. Yaffe has sold or otherwise improperly disposed of any music box that is securing the bank's position on their loans, right?

A   I'm sorry?

Q   It's not your testimony today that Mr. Yaffe has sold or otherwise improperly disposed or encumbered music boxes that are being -- that are secured to the bank in UCC filings?

A   I believe that there were notes in the evidence that there is a music box that had been pledged to another entity.

Q   Okay.  The bank was out at Mr. Yaffe's premises last week; were they not?

A    I believe so.

Q    And the bank inspected every one of the music boxes that the bank believes secured their position under the loan agreement, right?

A    I believe that to be the case.

Q    And no music box was identified to anyone, either my office or counsel for bankrupt's office, that there was a problem with double, you know, pledging of a music box?

A    I not sure.

Q    Okay.  And one of the things that was being demanded of NGE by the bank to settle this in advance, as you described it, was to segregate out Gainesville because of the commingling problem?

A    Correct.

Q    And isn't it true that NGE -- or I'm sorry, Gainesville, has offered to move and is in the process of actually moving out of that physical site to solve the problems the bank had?

A    I believe that they're trying to move out. I don't know personally.

Q    And, also one of the things you wanted was a monthly physical inventory which the bank is not entitled to under the loan documents?

A    Again, this was for a new agreement.

Q    Right.  And the bank can appreciate the burden that this would put on an ongoing business to have people doing a physical inventory every single month instead of once every quarter, right?

A    But again, this was not discussed with the bank.

Q    It was not discussed with the bank?  That's something that NGE said they wouldn't be able to agree to right away, but they --

A    We did not know that was a concern of the company.

Q    That they didn't want to be inventory -- have inventories every single month?

A    Right.  We said we can discuss the forbearance.

Q    And you say the bank has concerns about inventory, that had an expectation of having a certain dollar amount inventory at NGE and another expectation of a dollar amount inventory at NGC down in Sarasota and that these expectations were not met in the bank's view.

It sounded to me, in your testimony, like a lot of it was based upon suspicion, a lot of it was based upon a belief that either the value was not what it should be of particular coins or certain coins that were claimed to be on consignment were in fact not.  But would you agree with me that value is a subjective analysis?

A     As put on the books and records, it should be the lower of cost or market.

Q     Is there a requirement in the loan agreement that mandates that it be done exactly that way?

A     Typically there is.  Again, I don't know the specifics on this case.

Q     Okay.  And, again, it was never raised as a problem with NGE before you raised it in July of 2009?

A     Yes.  Because again, according to the financial statements, a shareholder now owns the grading company.

Q     And that was disclosed to the bank at least a year or two ago, right?

A     No.  Again, it's my recollection that Mr. Yaffe acquired it and I learned of it through the financial statements.

Q     But the financial statements informed the bank, did they not, that the -- I forget the exact terminology, I don't have it in front of me, but there was a ownership interest from NGE, one of the shareholders?

A     No.  It's a related party.

Q     A related -- a related party.

A     Which we understood to be the in-laws.

Q     Okay.  Did the bank ever follow up on that to see who or what that meant?

A     I'm not sure.

Q    Well, if it was important to the bank, as you now say, don't you think that would be a prudent thing to do?

A    Again, if Mr. Yaffe owned it, it was more prudent.  Again, it was the bank's understanding that it was in-laws in Colorado.

Q    You also testified that during the replevin action, Gainesville was leaving the building with boxes. And I don't know if you meant to imply that there was something improper and nefarious involved here?

A    From my understanding of the situation, it was conveyed to the bank that people were running out of the back door with boxes.

Q    And are you aware that Gainesville was operating a business out of that location in which boxes of coins and other inventory would be sold to people so necessarily things would be coming and going?

A    Sure.  But again, running just before the sheriff began.

Q    And was anything found in those cars that you're aware of that led the bank to believe that things were improperly being taken that were, in fact, bank inventory?

A    Again, what was -- again, I didn't look at everything that was taken, but the boxes I did personally

look at.  As I said, had grading supplies at National Gold Exchange.  It had inventory of the grading company at NGE.

Q    But the concern would be that bank inventory was walking away, isn't that right?

A    I don't know what was going on.

Q    And you don't have any evidence of that because if you did you'd for sure present it to the Court here today, wouldn't you?

A    I'm sorry.  What was the question?

Q    If you had any evidence that bank inventory was leaving the premises to be sent someplace else, if you had that, you'd be presenting it here to the judge today, would you not?

A    Well, I don't know exactly.  Again, we're still trying to ascertain what is our inventory and I don't know what Gainesville has for inventory, so I can't deduce as to whose inventory is what clearly.

Q    You've testified that you believe the bank's collateral today, or your counsel stated, could be much more significant than $5 million.  In point of fact, Ms. Sousa, you don't really have any evidence that it is $5 million or $8 million or $1 million or any other specific number, do you?

A    I'm sorry?

Q    You don't have specific evidence that the collateral is under water $5 million or $8 million or $10 million, do you?

A    My examiners put together a pro forma Barnaby's based on their findings, which the first one said $5 million.  And they have been -- as this due diligence has been continuing, they have continued to adjust it and it's gone nowhere but down.

Q    But it could also be -- going down, you mean going --

A    The collateral -- the collateral is going down.

Q    But it's entirely possible, is it not, that when you do further investigation including checking consigned coins, including doing valuations, that it could go up as well.  Isn't that possible?

A    No.  Because, again, our biggest inventory was $6 million at the coin grading company in Sarasota, and it's my understanding that, although the first time we were there we could count $6 million, just over a million dollars was replevined and the rest was deemed to be commingled.

Q    Because of a claim by a company called A Mark?

A    I guess so.

Q    Okay.  But you don't know whether or not that's true?  That could be a dispute that has to be settled and

resolved between NGE, Sovereign and A Mark, correct?

A     I would imagine.

MR. SAXE:  That's all I have, Judge.

THE COURT:  Okay.  If you could hold one minute.  Okay, very well, redirect.

REDIRECT EXAMINATION

BY MR. SORIANO:

Q     Ms. Sousa, when you were at NGE you mentioned -- you started to mention that somebody appeared as the spokesman for Gainesville.  Who was that person?

A     I believe that the run-ins that the examiners had with respect to Gainesville, came from Alan Yaffe.

Q     Now, you also said that Gainesville items were considered as accounts receivable in the borrowing base, is that right?

A     Right.

Q     But instead it would have been -- your understanding was it was consignment arrangement?

A     Correct.

Q     Now, how would that affect the borrowing base, whether it was an account receivable or a consignment?

A     If it were, the inventory would be at the customer's -- for example, if there was a million dollars on consignment to Gainesville, they would borrow 60

percent or -- I'm sorry, 55 percent or $550.

If it was a receivable it would be a million dollars, plus their markup, maybe 7 percent, and that would be at an 85 percent advance rate.  So by treating it as a receivable, it increased the availability in the borrowing base.

Q    I want to go over a few documents with you that are in the exhibit book, if I might, since I haven't really qualified these to be admitted, and ask if you could look at Tab 29?

A    Okay.

Q    And Tab 29 consists of a number of documents. Would you go through these and let me know if you can identify them?

A    Sure.  During the replevin, numerous documents relating to Eldorado was identified.  This first one is a profit and loss statement for 2008.  That address for Eldorado is the same address that was utilized that we saw as on the UCC for Gainesville and it is a UPS store.

Q    A UPS store?

A    Yes.

Q    How about the document -- the following document?

A    The next document was found just recently, and it indicates that NGE is in bankruptcy and that it is

their intent to continue to do business under Eldorado. And it gives us concerns that the estate's assets may be moved over to Eldorado.

Q    Okay.  The document behind that?

A    Also found was this IRS for Eldorado, which shows the address to be the 3119 Racita Court, which again in the bank's records was the original location of the articles of incorporation, I believe, for Gainesville.

The next document is an UPS agreement for a box with Shirley Yaffe.

Q    And who is Shirley Yaffe?

A    It's my understanding that Shirley -- and, again, it's that address, the UPS store, if you flip over to the next one, 13014 North Dale Mabry Highway.  Shirley Yaffe is the wife of Alan Yaffe, and she is the bank's contact with respect to the loan and for cash transactions with the loan administrator.  And she was also listed on the wire agreement for Eldorado.

Q    And there's a document right before the UPS document.  Is that what you're referring to here?

A    (Reviewing documents.)

Q    Well, maybe you don't have it.

A    I don't think I have it in here.

Q    That makes me nervous.

MR. SORIANO:  Your Honor, before I -- can I approach?

BY MR. SORIANO:

Q    This is the document.

A    Yes, I don't have that document.

Q    I'm sorry.  Do you recognize that document?

A    Yes.  This is a document that we found that lists Michael Yaffe as president and also lists Shirley Yaffe with wire authority for Eldorado.

MR. MCINTYRE:  Excuse me, Your Honor.  May we view the document?  I don't believe it's in our book either.

THE COURT:  Yes, that's fine.  And speak at the podium.

MR. MCINTYRE:  (Reviewing document.)

THE COURT:  It's in my book between the tax records --

MR. SORIANO:  Right before the UPS.

THE COURT:  -- and the UPS store letter.

MR. MCINTYRE:  Okay.

BY MR. SORIANO:

Q    Now, behind UPS agreement, is this --

A    This seems to be the wire authority for Eldorado.

Q    And I notice beneficiary information.  And

since you're a banker, maybe you know this better than I do.  National Gold Exchange, Inc., what does that mean?  Does this mean it's a wire from Eldorado to NGE?

A    Yes.

Q    And that's about half a million dollars?

A    Uh-huh.

Q    This document that follows is Vonage?

A    Is Vonage, and has an account number for Eldorado Gold, and the user name is Alan Yaffe.  And the credit card information is from Shirley.

And the next document again has to do with the banking relationship at SunTrust of Michael Yaffe.  And then, again, what seems a little odd is that the -- according to the records, National Gold Exchange sold to Eldorado approximately $5 million worth of goods.

We actually have checks from the Sovereign account made out to Eldorado during the time period when the company was having -- was bouncing checks and having liquidity issues.  There is a series of these checks here.

Q    And these documents were all found at NGE's premises?

A    Yes.  All these documents were found at NGE's premises.

MR. SORIANO:  I'd move to have them

admitted into evidence.

THE COURT:  Any objection?  The Exhibit No. 29 has been offered into evidence.

MR. MCINTYRE:  If I could speak out of turn, Your Honor, I don't believe there's been any foundation laid for  --

THE COURT:  Speak at the podium.

MR. MCINTYRE:  Sorry, Your Honor.  For the second document, the document entitled Transition Dialogue.  Obviously it's a document that has negative information contained.  It has no date, it has no author.  The witness provided no foundation as to its authenticity, so I don't think that should be -- I don't think that's admissible.

I believe the rest of the documents look like regular business documents.  I don't believe there's a reason to oppose the admission of the remaining documents, but as to this one particular document, the second one located in the exhibit, I don't think a proper foundation has been laid to have it admitted.

THE COURT:  Okay.

MR. SORIANO:  The argument is, Your Honor, we found this at the Debtor's premises.  If Mr. Yaffe were here, I suppose I could ask him about it

as well.  But clearly, a document found at the Debtor that talks about Eldorado and National Gold Exchange and a transaction of the business from one to the other, I would think that's a fairly significant document.

MR. MCINTYRE:  Your Honor, may I voir dire the witness as to this document?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. MCINTYRE:

Q    Ma'am, did you find this document at the location of the Debtor.

A    No.  One of the examiners, who is present today, found that document.

Q    So you have no personal knowledge as to where it was found or how it was obtained, is that correct? Except that one of your examiners provided it to you?

A    Yes.

MR. MCINTYRE:  Your Honor, I don't believe this witness can even properly authenticate that it was located in the business records or where it came from with regard to the Debtor.

MR. SORIANO:  That's fine.  We'll provide the -- we'll deal with the testimony through the person that did find it.

THE COURT: Objection sustained as to the transition dialogue, which is the second document in Exhibit 29. Otherwise Docket -- Excuse me, Exhibit No. 29 will be received into evidence.

MR. SORIANO: Thank you, Your Honor.

CONTINUED REDIRECT EXAMINATION

BY MR. SORIANO:

Q Would you please also turn, Ms. Sousa, to Tab 30, and let me ask if you can identify this document?

A Sure. This is a -- during the replevin, this was a document that was found that shows that in April of 2009 that National Gold Exchange and Fazio Limited entered into a loan agreement for $350,000, and the collateral, I believe, was a music box.

Q Okay.

MR. MCINTYRE: Your Honor, I'm going to object and move to strike. If I understand correctly, this is redirect and it has nothing to do with the original examination of the bank, and was not brought up in cross-examination.

MR. SORIANO: Oh, but it was in fact brought up specifically, when Mr. Saxe asked her if music boxes had been pledged to other parties.

THE COURT: That's true. It was --actually he asked about that jukebox and that's what

-- I assume that's what this was getting to, and you may continue.

BY MR. SORIANO:

Q    If you'd please continue through this tab and just identify these if you would?

A    Sure.  This was an appraisal that was -- an insurance appraisal that was sent to the bank regarding the music boxes pledged to the bank, and it is the same individual to whom we had found another note to, and Kenneth Goldman is also listed as a customer of NGE.

The note to Mr. Goldman is right behind it, and that was done on December 8th, 2008, which is the next document.  And it lists that these music boxes pledged were primarily at Mr. Yaffe's home, as well as there was one we see offsite at the office of a Mr. Ron Kopel.  And it is my understanding that that is the individual with whom Mr. Yaffe wanted us to utilize and help replevin the music boxes.

Q    Now, was National Gold Exchange authorized under your documents to pledge these music boxes for other parties?

A    No.  That would be a default under the agreement.

MR. SORIANO:  I move to have those admitted into evidence.

THE COURT:  Any objection to Exhibit 30?

MR. MCINTYRE:  Brief voir dire, Your Honor?

THE COURT:  You may.

VOIR DIRE EXAMINATION

BY MR. MCINTYRE:

Q    Ms. Sousa, can you identify for the Court which music boxes Mr. Yaffe in fact pledged to the bank?

A    I think you have to go back to the original term loan.  It would be -- and again I don't know if it's in this binder, but there was a listing of 17 music boxes to my recollection.

Q    Can you identify for the Court which of those music boxes were pledged pursuant to the terms of the documents contained within Exhibit 30 to Fazio, Ltd., if any?

A    No, I cannot, but the UCC provides an all-asset lien against all and every music box that National Gold Exchange has.  And this is an agreement between National Gold Exchange, Mike Barber, who has those assets pledged to Sovereign, not Mr. Yaffe's personal collection.

Q    Now, there were two loans, with your bank, that were secured by music boxes?

A    That is correct.

Q    Is it true that one of those loans was paid

off?

A    Yes.  We don't know how or from what proceeds.

Q    I understand that, but it's true that whatever security interest that was created to secure that particular loan was satisfied, correct?

A    I'm sorry?

Q    Whatever security interest was created by that particular loan was satisfied, is that correct?

A    It might have been.

Q    Okay.  And so did the loan that was not repaid have specific music boxes identified to collateralize that loan?

A    I do not believe so.

Q    Can you look at the document and make a determination?

A    Sure.

          MR. SORIANO:  Just to shortcut, it, I mean, the main loan documents are all assets of NGE, so it almost is irrelevant whether you've got a term note with --

          THE WITNESS:  There was never a request to provide a partial release to a UCC.

BY MR. MCINTYRE:

Q    Is it your testimony that the default arises because of some form of a blanket lien or the specific

pledge of particular music boxes?  Do you understand my question?

A     Would you repeat that?

Q     Yes.  The loans, the two notes you identified, the term notes, specifically identified particular music boxes as collateral to support the loans; is that correct?  You can look at the documents if you want.

A     Yes, there's two issues.  One being that it's the collateral of the bank.  The next, I believe that the company cannot enter -- cannot obtain additional debt.  And this would be obtaining additional debt.

Q     Thank you, but that wasn't my question though.

A     I'm sorry.

Q     My question was that the music boxes that you're complaining of Mr. Yaffe pledging or the NGE pledging, those specific notes which secured -- or were secured by those music boxes, was paid, was it not?

A     One of the notes was paid.

Q     Okay, but that's not my question either.  My question is, you have a note that is secured by specific music boxes, correct?

A     I believe -- it's my understanding that both of the notes were secured by the collection.

Q     And would you verify that, please?

A     Sure.  (Reviewing documents.)

MR. SORIANO:  Your Honor, I don't want to interrupt but, again, if you look at the note, the note refers to a security agreement dated June 26th, 2007.

Actually it's Tab 5.  And it describes the securities -- describes the various notes and the security agreement which covers everything.  So I think there's no specific items to go with specific notes.  You can see that this covers all three notes, the revolver and the two terms.  And you can look at the assets, and it's everything.

MR. MCINTYRE:  Your Honor, I understand that's Mr. Soriano's interpretation.  We've just received -- or I've just received these documents for the first time.

And I think the witness is on the stand for the purposes of determining whether the bank knew, what they knew, and what they're trying to contend.  If the bank is trying to contend that there was some improvident pledging of assets, my question is, isn't it true that at least one of the two notes was paid off, and I'm trying to determine whether or not Mr. Yaffe might have had the understanding that that the music boxes -- some of the music boxes that were pledged to this other

borrower or lender, weren't free to be pledged by virtue of the payoff of the first note.

THE COURT:  I understand your point on that.  I just happened to have been sitting there reading the document that Mr. Soriano referenced when he made that point.  And there is a blanket lien.

I think for purposes of admissibility and relevance, the document is admissible and relevant. Your point, I think, goes to the weight of it.  It may be that this was -- there may have been some other understanding.

But under the terms of the amended and restated security agreement, there is a blanket on all personal property, and one of the negative covenants is a non-pledge covenant which you would expect to find in such a document.

MR. MCINTYRE:  Very good, Your Honor. Withdraw the objection.

THE COURT:  So I'll overrule the objection.

MR. SORIANO:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  So 30 was admitted, Judge?

THE COURT:  30 is being admitted.

CONTINUED REDIRECT EXAMINATION

BY MR. SORIANO:

Q    I'd like to you, if you would, turn to Tab 31, Ms. Sousa, and ask you if can identify this -- these documents.

A    Sure.  During the replevin we found records pertaining to some type of arrangement with A Mark Precious Metals, who is the entity that is disputing the inventory at the grader.

And this shows some type of repo limit of up to $12 million.  And looking at it, it looks like there was approximately $3,050,408 outstanding under this agreement.  And then below that number there's some type of gold ounce tracking.  I'm not quite sure what that pertains to.

But this agreement is -- we found it right behind that spreadsheet and it is dated June 21st of 1999.  And it appears to give the company the ability to sell coins to this entity and, for a fee, maintain the right to repurchase them back at a future date.

Q    All right.  Now, what would be the significance of that for Sovereign?

A    Again, with having all assets, if he is receiving -- if someone else has possession of our coins or of our inventory, and it's -- we then -- it poses a

question of where is this inventory coming from, where is it located, who has the true title to these coins, because at some point the bank finances inventory.

And unless it was a true sale, we would not have been repaid under our inventory advance rate.

Q   And is there anything in here that makes you think it might not be a true sale?

A   Well, having the ability to buy it back and then having -- and seeing that according to the codes, it looks like the inventory is located -- this BT appears to be referenced as Brinks Tampa.

So, you know, it seems like there's a significant amount of inventory that the bank was not aware of under some type of an arrangement the bank was not aware of with A Mark.

MR. SORIANO:  Move to have that exhibit admitted, Your Honor.

MR. MCINTYRE:  No objection, Your Honor.

THE COURT:  Exhibit No. 31 will be received into evidence.

BY MR. SORIANO:

Q   If you would turn now to Exhibit 32, Ms. Sousa?

A   Certainly.

Q   And ask if you can identify what this is.

A   Again, during the replevin, we were surprised

to find another type of what appears to be a lending-relationship with yet another entity.  It appears as Republic National Business Credit, and it looks like there's a prom note and a security agreement.

And it looks as though, based on various purchase order of inventory, that the company received a -- it appears to be an advance against those coins.  And we found numerous of these, which are summarized right behind the backup data, and again it appears to be $12.5 million worth of notes, which again is alarming and a significant amount.

And we found, you know, corresponding wire activity through this RNBC account balance.  The bank was only aware of its accounts with Sovereign as well as one account with SunTrust that the examiners had indicated to be minimal activity.  And as part of the field exam, they looked at cash records and this account was never introduced to the bank.

MR. SORIANO:  Move to have this admitted into evidence.

THE COURT:  Any objection?

MR. MCINTYRE:  No objection, Your Honor.

THE COURT:  Exhibit No. 32 will be received in evidence.

MR. SORIANO:  No further questions, Your

Honor.

THE COURT:  Any follow up?

MR. MCINTYRE:  No, thank you, Your Honor.

THE COURT:  Very well.  No follow up on this witness.  You may step down.

(Witness excused.)

THE COURT:  I'll assume this evidence is going to be for all motions that are pending today, and the Court will consider -- and I've also got Mr. DeCailly's motion which is basically the same.  And Mr. DeCailly, you'll have an opportunity, if you want to add something at the end that's not covered. But hopefully we can get it all in through one shot here.

MR. DECAILLY:  I think we're getting the proof, Your Honor.

THE COURT:  Okay.  I'm sorry?

MR. DECAILLY:  I think we'll -- I'll just let them proceed and take care of it --

THE COURT:  Okay, thank you.  Thank you, Mr. DeCailly.  Mr. Soriano, your next witness?

MR. SORIANO:  Do you want to forward, Your Honor?

THE COURT:  I'm sorry?

MR. SORIANO:  I said, do you want to go

forward?  Everyone's looking at the time and I know you have a hearing at 1:30.  We can do it.  I can go forward.  I also have a short hearing at 1:30 before Judge Delano.

THE COURT:  Judge Delano?

MR. SORIANO:  We can proceed -- we can keep going.

THE COURT:  Well, let's talk.  I cancelled my 1:30 hearing.

MR. SORIANO:  Okay.  Well, Mr. Crawford's actually going to put on a couple of the witnesses, so I could probably sneak out for a little while because my hearing will not last very long.

THE COURT:  Okay.

MR. SORIANO:  But we can proceed, and I don't know if you want to break for lunch or how you want to do that.

THE COURT:  Well, we can go from 1:30 to 5:00 or even a little bit later than that.  I have a sense we'll probably end up using the whole afternoon.

Let's do this.  Let's go to 1:00 o'clock and then we'll break till 1:30.

MR. SORIANO:  We actually do have one witness who's pretty quick and we could -- if you

want, if you prefer --

THE COURT:  Okay, maybe we can do that.

MR. SORIANO:  We could do that.  We could have -- we're not going to have that much.  The witnesses won't be too much longer from now on, but --

THE COURT:  How much more in terms of time do you have?

MR. SORIANO:  We're going to have two -- I think four more witnesses, none of whom -- only one will take a little while.  And it's just really the people from Navigant to explain the procedures we went through, more than anything else, to assure everybody about what I consider the purity, if I can, of the process and how things are being safeguarded.

And I don't think it's going to be anything like Ms. Sousa.  She was sort of the main witness.

THE COURT:  Okay.  Do you think it'll be another hour, two hours?

MR. SORIANO:  I would say two, to be safe.

THE COURT:  Okay.  So if we broke at --if we broke now and came back at 1:30, that'd be 1:30 to 3:30, and you add on cross-examination.  Let me

ask Mr. Saxe and Mr. McIntyre what your thoughts in terms of time in terms of should be break now for lunch, so we have enough time to finish today. I can go a little bit later but we have other people that are involved in keeping this courtroom open.

MR. MCINTYRE: Your Honor, I don't believe that we'll have substantial cross-examination.

I think we would want to reserve some portion of time at the end simply to figure out once you've heard the evidence what do you do with this case.

THE COURT: Well, that's fair.

MR. MCINTYRE: I think that's the crux.

THE COURT: Okay. Well, let's go ahead then and we'll break now. We'll break until, say, 1:35.

MR. SORIANO: Thank you, Your Honor. Can we just leave our things?

THE COURT: Yes, please. You may leave everything here. We'll see you back here a little bit after 1:30.

THE COURTROOM DEPUTY: All rise.

(Recess taken from 12:13 to 1:37 p.m.)

THE COURTROOM DEPUTY: This Honorable

Court is again in session.

THE COURT:  Please be seated.

THE COURTROOM DEPUTY:  Judge, Ms. Mora is back on the line now.

THE COURT:  Okay, very well.  We're back at a continuation of the evidentiary hearing. Mr. Crawford, if you want to call your next witness.

MR. CRAWFORD:  Thank you, Your Honor. Sovereign Bank would like to call Mike Ferrelli.

THE COURT:  Okay, Mr. Ferrelli, if you could come forward, stand at the lectern in order to be sworn, please, sir.

THE COURTROOM DEPUTY:  Please state your name for the record, spelling your last name.

THE WITNESS:  Yes, my name is Michael Ferrelli.  Last name is spelled F-e-r-r-e-l-l-i.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered by the courtroom deputy.)

THE COURT:  Okay.  Mr. Ferrelli, if you would please have a seat in the witness chair and adjust the microphone so that you can be heard. Okay, Mr. Crawford, you may proceed.

MR. CRAWFORD:  Thank you, Your Honor.

MICHAEL FERRELLI

being first duly sworn, was examined

and testified under oath as follows:

DIRECT EXAMINATION

BY MR. CRAWFORD:

Q    Mr. Ferrelli, could you tell me who your employer is?

A    Sovereign Bank.

Q    And what is your position at Sovereign Bank, sir?

A    I'm a commercial field examiner for Sovereign Bank.

Q    And what exactly does that job entail?

A    It entails validating the collateral of the borrowing base certificates that are received by the bank, undergoing the investigation of the A/R collateral and the inventory collateral.

Q    What kinds of things would you normally do to verify the borrowing base certificates you receive?

A    Well, we do perform several tasks.  We do a review verifications as part of our routine procedures that we do with various customers.

Q    What do you mean by a verification?

A    Well, what we do is we call certain customers up just to confirm the balance of the receivables that

they're sending into the bank as collateral to support the borrowing base certificate.

Q    Okay.  And how long have you been in this position with Sovereign Bank?

A    I have been employed with Sovereign Bank since 2003.  I have been in banking for 15-plus years, doing much of the same thing that I'm doing today.

At various positions prior to Sovereign, I did work for UJB, which became Summit and Fleet.  And prior to that I worked for PNC for a couple years.

Q    In all of those you did similar jobs, as your job as an examiner?

A    That's correct.

Q    Can you tell me about your educational history after high school?

A    I attended Wagner College where I completed by Bachelor of Science in Business Administration and Economics, and I also have a background in accounting.

Q    Any other degrees other than your degree from Wagner College?

A    No.

Q    Okay.  When did you graduate from Wagner College?

A    1989.

Q    And since 1989, you've been in banking?

A    Yes.  I did internal audit for a couple of years.  In addition to UJB, Summit and Fleet, I also worked for the Bank of Tokyo in New York City as an internal auditor for them.

Q    Are you familiar with the relationship between Sovereign Bank and National Gold Exchange?

A    Yes.

Q    When did you first become aware of this relationship?

A    Well, during the most recent visit to NGE to conduct a field exam for Sovereign Bank.

Q    Okay.  And who contacted you to be part of this field exam?

A    I was contacted by Rob Flohr on July 11th, a Saturday, to perform an audit, along with Laurie Petry (phonetic) on Monday, July 13th.

Q    As part of your audit, did you conduct a verification of accounts receivable?

A    Yes, I did.

Q    Okay.  I want to ask you about a couple of those accounts you verified.

A    Sure.

Q    The first account is Rifkin Management.  Do you recall that?

A    Yes.  Rifkin Management was part of my sample.

We tried to sample approximately $6 million of A/R for review, of which Rifkin was part of it.  We had one invoice for approximately $500,000, which we were trying to confirm on the A/R side, as well as (inaudible) on the inventory side.

Q     Were you able to verify that account receivable of Rifkin Management?

A     Well, based on my initial call, I did call a 339 number, which was given to me by Ray Cloutier who obtained the number from Mark Yaffe to contact this specific company.  And the company was based out of -- in Fort Lauderdale, Florida, based on the aging that I was reviewing.

Because I couldn't get through, I called Information and they instructed me that at that Fort Lauderdale location for Ron Rifkin Management, Inc., there was no such phone number for that company.

Q     So at the number that NGE provided, you were unable to contact anyone?

A     Correct.  The number that was provided to me through Ray was for that specific customer.  So what we attempted to do was Ray had asked Mark whether or not he has another number for them, and he was provided with a 781 number, which I in turn called, received a voicemail and left a detailed message for three invoices, two of

them being inventory, one being A/R, to confirm the balances of those invoices and to call back.

Q    Did you ever receive a call back?

A    No, I have not.  And based on my discussion with Ray Cloutier, who sent me one number that I called, it might be a Massachusetts' number.  The 781 was also on the aging as of July 11th.

Q    So the bankruptcy documents from National Gold Exchange didn't reflect the 781 number as the contact number for Rifkin Management; is that your testimony?

A    That's correct, as of July 11th.

Q    Okay.  When you called the 781 number, you said you got a voicemail.  Is that correct?

A    That's correct.

Q    What was the message on the voicemail?

A    It was an indescript kind of a voicemail message.  And at the end of the message, I just left my name and phone number and with a request to call back and confirm several invoices that I was trying to confirm.

Q    Did the voicemail message identify the person whose number it was?

A    No, it was kind of indescript, from what I recall.

Q    Let me ask you about some other invoices you verified.  Did you do any verification on invoices for

Eldorado Discount Gold?

A   Yes, I did.  I initially tried to confirm a couple of invoices with Eldorado Gold and also tried to revisit verifying the entire balance of Eldorado Gold with about 1.5 million in A/R and about $700,000 in consignment inventory with Eldorado Gold.  And on my first attempt, I tried to call Harvey Gollen.  He wasn't available.

And Eldorado, the individual that I did confirm balances with was a Eric Levinson, who said that he would be able to confirm those balances with me of 1.5 million, which he agreed and confirmed with me those balances, as well as the $700,000 balance of inventory that he had.  And he had expressed that there was -- approximately 300,000 was being returned from consignment in the middle of July.

Q   So you were able to confirm the Eldorado invoices with an individual named Eric Levinson; is that correct?

A   That's correct.

Q   At any point did you learn any additional information about Eric Levinson?

A   Well, after the confirmations were conducted, it was brought to my attention that Eric may in fact work in the building that I was conducting my verifications.

Q    And you were not aware of this at the time that you actually conducted the verifications?

A    No, not at all.

MR. CRAWFORD:  No further questions for this witness, Your Honor.

THE COURT:  Any cross?

MR. MCINTYRE:  No, Your Honor.

THE COURT:  Okay.  Very well.  Thank you. You may step down, Mr. Ferrelli.

(Witness excused.)

THE COURT:  Mr. Crawford, you may call your next witness.

MR. CRAWFORD:  Yes, Your Honor.  Sovereign Bank would call Robert Flohr.

THE COURT:  Mr. Flohr, if you could come to the lectern to be sworn.

THE COURTROOM DEPUTY:  Please state your name, spelling your last name for the record.

THE WITNESS:  Yes.  It's Robert Flohr, F-l-o-h-r.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered by the courtroom deputy.)

THE COURT:  Mr. Flohr, if you could have a

seat in the witness chair and adjust the microphone so that you can be heard.  Mr. Crawford, you may proceed.

MR. CRAWFORD:  Thank you, Your Honor.

ROBERT FLORH

being first duly sworn, was examined

and testified under oath as follows:

DIRECT EXAMINATION

BY MR. CRAWFORD:

Q    Mr. Flohr, how are you today?

A    I'm doing well.  Thank you.

Q    Good.  Can you tell me who your employer is, sir?

A    Yes, it's Sovereign Bank.

Q    And what is your position at Sovereign Bank?

A    Commercial operations manager.

Q    And what do your duties entail as the commercial operations manager?

A    Well, I assist my director in operating the day-to-day activities of the Department of Commercial Field Exam.

Q    And so are you involved in the conducting of field exams in your position?

A    Not primarily, no.

Q    Are you ever involved in conducting field

exams?

A     Yes.

Q     How long have you been in your current position with Sovereign Bank?

A     Since 2001.

Q     Tell me about your post high-school education?

A     I graduated for Suffolk University with a BS/BA in 1989, and I continued on with employment soon after that graduation.

Q     Tell me just a little bit about your employment history, kind of generally, from the time you graduated from college until you went to work for Sovereign Bank.

A     Sure.  I was employed by a company called Workers' Compensation Bureau of Massachusetts, where I held several positions within the company from classification analyst to field auditor for Workers' Comp.  And I ended my career there as a staff accountant.

Q     But that was your only job prior to Sovereign Bank?

A     Yes.

Q     How many field exams would you say you participated in at Sovereign Bank, approximately?

A     Since my employment, I'd say almost 300.

Q     Are you familiar with Sovereign Bank's relationship with National Gold Exchange?

A    Yes.

Q    When did you first become aware of that relationship?

A    When I was employed with the bank, I was hired as an examiner.  So I was aware of some of the portfolio that we were auditing.  And I was aware that NGE was part of a precious metals group.

Q    Were you recently asked to participate in an audit of NGE?

A    Yes.

Q    As part of that audit, were you involved in verifying certain accounts receivable provided by NGE to Sovereign Bank?

A    Yes, I was asked to assist.

Q    Okay.  Let me ask you some questions about an account called Tudor Trust, if I may?

A    Uh-huh.

Q    Do you recall that particular account receivable?

A    Yes, I do.

Q    Tell me what part of verifying that account receivable you were involved with?

A    Sure.  On July 16th, I was requested to make a physical visit to an address in Lynn, Massachusetts.  I drove down to the property and viewed a residential

location which I obtained images of and sent to my manager.

Q    Do you recall the address that you went and viewed?

A    Yes.

Q    And what was that address?

A    36 Tudor Street.

Q    In Lynn, Massachusetts?

A    In Lynn, Massachusetts.

Q    And do you know if -- what were you told about that address before you went and viewed it physically?

A    I understood that that was a receivable account on NGE's A/R aging and it was something that they wanted assistance to confirm.

Q    So that residential address was the address of a customer of NGE; is that correct?

A    That's correct.

Q    Did you do anything other than visit the physical address of 36 Tudor Street, Lynn, Mass as part of verifying the account receivable of the Tudor Trust?

A    Yes.  I returned to my office and I performed a public tax review, using a public website to confirm that that was in fact the property I visited and that was the address.  And the information I provided indicated an image of the property, so it was confirmed and indicated

ownership as well.

Q    And who was listed as the owner of this property?

A    A gentleman named John Gray.

Q    So the owner of the property was not Tudor Trust?

A    Correct.

Q    Did you do anything other than visit the property and look at the online property records related to Tudor Trust?

A    Yes.  I was requested to perform a reverse phone lookup.

Q    Uh-huh.

A    I used a website called Intelius, which is a people search database.  I entered in a phone number that was provided to me by my manager, and the results were somewhat limited.  They just indicated it was a cellular phone number to a Plymouth County, I believe.

I was curious about the information because I was expecting to see something in Lynn.  So I paid an additional fee for additional information, at which time a name was provided as a result of that action.

Q    And what name did you receive in your report as being associated with the phone number you were provided?

A    It indicated the name Beverly Sverker, which I

provided to my manager once I had the information.

Q    And what were you told about the number that was provided to you to perform this reverse lookup on?

A    That that was the number for Tudor Trust.

MR. CRAWFORD:  Your Honor, I apologize. This document, I realized this afternoon, was not included in our binder.  I do have a copy of it. May I approach the witness?

THE COURT:  Do you have copies for opposing counsel?

MR. CRAWFORD:  I didn't realize until I got back after lunch, so I just have this one copy. But I'll let them look at it.

THE COURT:  Okay.  Why don't you let them look at it first.

MR. CRAWFORD:  Yes, Your  Honor. (Presenting document to counsel.)

THE COURT:  Okay, you can have the witness identify it.

MR. CRAWFORD:  Yes, sir.  Thank you.

BY MR. CRAWFORD:

Q    Rob, I've provided you a document which has not been marked at this time.  But do you recognize that document?

A    Yes, I do.

Q    Can you tell the Court what it is?

A    This is the Intelius report that was provided from the website based on my efforts on the reverse phone lookup.

Q    And what phone number did you use in that report?

A    The one indicated on it, the 781 area code, 361-2302.

Q    And was that the number you were provided as the number of Tudor Trust?

A    Yes.

Q    And who does that report show is registered to that phone number?

A    Beverly Sverker.

MR. CRAWFORD:  Your Honor, I'd ask that this exhibit be moved into evidence.

THE COURT:  Any objection.

MR. MCINTYRE:  No objection, Your Honor.

THE COURT:  Okay.  The Court will receive it as the Bank's Exhibit 37.  Is that correct, Marti?

THE COURTROOM DEPUTY:  Yes, Judge.

THE COURT:  Exhibit 37.  Let's get a tag on that.

MR. CRAWFORD:  May I approach the clerk

with it?

THE COURT:  You may.

MR. CRAWFORD:  (Presenting document to courtroom deputy.)

BY MR. CRAWFORD:

Q    At any point in your involvement in the audit, did you learn any further information about the Beverly Sverker that was identified in the Intelius report?

A    Yes, I was told that she is a consultant for NGE.

Q    And were you told what she does for NGE?

A    I understand it's computer consulting.

MR. CRAWFORD:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. MCINTYRE:  May I have a moment?  (Conferring.)  No cross, Your Honor.

THE COURT:  Very well.  You may step down, Mr. Flohr.  Thank you.

(Witness excused.)

THE COURT:  Now, Mr. Crawford, any further witnesses?

MR. CRAWFORD:  Yes, sir.  We would like to call Ray Cloutier to the stand.

THE COURT:  And Mr. Houtier?

MR. CRAWFORD:  Cloutier.  Sorry.

THE COURT:  If you could stand at the lectern.

THE COURTROOM DEPUTY:  Please state your name, spelling your last name for the record.

THE WITNESS:  Raymond Cloutier, C-l-o-u-t-i-e-r.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered by the courtroom deputy.)

THE COURT:  Okay, Mr. Cloutier, if you could have a stand -- excuse me, a seat in the witness stand, and adjust the microphone so that you can be heard.

RAYMOND CLOUTIER

being first duly sworn, was examined

and testified under oath as follows:

DIRECT EXAMINATION

BY MR. CRAWFORD:

Q    Good morning, how are you today?

A    Very good.  Thank you.

Q    Good.  Tell me your place of residence, sir.

A    721 Smithfield Road, in North Providence, Rhode Island.

Q    And who's your employer?

A    I'm self-employed.

Q    Do you ever work as an agent for Sovereign Bank?

A    Yes, I do.

Q    And how does that relationship come about?

A    I perform field examinations and also participate in testing of collateral on behalf of Sovereign Bank.

Q    Do you have a confidentiality agreement with the bank?

A    Yes, I do.

Q    Okay.  Tell me a little bit about your educational background after high school.

A    I graduated from Bryant College in 1987 with a business degree and that's where I stopped.

Q    After you graduated from Bryant College, just give me a brief overview of your work history.

A    For the last 21 years I have primarily worked in the banking industry.  I worked for banks directly for about 12 years and I've been self-employed for the last eight years.

Q    And during that time have you always conducted exams for banks?

A    Yes.  I performed field examinations for

Sovereign Bank, Fleet Bank, Bank of Boston in various positions, as well as being the audit manager.

Q    Are you familiar with Sovereign Bank's relationship with National Gold Exchange?

A    Yes, I am.

Q    When did you first become involved in that relationship?

A    I believe it was sometime late in June, actually, where Rob Flohr contacted me to schedule a regularly scheduled field exam at National Gold in August 2009.

Q    Did you contact National Gold about the regularly scheduled exam?

A    Yes, I did.  I contact Mark Yaffe through e-mail, and we set up a date of August 10th for the normally scheduled field exam.

Q    So you were initially scheduled to do a field exam on August 10th?

A    Right.  It was just a regularly scheduled exam that was scheduled to be performed, and confirmed with Mark.

Q    Other than this regularly scheduled exam which would be happening in a few days, did you have any other experience with this account?

A    Yes, I received a call from Rob Flohr July 9th,

asking me to go to National Gold to conduct an unannounced inventory test.

Q    Let me ask you some questions about that unannounced inventory test.  When did you arrive in Tampa for that?

A    I believe I arrived 4:00 o'clock in the morning on July 10th, and went to the company at approximately 9:00 o'clock.

Q    When you got to the company, did you request any documents to conduct the unannounced inventory?

A    Yes.  After meeting with Mark and speaking with Mark Yaffe, I, along with another examiner, asked him to provide a perpetual inventory listing as a basis of trying to conduct a physical inventory.

Q    What's a perpetual inventory listing?

A    A perpetual inventory listing would be a report that the company maintains that shows what inventory they have on hand, on premise.  And for control purposes, their control purposes, is what they use to control inventory on hand.

Q    Why is it necessary to have a perpetual inventory when you're doing an unannounced inventory check?

A    Well, it's the only basis that we can use to verify the inventory on hand.  In a normal field exam

situation we would request that documentation just to perform test counts as well.

So without any -- we don't know what inventory is on hand unless the company tells us what they have, for one. And they usually use those documents as the basis for reporting collateral to the bank. So we would normally request that information.

Q    On July 10th, were you provided a perpetual inventory?

A    No, we were not.

Q    Was anyone at Sovereign Bank, to your knowledge, provided a perpetual inventory on July 10th?

A    No.  Nobody was provided a perpetual inventory report.

Q    What, if anything, did NGE tell you about why they did not provide the perpetual inventory that day?

A    Well, we discussed with Mark Yaffe the possibility of trying to get a perpetual inventory report up, any kind of inventory report, any kind of report showing what inventory the company had on hand. And he explained he was having difficulties getting such a report because he was having IT problems, that he was trying to work on with his IT person located in Massachusetts.

He explained that there was some damage done to

his server, which prevented him from printing out any kind of reports related to inventory.

Q   As an examiner, did the inability of NGE to provide you a perpetual inventory cause you any concern?

A   Yes.  I mean it -- the perpetual inventory in this case had previously been referred to in all of the previous exams.  So it was something that was readily available and used in previous exams.  So when we were unable to get it now, it raised concern.

Q   When you arrived at NGE's facility on July 10th, did you have any idea of what businesses were operating out of that facility?

A   The only business I was aware of, prior to going to the company, was that NGE operated at that location.

Q   When you arrived, did any of NGE's employees inform you that there were any other businesses besides NGE operating there?

A   No.

Q   At any point in your examination during the unannounced inventory on July 10th, did you learn that there were other entities operating out of that location?

A   Yes.  At one point there was some shipments going out the back entrance of the building.  Mark had showed us some inventory that was going to be shipped

out.  And the other examiner I was with decided just to go take a look at what was being shipped out at that point.

Q    And just for clarity, when you say "Mark," do you mean Mark Yaffe?

A    Mark Yaffe, yes.

Q    Okay.

A    He showed us the inventory, some of the product that was going to be going out on this particular shipment and some other things as well.  But he was just showing us -- he showed us some products and gold bullion and silver products.

Q    So what did you observe when the other auditor -- sorry, when the other examiner started walking towards the back of the facility to investigate these shipments?

A    Oh, the other examiner just wanted to go see what was being shipped out.  And as he was doing so, I heard Alan Yaffe yelling at the other examiner, telling him,, "This is not your -- this is not your stuff.  You don't have any right to look at this stuff."

And I kind of heard that and he was mentioning some other words, but I was a little further down speaking with Mark.  I didn't hear all of the words that were discussed.  And he kept repeating, "This is not your inventory.  You can't look at it."

Q    What, if anything, was your reaction to that statement by Mr. Yaffe?

A    Actually, we were kind of very surprised. Again, at this point we believed that all of the inventory located at the facilities belonged to National Gold.  I didn't hear anything about any mention of another company.  He just said, "This is not your stuff."

And then the other examiner came back to the room, the one I was in, and said that Alan was quite upset about him looking at inventory and he mentioned it wasn't the bank's.

Q    At some point during that day, did you learn whose inventory it allegedly was in the back of the building?

A    Yes, we heard that -- we asked, "Well, whose inventory is it?"  And they mentioned it was Gainesville Coin's inventory, which was the first time that we were really aware of Gainesville Coin being there.

Q    What, if any, visible means were there -- sorry, strike that.

What way, if any, was readily apparent for you to tell whose inventory belonged -- what inventory belonged to NGE and what inventory belonged to Gainesville Coin?

A    There really wasn't any definition of whose

inventory belonged to what company.  I didn't see any names really on any packages or boxes.  I mean, there appeared to be inventory strewn throughout the facility. There was inventory on the floor, inventory on racks, inventory in safes.  You know, it looked like one central area of product that was just everywhere.

So we really didn't know.  You know, there was nothing defining the Gainesville Coin inventory.  While we were sitting in a small room, we for the first time noticed some small boxes that said Gainesville on the outside of the box.

Q    After you noticed these few small boxes, did you look around the facility to see if there were any other boxes labeled "Gainesville"?

A    Yeah, we tried to just try to -- we were just trying to get a layout of the facility in general.  I had never been to this company and just as a normal procedure you like to try to see how the company is set up, how it's laid out and, you know, where they're storing their product.

But, no, there was really no definition.  There were no signs.  The only sign that I was aware of was the NGE letters on the outside of the building.

Q    So based on your observations of the building that day, what percentage of the boxes and inventory that

you saw were clearly marked "Gainesville"?

A    It was only a very small percentage, just limited to the small amount of boxes that were in the small room that we were working in.

Q    And on that Friday, the 10th, were you allowed to count any inventory?

A    Yes.  Alan Yaffe and Mark Yaffe suggested that we start counting inventory in the small room that we had been located in.  We said, "Fine, we'll try to count some inventory.  We don't even really know what we're counting.  We have no records to compare these to."

So basically we were just trying to verify counts that were in the boxes in one room.  And that pretty much took most of the day.

Q    Can you describe the types of coins that you were allowed to look at for the majority of the day?

A    Most of the coins in that room were Sacajawea dollars, some Buffalo nickels, some Jefferson nickels.  That pretty much made up the bulk of the inventory in that room.  There were small quantities of Susan B. Anthony dollars and some dollar coins.  Other various U.S. coins.  They weren't really in boxes; they were kind of in plastic containers.

Q    So after that first day at NGE, did you return on Saturday?

A   Yes.  We came back on Saturday, July 11th, because it was quite apparent that we were not going to be able to complete our physical inventory on July 10th. There was no records to verify, and we had only counted a small portion of the inventory that was there.  But we at that point still didn't have any cost values for this inventory; it was just product that we were counting on Friday.

So initially Mark had declined to allow us to come in on that Saturday.  But late on Friday, early Friday evening, he decided to make the facility available on Saturday to do the -- continue the physical inventory.

Q   When you returned on Saturday, what, if any, changes in the facility did you notice?

A   It looked like the facility had been cleaned up significantly and a lot of the boxes were arranged and it looked a lot more neater -- more neat in the facility, as far as how the inventory was stored, and just how everything was left in the rooms --

Q   What if --

A   -- from the night before.

Q   What, if anything, were you told about this change in the kind of organization of the facility?

A   Well, Mark Yaffe explained that he saw the difficulty we were having trying to do the physical

inventory and he decided to call in some of his employees after leaving on Friday night to come back to the facility to "straighten out the place," were his words, to make it easier for us to identify inventory on hand.

Q    Did Mr. Yaffe say anything to you about actually coming in that night to continue business operations?

A    No.  He said that he really wanted to help us focus on completing our physical inventory and this was the best way.  You know, he wanted to help.  And, you know, obviously the boxes were a lot more better arranged at that point.

Q    On Saturday, did you receive a perpetual inventory from NGE?

A    Yes.  We received two perpetual inventory reports.  One report was for serialized coins.  These --

Q    Let me stop before we go any further.  For the Court's benefit and for mine, really, what's a serialized coin?

A    Well, that was the name of the report that he gave us.  Serialized coins in this case would be coins that were graded by a third-party grading company.  They would grade the coin, assign a grade to it.

The coin would be encapsulated in a plastic holder that's sealed.  And the grading company would also

assign a unique serial number to that coin. And most of these coins were the high-dollar value coins that the company kept on hand.

Q    So that's what other people have referred to as graded inventory?

A    Yes.

Q    Okay.

A    And he used primarily three grading companies to do that.

Q    Okay. Once you received -- I'm sorry, I actually cut you off. You said you received a serialized inventory report. Did you receive anything else to satisfy your request for perpetual inventory?

A    Yes. Well, the remainder of the inventory consisted of large quantities of coins that he considered bulk or raw inventory. These were lesser-valued coins on an individual basis, but they had a significant value in total.

These had large quantities of these, you know, small-dollar valued coins. And the report that he provided for that was one page of about 30 or 40 different items identified on this page. But it was called the raw inventory report.

I asked him if he had any further detail for this report, but he said this was the only report that he

can provide.

THE COURT:  What was the name of that report?

THE WITNESS:  It was the raw inventory report.

BY MR. CRAWFORD:

Q    So when you received this raw inventory report, what, if anything, did it tell you about the majority of the coins you had counted the day before?

A    Well, like I said, we were limited to a couple of areas and that being the Sacajawea dollars and some nickels, Buffalo nickels and some other assorted nickels. The Sacajawea dollars were valued at about approximately $2 million on this report.  And the Buffalo nickels were maybe $400,000 or $500,000 on this report.  But there was no detail on this report, which made it difficult for us to kind of categorize inventory.

Q    If you recall, how many Sacajawea dollars were listed on the report?

A    There was over 27,000 Sacajawea dollars.

Q    With that information, were you all able to complete your physical inventory on Saturday?

A    Yes.  On Saturday, there were four people actually conducting the physical inventory of the raw inventory report and I focused on the serialized

inventory report on that day.

Q   And what, if anything, did your counting of the serialized inventory uncover?

A   It was quite evident, soon after counting -- starting the count of the serialized coins, that more than half of them were not actually there.  They were outside -- they weren't there at the time at the company's premises.

Q   Can you -- if you recall, can you tell me about what the dollar value of the coins that were not on the premises were?

A   Approximately $2.7 million.

Q   What did you do when you found this $2.7 million in coins not at the facility?

A   Well, as I said, I think there was about 2,000 coins in total and about 1,200-plus weren't there.  So I asked Mark Yaffe, you know, where the missing coins could be.  And he explained to me that they were all out at a coin show with his employees.

Q   Did he tell you when the coins would be back for you to count?

A   Yes.  He said they'd be back either on Sunday or Monday, returned from the coin show.

Q   And did the coins return?

A   Well, yes and no.  On Monday afternoon, Mark

came to me and said he had the coins returned from the coin show and he said I'd be able to look at them now. He pulled out a box out of a briefcase and there was approximately 40 coins in a box.  And --

Q    And how many coins did you say were missing from the inventory?

A    It was probably 1,200 coins, serialized coins.

Q    What was the estimated value of the coins that returned from the show?

A    I did a full inventory of those coins and it was approximately $210,000 came back from the show.

Q    What did you do after you finished counting the inventory that returned from the show?

A    Well, I approached Mark and said, "Mark, you know, where are the rest of the -- where are the rest of the coins?"  And he stated to me that all of the other coins were sold at the show.

So I asked him at that point to provide invoices for these coins, you know, just to support the sales that occurred at the show.  And he said that he'd have to get back to me on that.

Q    At any point did Mr. Yaffe -- did Mark Yaffe get back to you about these invoices?

A    Yes.  Several hours later Mark brought to me copies of invoices that he stated represented all of the

show sales that occurred at the West Palm Beach Coin Show that was going on during our visit at the company.

And he explained to me that -- well, after he gave these invoices to me, I asked him if there was any kind of shipping documentation, any kind of signed documents from his customers acknowledging receipt of the coins or, you know, any other kind of documentation he could provide, a purchase order, to support these invoices.

And I just took it that these were sales, but he stated to me that he didn't have any additional documentation to support these sales because the coins were picked up at the coin show by customers and that they don't sign any documentation when they pick them up at the show.

Q   Let me ask you about one particular group of invoices that you received.  I believe they were invoices that listed the company receiving the consignment as Tudor Trust.  Do you recall those invoices?

A   Yes, I do.

Q   Could you open the exhibit binder in front of you and look at Tab 26.

A   (Locating documents.)

Q   Can you identify the documents in Tab 26 of the binder, sir?

A    Yes, these were the invoices that Mark gave to me as show consignment sales for Tudor Trust.

THE COURT:  You say they're show consignment sales.  Do you mean that these are the invoices for the sales that took place at the Palm Beach --

THE WITNESS:  Yes, Your Honor.  These were -- these invoices that he provided to me were invoices that he said were all related to sales that occurred at the West Palm Beach Coin Show.  And this was how he would explain the coins being missing from the physical inventory that I performed on the serialized coins.

THE COURT:  Okay.  So Exhibit 26, these are coins that it was represented to you had been sold to various miscellaneous individuals?

THE WITNESS:  No, these were sold to Tudor Trust.

THE COURT:  Oh, to Tudor Trust.  Okay.

THE WITNESS:  Right.  That is the --

THE COURT:  In one bulk, large purchase?

THE WITNESS:  There were, I think, three invoices --

THE COURT:  Okay.

THE WITNESS:  -- that Mark initially gave

to me.

THE COURT:  Oh, I see.  In fact, there are three invoices here.

THE WITNESS:  Okay?  And then afterwards, there actually was another invoice as well.

THE COURT:  Okay.  So just to conceptualize it, it was represented to you that at this coin show in which some 1,200 coins presumably were being shown for customers, that a large portion of them would have been sold to this customer, Tudor Trust?

THE WITNESS:  Yes.  It was a couple of other customers as well, but the Tudor Trust invoices represented the majority of those coins that were sold at the coin show.  There was a couple of other customers as well that were told to me as being consignment sales, related strictly to the coin show.

THE COURT:  Okay.  Now, you did use the word "consignment sales" before in connection with the Tudor Trust.  Does that mean that they were put on consignment with Tudor Trust, so Tudor Trust could turn around and sell them to third parties and then pay back --

THE WITNESS:  Yes.

THE COURT:  -- as opposed to an outright sale?

THE WITNESS:  Right.  That's exactly right.  They would give customers coins on consignment, in this case Tudor Trust, and this would allow Tudor Trust to sell the coins and then, you know, in fact in return pay -- it would be able to pay National Gold.

THE COURT:  Okay.

THE WITNESS:  And they would do that with some other customers as well.

THE COURT:  Okay.  Thank you.

BY MR. CRAWFORD:

Q    Ray, if you recall, do you recall what the total value of the consignment invoices to Tudor Trust that you were provided were?

A    Yes.  Approximately $1.8 million.

Q    And that's 1.8 of the approximately -- how much was approximately sold at the show, allegedly?

A    There was over $2 million sold at the show, because I had some other invoices as well that were given to me afterwards.  Because after going through every single coin on the initial batch of show consignment sales, I was still significantly short as far as reconciling missing coins.  And so then I learned there

were some other additional sales as well.

Q    So the Tudor Trust invoices, that represented the bulk of the inventory that was sent out on consignment from the show?

A    It was certainly -- yes, it was the majority of the coins sold at the show.

Q    Okay.

MR. CRAWFORD:  Your Honor, we'd tender Exhibit 26 into the record.

THE COURT:  Any objection of the Court's receipt of Exhibit 26?

MR. MCINTYRE:  No objection, Your Honor.

THE COURT:  Very well.  Sovereign's Exhibit 26 will be received into evidence.

BY MR. CRAWFORD:

Q    Ray, at some point, were you involved in confirming the validity of these invoices as other members of your examination team have testified to?

A    Yes, I was.  Since we really couldn't get any other documentation from Mark or the company related to these sales, just a normal routine procedure would be to try to perform some phone verifications with these types of sales.

So with Mark's permission, I asked him -- you know, first I asked him if we would be able to perform

phone verifications on any accounts that he told us were show sales. And he said, "Fine, that's not a problem."

Q   At any point, did you ask Mr. Yaffe to provide phone numbers or a contact phone number for Tudor Trust?

A   Yes, I did.

Q   What, if anything, did he tell you?

A   He provided a list of contacts of various customers and their phone numbers, including Tudor Trust. He wrote them down on a list -- a list on paper that I had given him previously and he wrote the contact information down.

Q   Do you recall the number that was provided for Tudor Trust?

A   Not off the top of my head but it was the number that he wrote down on the document that he listed as -- it was a Massachusetts number.

MR. CRAWFORD:  Let me -- Your Honor, if I could approach the clerk for Exhibit 37?

THE COURT:  You may.  What exhibit is this?

MR. CRAWFORD:  This is the exhibit we just --

THE COURT:  Okay, Exhibit -- which would be Exhibit 37.

MR. CRAWFORD:  37.

THE COURT:  Okay, thank you.

MR. CRAWFORD:  I apologize.

BY MR. CRAWFORD:

Q    Would you just take a look at that and don't comment about it to the Court.  If you'd just look at it for me?

A    Okay.

Q    Does that refresh your recollection at all --

THE COURT:  Speak from the podium.

MR. CRAWFORD:  Sorry, Your Honor.

BY MR. CRAWFORD:

Q    Does that refresh your recollection at all about the phone number you were provided?

A    I guess it does.

Q    Is the phone number you were provided the number that's on this report?

A    Yes.

MR. CRAWFORD:  Thank you, Your Honor.  May I approach the clerk to return the exhibit?

THE COURT:  You may.

BY MR. CRAWFORD:

Q    At some point did you attempt to contact anyone at the phone number that you just identified on Exhibit 37?

A    Yes, I did.  I was told that the contact person

for the Tudor Trust was a gentleman by the name of Charles Gray.  And then I proceeded to call the number that you just showed me.

Q    And what response did you get when you called that number?

A    After several attempts that really didn't get through to anything, there was no answering machine, someone did answer the phone and I explained we were just performing some verification on some accounts receivable balances and that I'd like to speak with Charles Gray.

Q    And what was the response when you asked that question?

A    The woman answering the phone said that Charles was with a customer right now, a client, and that he was unavailable to speak with me.

Q    What did you do then?

A    I asked her what her name was and asked if she'd be able to confirm the accounts receivable show sales that I received?

Q    And what did she say?

MR. SAXE:  Objection, Your Honor.  Same objection as before.  This is a hearsay statement made by an out-of-court declarant used to prove the substance of what's being said here in court.

THE COURT:  I think the attempt here is to

show that this person was in complicity or an agent of the Yaffes or the Debtor and thus, if this ties up, that will be an admission and therefore not hearsay.  The objection will be overruled.

BY MR. CRAWFORD:

Q    So what response did you get when you asked if this person could verify the invoices?

A    She said she could.  And I asked what her name was and what her position at the company was.

Q    And what did she tell you?

A    She told me her name was Suzana Burke and that she was the office manager of Charles Gray, Inc., located in Massachusetts.

Q    So she said you had reached a company called Charles Gray, Inc.?

A    Yes, she did.

Q    Did you ask her if Tudor Trust was also at that location?

A    I asked if Tudor Trust was at the same location or if she was affiliated with Tudor Trust and she said, "No, Tudor Trust is a client of ours."

Q    Did she tell you what address Charles Gray, Inc. was located at?

A    Yes, she told us that Charles -- she told me that Charles Gray was located at 36 Tudor Street, in

Lynn, Massachusetts.

Q    And was she able to confirm the show invoices?

A    Yes, she was.  She confirmed the three show invoices that I received from Mark Yaffe, without exception.  And she mentioned to me that she -- they actually were contingency sales is what we described to me, and that they had already sold approximately $500,000 of the July 4th invoice that I had asked her to confirm.

Q    What, if anything, did she tell you about the location of the coins on the invoices?

A    I asked her if the coins were located at 36 Tudor Street.  She replied they weren't, because they travel around the country and that the coins travel around with them, visiting various clients.

Q    At any point in your examination, did you have -- did you learn information that made you believe the person you spoke with was not Suzana Burke?

A    Yes.

Q    Tell me about that information, please.

A    Well, while I was going through the process of still trying to reconcile the inventory variances that I was coming up with, I noticed some billing errors related to the show sales, duplicate billings, and I approached Mark Yaffe to explain to him I was getting these duplicate billings from the invoices that he gave to me.

And at one point he explained that they were having problems with their billing -- the billing system related to show sales and that he needed to speak with his IT person, Beverly Sverker.

Q    Had you heard Beverly Sverker's name before this conversation?

A    Yes, I have.  Mark frequently referred to her on the first day we were at the company trying to -- she was the person that was trying to get us the perpetual inventory list and the inventory reports that we initially requested, and that he was conversing with her to try to do that.  So he kept referring to her throughout all of this.

Q    So you were led to believe Beverly Sverker was an employee of National Gold Exchange; is that correct?

A    An employee of National Gold, correct.

Q    And at any point did you speak with Beverly Sverker during this conversation with Mr. Yaffe -- with Mark Yaffe?

A    Yes, I did.  He actually put me on the phone with Beverly to discuss some of these billing discrepancies that we were coming up with.  And she explained that they were having problems with show invoices, and that this would be something that would be cleaned up by month's end, prior to it actually

happening.

Q   So when you spoke with Beverly Sverker on the phone, did you form any opinion on whether or not she was the same woman as Suzana Burke?

A   Yes, I did.

Q   And what was the opinion?

A   I believe I was speaking to the same person.

Q   At any point in your examination, did you come across any other reasons to doubt the validity of the invoices you were provided, of show sales to Tudor Trust?

A   Well, when I was reviewing the show invoices, I was cross-referencing the inventory report that I had received for the serialized coins.  And I was noticing coins that I counted on July 11th at the company -- or on July 13th at the company that were listed on the invoices that were presented to me as show sales from July 4th, July 10th and July 11th to Tudor Trust.

Q   So just so I'm clear, you received invoices that had coins on them that were supposedly shipped on July 4th, and other coins that were supposedly in Miami for this coin show --

A   Palm Beach.

Q   I'm sorry, in Palm Beach for this coin show, but were actually in the inventory you were counting at the company?

A    Yes.

Q    Anything else in these invoices you were provided that made you believe they may not be completely correct or valid?

A    Well, after -- like I said, initially, there was some invoices that were not given to me that were related to show sales.  And I initially received an invoice for Rifkin Management for approximately $131,000, which was given to me as show sales.

Afterwards, because of a billing discrepancy that I came up with, all of the coins that I had shown on a Patriot Trading invoice were incorrectly billed on their invoice.  And they actually should have been billed --

Q    When you say "billed on their invoice," who is they?

A    Patriot Trading was another show consignment sale that I was given initially by Mark Yaffe.  And I realized that they were not correct, because I received another invoice for Rifkin Management, an additional one for 391,000 that included -- that was related strictly to show sales.

Q    Uh-huh.

A    So now I had over $500,000 in show sales to Rifkin Management.  And after the difficulties that Mike

Ferrelli had in confirming the Rifkin Management balances, it became questionable in my eyes as far as the legitimacy of that billing related to the show sales.

Q    Did you find any duplication amongst the Tudor Trust invoices that made you doubt their validity?

A    Yes.  There was -- I initially received three invoices related to Tudor Trust, as I said.  And then subsequently I received another invoice that was for over $800,000.

When I started reviewing that particular show sale, I realized that the majority of all of those coins on that invoice had been previously billed on another Tudor Trust invoice that was already given to me.  So I brought that to Mark's attention and he recognized that the coins were -- they were billed in error as well.

Q    And are all four of those invoices behind Tab 26, just to clarify?

A    (Reviewing exhibit.)  Yes, they are, including a show invoice that he converted to a regular receivable as well, is included here.

Q    Now, let me move us forward a little bit in time.  At some point you're aware that Sovereign Bank obtained a writ of replevin and proceeded to exercise its rights and replevy the goods; is that correct?

A    Yes.

Q    Were you involved in that process?

A    Yes, I was asked to assist Navigant Consulting in that process.

Q    Okay.  Let me ask you some questions about that.  When you were conducting your original inventory, did you find any coins of a particularly high value that stuck out in your mind?

A    Yes, there were two coins that were valued over $200,000 and another coin that was valued at $550,000.

Q    What was the coin that was valued at $550,000, if you recall?

A    I believe it was an 1893-S Morgan silver dollar, with a grade of 64 or 65.

Q    And when you went into the facility as part of the replevin, what did you do in relation to that particular coin?

A    I tried to locate some of the higher value coins, just to see if they were still there, and I could not find the coin that was over $500,000.

Q    So what did you do when you couldn't find the most expensive coin in the company's inventory?

A    I let the bank know about it, that I couldn't locate some of those coins.  I also informed someone from Navigant that I couldn't locate that coin.

Q    Did you ever inform anyone at NGE you couldn't

locate the coin?

A   Yes, I spoke with Mark Yaffe about it the next day and asked Mark if he knew where the $500,000 coin was?

Q   And what did Mark tell you?

A   Mark initially told me that the coin was still on the rack in the work area.  I told him that it wasn't, I looked through it.  And then he remembered that the coin was actually sold the previous week.

Q   Did you ask who it was sold to?

A   Yes, I did.

Q   What did Mr. Yaffe, if anything, tell you about who the coin -- this $500,000-plus coin was sold to?

A   He said he could not remember who he sold the coin to.

Q   Okay.  Let me ask you a couple of other questions.  At any point during the replevin, did you become aware of an individual working for NGE named Eric Levinson?

A   Yes, I did.

Q   And tell me how you became aware of that?

A   I initially met Eric on the first day that we went to the company.  He was --

Q   Hold on.  When you say the "first day," do you mean July 10th?

A    I'm sorry.  July 10th, yes.  Eric was with Mark, and they were showing the other examiner and I some coins -- some gold bullion that was going to be shipped out on that day.  So I was first introduced to him then.

Q    And the materials you were shown, you were told were NGE inventory?

A    I was told that it was NGE inventory but not related to inventory related to the Sovereign Bank's inventory.  It was not Sovereign Bank's inventory, as I was told.

Q    At any point during the replevin did you learn any further information about Mark (sic) Levinson?

A    Eric Levinson?

Q    I'm sorry, Eric Levinson, my apologies.

A    Yes.  After the replevin had began, I happened to be working at the desk where Eric sat, just reviewing coins.

Q    How did you know it was Eric Levinson's desk?

A    I saw a picture of Eric there, along with just documents with his name on it.  And I saw him sitting there while I was at the company.  So I knew he sat there.

Q    Can you describe Eric Levinson?

A    Yes, heavy-set gentleman with a beard, a mustache, blondish hair, glasses.

Q    Is there anything else that occurred that would make you think Eric Levinson was an NGE employee?

A    Yes.  Actually, just the other day on Saturday, Eric was there assisting Mark, taking some equipment and supplies out of the building.  And he asked me if I knew the whereabouts of a watch that was held in an NGE safe.

He explained to me that it was grandfather's watch and it was just being held in the safe and it had a lot of sentimental value to him and how he would go about retrieving his watch.  I asked him -- I told him he should speak with Al Robinson of Navigant, and just kind of coordinate that and explain to Al how he could get his watch back.

Q    When you were sitting -- when you were working at Eric Levinson's desk during the replevin, did you find any documents that you thought were unusual?

A    Yes, I did.

Q    Can you tell us a little bit about that?

A    I found bank statements, cancelled checks, checkbooks for Eldorado Gold on his desk, along with correspondence related to Eldorado Gold and just a lot of information regarding Eldorado Gold.  In particular, like I said, bank statements and checks, checks he had written.

Q    What, if anything, did that lead you to believe

about Eldorado Gold?

A    It led me to believe that Eldorado Gold was operating out of this location.

Q    So in addition to Gainesville Coin and NGE, you now suspected that Eldorado Gold was operating out of that location?

A    Yes.

Q    At any time after you were sitting at Mr. Levinson's desk, did you learn any additional information about Mark (sic) Levinson that you thought was important?

A    Eric, yes.

Q    I'm sorry.

A    That's okay.

Q    My apologies.  Eric Levinson.

A    Yes, I did.  I was actually speaking -- I spoke with Mike Ferrelli afterwards and after he arrived back here yesterday, I believe, and just going over his actions related to making phone verifications.  He told me that a person's name he was given to confirm the Eldorado Gold balance was Eric Levinson.

Q    Let me ask you some questions about the replevin related to Gainesville Coin.  When you re-entered the premises, just tell me what occurred in regards to Gainesville Coin being in -- operating on the premises.

A    Well, after the replevin began, obviously there was a lot of confusion, and Alan Yaffe had made it known that a significant portion of the facility was related to Gainesville Coins.

Q    When you say "a significant portion of the facility," what do you mean by that?

A    The general work area that I believe was all related to NGE, he pointed out as being related to Gainesville Coin, along with several safes and the entire back portion of the building.

So when you looked at the area he was saying was related to Gainesville, it looked like it exceeded National Gold's space, as far workers go.

Q    When you were conducting your inventory on July 10th and 11th, what if anything did you believe was the area where Gainesville Coin may be operating?

A    Well, based on the confrontation that Alan Yaffe had with the other examiner, I believe that the -- and we both believed that the Gainesville Coin section of the facility was related to the back area, like a third or less of the building.  And I believe that's the area that Gainesville Coin was situated.

Q    At any time during that initial inventory, did anybody at NGE or Gainesville Coin attempt to clarify what area was Gainesville Coins?

A    No.

Q    At any point, did you become involved with the discussions with Gainesville Coin over what -- which of the coins onsite belonged to them?

A    Yes, I did.

Q    Tell me how you got involved with that?

A    Al Robinson, of Navigant Consulting, approached me in helping them assist, trying to differentiate Gainesville Coin inventory and National Gold's inventory, because I was involved in performing the physical inventory of National Gold, and thought I could assist them in that particular task.

Q    Well, tell me how that process went.

A    Well, I met with Mike Yaffe and Joe Yaffe and Corey Mata (phonetic).  They were the primary people involved with Gainesville Coins.  And I asked them if they could -- if they would provide invoices and proof of payment for any coins that Gainesville purchased.

Q    At any point, was Alan Yaffe involved in these discussions?

A    Yes, he was.  He expressed to me numerous times that -- he just pointed to general areas and he kept saying, "This is all Gainesville, this is all Gainesville."  And, you know, I was trying to work with his sons, Joe and Michael, to differentiate inventory

related to Gainesville.

Q    What, if anything, did Joe and Michael tell you about Alan's relationship to Gainesville Coins?

A    I asked them, both Mike and Joe, if their dad Alan was an employee of Gainesville Coins and they told me, no, he's an advisor to them, related to Gainesville Coins.

Q    What, if anything, did they tell you about Shirley Yaffe's involvement with Gainesville Coins?

A    I believe they said that she was -- she acted in the same capacity.

Q    Tell me, was there a category of inventory that was easy to differentiate -- a category of inventory that's easy to differentiate between what was Gainesville Coin and what was NGE?

A    Yes.  As I was working -- trying to work with Joe and Michael Yaffe and Corey Mata, and I was trying to assist them in trying to help segregate their inventory. And, like I said, we were trying to see if there were any bulk items that they had that I could easily distinguish as being related to their company.

I had a decent idea about certain product mixes that National Gold had, so I was trying to see if we could differentiate certain things that they had in their inventory that was definitely not part of, you know,

National Gold's inventory. And one of the categories of coins, for instance, an example would be Perth Mint coins purchased from Australia.

And so what we tried to focus is to get that stuff cleared away as far as -- I asked them for invoices and proof of payment for those coins and which they worked at getting for me. And so I was able to clear up some bulk coins related to them.

Q   How long did that process take?

A   That took a few hours to go through that process and --

Q   What about --

A   I'm sorry.

Q   Please finish.

A   No, I mean, you know, we took care of things that were obvious, things that were obviously not related to National Gold. And those are the kind of things that we cleared up first.

So I assisted them and kind of acted as an intermediary between Gainesville and Navigant, as far as Al's group controlling the inventory.

Q   After you finished with these easy things that just took a couple hours to separate, did you have any experience trying to separate the raw coin inventory that was onsite?

A     Yes, that was certainly more difficult to do. Raw coins, there were some categories of coins that appear to me both companies sold.

Let me just take a step back.  I re-asked both Mike and Joe Yaffe if they had any kind of inventory report, if they had, you know, a professional inventory listing or any kind of inventory report that could help us in this process.

I said, "It would be great if you guys had an inventory report, at least, you know, to kind of help us focus in certain areas of coins that belong to you."  But unfortunately, they didn't have any kind of inventory records of that nature.

So we were kind of left to manually going from coin lot to coin lot, trying to get vendor invoices to show that the -- you know, and proof of payment.

Q     So the lack of any inventory tracking on Gainesville's part made it difficult to separate the remaining coins?

A     Absolutely.  Yes, that was -- that would have helped us out considerably.

Q     What, if anything, do you recall about bulk coins that were presented by NGE as being their property during this separation?

A     There were a couple categories of coins, in

particular, that it appeared that both companies sold: Silver eagles, Presidential dollars and raw Morgan silver dollars, in particular. Those kind of inventory items on NGE's books were about $6 million as of, say, July 11th, so I knew those categories were going to be difficult to differentiate.

And the other category of coin would be the serialized coins.

Q   Okay. Let me take you back to the bulk coins then for just a second. At any point, were coins that NGE had presented as their inventory claimed by Gainesville Coin?

A   Yes. On the initial test count performed on July 11th of the raw inventory, there appeared to be Silver Eagles -- Silver Eagle dollars and Morgan silver dollars that were presented to us as being National Gold's inventory so --

Q   And then Gainesville, during the replevin, claimed that as their inventory; is that correct?

A   Yes. But they --

Q   Well --

A   I'm sorry.

Q   That's okay.

A   They were able to provide some vendor invoices for some of those coins as well. But they were just --

like I said, they were -- it was reported to us that that was National Gold's inventory previously, some of it.

Q    What was your experience trying to separate what you referred to as the serialized high-value inventory, the graded coins?

A    It was clearly more difficult.  There is a couple of reasons for that, one being Gainesville could buy coins in bulk, send them out to a grading company.  They get them returned from the grading company without any record of a serial number coming back.  Not having an inventory report from their side, to verify that, made that difficult.

The other thing that made it difficult for us in this process was we -- despite repeated attempts to get current inventory reports after July 11th, we really couldn't get our hands on that.  So we didn't really know what kind of activity occurred from July 10th or 11th to the date of the replevin.

You know, so we were kind of forced to, you know, make our own assessment of those things.  It's difficult to do so because, again, we didn't know what kind of inventory activity occurred during that break, in between the physical and the replevin.  So that made it very difficult.

Q    In your attempts to separate these coins, what,

if anything, did you conclude about Gainesville Coin and NGE's ability to clearly delineate their inventories?

A    Like I said, there were items such as the Perth Mint coins that are very -- they were very easy to distinguish, and they could provide documentation very easily on that.

Other coins were kind of in a gray area, as far as being able to say these are Gainesville Coins or these are NGE's coins, just because there are a couple of similar categories of coins that they both maintained. And, you know, we tried to get through as many as those as possible, if they could provide a vendor invoice and proof of payment.

And, if anything, I tried to be more liberal in taking their side on some of the things. I mean, if it was in a general area that some of the other coins are in, you know, I kind of accepted that some of that may have been related to Gainesville. But, again, they still have to provide vendor invoices and proof of payment.

Q    So were there -- have all of those coins, all of those serialized coins, have they been determined whose inventory they belong in?

A    No.  There's still some -- after the replevin -- while the replevin was in place -- it stopped on Friday, the 24th, I believe.  I was in the process of

trying to go through that process, and then I didn't revisit the company until this past Friday.

But Joe Yaffe and Michael Yaffe brought it to my attention that they kept some of those coins I was reviewing separate, to allow me to continue that process.

Q    So this is still an ongoing process?

A    Yes.  It wasn't completed.  We were trying to get -- like I said, it's more difficult for them to get invoices strictly related to the graded coins in all cases.  Some they may have had for quite a while.  I really don't know when they received them.  They can't tell me when they received them.  But they were continuing to try to work on providing invoices for that.

So most of the inventory related to Gainesville, with the exception of those graded coins, was removed after the replevin began again.

Q    Let me ask you another question about this process.  At any point, did you come up with any way to possibly overcome the lack of an inventory by Gainesville to make it easier to determine who owned which coins?

A    Again, I tried to consider the product mix, the coin mix, if you'd want to put it that way, between the two companies.  Based on what I saw with National Gold and based on my discussions, trying to work with Michael Yaffe and Joe Yaffe and Corey Mata, as far as -- you

know, just talking to them, trying to find out:  What are the coins do you sell?  You know, what do you primarily deal in?

Q    What, if any, other sources of information or other records did you think about could possibly assist you in determining which coins belonged to which company?

A    One of things, you know, I was aware of in speaking to Joe Yaffe and Michael, they told me they have a website that they sell -- they sell primarily most of their coins through their website and also on eBay is where they do most of their sales.

So I had -- like I said, I left, I rejoined the replevin on Friday.  And on Thursday prior to that, I attempted to just look on the website and see if I could see coins that they had for sale that I could download or print to see if I could help clear up their inventory for them so they can, you know -- because I knew I was going to be continuing that process when I returned.

Q    And what exactly did you do?  Describe to me what you did to --

A    Well, I just researched the various coins that they had as certified, serialized types of coins.  These are mostly American U.S. coins, consisting of silver dollars and gold $20 pieces that are considered rare coins that are graded, that they kept on their website.

I reviewed some of these coins and I also wanted to see if NGE's website had similar coins on their website.

Q    How many coins did you look at, approximately?

A    I looked at about just over 20 coins that I reviewed.  And the one thing I noticed on both websites was the same exact coin was on each of the websites related to these serialized graded coins,

Q    All 20 of the coins you randomly selected were on both websites?

A    The ones that I randomly selected, that's true.

Q    Can you look behind Tab 28 in your binder?

A    Yes.

Q    Can you tell me what that is?

A    That is the Gainesville Coin website.

Q    Is there anything else behind Tab 28?

A    There is a picture of a coin that I had reviewed online.

Q    Is there anything else in Tab 28 besides Gainesville Coin's website?

A    Yes, there's also a printout of the coins available on the National Gold website.

Q    Is that one of the coins that you looked at?

A    Yes, it is.  The coin that you see that is a picture of an 1889-O Morgan silver dollar, rated by PCGS,

with an MS-64 grade, this same exact coin was listed on both websites, for both National Gold Exchange and Gainesville Coin.

And it's the same exact coin because of a couple reasons:  One, the picture is the same but also the serial number related to this coin is on the picture, which is unique to that coin.  And that same serial number and the same picture was on both websites.

Q    Is there any part of Tab 28 that gives you a better comparison of the two coins?

A    Yes.  The last page of this half is a side-by-side picture of the coin that I took for an example in this case.  You can see that the same serial number is related on both coins.  The same exact coin, if you look to the top picture of the coin, you can see the same smudge marks and marks on that coin.

And, again, I just randomly selected, you know, 20 of these coins and they're all the same on both companies' websites.  I was really just doing this to help make it easier for Gainesville to segregate that inventory that I knew I had to go back and look at for them.

Q    At any point, did you try to go back and find these 20 coins you looked at and prepare a similar exhibit to Exhibit 28?

A    Yes, I went back to look at the website yesterday and all of the coins that I looked at pretty much were gone from the site; they're listed not anymore for sale on the Gainesville Coin site.  So they no longer exist on the site.

MR. CRAWFORD:  Your Honor, we'd ask that Exhibit 28 be moved into evidence.

THE COURT:  Any objection?

MR. MCINTYRE:  No, Your Honor.

THE COURT:  Exhibit 28 will be received into evidence.

MR. CRAWFORD:  No further questions at this time.

THE COURT:  Any questions of this witness?

MR. MCINTYRE:  No questions, Your Honor.

THE COURT:  Okay, very well.  Sir, you may step down.  Thank you.

(Witness excused.)

THE COURT:  Mr. Soriano, any further witnesses?

MR. SORIANO:  Yes, Your Honor. I'd like to call Mr. Al Robinson.

THE COURT:  Mr. Robinson, if you could come forward to the lectern, please, to be sworn.

THE COURTROOM DEPUTY:  Please state your

name and spell your last name for the record.

THE WITNESS:  Albert Robinson.
R-o-b-i-n-s-o-n.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered by the courtroom deputy.)

THE COURT:  Very well, Mr. Robinson, if you could please have a seat in the witness stand and adjust the microphone so that you can be heard.

ALBERT ROBINSON

being first duly sworn, was examined

and testified under oath as follows:

DIRECT EXAMINATION

BY MR. SORIANO:

Q    Mr. Robinson, would you, for the record, indicate where you reside?

A    I reside at 3212 Tanglewood Trail in Palm Harbor, Florida.

Q    And by whom are you employed?

A    I'm employed by Navigant Consulting.

Q    What is Navigant Consulting?

A    It's an independent consulting firm with about 2,000 employees, a public company, and part of the firm performs forensic accounting type services.

Q    And what is your position with the firm?

A    I'm a director with Navigant Consulting.

Q    And what are your responsibilities generally?

A    I handle investigations or engagements assisting counsel and clients in forensic accounting type services and investigations.  Also assist them in some cases in responding to subpoenas by conducting inventories of records and electronic records also.

Q    And would you, for the Court, also indicate your educational background?

A    I have a B.S. in accounting from the University of Baltimore, I am a CPA at State of Texas, I'm also AICPA certified in forensic accounting, financial forensics and also am a certified valuation analyst.

Q    And would you please give us your employment history after school?

A    I've worked with a couple major CPA firms, a tour in Viet Nam with the United States Army, returned back into public accounting, went into the FBI for 25 years, retired as the agent in charge of the Tampa Regional Office.  And then went with Nav -- excuse me, with Price Waterhouse Coopers for three years as a manager there, and then transitioned over to Navigant.

Q    And when you were with the FBI, what were some of the things that you did for the agency?

A    I did everything that the FBI handles but certainly that included white collar white crime investigations, fraud, bank embezzlements, those types of matters.  But also included kidnappings, extortions, civil rights, all of the jurisdictions that the FBI has.

Q    At some point in time, did you and Navigant get retained by Sovereign Bank?

A    Yes, sir.  Just about two weeks ago.

Q    And how was it explained to you?  What did they ask you to do?

A    Well, they advised that they were seeking a court order to seize the inventory and records of NGE, and that they were requesting our services to do an independent inventory and collection of all the inventory of coins as well as the records there.

And also that included the process that involved the computers.

Q    And did you set up procedures to do this?

A    Yes, sir.  I developed a work plan, following frankly the very kind of work plan we'd used in the FBI to conduct a search.

Q    Can you just briefly kind of just describe what those procedures are?

A    That would involve when you go on the site of taking photographs of the complete site before you get

started, taking and developing a floor plan of the site assigning a numbering system to all of the rooms, and in individual rooms or work areas to assign the numbering system to cabinets and other possible storage areas, and developing an evidence numbering system so that you could see from that numbering system where that evidence was collected.

Q    And in this particular situation, when it was collected, what was supposed to happen with the evidence?

A    Well, the original plan was to take and collect a coin, bag it and place seals on it, using supplies provided by Brinks, then the coin would be transported to Brinks.  The hard copy records, which was the second phase of the collection process, was to collect all the hard copy records and box.  Those we had originally just planned to bring back to the office.

As far as the computers are concerned, the court order said we could seized the computers, but also in the court order was a provision that rather than seizing, we could image those computers, and that was the process we also implemented.

Q    Okay.  And were you in charge of this process?

A    Yes, sir, I was.

Q    Okay.  Did you eventually put these procedures into practice?

A     Yes, I did.  But it was a meeting with the Sheriff's Department that had a slight modification.

Q     And what was that?

A     We had originally, in our work plan, figured that to speed up the process of collection, that we would go to cabinets and simply take a box of the contents in the particular cabinet or shelf.

But after our meeting with the Hillsborough County Sheriff's Department on the morning that we went on-site, the Sheriff's department advised that while they were in agreement with the work plan, they advised that they required that there be a detailed inventory including a coin count.

So that instead of going to a shelf or drawer and just taking and collecting it all and with the intent of itemizing the inventory later on, we were required on-site to actually prepare a detailed inventory, which we did.

Q     And did that change how long it took to go through that process?

A     Well, we met at the Sheriff's Department at 11:30 and we went onsite -- I believe were in the building at 1:30.  And in that time period, my colleague sitting in the back, Kevin Kwan had developed a system of scanning and Excel worksheets to be able to provide the

level of detail that we would need.

Q    But did the sheriff's requirements mean that you had to stay in there a lot longer than you had originally planned?

A    Yes, sir.  It was a much more detailed collection process involved.

Q    Okay.  Would you please describe the events of the morning when you went with the -- when you went with the -- I assume you went at some time along with the sheriff?

A    Yes, sir.

THE COURT:  What's the date we're talking about?

THE WITNESS:  That would have been July the 22nd.  The order was on the 21st and this was July 22nd.  Wednesday.

The target time was 1:00 p.m. for the Sheriff's Department to go in.  We had assembled in the rear of the building in a large parking area, all of our team.  And the Sheriff's Department showed up at approximately 1:00 o'clock but didn't get entry until shortly -- well, 15 to 20 minutes later.

During that time frame, while we were in back, members of my team began seeing people

literally running out of the back of the building. It was described to me they were running out of the back of the building with boxes, running to cars, throwing the boxes into cars and driving off.

I observed -- did not observe firsthand them running out of the back of the building. I did observe vehicles driving away very rapidly. One of the members of our team was able to take video and photographs of some of this activity that was taking place.

BY MR. SORIANO:

Q    What were the conditions of the premises when you went into the building?

A    We got into the building at approximately 1:30 p.m. and were confronted with a building that had been occupied for about 15 years and it was cluttered -- I think that's the right word, cluttered -- with shelves and tabletops covered with coin, office supplies, all kinds of materials.

To describe the space, we're talking about a one-story space in a strip shopping mall. This one-story space in the front entrance, front and back, had a triple door system for security purposes. Once you -- if you came in through the front you were confronted with a three room area which had now double doors to get into

the -- further in.

In that three room area was a conference room which I believe the audit team worked out of, the bank audit team, when they first went there.  There were other rooms that contained supplies and also coin inventory.

When you went through those double doors you now opened up to a very large area with rooms off to the right containing coin.  But as you looked out into this open area, what you saw were basically wire type shelves that lined the walls, wire type shelves that created in three different areas, one in opposite corners and then also one kind of in the middle, and those basically were shipping areas.

And outside of all those shipping areas were tables which basically served as desks.  You didn't see conventional desks with drawers.  These were tables.  And on the walls were reference materials and over 200 computers strewn around in the shelves that lined the area and also on the shelves that basically formed the areas where the shipping were.

So you had 200 computers on the tabletops.  As we walked around, we saw open coins -- coins laying around, coins under keyboards, under pads of paper, laying on the floor.

They had nine safes throughout the facility.

Some were open, some were closed.  As we walked around, we saw no signs identifying Gainesville at all, but we did see cluster areas where various people were working.

Q    Did you know about Gainesville going in?

A    I did not know about Gainesville.  When I walked in, however, the sheriff -- Sergeant Don Morris, who was in charge of the Sheriff's Department, informed me that he had been advised that a company known as Gainesville Coin, Incorporated was present onsite.

He had instructed me -- he said he had been instructed that Gainesville Coin was not a part of the court order and as such that we would be required to take whatever steps we cold to ensure that Gainesville could continue to operate.

So we were confronted with -- at that point we were confronted with the reality that -- shortly thereafter we realized we had a large number of employees -- I say a large.  The majority of employees were Gainesville employees and that these were people that were going to be allowed to continue to work as we tried to do the inventory.

Q    So did that create -- did that create any particular problems for you?

A    My immediate concern was just trying to get control of the space and get an understanding of where

the inventory was. I needed to understand how we could control movement, allow them to do business while we were able to gain control of the area so that we could do the inventory to collect NGE -- again the coin inventory, records, computer data and that sort of thing.

Q   And did you have difficulty sorting between the two companies?

A   It was an immediate challenge when I became aware of it. Alan Yaffe approached me and advised me his concerns for the ability of Gainesville to continue to operate. He indicated that they had sales, they had shipments that needed to be done and that he needed to be able to keep that operation going.

Q   Was Alan Yaffe the primary spokesman that you dealt with for Gainesville?

A   He was the spokesman for Gainesville. He did not identify himself as being an officer of Gainesville, but it was clear that he was the spokesman for Gainesville.

Q   Okay.

A   I did -- his wife Shirley was also on site. She primarily was seated in one of the shipping areas and from time to time I did have to deal with her. And she spoke on behalf of Gainesville with regard to coordination of different things.

Q   Okay.  Now, you indicated inventory.  I think you also mentioned computers.  Did you have the issue -- the same problem with the computers as to whose was what?

A   This -- being confronted with the fact that we have another company there -- it's difficult to visualize unless you were there to see.  There were virtually 200 computers in this facility, many covered with thick coats of dust, wires -- just hundreds, maybe thousands of wires going up into the ceiling and strewn all about, connecting all of these computers.

One of my immediate concerns, in getting control of the computers was, was there any possibility that someone offsite could get access to the computers and possibly manipulate data.

So shortly after we got in I was directing our computer forensics team to attempt to identify all the computers that supported NGE, to deactivate them which meant turning them off so they wouldn't be accessible from the exterior.

During that process, we quickly realized that Gainesville computers were strewn throughout the entire space.  They were not just all clustered together, they were mixed in.  There might be one Gainesville computer and twenty NGE computers in some areas.

Q   And who identified the specific computers for

you?

A   Ultimately it was -- because we were trying -- we were turning off computers and getting complaints from Gainesville, primarily from Alan, that we were disrupting his operation.

So we quickly -- we told them to identify their computers.  They basically took Post-it notes and walked around the space and we had their computers marked throughout the space.  They were throughout the facility.

Q   Did you do any due diligence beyond just a sticky tab on the computer to determine whose computer it was?

A   Yes.  Since our process was to image the computers, and since Gainesville had brought it to our attention that they had computers that were essential to supporting their operations, I got initially with Sergeant Morris with the Sheriff's Department and proposed a process whereby if Gainesville -- once they identified the computer, we would take and access that computer and determine if it was on the Gainesville domain rather than the NGE domain.

If our forensically -- if our forensic specialists were able to make that determination, that it was on the Gainesville domain, we did not image that computer and we left the computer on.  If we could not

verify that, we turned it off.

Q   Now, were there some computers that had been identified as Gainesville computers that when you went through this process turned out not to be Gainesville computers?

A   We had computers that they identified -- what complicated it is, some computers had little decals on them saying NGE.  And when our technicians were going around, if they saw that, they turned them off.  And that's frankly when the problems started when Alan Yaffe came over and said, "You've turned off my computer."  Our folks were looking at it and saying it's an NGE computer, it's got a marking on it and then he's surprised that's in support of their operations.

And so that's when I would -- in that instance -- in each of those instances, I'd have our forensic specialist make it a priority to look at those computers and verify that they were on the Gainesville domain.

And again, having said that, once -- we would then mark -- put a marking on that computer so we could say that it is a Gainesville computer.  And once we made that determination, we did not image that computer, it stayed on to support Gainesville operations.

Q   Did you encounter any evidence of people wiping computers, cleaning them up?

A     Shortly after we got onsite, within an hour of our getting onsite of July 22nd, we noted a laptop computer that was sitting in the immediate vicinity of Mark Yaffe's desk.  And Mark Yaffe sat in the very middle of this open area.  And behind him we later determined was a group of young men who basically worked for Gainesville and did a lot of phone calls and computers.

In that immediate area we found a laptop computer which, when turned on had the identity of Alan Yaffe, but when examined we determined that a wiping software had been applied to that computer and there was absolutely no data on the computer.

Q     Aside from Gainesville, did you find evidence of any other companies using those premises?

A     Yes, I did.  Initially when we came in, having previously described those events of when we were first arriving and boxes coming out of the back, once I got onsite, there was a large roller-type cart, a two-level cart.

And on this cart was a piece of equipment described as probably a two-foot square box which we later -- we later found -- determined that all of the property on this rolling cart belonged to ICG, the grading company which had an office across the -- in the rear of BGE, it was over in a -- excuse me, NGE.  There

was building across the parking lot where that company had their offices housed.

But here in this space on this cart was a machine that printed labels. And these are labels that go on these sealed containers in which these valuable coins were placed. And this -- you know, this is a grading company that evaluates the coin, as I understand it, and they place on this label their grading -- the grading for that coin and they place it inside this sealed container with the coin.

So we were confronted with -- this was -- we were advised that this was -- the materials that were being taken out of the building at the time we arrived had been placed on this cart.

We also had -- on the cart in addition to this machine, we also had a long -- we had -- the actual labels had been printed out in a very long strand. And they already had been printed out.

And on those labels -- I had been advised earlier that this rating system, this grading system that they use in the coin industry, that it goes up to 70 and the 70 is the highest grade. And what I observed there was these labels all printed out with the 70 rating which was the highest rating.

Also on the cart -- going back to those labels,

they were stick-on type, appeared to be, and they were sitting there with this machine. Also on the cart were a variety of coins in boxes in various containers on the two levels.

And I postponed dealing with that so I could get an understanding of what we had and what was significant with that. And my concern was from the briefings in trying to understand the industry before, that the grading companies, the value of these coins is really, to a great extent, based on the independence of these grading companies and their ability to grade these coins. So I sensed there was importance to this equipment.

Later on, we inventoried -- I had staff inventory everything that was on those carts. We photographed it. I had a lieutenant from the Hillsborough County Sheriff's Department -- I called him over to look at it.

He informed me that if it's another company's property and not NGE's, that we should make every effort to make a determination as to verify the ownership of the property and then return that property to them. In this case, Independent Coin Graders.

We went through the materials and we could see that in these boxes with coin there were documents that

had ICG on the invoices and there was also references to Home Shopping Network.

Having said that, we could tell there was a lot of ICG material -- identification materials here.  We had a young lady from ICG across the street, she came over the next day.  And when she came in -- her name was -- her nickname was Libby.  I have her full name in my notes if you would like those.

I interviewed Libby and she explained that she was a representative from ICG and she was coming over to get this equipment.  And she explained to me -- I was asking her how was this equipment in the space.  She explained to me that they have a work area there, which I later found.  We had blank checks and other supplies for ICG.

I also learned that ICG had a computer server located -- housed in that space.  And she explained to me that because there is better security in the building -- and also she said that -- she used the word "share."  They shared employees to do different things.  So she said this equipment was over there to process some product.

She also mentioned that ICG had had some type of construction project and it was more convenient to bring some of the equipment over to process merchandise.

But I guess the bottom line is, she was explaining that they were over there for some business and she needed to take it back across the street to their offices so they can continue operations.

Mark Yaffe approached me several times over those two days asking me to look at those items and see if we could satisfy ourselves that they belonged to ICG so they could continue to operate.

Q   Okay.  In addition to ICG and Gainesville, did you find any evidence of any other companies that were maybe located at those premises?

A   Yes, we did.  There was another company known as Eldorado, which we located records for Eldorado in a desk that was located in close proximity to where Mr. Mark Yaffe sat and it was located near one of the safes in the center -- off to the side near -- in close proximity also to where Gainesville employees sat.  And we recovered those records from his immediate -- from the immediate area where Mr. Levinson sat.  I did not meet him, however, until Saturday.

And on Saturday -- I probably need to explain. Mr. Mark Yaffe -- it was also -- we were advised by the Sheriff's Department that while we were conducting the inventory that employees of NGE were allowed to come into the space.  They could observe.  They were not to

interfere in any way.  If they attempted to interfere that I would ask the Sheriff's Department to intercede.

So having said that, on a daily basis I had Mr. Mark Yaffe come in and along with -- some of his employees came in from time to time to do business on the phone.  They stayed out of our way.

But with regard to Mr. Yaffe and Mr. Levinson, on Saturday Mr. Yaffe came in accompanied by Mr. Levinson.  This was the first time I had met him. Mr. Yaffe was there.  He wanted to get some office supplies.  He indicated they were setting up another office.  And I agreed to let him take some office supplies out.  It seemed pretty harmless.

At that time, Mr. Levinson introduced himself and he explained to me -- and I think Ray, one of the auditors for the bank was also in the area, he explained that -- Mr. Levinson said that he had this watch that was a family heirloom and he would like to get it back if at all possible.

I explained that it had been inventoried and we would make an attempt to resolve that later but right now it's in inventory.  I did ask him to give me some written documentation with regard to his request.  And shortly thereafter he handed me a one-page written memo requesting that his watch be returned at the appropriate

time.

Q    Did he identify who he worked for?

A    No, he did not.  Not to me.  He just said he was here in the space.  He was in the space.  He had worked back in that area.  I frankly at that time was dealing with some other gold coin trying to resolve some issues with Gainesville during that conversation.  Again, my focus was, you know, to answer his inquiry about this watch.

Q    Were you able -- was it difficult for you to distinguish the operations of Gainesville from NGE when you were in there?

A    Well, as I said, there was no signs identifying Gainesville in the entire area.  Interestingly, we went in on a Wednesday afternoon, had a lot of young people sitting in the middle.  And Alan and his wife and a group back in the corner and there was a little room off in the corner which appeared to be exclusively Gainesville.

But on Thursday when I came in, a lot of the young people were wearing Gainesville Coin shirts, t-shirts.  I didn't see those on Wednesday, but I did on Thursday.

Q    Did you remove any business records from the premises?

A    I have not removed any business records from

the premises.  They -- just to understand, the initial inventory was focused on coins and then the second phase of the inventory was to be on the records portion of the recovery.

Q    Okay.  You did remove some coins?

A    The coins, as we -- again following that work plan and working with the Sheriff's Department, that first week we were there starting on July 22nd, we removed coins through the ordinary -- in conducting our inventory, we would take and place them in Brinks-provided bags.  We would have the Sheriff's Department witness.  We would place seals on those bags and then Brinks would arrive.

We had a very detailed inventory that we were maintaining.  Brinks had their own worksheets to keep track of all the bags.  And so there was -- each day we were trying to have multiple pickups of Brinks taking these bags of coins over to be held at Brinks.

All of the transfer was witnessed by either Sergeant Don Morris or a corporal with the Sheriff's Department.  They were the two people assigned to be a part of the witnessing process.

Q    Now, the Court and counsel for the Debtor has expressed concern about being able to make sure they get a good inventory on what was taken out.  Do you have that

inventory or are you in the process of putting it together?

A    We have -- each time we had -- we shipped out bags, we have a very complete, detailed inventory describing all of the coins in each of those bags and I have made, every time we did a shipment, a completely new inventory prepared just for those items that were shipped out that day.

Q    Now, did there come a time when you ceased these operations?

A    That occurred on the Friday, I guess that's the 24th of July.

Q    And what happened then?

A    At approximately 4:15 I had a young lady and a young man walk up -- it seems like everybody is young nowadays -- but these two folks came up to me, advised they were attorneys representing NGE.

They presented me with a one-page document advising me that NGE had filed for bankruptcy.  They stated that our firm should immediately stop work, that we should not have any inventory, that we should leave -- take our own equipment and supplies and leave the premises.

Q    And did you do that?

A    We did that but we did have a transition period

because our computer forensics people had taken hard drives out of computers and it took them approximately an hour to be able to return those hard drives back into those computers and put the computers -- but that back together again.

Q    Okay.  And I gather there was a time when you were allowed to go back into the premises?

A    We did not go back into the premises until the following Wednesday.  I believe it was July 29th.

Q    Okay.  And when you back on the 29th had the premises changed any since you had been there the last time?

A    When we back in, we took photographs before, just like we did the first time.  We inspected the premises.  The bagged coin all appeared to be in the same locations.  We inspected every bag.  We did not see any evidence of tampering with those bags.

We did, however, have concerns -- we had -- there was a three-drawer cabinet or four-drawer cabinet located immediately behind where Mark Yaffe sat.  We had opened up the drawers and taken just photographs of what was inside, the contents of each of those drawers, just what was on top really.  And a concern was is that when we opened up the bottom drawer of that -- Mr. Yaffe's cabinet, we saw documents in the photograph but yet the

drawer was empty.

We made those photographs a little larger and what we found -- and I don't have them with me, but basically we had two documents that were dated in May of 2006. And one was a -- it was prepared by NGE. It was a document talking about some kind of a marketing strategy for a company -- and I don't recall the name -- it was some kind of Mid Partners or something like that.

And there was a second document and it just said NGE confidential memorandum also for this company or business. It was something with Partners on the end of the name. And I did not have any conversation with Mr. Yaffe as to what happened to those documents.

Q    Were there any other documents that you noticed missing?

A    It's my understanding that there were some documents with regard to Eldorado that were initially observed that are missing. I do not have detail on that. But those were the two areas where we were concerned that something had been removed.

Q    Okay. When you came back in after the bankruptcy filing on the 29th, did you -- were you doing the same thing or did you kind of change the focus of your investigation?

A    We continued -- our primary focus, of course,

was to continue to complete the coined inventory.  And we were trying -- that was our primary focus but now we were transitioning into our records inventory.  So we were -- that process similarly was going around and boxing up those records, assigning evidence numbers again based on location and then bringing those boxes into kind of a holding or assembly area so we could account for them.

Q    Okay.  How about something with the July 11 borrowing base?  Did -- were you starting to doing any work in connection with the borrowing base?

A    Well, yes.  Based on the hearing that we had last week, our focus was not only collecting the hard copy records but also to do some review of the records to see if we could address some of the issues there.  So a couple of things happened.  And I have some notes here that if I may refer to them will help me kind of explain some of the processes that we went through.

One of the processes was just to see if we could identify the different businesses that were there.  So I directed our team --

MR. MCINTYRE:  Your Honor, may I interrupt?  If the witness is going to be referring to his notes, I would ask that we be able to review his notes and make them part of the record in this proceeding.  Can we have them shown to the clerk and

make copies of them so we can review them, please?

MR. SORIANO:  The notes are to refresh recollection.  I'm not sure you're entitled to copies but certainly you can look at them.

THE COURT:  You're entitled to certainly review the writings that he relies on to refresh his recollection, to cross-examine him on those and to introduce into evidence any portions of those that you feel relate to the testimony of the witness.

Why don't we see what he actually relies on and then after -- Mr. Robinson, after you're done testifying, put over on the side the papers -- sheets that you refer to during your testimony and we'll let counsel for the Debtor look at those and then use those in cross-examination.  And to the extent helpful, they may be marked as an additional exhibit.

MR. MCINTYRE:  Thank you, Your Honor.

MR. SORIANO:  Thank you, Your Honor.

BY MR. SORIANO:

Q   Mr. Robinson, during the course of the investigation, going -- moving now towards the records, did you discover any significant documents?  Or at least documents that caught your attention?

A   Well, we focused on several different areas.

One area was that I tasked everyone as they went through the records to see if they saw other businesses located there. And they would make copies from the various documents.

Whenever we saw another business that seemed to have a relationship, either based on having the same address or else a P.O. Box.

So I have here a folder that I'm looking at and what I have in here is a variety of documents. As an example, this is a FedEx shipping document and it's to the CC Marble & Tile Company at the same address, the 14309 North Dale Mabry. It's the same address as NGE. That's a tile company.

I have another FedEx -- should I just pull apart the one page that I'm looking at?

THE COURT: If you need -- why don't you respond to specific questions rather than just go through a bunch of exhibits unless there's a --

MR. SORIANO: No. That's fine, Your Honor, and that's probably appropriate.

BY MR. SORIANO:

Q In other words, you found addresses and -- other companies' names at NGE -- the same address as NGE?

A Yes. And what we found were variations like National Coin. Instead of National Gold Exchange, it

would be National Coin Exchange.  We found a document that referenced NGE and Eldorado.

Q    Uh-huh.

A    And this particular document was this document entitled transition dialog.  And this particular document that I'm looking at was a document that we retrieved from the cabinets from Mr. -- that were located behind Mr. Mark Yaffe's desk.

This particular document caught my attention because this document basically appeared to be kind of an announcement that was intended to be made advising that National Gold Exchange was tied up in bankruptcy and they were going to start operating another company known as Eldorado Discount Gold, Incorporated.

I was aware based on the -- before I came onsite, of the borrowing base, and I was aware that National Gold Exchange was listed on the accounts receivable for NGE in that borrowing base.

So when I saw this document it got my attention because now here NGE is going to be operating under the name of Eldorado Discount Gold.

MR. SORIANO:  And for the record, just if I might, this is actually in Exhibit 29, Your Honor, that's in evidence.

THE COURT:  Right, I have that.

THE WITNESS:  Of course, what caught my attention was that the second paragraph had words to the effect that it was run financially independent of NGE therefore had not been affected in any way by the bankruptcy.  And I was already aware that Eldorado was on the accounts receivable and had a business relationship with NGE.

BY MR. SORIANO:

Q    It also indicates that this company Eldorado Discount Gold was previously a shortwave radio company?

A    A shortwave radio marketplace is the verbiage in the letter.

Q    Did you see any evidence of transactions between NGE and Gainesville that caught your eye?

A    With regard to Gainesville, what we saw were the P.O. Box -- we have several documents showing a connection between Gainesville, their P.O. Box, and another company known as University Coin, Incorporated, which used the same P.O. Box address as Gainesville did.

So we saw a connection there.  And we also saw a connection -- another document that we retrieved from the cabinets behind Mr. Mark Yaffe's desk concerning ICG. And this document was -- it was a three-page e-mail, I only had two pages of this document, but at the top of it it said, "Talking Points for Mark," and it was an e-mail

from James Taylor dated October 15, 2007 at 1:47 p.m. to Mark Yaffe and it says, "Subject:  Talking Points to Yaffe."

And the talking points basically on this two-page document describe essentially -- the summary is that Mr. Yaffe has acquired ICG.  And the verbiage in this, if I may read it, is suggesting that the fact that Mr. Yaffe has acquired this grading company, would have a significant negative impact, and presented a conflict in his ownership.  At least that's my initial interpretation of the wording in this document.

And the reason I say that was the very opening sentence which stated:  "You do not want to have the coin community know that you have owned ICG since February 10, 2003."  And he has a series of points -- bullet points here.

But down at the bottom he has a series of statements stating that -- giving the examples of coins being overvalued, significant overvalued, and then the very last point he states, and I quote:  "Assume you were doing this in order to secure bank loans."

Q    Mr. Robinson, would you look at Tab 19 in that exhibit book there and see if that document is in that exhibit?

A    Yes, sir.

Q    Behind that tab?

A    (Locating exhibit.)

MR. SORIANO:  And I'm going to ask Your Honor if we could have this admitted into evidence.

THE COURT:  Okay.  The Exhibit 19 consists of a number of pages.

MR. SORIANO:  And I don't know if we need anything more than this from that exhibit.

THE WITNESS:  Yes.  Let's see, I can go through here and count the number of pages.  It does appear in this document -- in here under Tab 19 -- let's see (counting pages).

It appears to be the 13th page under Tab 19.  And I'm looking at a two-page -- the two-page document appears to be identical to the document and it also has at the top my initials and the date of August 1, 2009 which is the day that I retrieved it from the cabinet.

MR. MCINTYRE:  Your Honor, if I understand, they're seeking to introduce into evidence this James Taylor e-mail for the truth of the matter asserted therein.  If that's the case, I would object on the basis of hearsay.

Mr. Taylor is not an employee of the Debtor, it's not an admission against interest.

I don't know who James Taylor is.  I don't believe the witness has established any foundation to demonstrate any of these statements are truthful and so as a result we would object to its admission.

MR. SORIANO:  It does appear to be a business record of the Debtor, at least kept in their premises.

THE COURT:  It's not a business record. The business record exception is meant to cover regularly conducted activities like -- this is -- just because you find something in a business and it's a record doesn't make it subject to the business record exception notwithstanding the name of the exception.

So it wouldn't come in under that exception.  The fact you find records in a business, unless they're from the Debtor where you can get them under the admission rule, doesn't make them non-hearsay, and I'm afraid this --

MR. SORIANO:  All right.  Then we'll withdraw our request to have this admitted, Your Honor.

THE COURT:  Okay.  So as we stand now Exhibit 19 is not in evidence.

MR. SORIANO:  Correct, it's not.

BY MR. SORIANO:

Q    Did you see anything in connection with the sale of computers from NGE to Gainesville, Mr. Robinson?

A    Yes, sir.  As we reviewed the records, we located -- I have two invoices here but I think we located others, but basically these are invoices, NGE invoices, selling computers to Gainesville on July 21, 2009 which is, of course, the day of the court order, the day before we went onsite.

Q    Okay.

A    The one invoice is for a total of 25 computers and the second invoice is for an amount of little over $2,000 and doesn't state the number of computers involved.

Q    Okay.  Did you review, in connection with looking at some of the books and records in connection with the borrowing base, transactions with A Mark?

A    Yes, sir, we did.

Q    Did you see anything unusual with the transactions based on your review of the documents?

A    Yes, sir.  We were doing the task -- in the short time we had, and again we were collecting records, inventorying records and at the same time attempting to do a review in the short time we had.

And knowing that A Mark was one of the major

customers listed on the accounts receivable in the borrowing base of July 11, 2009, I had tasked our team as we collected records to be looking to collect records concerning A Mark, and specifically the invoices that were listed on the July 11th borrowing base just to do a test.

And we identified an invoice in the amount of 58,000-plus dollars and we found the supporting documents to it. And what we found was that this here is -- that this was an invoice listed in receivables, a sale and as a receivable in the borrowing base, yet we also found a document where the day before NGE had purchased the product from A Mart and the next day they were selling it back to them.

That got our attention simply because it raised the issue of is it a legitimate transaction if you're buying a product from a company one day and selling it back the next. And I can provide more exact information on the invoice if I may refer to my notes.

THE COURT: Okay. Is this an exhibit?

MR. SORIANO: No, it's not, Your Honor.

THE COURT: Okay.

MR. MCINTYRE: If I understand, Your Honor, the documents that the witness has been referring to recently are not within the exhibit

book; is that correct?

THE COURT:  Right.  I'm not sure --

MR. SORIANO:  Some are.  In fact, I really should have -- when we were there, I should have cleaned it up.  Do you recall the one document that dealt with -- what was it -- not the talking points but the --

THE COURT:  The James Taylor e-mail?

MR. SORIANO:  No, not the James Taylor but the --

MR. CRAWFORD:  The transition dialog?

MR. SORIANO:  The transition dialogue.  Actually, that was excluded from --

THE COURT:  Right.  And then that came in.

MR. SORIANO:  I'm not sure that particular one came in.  I probably should have moved it when he was talking about it.  That's a habit of mine.

THE COURT:  Okay.  That's Exhibit -- is it Exhibit 29?

THE COURTROOM DEPUTY:  Right, you haven't moved --

MR. SORIANO:  Yes, Your Honor.

THE COURTROOM DEPUTY:  They haven't moved that second page in again.

THE COURT:  Oh, okay, I excluded that last

one.

MR. SORIANO:  Right, right.

THE COURT:  Okay.

MR. SORIANO:  And I should have at that point moved to have that put in.

THE COURT:  Okay.  Any objection?  That's the transition dialog that I previously excluded because the witness who had been testifying wasn't really the right witness to authenticate it.

MR. MCINTYRE:  Your Honor, it's obviously a negative statement.  It doesn't claim to have an author.  I mean, I would think if you were going to admit it over a hearsay objection, you would do it as an admission against interest, but --

THE COURT:  It doesn't have to be an admission against interest.  It just has to be a statement of an opposing party which, by definition, makes it an admission and can be used for any purpose.  All the predicate I need is that this is something that was created by the Debtor or someone in the Debtor's premises.

MR. MCINTYRE:  Well, the difficulty, Your Honor, is I don't think they can establish that it was created by the Debtor.  They found it, they say, in the Debtor's premises.  There's no author

identified.

I don't want to make a big deal of it as though we're trying to hide something. I hadn't seen the document until today. It seems to me that to admit it for the truth of its content is premature. Not to say that it -- you know, it's obviously not a flattering document but I don't think that they can demonstrate at this point in time that the Debtor actually authored that document or a representative of the Debtor authored that document.

THE COURT: Okay, very well. This document, as I understand it, was found by Mr. Robinson among the records of the Debtor when -- as part of his investigation. By its terms, the document itself appears to have been one created by the company, and the fact that it existed on the premises when Mr. Robinson took possession of certain documents on the premises does sufficiently authenticate it.

It, on its face, is an admission, that is it's a statement of a party opponent. And even though it's not signed, it clearly would be an admission and relevant. I will overrule the objection and Exhibit 29 will be received in its

entirety.

MR. MCINTYRE:  Your Honor, my initial point or question was the documents -- and that was sort of a sidetrack --

THE COURT:  Okay.

MR. MCINTYRE:  -- that the witness has been referring to, I was trying to determine where those are because I don't believe --

THE COURT:  Well, I'm not sure.  We started down the road that he was going to be referring to all these documents and then we got into this sort of rambling dissertation a little bit.  And I didn't really see there was anything he was referring to until we got into that -- was that Exhibit No. --

MR. SORIANO:  I think it was just the FedEx labels was about the only time that he really -- or he indicated people being mailing things was the only time that he referred to documents.

THE COURT:  Okay.  And does he -- the FedEx label is not a document in the exhibit book, correct?

MR. SORIANO:  Correct, it's not.

THE COURT:  So if he has that, if he could put that aside.

MR. SORIANO:  Sure.  We don't need to spend time with that.

MR. MCINTYRE:  I thought I also heard something about a bill of sale with regard to some computers.  That may have been in the book.  I just -- I wasn't there.

THE COURT:  He did actually.  That's another one.  If you could--

MR. SORIANO:  But I don't believe he was referring to a document when he said that.  I could be wrong, but I don't believe so.

THE WITNESS:  I did not -- I did not have the document.  I was just describing from my recollection of those documents.

MR. MCINTYRE:  Was that from the witness' notes or was that off the top of his head?

THE COURT:  No, he was -- he was describing that from his recollection of something he had previously seen, but nothing more than that.

MR. SORIANO:  Correct.

THE COURT:  What about the -- was it a Federal Express invoice?

MR. SORIANO:  Yeah, I mean there was some label -- I mean, some things that had been mailed in to NGE, I guess with other companies' names on it.

THE COURT:  I think, thought, that was the -- was that UPS or Federal Express?

THE WITNESS:  That was Federal Express, two documents, that I referred to.

THE COURT:  Why don't you put those aside and Mr. McIntyre can look at those.

MR. SORIANO:  Okay, so Mr. McIntyre can look at those.

MR. MCINTYRE:  With regard to the A Mark line of questions, where they're -- I mean, I know we have some invoices here but then we heard something about some backup with regard to the invoices, the day one sale, the day two repurchase, or acquisition and resale.

Are those documents -- I mean, frankly I'd object to the witness having a stack of documents and picking and choosing -- you know, referring through them while he's testifying and picking and choosing what we see.

It seems to me he should testify from his memory.  If he wants to rely on a document, let's go through document-by-document and he can show them to us.  It's a little unfair to --

MR. SORIANO:  No, that's a fair -- that's a fair comment and we will do that.  We'll just work

from memory.

THE COURT:  Okay.

MR. SORIANO:  But I would ask you then, if you would, Mr. Robinson, just put those away --

THE WITNESS:  Okay.

MR. SORIANO:  -- and let's just work from memory.  And if you can't remember, we'll just move on.

THE WITNESS:  Thank you.

BY MR. SORIANO:

Q    So but I do want to hear -- from memory, you seemed to say there was something -- you were -- something caught your eye about the transactions with A Mark.

A    And the focus of this was to -- A Mark, one of the accounts receivable, has a significant account receivable in the borrowing base calculation of July 11th.  So, just in dealing with all of these boxes of records, I attached our team to keep an eye out for A Mark, to see if we could locate these invoices.

And so in that process, we found a sale of an invoice that is listed on the accounts receivable as an accounts receivable on the July 11th borrowing base.  So we wanted to see if that is a legitimate sale.  So we found the invoice and, that is -- it's a sale by NGE to

A Mark for $58,000.  And there was a list of coins on that document.

We then found a purchase order.  My recollection is it was a purchase order for NGE where the day before they had bought the same coins, the same coins from A Mark.  So in looking at that, the question that I was raising in my own mind was:  Is this a legitimate sale and receivable when they had the -- they purchased the product the day before and they're selling back to A Mark the very next day?

MR. MCINTYRE:  Your Honor, I'm going to go out on a limb and if my objection is not well taken, I'll lose it gracefully but --

THE COURT:  Well, give it a shot.  You'll never know, Mr. McIntyre.

MR. MCINTYRE:  Your Honor, my recollection, sir, is that there's a best evidence rule.  This gentleman is testifying -- they've got a large book of exhibits, and Navigant Consulting is not known for its lack of use of paper.

We've used them ourselves and we find that they are very efficient and good at pulling together documents.  It's surprising to me that such a relevant document wouldn't be contained --

THE COURT:  I understand your objection.

MR. MCINTYRE:  And so we'll make an objection under the best evidence rule and move to strike the testimony.

THE COURT:  It's Rule 1002, which is requirement of an original to prove the contents of a document.  You need to have the original -- except under 1003 you can have a copy.  So it's the best copy rule, we'll call it.  Which does make sense. I mean, if he's going to testify about all of these documents, he ought to be -- he ought to have the documents.

MR. SORIANO:  Your Honor, I do apologize a little bit.  You know, part of this is we're doing a lot of this on the run and we've been in and out, so we can't put on the same kind of case that we might always like to.

THE COURT:  That's fair but, Mr. McIntyre is at more of a disadvantage than you are.

MR. SORIANO:  And that's fine.  That's fine.

THE COURT:  Objection --

MR. SORIANO:  And I have no problem with that.

THE COURT:  Your objection will be sustained.

MR. MCINTYRE:  Thank you, Your Honor.

BY MR. SORIANO:

Q    You also mentioned -- excuse me, you didn't.
But you've heard evidence about Tudor Trust.

A    Yes.

Q    Did you find anything when you were looking --
well, maybe I should just stay away from this altogether.
Never mind.  I'm not going to get into it, because there
are transactions, but we're going to be doing it from
memory as opposed to the documents, and so I'll just move
on.

THE COURT:  Well, some of this is getting
repetitive.

MR. SORIANO:  I know, it is, and --

BY MR. SORIANO:

Q    There's one other document I'd like you to look
at.  If you would look at Tab 20 in the exhibit book.

A    There's multiple pages.  Is there a particular
document?

Q    Yeah, I would like you to look at the first
document in Tab 20.

A    This is the exhibit identification tag?

Q    No, no, I'm sorry.  Behind the exhibit
identification tag.  Actually, you could look at all of
them, but they're all pretty much the same.  I'm going to

ask you, have you seen these documents before?

A    Looking at Broadcast Messages and I have not seen any Broadcast Message documents.

Q    Okay.  Never mind then.

MR. SORIANO:  I have no further questions, Your Honor.

THE COURT:  Okay.  Either Mr. Saxe or Mr. McIntyre?

(Counsel conferring.)

MR. MCINTYRE:  No questions, Your Honor.

THE COURT:  Okay, very well.  Thank you, Mr. Robinson, you may step down.  Does the bank have any more testamentary evidence?

MR. SORIANO:  Yes, Your Honor, one further witness.

THE COURT:  Okay.  You may call him.

MR. SORIANO:  Kevin Kwan.  Oh, excuse me.  Apparently, he took a little break.

THE COURT:  Okay.  I assume that's your last witness?

MR. SORIANO:  Yes, it is.  And it will be a short witness.

THE COURT:  And so it might make sense to take about a five-minute break.  Okay, very well.  Court'll be in recess.

THE COURTROOM DEPUTY:  All rise.

(Recess taken from 3:53 to 4:05 p.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court is again in session.

THE COURT:  Please be seated.  Mr. Soriano, you may call your next witness.

MR. SORIANO:  Thank you, Your Honor.  I'd like to call Kevin Kwan.

THE COURT:  Mr. Kwan, if you could come to the lectern to be sworn in.

THE COURTROOM DEPUTY:  Could you please state your name, spelling your last name for the record.

THE WITNESS:  Kevin Kwan.  Last name is K-w-a-n.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Whereupon, the oath was administered to the witness by the courtroom deputy.)

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  If you could have a seat, please, Mr. Kwan.  Thank you, sir.

KEVIN KWAN

being first duly sworn, was examined and testified under oath as follows:

DIRECT EXAMINATION

BY MR. SORIANO:

Q   Mr. Kwan, would you state your address for the record, please?

A   My address is 8901 Ashford Gables Court, Tampa, Florida.

Q   And by whom are you employed?

A   Navigant Consulting, Incorporated.

Q   And what's your position with Navigant?

A   I'm a director.

Q   And would you please explain to the Court your education, post high-school education?

A   Sure.  I have a Bachelor of Arts degree in Business Economics from the University of California at Los Angeles.

Q   And your employment history after college?

A   Subsequent to college, I joined Coopers & Lybrand and its predecessor firm which is not Price Waterhouse Coopers.  And in 2001 I joined Navigant Consulting.

Q   Okay.  And what's your position -- maybe you already said this, but your position in Navigant and your responsibilities?

A   Sure.  I'm a director in the disputes and investigations practice, supervise and provide expert

witness services in litigation support, financial

investigations, and forensic accounting type of matters.

Q   And were you brought in as part of the Navigant
team to help on the Sovereign NGE matter?

A   Yes, sir.

Q   And what were your responsibilities in that
particular engagement?

A   Working with Al Robinson, I was assigned to
collect, catalogue and secure the coin inventory.  I
supervised a team of up to 14 members throughout the
process.

In addition to that, I helped with the doc
collection, cataloguing and securing of the hard copy
documents as well as arranged and had the hard copy
documents copied.

Q   Did you do any financial analysis as well as
part of this engagement?

A   Yes, sir.  I was asked to do an analysis on the
7/11/09 borrowing base.

Q   Okay.  And how did you go about doing that?
What was your procedure?

A   Sure.  With respect to the borrowing base, I
was asked specifically to look at the consignment
inventory.  What I did first was digitize all of the
invoices from the consignment inventory.  I believe it

was $6.4 million.

And in order to do a thorough analysis, I also digitized the serialized inventory from 7/11/09 in order to create -- have a comparative basis for the coins that were on the consignment invoices.

Q   Okay.  And in doing that, did you come across anything interesting, intriguing, bothersome?

A   Yes, sir.  What I did was I compared all the serial numbers on the various consignment invoices to the serialized inventory as of 7/11.

THE COURT:  When we're talking about the consignment invoices, are we speaking of the -- there was a Mr. -- was it Cloutier?

MR. CLOUTIER:  Cloutier.

MR. SORIANO:  Cloutier.

THE COURT:  Cloutier.  Sorry, Mr. Cloutier.  He testified about the Tudor consignment --

MR. SORIANO:  Tudor and the Rifkin.

THE COURT:  -- at the West Palm sale. There were those and then there was a few -- a couple hundred thousand of other invoices.  And those have all of the exhibits.  Is that what we're talking about?

MR. SORIANO:  Is that, Mr. Kwan --

THE WITNESS:  I believe those Tudor invoices, Your Honor, are inclusive.

THE COURT:  All right.  There was -- in that, there was an exhibit that had four of those dated July 4th, July 10th, July 11th, and July 11th.  Those made up most of the West Palm inventory and then there was another couple hundred thousand.  Is that --

THE WITNESS:  The Tudor Trust made up, I believe, approximately 2-1/2 million --

THE COURT:  Okay.

THE WITNESS:  -- of the 6.4 million.  There were additional ones.

THE COURT:  Okay.  And so what you're doing is you're comparing -- I don't know what exhibit that was.  It's Exhibit 20 -- was it Exhibit 24?  No, that's --

MR. SORIANO:  26, maybe, Your Honor.

THE COURT:  26?

THE WITNESS:  If it will help, looking at it in perspective, Your Honor, looking at Exhibit 24 is the borrowing base calculation.

THE COURT:  Okay.  That's your serialized inventory.

THE WITNESS:  Well, within this borrowing

base, there are numerous components --

THE COURT:  I've got you.

THE WITNESS: -- one being serialized inventory, which is represented to be the inventory that's at the site.

THE COURT:  Okay.

THE WITNESS:  Two, being consignment. Other items on here being inventory offsite, meaning down in the Sarasota at NGC and et cetera.

THE COURT:  Okay.

THE WITNESS:  So my focus was to look at two aspects, the consignment value of 6.4 million, and then the serialized value, which I believe --

THE COURT:  Okay.  On the July 11th, which would be Exhibit 24?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Okay, so you've got a consignment inventory, and then you have the serialized inventory.

THE WITNESS:  Yes, Your Honor.

THE COURT:  And the serialized, again refresh my memory on that.  Is that -- were those items that were actually in the possession of NGE on July 11th on the premises?

THE WITNESS:  That's my understanding.

THE COURT:  Okay.  So consignment, serialized.  Is there any other component of inventory other than those two categories?

THE WITNESS:  I believe there was inventory at other locations, such as Sarasota, at NGC.

THE COURT:  Okay.

THE WITNESS:  and then I believe another part of the borrowing base is obviously going to be accounts receivable.

THE COURT:  Okay, I understand.

MR. SORIANO:  Okay.

BY MR. SORIANO:

Q    So did you come across any discrepancies in doing your analysis of the borrowing base?

A    Yes, I did.  What I determined was that five of the invoices on the consignment inventory were at the exact same serial numbers as on the serialized inventory.

So it appeared -- the same inventory appeared in at lease two different places, meaning that the borrowing base calculation overstated the actual inventory of NGE as of 7/11.

Q    And by how much was it overstated?

A    Purely on the value basis, approximately $2.8 million.  But if you apply the 55 percent consignment

formula, I think it works out to about $1.4, $1.5 million overstatement.

Q   Okay.  In addition to looking at the 7/11 borrowing base and those particular areas of it, did you also do some preliminary valuation work?

A   Yes, sir.

Q   And would you explain to the Court how you went about determining valuation?  I don't know if you're an expert in coin valuation, but for your purposes, if you could explain for all of us how you go about doing that.

A   Certainly.  I'll definitely qualify that; I am not a coin valuation expert.  But some of the inventory that we captured was very straightforward, very quantitative-based.  Meaning that there's a specific year of a coin, a specific type of a coin and a specific grade of a coin.

And there were numerous resource materials that were at NGE.  One, especially a 2010 U.S. Coin Book that actually Mr. Yaffe contributed to.  So we utilized this 2010 Coin Book to assign values to the coin inventory that was very clear had all the categories:  a grade, a description, a year, and put a value to those.

Q   And did you compare that value to the value that the company placed on that in doing its 7/11 report?

A   Yes, sir.  In certain instances, not all

instances, we were able to compare values that NGC had for a particular coin.

Q     NGE?

A     NGE, I'm sorry.

Q     We have too many -- we have way too many of these, I know.  And what were you able to determine in doing that?

MR. MCINTYRE:  Objection, Your Honor.  The witness is about to testify about the value of the inventory.  He's not put on a foundation that he's competent to reach such a conclusion and hasn't provided the supporting information that he would have reviewed to reach the conclusion had he been competent.

THE COURT:  Okay.  That's fair enough.  Let me, before we get into that, let's back up a little bit and --

MR. SORIANO:  Okay.

THE COURT:  -- help me and explain a little bit.  What numbers are we comparing or would you be comparing in your analysis?

THE WITNESS:  Certainly.  The one example, as I've given, Your Honor, is based on invoices from the Sarasota inventory.  There was an owner-declared value placed on one of the invoices for a specific

coin, a Sacajawea, I believe -- or a presidential coin. So we compared that owner-declared value, to a value that's in a 2010 United States Coin Book.

And this particular coin book, I believe it's a published book. There were numerous copies throughout NGE.

THE COURT: Okay. And do have an exhibit that shows the invoices that reflect the owner-declared value?

THE WITNESS: It would be the Sarasota invoices.

THE COURT: And is that -- that's the comparison we're making, correct?

MR. SORIANO: Yes. I don't think that's in the book. I think it's a component of the borrowing base but probably not the specific inventory and items.

THE COURT: Okay. But this then relates back to the July 11 borrowing base certificate? What you -- is that what we're talking about?

THE WITNESS: No, Your Honor. These are actually invoices that we collected while Navigant Consulting was onsite down at NGC. Which basically supported the inventory onsite.

THE COURT: Okay. I'm just trying to

understand what you're -- you can compare a coin book valuation -- and I'll get to Mr. McIntyre's objection on that -- with some owner-declared valuations. Are these in any exhibits or anything?

THE WITNESS: Not at this point, Your Honor.

THE COURT: Okay.

THE WITNESS: We've pulled it together in the last 24 hours.

THE COURT: Okay. So what your testimony would be is based on your review in the last 24 hours, maybe a spot check of some owner-declared values, in other words -- and what owner declared those?

THE WITNESS: I believe it's NGE documentation. It relates to NGE.

THE COURT: Okay. And you were comparing those on a spot basis with, you know, a treatise of sorts that shows coin values?

THE WITNESS: Yes, Your Honor.

THE COURT: And the purpose of that is to show some discrepancy?

THE WITNESS: The purpose really is to assign a value to the inventory that's on hand. But during the process of assigning the value, I noticed

the discrepancy.

MR. MCINTYRE:  Your Honor, I'd to supplement my objection and push my luck with the best evidence rule, or best copy rule, again.  To the extent that it's being represented that statements were made within certain documents and the documents are being referred to, to say what the numbers were, there's an objection to the use of those without the documents, and they say that they're in their possession.

I understand there may be a learned treatise exception to going to the coin books, but the coin books aren't being provided, and so there are several reaches, I think, that preclude the Court from accepting this particular line of evidence as fact.

THE COURT:  I think Mr. McIntyre's objection is well taken but let me just lay out what the issues are, and then if you can overcome them that would be fine.

First, the objection is that the witness is testifying generally from memory about some spot-checking he did which does appear to violate the best evidence rule, which we usually don't refer to but if you're trying to prove the content of a

writing, you usually at least need a copy of the writing so we can make the comparison.

The other objection relates to the use of the market reports.  Market reports are admissible and an exception to hearsay but you need a predicate that this particular one is one regularly relied upon by people in the industry coming up with the market values.

MR. SORIANO:  That's right.  So we'd better just -- I'll just go with the borrowing base is how many millions understated --

THE COURT:  Okay.

MR. SORIANO:  -- and leave it at that.

THE COURT:  Well, you --

MR. SORIANO:  And sit down.

THE COURT:  Yeah, and you stick with your -- the silent stuff, right.

MR. SORIANO:  I'll sit down.

THE COURT:  The objection will be sustained.

MR. SORIANO:  No further questions.

THE COURT:  Did you say no further questions?

MR. SORIANO:  Yes, I did, Your Honor.

THE COURT:  Oh, okay.

MR. MCINTYRE:  No questions, Your Honor.

THE COURT:  Okay.  Well, thank you, Mr. Kwan.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You may step down.

(Witness excused.)

THE COURT:  Okay, very well.  Anything else by way of testamentary -- is that the right word?  Testimonial.

MR. SORIANO:  Testimony.

THE COURT:  Testamentary has to do with probate, that's the wrong court here.

MR. SORIANO:  Yeah, we don't want to talk about that here.

THE COURT:  This is testimonial.

MR. SORIANO:  No, Your Honor.  That's all the -- our case.

THE COURT:  Okay.  And any other documents?  Do you have all the documents?

MR. SORIANO:  We should, I guess, put the loan agreements.  We never put them in evidence and I'm told there's no objection.

THE COURT:  What are the numbers on those?

MR. SORIANO:  Those are 1 through 13.  I also note that we've talked about, in a round about

way, Document 14, which is a letter from me to Mr. Saxe proposing the forbearance agreement. And Document 15, I believe, is his response.

THE COURT: So 1 through 13? That was your first set?

MR. SORIANO: It's 1 through 13, yes, is our first set.

THE COURT: Okay. Any objection to 1 through 13?

MR. MCINTYRE: No, Your Honor.

THE COURT: Okay. Without objection, 1 to 13 will be admitted into evidence. And then did you want to do 14 or 15?

MR. SORIANO: 14 and 15.

THE COURT: Any objection to those?

MR. MCINTYRE: Your Honor, two objections. One would be relevance and two, to the extent that they are negotiations surrounding a forbearance agreement, it seems to me there would be settlement offers which would be precluded from being admissible on the objection of a party. I don't see where they're relevant anyway.

THE COURT: They're also hearsay.

MR. MCINTYRE: And they're also hearsay.

THE COURT: All right. We'll sustain

those objections.

MR. SORIANO:  Okay, that's fine.  I guess we could take judicial notice -- this is really more for probably a later motion, but Document 16 is a pleading by Mr. Saxe on behalf of Gainesville Coins, Inc.

THE COURT:  Okay.  That would be an admission.  I'd take judicial notice it was filed in the Hillsborough County Court.  I guess that's not a --

MR. MCINTYRE:  I don't think it's relevant, Your Honor.

THE COURT:  The question is relevance.

MR. SORIANO:  It's not really -- you know, the thing is it's not going to be so much relevant to this, and maybe we don't even to worry about it, but it will be as to the application.

THE COURT:  Okay, and I'll sustain -- yes, you've got to remember to move to admit it whenever it's relevant.

MR. SORIANO:  Keep my matter --

THE COURT:  For purposes of this hearing, the objection will be sustained.

MR. SORIANO:  All right.  I'm not sure how many of these we've gotten in.  Have we got in 17,

which is National Gold Exchange's financial statements?

THE COURT: I don't believe that's in?

THE COURTROOM DEPUTY: No.

THE COURT: Any objection to 17?

MR. MCINTYRE: Your Honor, they haven't been authenticated. I haven't had a chance to review them, and I don't think anyone's provided any testimony with regard to them.

THE COURT: Okay. What was the source of these -- if these are --

MR. SORIANO: I think Ms. Sousa talked about these a little bit. I think she testified as to some of the financial affairs but she didn't -- I don't know if she referred to this or did it from memory. I think --

THE COURT: Is it --

MR. SORIANO: Well, I'll withdraw the request. That's fine.

THE COURT: Okay, very well. 17 will not be admitted.

MR. SORIANO: I'm not sure now of these others. I have not -- I didn't keep good track of where we are with these other documents.

THE COURT: 18 is not in.

MR. SORIANO:  18 is not in?

THE COURT:  Correct.  Is that correct, Marti?

THE COURTROOM DEPUTY:  Right.  The next one that's in is 26.

MR. SORIANO:  Okay.

THE COURT:  Why don't you go through those and see which, if any, of those that you need to have in evidence.  Some of these we never referred to.

MR. SORIANO:  True.  And probably, if that's the case, I don't think we do need them.  (Reviewing documents.)  I don't think we need any others, Your Honor.

THE COURT:  Okay.  So, Marti, just to sum up, what are the other exhibits that are in evidence?

THE COURTROOM DEPUTY:  No. 26, No. 28, 29, 30, 31, 32, and this one, 37.

THE COURT:  Okay.  Does that take care of it?

MR. SORIANO:  Yes, that's sufficient.

THE COURT:  Okay.  Mr. McIntyre or Mr. Saxe, do you have any testimonial evidence or documentary evidence that you'd like to introduce at

this time?

MR. MCINTYRE:  No, Your Honor.

THE COURT:  Okay, very well then.  Then let me hear argument from the parties and interested parties, starting with the movant.

MR. SORIANO:  There are two movants, but in the case of -- in connection with our motion, Your Honor, I hope that we've made a sufficient case to explain why we had concerns in the first instance.  To back up what we said at the very first hearing on this, that we had concerns going in to get our writ in the first place, that we had grave concerns about returning inventory to the Debtor-in-Possession and making sure that we were able to maintain the books and records, or at least copy them.  Because you can see that there's still a lot of loose ends in this case.

I mean we're not even close to knowing all the facts here.  And frankly we weren't able, given the time constraints and given what we know, to even provide more evidence.  I mean, there were a lots of leads that we have, but we're not able to prove them all today.

But clearly there's enough evidence here of mismanagement, of danger with -- I mean, with

commingling of personnel, records, assets, to jeopardize our interests, certainly, in this bankruptcy case, and I think frankly support the appointment of a Trustee.

I think it's significant today that Mr. Yaffe is not here. We noticed the deficiencies in the initial filings, also it would affect assets. The records are incomplete. We don't have accounts payable. The bank feels -- would feel gravely at risk to turn the matters over. And I think somebody, a neutral party, is going to have to come in and look at this situation.

If you look, we have situations with Gainesville where, certainly operationally there's some overlap. We have interests of the principals of this company having at least some interest -- whether it's through their children or through their control of that entity. We have Eldorado, and we have a lot of concerns here. And I think when the dust settles, we're going to find out that this is a very bad situation, certainly for the bank.

So I believe we've made a sufficient case to excuse turnover and to convert this case to a Chapter 7. If you notice, there's been no notice for adequate protection to use cash collateral,

excuse me.

The Debtor, as far as I can tell, I think the evidence to some extent bore this out, really doesn't have any operations once we went in there. It looks like that locale is being operated by Gainesville much more than National Gold.  So the only argument I guess is, "Allow us to liquidate your collateral for you, we'll do a better job of it."  Well, we have a feeling that they frankly have been doing that for awhile and I'm not sure it's good for us.

I did find intriguing, or at least interesting, the idea of the equity of one of these shareholders being placed -- there's a possibility under a plan.  I don't know if that was extended for both shareholders or not; Mr. Alan Yaffe as well as Mark Yaffe.  We don't know if there's much equity in Mr. Mark Yaffe's home, there may be Mr. Alan's, but I'm not even sure that's been proposed.

But I think even if that were the case, with all the problems going on with this company and I would have to say mismanagement, I think we've made a case for -- to excuse turnover and to convert this case to Chapter 7.  And in the event you didn't, you certainly could consider a Chapter 11

Trustee.  And I think if you weren't going to do that, you'd almost be required under the statute to appoint an examiner.

But I do think it's going to save us all a lot of time and energy and expense if we go right to a Chapter 7 Trustee and let this -- let the Trustee investigate.  They're not proposing to do anything except liquidate anyway.  And certainly there are people out there who know how to sell coins if we have to retain -- or if the Trustee has to retain one.

So we would ask, Your Honor, to grant the relief right now, I think, and just convert the case to Chapter 7.

THE COURT:  Okay, think you.

MR. MCINTYRE:  Did the other moving party want to make their argument as well, then I can respond to both.

THE COURT:  Okay, Mr. DeCailly.

MR. DECAILLY:  First of all, Your Honor, one of the motions up is to shorten time.  There is a requirement to -- for motions to convert.  And I believe that our motion, as short as it was, I believe that -- first, I'd ask the Court to consider allowing us to shorten time and to, for lack of a

better term, legitimize today's argument.

THE COURT: Certainly. I will consider the time constraints to be pressing and will not base my ruling on the shortness of time but on the merits.

MR. DECAILLY: Thank you, Your Honor. The next thing is, is we have to look at what the secured creditor is asking versus what we're asking, which is essentially the same thing but in reverse. But if we're looking at the types of relief requested, from an unsecured creditors' standpoint, we have to look at costs.

We believe an examiner is out. An examiner is going to cost a significant amount of money to do what the bank has already done. And if the examiner determines that it must be a Trustee or converted, I don't believe that examiner can serve as the Trustee or the Chapter 11 Trustee or a Chapter 7 Trustee. So there is another person and more administrative expenses that makes the determination and moves on.

That narrows us down to just two: Either doing a Chapter 11 Trustee or converting to Chapter 7. Certainly, a Chapter 11 was first in our motion, not because that's preferred, but because

based on the infancy of this case and based on not having this hearing yet, I believe it was a bit premature to be jumping right to Chapter 7.

Obviously, the secured creditor had the benefit of their books and all their records and their excellent investigation team.  I did not.

So if you go through mismanagement, we start with the condition of the premises, the IT problems, the commingling of the assets with Gainesville Coin, with ICG.  They couldn't even provide either entity, Gainesville Coin or NGE, a basic inventory report.

Your Honor, I could tell you that I don't know how one stays in business if they don't know what inventory they have on hand on a daily basis, if not on a weekly basis.

So certainly their inability to meet basic reporting requirements from Business 101 certainly does not give creditors a good feeling about their ability to go forward and manage their own affairs even under the supervision of the Court.

Now, while the Eleventh Circuit has been sort of silent on the issue of appointment of a Chapter 11 Trustee, the Southern District of Florida, in the Sun Cruz Casino, LLC case, at 298

B.R. 821, has also given us additional cause.

If you set aside the fact that they didn't observe basic business practices at NGE, but there's certainly a conflict of interest with the principals has arisen.  There was testimony today that there appears to have been at least $2 million worth of checks written to Mr. Mark Yaffe from 1/1/09 to 7/22/09 and then another million four to American Express.

That certainly creates a conflict as to we really wouldn't expect -- one cannot expect the principals of the Debtor-in-Possession to investigate themselves and bring adversaries against themselves for possible fraudulent conveyance of assets.

So then we must go down -- then we ask the Court then again to consider the unsecured creditors' position that, okay, if we do a Chapter 11 Trustee, how much money is that going to take away from the unsecured creditors?  Because basically the Chapter 11 Trustee is going to do what I believe, and the secured creditor believes, is doing what NGE was already doing, liquidating.

But, unfortunately, NGE was liquidating through NGE, through Gainesville Coin and then

proliferating the rest of the inventory through the Tudor Trust, Rifkin Management, Independent Coin Grading and A Mark. So they were already in liquidation.

So in the interest of the unsecured creditors, which I represent one of those, who stand to get nothing or very little, we want to keep administrative expenses low. And the best way to do that is just simply to convert this to a Chapter 7.

And I don't think we need to kid ourselves that a Chapter 11 Trustee is going to able to come in here and do anything but liquidate. So we might as well go on down to the Chapter 7 and get this thing converted.

And I believe, as further support, I believe Mr. Saxe might have hit the nail on the head. They had an opportunity to work this out with the bank. But one of the sticking points was all the reporting requirements on a monthly basis that the bank wanted them to perform.

There are also the same or similar reporting requirements in a Chapter 11. So if they weren't willing to work it out with the bank, I don't foresee us getting forthright and on time reporting from the Debtor-in-Possession in a manner

either with a Trustee or without a Trustee because a Trustee is going to have to rely on, in some respects, to the Debtor to get through things.

So we ask the Court to grant this motion, our motion, for conversion to Chapter 7. We ask the Court to consider it today.

THE COURT: Okay, thank you, Mr. DeCailly. Anybody else? Yes, let me hear from the U.S. Trustee.

MR. WILKES: I will be extremely brief, Your Honor, because I think both the secured creditor and the unsecured creditors have stated the crux of the issue. This case came into court quickly and it quickly needs to be converted.

The evidence that has been put on is extreme allegations of fraud, dishonesty, incompetence of the personnel, misconduct and mismanagement of the business. The unsecured creditor raises the right issue, that you're at the point right now under statute that an examiner is needed to be appointed in this case. That's including another layer of administrative expenses.

You've also go the possibility, considering how Your Honor rules today, that an examiner isn't the right one, a Chapter 11 Trustee

is.  But there is also the realization that the quickest way to the end result is through the conversion of the case under a finding of 1104 and 1112(b), that conversion is appropriate and is in the best interest of the estate, as well as all the creditors.

And in this, what we've seen so far, Your Honor, although this is only a week-and-a-half-old case, that this case needs to be in a Chapter 7. And that's -- the United States Trustee's position would supporting that of conversion to Chapter 7.

THE COURT:  Okay.  Well, thank you. I appreciate that, Mr. Wilkes.  Mr. Farfante?

MR. FARFANTE:  Your Honor, I too will be very brief, but we represent two parties: ScotiaMocatta is the first party.  We don't believe they're even a creditor in this case, but they had precious metals at NGC, which we believe we swept up in the replevin action.  And I hope to continue our dialogue with Mr. Soriano's office and Mr. McIntyre's office about making sure that property, which is ScotiaMocatta's, goes rightfully back to them.

THE COURT:  How much is it?  What's the value?

MR. FARFANTE:  They believe it's approximately $1 million worth of coins.  But that's the NGC -- that's the Sarasota facility that was testified about earlier.

THE COURT:  All right.

MR. FARFANTE:  And we also represent Republic National Business Credit.  They are alleging a purchase money interest in certain coins.  There was some testimony earlier about them as well.

They retained us late last week and are just getting up to speed on all of the developments and the motions, so I don't have a position from them.  But I just wanted to give the Court our representation.

THE COURT:  Well, I'm sorry.  What's your position?

MR. FARFANTE:  They don't have a position on conversion.

THE COURT:  Oh.

MR. FARFANTE:  Obviously, I think with the examiner, they share the concern about the cost of having the examiner appointed.

THE COURT:  Oh.  So you're neutral on the relief?

MR. FARFANTE:  Yes.

THE COURT:  Okay.  Ms. Mora, are you still there?

MS. MORA:  Yes, Your Honor.  It has been very entertaining to listen to it at this end.  Your Honor, on behalf A Mark, we would join with the position of the bank and with Caligula in requesting the conversion to a Chapter 7.

As the Court has heard during the day today, there have been some issues raised with respect property at the Sarasota grading company with respect to property that is owned by A Mark.  And in addition to that, A Mark is also an unsecured creditor of this Debtor.

We, likewise, would like to see administrative costs minimized, and I think that could best be achieved through conversion and the appointment of a Chapter 7 Trustee.  Thank you.

THE COURT:  Okay.  Thank you, Ms. Mora.  Okay, very well.  Mr. Saxe or Mr. McIntyre, you can two-team it or single-team it, however you want to do it.

(Counsel conferring.)

MR. MCINTYRE:  Your Honor, we're in somewhat of a unique situation.  We're a week into the case and we're talking about whether or not the

case should be dismissed or converted.

Most of the unsecured creditors -- and from what we've been able to ascertain, there are many -- have not had a chance to "lawyer up," as they say.

Caligula, obviously, was well attuned to this case because Caligula is Paul Bilzerian, a personal enemy of Mr. Yaffe, well vetted in the court system and anxious to do whatever he can do, not necessarily driven by economic benefit. And I think that's obvious from the pleadings.

I mean, the remaining -- the last comments of Caligula's position is that we're not going to get any money, so let's just turn this into a Chapter 7. And in terms of worrying about cost savings, they're not coming out of Caligula's pocket.

So I don't really see why that's a concern that would legitimately be raised as the representative for the unsecured creditor body. I understand they have a position and they have every right to articulate it, but I don't think that they make a fair representation of the unsecured creditor body.

The Bank, similarly, does not represent

the position of the unsecured creditors.  Conversion is great for them.  They come in, they take all of the assets and there's not going to be anything left for the unsecured creditors.  Possibly avoidance actions.  But you've got a Trustee that's going to step into a mess that I don't know how someone with money plans to do well.

Now, the Chapter 7 Trustee, you know, possibly they'll yield some results to the unsecured creditors.  Most likely, they'll file a bunch of litigation and who knows where that comes from.  But at the end of the day, you have a business that was doing some tremendous volume that is going to die.

And that decision may be the right decision ultimately, but the question I have is: Isn't it really the unsecured creditors that get affected by the decision made today?  And has the Court allowed, or has the process allowed sufficient notice to the unsecured creditors to determine whether they'd like what's behind door number one or door number two or door number three, I guess you could say.  Examiner, trustee, conversion.

And the reason I say that is, as I've pointed out -- and I raised the issue of Mr. Yaffe's

willingness to pledge the equity in his homestead, which we suggest is approximately $15 million, not as an admission of any wrongdoing but as of a commitment to restructuring his business that he spent his life developing.

Now, there was comments made about him being a bad businessman and not knowing what he's doing. He has been in business since 1977. He wasn't in a economic -- or a monetary default with the bank. He was on the verge, he contends, of refinancing out the bank. And the rules, as you heard the bank representative, changed dramatically.

You also heard the volume of his cash flow changed dramatically over the past several years. And you've experienced it in many cases. When a company goes from millions of dollars, to hundreds of millions of dollars, to multiples of the hundreds of millions of dollars, there are issues that arise in that kind of growth that small businesses don't always address appropriately.

And so the question, I think, that this Court has to struggle with is -- you know, you hear about deficiencies in filings. Well, they didn't have any of the books and records. They were seized.

Now, you have an extraordinary situation. I haven't experienced a situation where the Debtor was dispossessed from its business by virtue of an ex parte writ, no notice, no nothing. The day the case is filed, they immediately try and retake possession.

They don't get possession of their books and records. The fact that they haven't filed their schedules I don't think can be held against them because they didn't have the documents to do it with.

With regard to oversight, I don't disagree. I think that there definitely needs to be some form of oversight. And whether it's a Chapter 7 Trustee, whether it's an 11 Trustee, whether it's an examiner, or whether it's a chief restructuring officer, whether it's a solution crafted by a Creditors' Committee or the Debtor, it seems to me that if the parties-in-interest, really, here -- I mean, the bank gets its collateral. That is what it is.

You might liquidate it for more, if you know what you're doing. You might liquidate it for less. If you can do it over time, you might get more money. If the bank does it, as they would

typically do it, just fire-saling it, you're likely to get less.

The only chance of the unsecured creditors getting anything out of this case, it strikes me, is if Mr. Yaffe comes in and tries to reorganize this business with oversight and controls in place. And if he's willing to pledge what he proffers to be or we proffer to be somewhere between $10 million and $15 million in equity in his homestead, which is otherwise exempt -- I mean, there's no mortgage on his homestead with this particular bank.  It's held as tenants by the entireties and it's his homestead.

It's an asset.  Well, maybe if they can show some tracing of money into the homestead, maybe there's an argument for equitable lien, but that has -- no testimony has been put on about that.  No evidence has been put on about that.  And we don't believe anyone will be able to demonstrate that.

He's saying, "Look, I'm all in.  This has been my life's work."  I mean I don't think you become a coin dealer of this kind, with this volume, by doing something that you're not passionate in. And this is what he wants to do.

He's at a crossroads himself.  He can go off and start a new company and start doing the coin

business all over again and leave the bank to collect his collateral and liquidate it for a small amount of money.  They can liquidate the music boxes for a small amount of money.

They can pursue him on his guarantees but it's not going to get them very far.  In terms of the materiality of the debt, it's not going to get them repaid, whereas if he's allowed to be involved in the reorganization of this business -- and it's not a liquidation of the business.  When I said liquidate the coins, that's what they do for a living.  They sell coins and they buy coins and they make a margin.

The concept is to continue to buy new coins or sell -- obtain new coins to sell, in the process to somehow pay back the secureds and the unsecured creditors more than what they would get in a Chapter 7 liquidation.

What I would propose is, nothing completely specific, but that at this juncture allow a Creditors' Committee to be formed upon notice to the creditors.  I'm guessing, and I have received several calls which we've referred out to lawyers around town, from people that say, "We're owed money, we need to know what to do."  One was in

Canada for the Vienna Philharmonic.  You know, another one, I heard from Mr. Jennis, someone was in Belgium.

You're talking about a lot of European creditors who, you know, the chances of them being able to, one, find a lawyer and, two, have the lawyer appear today, are small.  It just seems to me that the parties that are affected most about your decision today aren't here and are not being adequate represented in this particular analysis.

And if they have a shot at getting paid through a mortgage in his homestead and his cooperation and enhance the liquidation value of the collateral by virtue of his participation, with oversight, it seems to me that it should be the unsecured creditors, the people that going to walk away from that money, that should get to decide whether that money should be walked away from or not or whether just the Chapter 7 Trustee makes more sense, as opposed to the parties that stand to benefit from it for their own agendas.

And so, Your Honor, for those reasons I would suggest to task the United States Trustee's Office with quickly forming an Unsecured Creditors' Committee.  If the Unsecured Creditors' Committee

comes in and says liquidate, convert it to a 7, then who else are you going to listen to?  I mean, it seems to be that it's a foregone conclusion.

But if they don't -- and in the meantime, while they're doing that, I would propose to file a plan.  I can file a plan within a week and I will. I already know what the plan is going to say.  And allow the Unsecured Creditors' Committee, counsel or their representative, to sit and look at that plan versus the Plan of the bank.  Stick it with the Trustee who gets a small percentage for anything over a million bucks, who is unlike -- who is unfunded, because the bank is already undersecured.

We've seen that movie before.  They may sign up for a whole bunch of litigation and run up a lot of litigation costs which prove, I think, to be more expensive than the Chapter 11 Trustee costs, and generally a small dividend for the unsecured creditors, if anything.  And if they choose that, then they choose that, their choice.  But it seems unfair to deprive them of that choice because of the bank's rush to get the case converted.

And in fairness to the bank, the bank didn't file the motion to convert until last night. Realistically, it was Caligula that's seeking to

have the case converted quickly.

You know, a creditor who -- interestingly enough, their claim is derived from a contract whereby they were going to take National Gold Exchange public and they were going to get a fee for that, Mr. Bilzerian's front. And Mr. Bilzerian has been enjoined by the SEC from participating in those kinds of activities --

THE COURT: Let's not get into too many facts, because --

MR. MCINTYRE: Fair enough.

THE COURT: -- inevitably, it will require a response and I don't want to be getting into that.

MR. MCINTYRE: Fair enough, Your Honor. The simple point is, the collateral, the coins have been secured. It's easy for this coin -- I'm sorry, this Court to maintain the status quo of the coins. It would be nice if the coins could be sold with agreed release prices by the bank. It would be -- but frankly I don't think that's necessary over the course of a week or two.

But I think what is required for equity to the unsecureds that aren't here today is an opportunity to weigh: Do I want to do a plan with controls? Or do I want to just turn it over to a

Chapter 7 Trustee and cast my lot in with them?  And it seems to me when they make that vote, then that's the vote that should count.  Thank you, Your Honor.

MR. SORIANO:  Just a very brief response, Your Honor.  And that is the real recovery, I think, for unsecured creditors, if there's going to be one here, is going to be through actions, avoidance actions, fraudulent transfer actions.  And those are items actually that probably will benefit the unsecureds much more than what's going to happen and whether they propose a plan or we liquidate.

There's not going -- we don't think there's going to be very much collateral here. I don't know how you could operate this business, just operationally, while you're trying to do a Chapter 11 case.

You've seen the various conflicts between the principals, these different entities, Gainesville.  And somebody has to look at that and it certainly isn't going to be the Debtor.  I mean, those are the things that caused us trouble.

The deeper we got into it, the more we see this inter-tangling and we wonder if it's been really -- and I don't want to overstate it, but the first reaction is:  This is a shell game with coin.

It keeps moving around, different people. You do the inventory one day, you turn it into a receivable the next day. It moves around and you see a lot of interrelated party transactions.

I think what's really going to happen here is somebody -- we're going to have to have a good Trustee or the Trustee is going to have to hire a good forensic accountant and we're going to have to go through this with a fine-tooth comb. And that is the best chance for unsecured creditors to seek a -- obtain a recovery in this case.

THE COURT: Mr. DeCailly.

MR. DECAILLY: Your Honor, I'm going to spare you. I'm not going to bother with the Bilzerian comments.

THE COURT: Thank you.

MR. DECAILLY: My client is Caligula, bottom line. Your Honor, I would just point that I was looking through my notes, the only person or entity that's going to get down to the bottom of a missing $500,000 coin is going to be a Chapter 7 Trustee and that will cover half of our claim. We ask you to convert today.

THE COURT: Okay. Very well, the Court has before it motions to convert this case to

Chapter 7 or, alternatively, appoint a Chapter 11 Trustee immediately or, alternatively, appoint an Examiner.

Let me say, as an initial matter, that the case has been very well presented, very professionally presented by the professionals who have been involved in this over the last couple of weeks. The case was fully presented and well done on both sides -- and on all sides.

As far as the factual background here, while the Debtor doesn't concede anything and wishes an opportunity to prosecute this case as a typical Chapter 11, the bottom line is that the evidence of misconduct and mismanagement is substantial.

Mr. Cloutier's testimony, I thought, was most illuminating on that in his description of his experience from the ground floor, as he tried to walk through and find out where the inventory was, the receivables.

I'm not going to write a decision on this but it would be one that would be interesting reading, if I did, about the Tudor Trust and whether Suzana Burke is really Beverly Gray Sverker, if I've got those names correct. And I can picture 36 Tudor Street. It's not an office building.

The entity Charles Gray, Inc. -- which has the initials CGI, as opposed GCI and ICG, I don't know if that's coincidence or not.  But all of that, I don't need to go through line by line, because it's fairly overwhelming in terms of that this case either calls for conversion or appointment of a Chapter 11 Trustee, and that's what it comes down to.

From my perspective, I've got to make a very difficult judgment call on what's in the best interest of the creditors and the estate here.  Clearly, there's ample grounds to convert this case today.  A Chapter 7 Trustee would be appointed and work cooperatively with Debtor's counsel and the bank's counsel.

Although Debtor's counsel in a Chapter 7 would have minimal involvement, it basically would be the Chapter 7 Trustee working with the bank and pursuing claims.  That's fairly straightforward and does have appeal, because it may result in lesser administrative claims.

It's not obvious but it appears from what I've heard that the bank is undersecured.  Probably, there's not $35 million in gold sitting out there, receivables and other assets.  So in a typical case,

the bank would get everything and, you know, the Trustee would pursue claims, and that would be expensive and litigation that would go on for a substantial period of time. And that may be the best alternative.

The other alternative is to appoint a Chapter 11 Trustee to get control of things immediately basically, to displace the Debtor-in-Possession, in every respect to exercise control as if -- as much control as a Chapter 7 Trustee but to do so in the context of a Chapter 11 plan.

What's appealing to that as an alternative is that notwithstanding these recent events -- and I mean that in the last six months, a year, maybe shorter, but that time frame -- there is still an institutional knowledge here and a motivation on the part of the principals to try to salvage the situation, if not any money, by contributing their efforts to avoid all of that litigation that would occur in a Chapter 7, by increasing the value of what's in the pot, by working cooperatively with the Chapter 7 Trustee, and by throwing into the pot, as Mr. McIntyre has suggested basically what would be the best case in an equitable lien litigation that, at best, is a difficult case to make but, in theory,

is there.

And that may present a framework in which unsecured creditors do get paid something more and sooner than the inevitable zero or pennies on the dollar, which would occur in an over-encumbered estate, such as exists in this case.

So, as difficult a decision as it is and as close a question as it is, I think -- and it's my conclusion -- that it's in the interest of creditors here, the unsecured creditors and I think ultimately the Bank, to allow this case to go forward on a relatively fast track to see if a consensual plan can be put together that produces more value for everyone than would be available if we just let the thing go down the tubes into Chapter 7 right now.

Time may prove this judgment to be not the best, but it may turn out that we have a consensual plan that creates value where otherwise none existed.

Accordingly, I will grant the motions. I'll just simply grant the bank's motion for the appointment of a Chapter 11 Trustee.  I will, as part of that order, schedule a status conference for --

THE COURTROOM DEPUTY:  We actually have

one, or do you want a sooner one?

THE COURT:  What is the date?

THE COURTROOM DEPUTY:  It's set for August 19th.

THE COURT:  Okay.  That would probably work.  We'll go with the August 19th date.  That would give parties possibly the ability to get a Chapter 11 Trustee appointed.  I don't want to presume, because I know the U.S. Trustee is going to have to -- is going to have its work cut out.

Mr. Wilkes, moving quickly, obviously, in this case would be very, very important.  So if you could confer with all parties on who would be a good Chapter 11 Trustee, so that when we come back at the status conference we can be talking about an end game here and what hopefully will be a relatively quick Chapter 11.

If things are not going appropriately in the Chapter 11, obviously conversion remains available on an emergency basis to re-address matters.  But for purposes of proceeding forward and in my view the best chance of maximizing on return to creditors, we're going to give this a shot in Chapter 11.  And, Mr. Wilkes, I'd appreciate your assistance on that.

Mr. Soriano, if you could do an order, for the reasons stated orally in open court, granting your motion to the extent I've ordered.

MR. SORIANO:  Okay, Your Honor, thank you. We also today -- there are still the motions to excuse turnover and to compel turnover.  As things stand now, when you clarified that, we were still able to go in and get records and not remove stuff. Is that something that we'll be able to continue?

THE COURT:  I continue to feel -- and I'll hear from Mr. McIntyre on this -- but that is important, number one, that somebody stay in possession and, number two, that we continue the process of getting information.

Obviously, when a Chapter 11 Trustee gets appointed, then the Chapter 11 Trustee assumes the role of pilot of the ship.

MR. SORIANO:  Right.

THE COURT: And I would expect that the assets would be turned over to the Chapter 11 Trustee.  So maybe the appropriate thing at this point is to -- since we're here on a final hearing on the Debtor's motion for turnover and the bank's motion to excuse turnover, to enter a final order denying the motion for turnover by the Debtor and

entering a final order directing the bank, upon appointment of the Trustee, to turn over to the Trustee the assets in its possession, and otherwise remain in possession and continue the process that it has initiated and is continuing pursuant to my last order, as modified by my oral ruling last Friday.

MR. SORIANO:  Right.  And which we have not removed anything.  In fact, we brought some stuff back that we took out in our little gap period.  So that's not an issue.  As long as we can continue getting access to books and records.  That's, for us at least right now, the most important thing.

THE COURT:  Okay.  Let me --

MR. SORIANO:  We'll be happy to cooperate with the Trustee.

THE COURT:  Mr. McIntyre, did you have something to add to that?  And I do need to go through the calendar and make sure I cover all of the motions.

MR. MCINTYRE:  Your Honor, it occurs to me that, if I heard correctly, some of the coins have actually been brought back to National Gold.  It seems that if a Trustee is going to be taking

possession, and given the fact that there's an ongoing business running at the facility in Gainesville Coin -- if there is or is not, I'm not certain. But it seems to me that since the bank has taken possession on some levels as to the coins and inventory, they should hold possession and take possession until a Chapter 7 (sic) Trustee has been appointed.

As to books and records, if they've copied and imaged everything, I think that they need to be turned over to the Trustee when the Trustee has been appointed. And the only other comment I had -- and so I really think it's just maintenance of the status quo until the Trustee --

THE COURT: And I don't think Mr. Soriano disagrees with that.

MR. SORIANO: Right. That's right.

MR. MCINTYRE: The logistic is, to the extent there's stuff there, so that there's no further allegations of things being taken or not, if the bank secures those things, they know where they are, they put them back, take them, hold them, give them to the Trustee, or if they have a Trustee by tomorrow maybe it's fine to just turn over the keys then. But you have the difficulty of other

businesses running out of the same premises.

The other comment goes to the other matters on the calendar.  There has been work done by both Mr. Saxe and Drummond, Wehle & Ross.  Those are on for application to be employed today.  I certainly don't know that there's a need going forward by the estate, and the Trustee will make that determination.  But I would ask that their compensation be approved nunc pro tunc to get us to this point.  And I suppose the proof will be in the pudding in terms of if a Chapter 11 plan can be confirmed by the Trustee, rather than the case ultimately being converted.

But that leads to my next comment, which is I believe we have some substantial background in getting this case to confirmation.  I'd like to deliver to the Trustee a potential plan of reorganization that I know that the principal of the Debtor, Mr. Yaffe, would fund in some part with the mortgage on his home.

We took at $25,000 retainer to do this case last Friday.  I believe that the funds came from a source other than National Gold.  And if they did -- and I'm raising this stuff now just to clarify because I don't want to proceed at my peril.

If they didn't come from National Gold, I'd like the opportunity to get a Plan in the hands of the Trustee so they can move forward.

And then obviously I would do nothing further until -- you know, if the Trustee chooses to hire other counsel or us, that's their decision and I don't really care one way or another.

But since you've sort gone out on a limb and approached the situation by appointing a Trustee, I'd like to see at least that plan delivered to the Trustee and I don't have to forfeit or worry about spending more time that may be subject to attack with regard to our retainer. I know you can't give me an order solving those problems but at the minimum -- I haven't been in this situation before --

THE COURT:  Right.

MR. MCINTYRE:  -- and I'd like a little direction as to what we do from this point forward.

THE COURT:  Sure.  No, that's all fair for discussion.  The appointment of a Trustee, as you are well aware, divests the Debtor-in-Possession, and thus there's no authority for compensating the attorney for a Debtor in a Chapter 11 in which a Trustee has been appointed.

All services rendered up through the date of the appointment, however, are for the Debtor-in-Possession.  And I indicated at the last hearing that I would be approving Mr. Saxe's participation through this hearing, and I intend to carry through on that.

I think now where we are, it moots out the issues going forward, although Mr. Saxe and yourself may want to, and hopefully will, continue as representing the Debtor, but you'll have to deal directly with the principals of the Debtor in terms of compensation.

In terms of compensation for your services through the date of the appointment, which is a few days off, just from processing, those will be considered on application.  And it's not my habit of cutting well-earned fees, and you certainly have your retainer which probably would cover that at that point.

MR. MCINTYRE:  Have you -- I don't want to push my luck, but to the extent that the money did not come from the estate and since the assets have been frozen -- I wasn't here at the time, I was on vacation, but I believe the assets came directly from Mr. Yaffe.  If he funded the retainer, is there

an issue with those funds continuing to be used for the Chapter 7 (sic) Debtor?

THE COURT:  You know, it's not twenty questions, Mr. McIntyre.

MR. MCINTYRE:  I got one and I appreciate the answer to that.  So I'll take that and run.

THE COURT:  I don't want to go down that slippery road.  I start answering one question and then, you know --

MR. MCINTYRE:  All right.

THE COURT:  Then I always hear about it later on how I ruled and, you know, I can't rule in a vacuum.  Just, you know, we're here to solve some problems --

MR. MCINTYRE:  Very good, Your Honor.

THE COURT:  -- and I'm sure you'll contribute to that process and we won't get caught up in minutia and professionals fighting over small issues.

MR. SORIANO:  If I may, Your Honor?  Mr. McIntyre was saying that the Debtor would prefer that we actually remove the stuff, and we can do that.  We have no problem.  We have the Brinks set up.  In some ways it's easier and then turn it over to the Trustee once the Trustee is appointed.

THE COURT:  I'd rather get the Trustee appointed before we start making decisions.  I mean, the Trustee may --

MR. SORIANO:  Okay, that's fine with me --

THE COURT:  You know, the premises is another issue.

MR. SORIANO:  -- because, frankly, the premises as far as I know are either leased or owned by NGE.

THE COURT:  It's got a big sign --

MR. SORIANO:  You've got Gainesville there.

THE COURT:  What I heard was there's a big sign outside --

MR. SORIANO:  There is.

THE COURT:  -- that says NGE.

MR. SORIANO:  There's no sign that says Gainesville, I can tell you that, so --

THE COURT:  They may have to change or get rid of those T-shirts and -- but that's for the Trustee to decide.

MR. MCINTYRE:  Very good, Your Honor.

THE COURT:  Let's just keep the status quo.  Okay, in terms of the calendar --

MR. SORIANO:  Oh.  Oh, I'm sorry.

Actually, my colleague mentioned something very good. There was -- we had heard some -- I don't know if it's true -- about insurance being cancelled there, and I'd ask counsel if they know anything about that.

MR. MCINTYRE: I do not.

THE COURT: Okay. Well, why don't you deal with that --

MR. SORIANO: Certainly, whoever the Trustee is, that's going to be an issue.

THE COURT: That's an immediate issue but it's not technically before me.

MR. SORIANO: No, it's not.

THE COURT: Why don't you find out.

MR. MCINTYRE: My client will cooperate with the Trustee. The second they've been appointed, he can go through all of the business issues or she can go through all of the business issues with our client.

THE COURT: Okay.

MR. MCINTYRE: We'll give him full access and I'm sure he'll want to cooperate with them every way he can.

THE COURT: Okay. Going through the calendar then, Item No. 1, the FEH on the emergency

motion to excuse turnover, I'd be granting that, as I previously indicated. I'd be denying the Debtor's motion for turnover.

Debtor's application to appoint Saady & Saxe, P.A., unless there's an objection, I would be approving that for purposes of the conduct of this hearing and up through the appointment of the Chapter 11 Trustee. Mr. Wilkes?

MR. WILKES: The only issue, Your Honor, is under Rule 6003(a), no final order is to be entered within 20 days of filing the case. It may be best to push that off to August 19th.

THE COURT: You're correct. You're correct. What I'll do is I'll do an interim on that. Thank you, Mr. Wilkes, you're absolutely correct. I'll do an interim order.

Have I done one on your retention, Mr. McIntyre? Or did you --

THE COURTROOM DEPUTY: Yes, we --

THE COURT: -- have you filed an application to be retained?

THE COURTROOM DEPUTY: We did that order.

THE COURT: We did the order. Okay, so we'll come back at the status conference to enter a final order, which will take you both through the

date of the conversion in terms of your retention.

THE COURTROOM DEPUTY:  Do you want me to have the case manager do the same order --

THE COURT:  Yes.

THE COURTROOM DEPUTY:  -- on that one?

THE COURT:  We'll do the same order for Mr. Saxe's firm.

MR. MCINTYRE:  Your Honor, there was another firm as well, the Drummond, Wehle and Ross firm.

THE COURT:  Yes, I wanted to ask you about that.  I haven't -- I think they were at the first hearing.  Are they in the same position but just --

MR. MCINTYRE:  They were transactional lawyers for National Gold.

THE COURT:  Have they expended time in the case?

MR. MCINTYRE:  Not a lot but they have spent some.  I know that they have spent some, particularly J.J. Wehle.  He's a former Andersen guy, a high-level tax lawyer, and I know he was involved in the structuring of the Debtor and the issues -- you know, the Chapter 11 issues, had this case gone forward.

THE COURT:  Why don't we do this:  I'll

just do that on the interim and then everyone can take a look at it.  We'll come back at the final.  At best, it will be the same arrangement that you and Mr. Saxe have.

MR. MCINTYRE:  So interim orders approving through the date of Chapter 11 Trustee appointment.

THE COURTROOM DEPUTY:  Our order will just say --

THE COURT:  It will just be an interim order.

MR. MCINTYRE:  Okay.

THE COURTROOM DEPUTY:  Interim approval until the final hearing at the status.

THE COURT:  Yes, subject to our final hearing.

MR. MCINTYRE:  And you guys will be those orders?

THE COURT:  Yes.

MR. MCINTYRE:  Okay, very good.  So we don't owe you any orders --

THE COURT:  That's correct.

MR. MCINTYRE:  -- if my score sheet is right.

THE COURT:  So far you're doing all right here.

MR. MCINTYRE: Okay.

THE COURT: I'm trying to keep your time down, Mr. McIntyre.

MR. MCINTYRE: The case management conference, I guess you won't be looking for a case management -- our case management summary.

THE COURT: Well, you're not the Debtor-in-Possession, I suppose that's correct. I actually never thought of that. That's an administrative order.

MR. MCINTYRE: We moved for an extension to respond. If you grant our extension, I think it would --

THE COURT: Well, you still need to file your schedules.

MR. MCINTYRE: Right.

THE COURT: And I think there would be a benefit. Go ahead. I mean I don't know that we have an exception to filing that because there has been a Chapter 11 Trustee. So just put that on the list, since you still have to get your schedules done at some point and --

MR. MCINTYRE: Okay. And we'll work it out with the Trustee, getting access to the books and records to do that.

THE COURT:  Well, Mr. Soriano would be happy --

MR. MCINTYRE:  I'm sure.

THE COURT:  -- to give you access any time you want it.  But we do need to get those schedules and statements.

MR. MCINTYRE:  Very good.  We'll do that.

THE COURT:  And the case management summary shouldn't be that difficult.  Frankly, it's probably already in the papers that you filed, the basic information.  I certainly have heard about here today, or least read about it.

MR. MCINTYRE:  I think we've asked through the 10th.  I believe that's the deadline that we've asked for.

THE COURT:  That's fine.

MR. MCINTYRE:  Make it simple.

THE COURT:  I'll grant that motion.

MR. MCINTYRE:  I guess I'll do that particular order.  We'll submit that order.

THE COURT:  And the motion by Caligula, tell you what, Mr. Soriano, you cover that in your order.  Just say it came on for hearing on both motions and granted to the extent provided.

MR. SORIANO:  Yes, sir, Your Honor.

THE COURT:  Okay.  And then I'll also grant the motion -- or you can include in there -- and Caligula's motion to shorten time to consider appointment of a Trustee or conversion, I'll grant that, and I have considered it and I agree.

Okay, very well.  Is there anything else that we can cover in the National Gold Exchange case here today?

(No response.)

THE COURT:  Okay, very well.  Thank you all.

MR. SORIANO:  Thank you, Your Honor, on behalf of the bank for your --

MR. MCINTYRE:  Thank you, Your Honor.

THE COURT:  -- taking this on so quickly and giving us your attention.

THE COURT:  Well, thank you all for a job well done.  Court will be in recess.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Whereupon, the proceedings concluded at 5:12 p.m.)

# C E R T I F I C A T E

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

 I, CHERYL CULVER, Certified Court Reporter, Notary Public, and Administrative Office of U.S. Courts Approved Transcriber, hereby certify that the foregoing proceedings were transcribed from a copy of a CD of the electronically recorded hearing that was provided by the court.

 I FURTHER CERTIFY that the foregoing transcript constitutes the official record of said proceedings prepared to the best degree possible based on the quality of the recording, phone appearances, speaker proximity to microphones, completeness of speaker identification logs, without benefit of exhibits, and given the expedited and/or technical nature of the proceedings.

 I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of counsel involved in the matter, nor do I have any interest in the outcome.

 THIS CERTIFICATION is limited to originals and official copies of transcripts bearing the reporter's original signature in blue ink and official seals.  Transcripts are not authorized to be distributed to anyone other than the ordering party and copies are to be purchased directly from the reporter.  Further, transcripts are not intended to be circulated as they may contain unredacted personal information restricted by judiciary privacy policy.

 SIGNED AND SEALED this 11th day of August, 2009, in Tampa, Florida.

_Cheryl Culver_

Cheryl Culver, CCR, B-1281
Certified Court Reporter
State of Florida Notary Public