IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                          :
                                :
NATIONAL GOLD EXCHANGE, INC.    :   Case No. 09-15972-8W1
                                :         Chapter 11
              Debtor            :
- - - - - - - - - - - - - - - x

**MEETING OF CREDITORS**
**Pursuant to Section 341**

**LARRY HYMAN**


BEFORE:          CYNTHIA BURNETTE, Assistant U.S. Trustee
                  for Office of U.S. Trustee

DATE:            September 16, 2009 - 1:30 - 2:54 P.M.

LOCATION:        501 E. Polk Street
                 First Floor Meeting Room
                 Tampa, Florida  33602

REPORTER:        Gretchen L. Schultz, CCR
                 Certified Court Reporter
                 Notary Public at Large
                 for the State of Florida



Pages 1 to 75


_____

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida  33556
(813) 920-1466

2

A P P E A R A N C E S:

For the Debtor:        RICHARD McINTYRE, Esquire

For Sovereign
Bank:                  DON CRAWFORD, Esquire
                       KEVIN KWAN

For Republic
National
Business Credit:       DARREN FARFANTE, Esquire

For Caligula
Corporation:           PAUL DeCAILLY, Esquire

For Joseph
Luzinski,
Chapter 11
Trustee:               JOHN EATON, Esquire
                       WILLIAM KING, Esquire

For A-Mark
Precious Metals:       JEFFREY SNYDER

For Scott
Standafer, owner
of American Rare
Coins, Inc.:           GREGORY PAULES, Esquire

Also Present:          Joseph Luzinski, Chapter 11 Trustee
                       Jan Stinchfield

3

INDEX OF EXAMINATION

WITNESS:

**LARRY HYMAN**
(Representative for the Debtor)                              Page

Examination by Ms. Burnette                                   7
Examination by Mr. DeCailly                                  18
Examination by Mr. Paules                                    31
Examination by Mr. Eaton                                     36
Examination by Mr. Crawford                                  47
Further Examination by Mr. DeCailly                          69

4

**P R O C E E D I N G S**

(Whereupon, the proceedings commenced at 1:34 p.m.)

MS. BURNETTE:  Good afternoon.  My name is Cynthia Burnette and I'm the Assistant United States Trustee in the Office of the United States Trustee, Tampa/Ft. Myers Division, and I have been designated by the United States Trustee, Donald F. Walton, to conduct meetings of creditors.

We're here today in the case of National Gold Exchange, Inc., Case No. 09-15972-MGW.  The bankruptcy Petition was filed on July 24th, 2009. Today's date is September 16th, 2009, and this meeting was continued from August 28th, 2009.

In this case, a Chapter 11 Trustee has been appointed, Joseph Luzinski.  However, we do have a representative of the Debtor present, and the Debtor's original bankruptcy counsel, Richard McIntyre.

Mr. McIntyre, would you please introduce the Debtor's representative?

MR. McINTYRE:  Sure.  I'm Richard McIntyre. This is Larry Hyman.  He's going to be appearing today as the Debtor's representative.

MS. BURNETTE:  And Mr. Hyman, what is your

5

role, or title?

MR. HYMAN: Financial advisor.

MS. BURNETTE: We also have appearances by numerous counsel and creditors, and we'll go around the room and have them state their name and who they represent for the record.

Please speak loudly because the meeting is being recorded.

MR. FARFANTE: Darren Farfante for Republic National Business Credit.

MR. CRAWFORD: Don Crawford on behalf of Sovereign Bank. And with me is Jan Stinchfield, who is a representative of Sovereign Bank.

MS. BURNETTE: Thank you.

MR. DECAILLY: Paul DeCailly, appearing on behalf of creditor Caligula Corporation.

MR. LUZINSKI: Joseph Luzinski, the Chapter 11 Trustee.

MR. EATON: John Eaton on behalf of the Trustee.

MR. KING: William King on behalf of the Chapter 11 Trustee.

MR. SNYDER: Jeffrey Snyder on behalf of A-Mark Precious Metals, Inc.

MR. KWAN: Kevin Kwan on behalf of Greenberg

6

Traurig and Sovereign Bank.

MR. PAULES:  My name is Gregory Paules.  I'm here for Scott Standafer, the owner of American Rare Coins, Incorporated.

MS. BURNETTE:  Is that everyone?

(No response.)

MS. BURNETTE:  Okay.  Thank you.  The meeting of creditors is an opportunity for the U.S. Trustee and creditors to examine the Debtor concerning the financial affairs and assets and liabilities of the estate.

The meeting will be recorded.  We also have a court reporter present, Kim Johnson's Reporting Service, Ms. Gretchen -- Schultz?

THE REPORTER:  Schultz.

MS. BURNETTE:  -- Schultz, who is also recording the meeting.  I would ask that if you -- once you're given an opportunity to ask questions, please come forward so that we can make sure that the recording device collects your questions and the answers that are given.

First order of business, Mr. Hyman, please raise your right hand.

Whereupon,

**LARRY HYMAN**

7

a witness herein, was sworn by the U.S. Trustee,

examined, and testified as follows:

MS. BURNETTE:  Thank you.

**E X A M I N A T I O N**

BY MS. BURNETTE:

Q    When did you become a financial advisor for National Gold Exchange?

A    On or about September 1, 2009.

Q    And who are you employed by?

A    Originally I was retained by Phoenix Gold Corporation to assist them in the setup of their accounting books and records, and Phoenix Gold is one of the proponents of the Plan, the Reorganization Plan. And then I was asked to assist in the preparation of these Schedules.

Q    Okay.  And so you did not participate at -- or were involved in the company at the time of the filing?

A    That is correct.

Q    And who was the principal who actually approved or required the bankruptcy filed?

A    Well, Mark Yaffe is the one who retained me.

Q    Okay.  And does Mr. Yaffe have something to do with Florida Gold Corporation also?

A    Florida -

Q    I'm sorry.  Phoenix Gold Corporation?

8

A    Yes.  He is the president.

Q    Okay.  And is there a reason why Mr. Yaffe is not present today?

A    I do not know why he is not present.

Q    And what is the Debtor's business, National Gold Exchange?

A    They primarily dealt with the purchasing and exchange of gold coins, precious metals, for a profit.

Q    And when did the Debtor begin operating?

A    That, I am not sure of, when they first started operating.

Q    Are you familiar at all with the operations pre-filing?

A    I am not.

Q    And who would we need to speak to if we wanted to know about what occurred prior to the filing of Petition?

A    Well, the only individuals whom I have dealt with are Mr. Yaffe and Lynn Barnhardt, who is an accountant that had done work for the corporation.

Q    Lynn Barnhardt.  Is Lynn Barnhardt -- were they employed by the Debtor or was it an outside accounting firm?

A    No.  She's an outside accountant.

Q    Do you know who the officers, directors, and

9

shareholders of the Debtor are?

A    To my knowledge, just Mark Yaffe, and I believe his brother -- Alan?  Alan Yaffe.  They were 50/50.

Q    And do you have any idea why the case was filed?  Do you know anything about why the bankruptcy case was filed?

A    Well, to my understanding is that Sovereign Bank, under a replevin order, confiscated all the inventory, books, and records of the Debtor, which caused the filing of the Chapter 11.

Q    And do you know when that occurred?

A    I'm going to say about the middle of July.  I don't know the specific date.

Q    July of '09?

A    Correct.  Yes.

Q    Do you know if National Gold Exchange was current in payments to Sovereign Bank at that time?

A    I do not know.

Q    Now, there were an original set of Schedules and Statements that were filed, and I'm assuming you didn't participate in the preparation of those documents; is that correct?

A    That is correct.

Q    And Amended Schedules and Statements were

10

filed on September 4th, 2009.  And did you participate in the preparation of these documents?

A    Yes.

Q    And do you believe them to be truthful and accurate to the best of your knowledge?

A    To the best of my knowledge, yes.

Q    And did you sign these documents?

A    I did.

Q    And where did you get the information to include in the documents?

A    Primarily from records that the Debtor had in their possession.

Q    That the Debtor had in its possession all along, or were these records that Sovereign took control of and then returned to the Debtor?

A    I don't know if Sovereign originally had taken possession of the records I reviewed, but there were certain records to back up or substantiate information on the Schedules.

Q    Okay.  I'm looking at the Declaration concerning the Schedules, and is that your signature?

A    Yes.

Q    And I'm looking at the Declaration that's attached to the Statement of Financial Affairs.  Is that your signature?

11

A    Yes.

Q    Okay.  Thank you.  Do you know what the Debtor hopes to accomplish with the bankruptcy?

A    Well, once again, they have proposed a Plan that would, over time, pay 100 cents on the dollar to all the creditors in this case.  And, of course, they hope to continue to operate, essentially doing the same business they did prior to the bankruptcy.

Q    Is National Gold Exchange currently operating?

A    No.

Q    And do you know where the assets of the company are presently located?

A    To my understanding, all the assets and inventory are in the possession of, I believe, Sovereign Bank or at this point I guess the Trustee, the Chapter 11 Trustee.

Q    What about the books and records?

A    I believe them to be also in the possession of either Sovereign or the Chapter 11 Trustee.

Q    And so what records did you -- you said the Debtor retained some records that you used to create the Schedules?

A    Yes.  Basically what I did, the Debtor had -- did a draft, if you will, of the Schedules and then I met with actually Ms. Barnhardt and asked for backup to

12

the numbers and the information in the documents.  And a good portion of the information, she did have backup bank statements, audited financial statements just back up some of the sales numbers, things like that.  There was other items that she did not have any records, and I believe those were answered either as estimated or they just could not be answered because she did not have the information, nor could I verify the information.

Q    Well, I've done a cursory review of the Plan and Disclosure Statement that was filed by Phoenix Gold, and I haven't thoroughly examined the Schedules because I didn't anticipate that I would be conducting this meeting of creditors today.

But, I do see -- for instance, I'm looking at Schedule B and I see gold and silver coins inventory estimated between 16 and $20 million included on the Schedules.  But then when I look at the Plan, which calls for the liquidation of all the assets, I see that the Plan says that the inventory, the gold coins, would yield approximately $1 million.

MR. McINTYRE:  Since I drafted the Plan, let me just make a -- because that was the issue that came up in court today.  I'd like to clarify that.

The schedule, the proforma attached to the Plan, was not designed to demonstrate ultimately

13

exactly what the liquidation would yield.  Those are floors.  The concept was to give the bank and the unsecured creditors minimums, and the concept was, well, if you're liquidating over time, it was to set out a schedule to say, look, by this point in time we, pursuant to the Plan, agree to obtain at least this much, due to liquidation of whatever assets you can sell as quickly as you can sell.

So, that did come up, and I wasn't as clear as I could have been in drafting the Plan.  The concept is not to say that you add up all the dollars that reflect the liquidation there of those particular assets and that's what it will yield.  Those are minimums.

Does that make sense, I mean reading it in that light?

MS. BURNETTE:  No.  But --

MR. McINTYRE:  If it doesn't, too bad, because that's what it means.  I can tell you.  And I'm the one that put it in there --

MS. BURNETTE:  Well, I mean I would say it would make sense if the number was a little closer and, you know, I would think that coins are relatively liquid, but maybe I'm wrong.  So, I don't know.

14

BY MS. BURNETTE:

Q    Mr. Hyman, how much do you know about the coin industry?

A    Well, first of all, I have not seen the inventory and, once again, this was an estimate that was given to me --

Q    So, you were just facing this on the books and records of the Debtor.  You didn't actually go and go into a safe and do some kind of a --

A    That is correct.  And nor if I went to the safe and I looked at coins could I -- do I have the knowledge to value their worth.

Q    Okay.  So, you would not be able to provide us with -- and is that the case for all the assets that are listed here?  For instance, the other -- let's see what else we have.  Well, we don't have any value for accounts receivable.

     But you didn't -- did you look at an aging of accounts receivable to know or have any idea -- I mean I think the Plan values the accounts receivable --

          MR. McINTYRE:  No.  Again, floors.

          MS. BURNETTE:  At --

          MR. McINTYRE:  What he's committing to collect from them -- he's trying to collect as much as he can.  There were offsets to some of the accounts

15

receivables.

Because again, there's no representation that that's what they're worth. When you read it, I don't think you can say that I said that's what they were worth. All you can extract is that that was what he is committing to collect at a minimum. And the concept was, if he didn't hit those minimums he would supplement that with additional cash from liquidation of other assets of his or operation of the business.

This was a guaranteed payment stream, you know, that's -- with the idea from liquidation of categories, this is what you can expect to receive. That's all.

MS. BURNETTE: Okay.

THE WITNESS: And I think it's important to understand that a lot of this came out in the court hearing today. But the Debtor had apparently a very antiquated accounting system, and the individual or individuals who have knowledge of the programs and the computer system itself are not local to this area. So --

BY MS. BURNETTE:

Q    And who would that be?

A    I'm not sure who that individual is, but the

16

-- it's been very difficult for anyone to get any

information on any of the -- I'll say historical

information of the company; accounts receivables, you

know, an inventory listing, things like that.

Q    Okay.  So, you've used the Debtor's books and

records to determine the numbers that you put in here,

is that -- that the Debtor provided to you and was

substantiated by Ms. Barnhardt?

A    Well, where there was -- where I could

estimate, or what they said is an estimate, I said,

okay, I'll accept that number.

There was some information, it's very limited.

Like, for instance, on the bank accounts, I have bank

statements that I was able to substantiate those

balances.

Q    As of the date of filing?

A    Correct.  For the music machines, and I'm

looking at Schedule B, on page 1.

Q    Right, that are valued on the Schedules at

$9,811,000 --

A    There's an appraisal.

Q    There's an appraisal, as of what date?

MR. McINTYRE:  It's --

THE WITNESS:  Well -- I'm the one testifying

here.  I want to say it's within the last year, but

17

I have a copy of it here, so I can pull it.

BY MS. BURNETTE:

Q    Well, you can -- let's see.

A    April 27th, 2008.

Q    Okay.  And with the accounts receivable, you said "Unknown."  Is anyone out there trying to collect accounts receivable, to your knowledge?

A    The only thing I can -- I assume the Chapter 11 Trustee is out there trying to collect, although I don't have any personal knowledge of that.

Q    Do you know if the Chapter 11 Trustee knows who even owes the company money?

A    I do not know.

Q    Okay.  And with regard to the gold and silver coins, was that the book value that the Debtor had in its records of the coins?

A    What line are you --

Q    I'm on inventory, line 30 of the Schedule B.

A    Once again, this is an estimate that they provided to me and I don't know how they --

Q    When you say "they," who's they?

A    Well, Lynn Barnhardt.  That's the individual whom I worked with.

Q    So, you don't know if that was as of December 31st, 2008, or July 24th, 2009?

18

A     That is correct.

Q     Do you know if Sovereign Bank liquidated any of the assets that they seized in --

A     To my knowledge, I do not believe they have.

MS. BURNETTE:  Okay.  I'm going to open it up to creditors.  You all know more about the case than I do.  So, who wants to go first?

Do you want to pull your chair around?  Please state your name and who you represent for the record.

MR. DECAILLY:  Paul DeCailly for Caligula Corporation.

**E X A M I N A T I O N**

BY MR. DECAILLY:

Q     Okay.  Mr. Hyman, I believe -- I want to clarify, who are you currently working for?

A     Well, I was retained by Phoenix Gold Corporation.

Q     Okay.  And that corporation, are you aware -- from the Petitions or the Schedules or the Statements, do they have any claim of interest against National Gold Exchange?

A     To my knowledge, no.

Q     Okay.  Do you know when the company was formed?

19

A    I believe Phoenix Gold Exchange was formed after the bankruptcy was filed for National Gold Exchange.

Q    Okay.  So, it would be something that happened postpetition.  It's my understanding that the principal of Phoenix is Mr. Mark Yaffe?

A    Correct.

Q    Okay.  And are you aware or have been made aware of whether or not you have been approved in any way by the Bankruptcy Court to act on behalf of the Debtor?

A    No application has been filed on my behalf. Although, as I said, I'm retained by Phoenix and I did assist in the preparation of these Schedules.

Q    Did Phoenix prepare these Schedules or did National -- did the Debtor prepare them?

A    No.  This was done by, I'll say, the Debtor's accountant with my assistance.

Q    Okay.  I want to go over -- the Trustee hit on some of the questions I had.

If you look at Schedule B, line 5, books, pictures and other art objects, it indicates "antique music machines"?

A    Yes.

Q    Okay.  And is it the Debtor's position that

20

those -- that the machines -- is it one machine -- how many machines is included in this particular entry?

A    There are -- I'm going to say there's like 15 or 20 machines.  I have a listing that was provided to me with the appraisal of worth.

Q    Okay.  Did that listing, if you remember, or if you have it, did it make any distinction about whether or not Mark Yaffe owned the machine or whether or not National Gold owned the machines?

A    No, it did not.

Q    Okay.  Do you know if these machines are serialized, meaning they have serial numbers on them?

A    I do not know.

Q    Okay.  And are you aware or through your speaking with the accountant, do you know how they came to the value of $9,811,000?

A    Once again, there is an appraisal back in April of '08 that gave a value of that amount.

Q    Okay.  So, that's based on 2008 numbers?

A    Correct.

Q    And then looking at -- well, let me ask you: You sort of answered this, but I want to make it clear. Did you -- or were you able to obtain any information from either the accountant or any other representative National Gold Exchange related to computer-generated

21

reports of inventory?

A    I was not.

Q    Okay.  At any time when meeting with Mr. Yaffe -- well, have you met with Mr. Yaffe and discussed these with him?

A    Not specifically the Schedules, no.

Q    Okay.  So, you never went over them with the actual principal of the Debtor?

A    The only individual I actually went over them with was Ms. Barnhardt.

Q    Okay.  And was she an employee or a separate accountant?

A    She was a separate contractor with the National Gold Exchange.

Q    Okay.  Do you know if she works for a particular accounting firm, or is she on her own?

A    I believe she's a -- she's a CPA and I do believe she's a sole practitioner.

Q    Okay.  Did she have an office independent of National Gold Exchange?

A    I believe she does.

Q    Okay.  When you met with her, did you meet with her at her office?

A    No.

Q    Did you meet with her in your office?

22

A    No.

Q    Where did you meet with her at?

A    At the offices of Phoenix Gold Corporation.

Q    Okay.  And where are those located?

A    They're on North Dale Mabry, directly behind where the Debtor was located.

Q    Any other businesses operating out of that same location?

A    There is a an appraisal service that he also performs under a different corporate name.  I don't recall the name, but --

Q    Okay.

A    -- they do operate out of that same location.

Q    Is it one big room or are there several -- is there a segregation between --

A    The best I would describe, it's two large rooms and although there's a pass-through there, one side of the wall is Phoenix, the other side of the wall would be the appraisal service.

Q    Okay.  Now, I believe you indicated you had an opportunity to look at some of the bank statements?

A    Correct.

Q    Do you recall what months those bank statements were from?

A    I have them here.  I can tell you.

23

Looks like for -- I'll just run through them. For Colonial Bank was July 31.

Q   That was through the end of July?

A   Correct.

Q   Okay.

A   For ADM Investor Services -- actually, that was dated September 3rd, 2008.

Q   Okay.  What's the earliest one you have?

A   Well, I only got a bank statement to substantiate the number on the Schedules.  So, I just had the copy of the one bank statement that would substantiate the number on the statement.

Q   Okay.  You said you had a statement ending in July 31 from Colonial Bank?

A   Yes.

Q   Okay.  And did it start -- this transaction start the beginning of July?

A   No.  There was -- this - Colonial Bank looks like it was somewhat of a dormant account, well, at least for the month of July, because the beginning balance and the ending balance were the same, except for a $25 service charge.

Q   Okay.  Any idea why Colonial Bank would have been left off of the Schedule B?

A   I thought they were on there.

24

Q    Unless I'm missing --

MS. BURNETTE:  It's not there.

THE WITNESS:  No, it's not.

BY MR. DECAILLY:

Q    And you were unaware of this omission when you signed these, the Declarations?

A    Yeah, because I have the statement here, but I guess it was just --

Q    What other banks?

A    There is Sovereign Bank with a $17,500 balance.  There is -- although this is listed as SouthTrust, it was SunTrust Bank --

Q    Okay.

A    -- $6200.

You know what, I have to correct myself. That's for the profit sharing plan.  I have it right here, so that's not --

Q    The Colonial Bank?

A    The Colonial Bank, yes.

Q    Okay.

A    Yes.  Yes.  So, that's the reason it wasn't included, although I have a copy of it here.

Q    Is the statement -- well, what's the balance on the statement?

A    It's 17,000, but the bank statement is clearly

25

listed as profit sharing plan.

Q   Okay.  And what did you say the beginning balance was?

A   Well, the beginning balance was -- this is as of July 1, 2009, 19,256.97.

Q   Okay.

A   And the ending balance is 19,231.97.

Q   Okay.  Did you make any attempt, prior to putting your name and basically saying that the information is true and correct, to the best of your knowledge, to obtain any other further bank statements?

A   Well, once again, this is the only bank accounts that they indicated they had, so.

Q   No.  I mean backwards in time.  About how far back in --

A   I did not.

Q   You did not?  Okay.  I'd like you, if you could, while you're at the Statement of Financial Affairs, page 2.

A   If I can find them.  They're here somewhere.

MS. BURNETTE:  I'll share.

BY MR. DECAILLY:

Q   And I want to direct your attention to Question No. 3, specifically 3(b) and 3(c).  They're indicated that for 3(b), asking about debts non-consumer

26

debts that have been paid in the last 90 days.  There's an indication there that the information is not available?

A    Correct.

Q    Okay.  And was that --

MS. BURNETTE:  Could you stop for a minute?  We seem to have lost our recording here for some reason.

(Discussion off the record.)

MS. BURNETTE:  I'm sorry.  Would you please state your name again so --

MR. DECAILLY:  Oh, Paul DeCailly, appearing on behalf of unsecured creditor Caligula Corporation.

BY MR. DECAILLY:

Q    Are you prepared today to adopt the -- based on the oath you took today that the information for Question 3(b) was not available at the time these were -- Petitions and Schedules were filled out?

A    Correct, it wasn't available to me to --

Q    Okay.

A    Yes.

Q    So, you don't know if it was available to the Debtor or not, it just was not provided to you?

A    Well, once again, we went down this list and said, do you have information, and the answer was "No"

27

or "Yes," "Here's backup."  So, you know, we did verify that.

Q    Did they give you 90 days worth of backup?

A    I do believe I have some backup information for some of the transactions.

Q    Okay.

A    I'm not sure if it's a complete list.

Q    Right.  But based on the bank statements for 90 days that they had given you, there was no way to indicate any payments made to creditors in the 90 days prior?

A    I did not get any bank statements going 90 days back.

Q    Okay.  So when it says here, the information wasn't available, it means that the information wasn't available to the representative of Phoenix Gold, Incorporated?

A    Correct.

Q    Okay.  So, we don't know --

A    Well, when you say Phoenix.  The representative of National Gold Corporation.  Let's don't get our corporations --

Q    Well, who was --

A    Or National Gold Exchange.

Q    Who was the representative of National Gold

28

Exchange?

A    Well, once again, Lynn Barnhardt, I was working with her to help compile these Schedules.

Q    So, she wasn't able to -- so National Gold Exchange was not able to give you information to determine whether or not there had been creditors paid money, or debts paid, 90 days prior to filing?

A    That is correct.

Q    Okay.  And the same for letter (c) under Question No. 3, they were unable to provide you with any lists of insiders who might have been paid?

A    Correct.

Q    And then if you can go to the next page, page 3 at the bottom under "Losses," there's a loss there of one point -- about $1.2 million net loss, it looks like 290,000 of it was insured from theft, stolen from FedEx?

A    You're on Question No. 8?

Q    Yeah, the very bottom one.  It's sort of jammed in there at the bottom.

A    Yes.

Q    Do you know, are you aware of whether or not there is any ongoing investigation by state or local authorities into that loss?

A    I do not know.

29

Q    Do you know if the 290,000 of insured value has been collected?

A    I do not know.

Q    Do you know who the insurer was?

A    No.

Q    Okay.  And then on page 4, Question 11, closed financial accounts.  It says information not available.

Let me back up a little bit.  Do you know how long Ms. Barnhardt had been working for National Gold Exchange?

A    I believe since 2000.

Q    Okay.  And she was not able to provide you information with closed financial accounts?

A    No.

Q    Okay.  And then on page 5 of No. 14 -- first, I want to make sure you and I are on the same page so when I ask the question there's no ambiguity.

Would you agree with me that when you file Amended Statements and Schedules that you're filing them basically saying on the date of filing this was the condition of the Debtor?

A    Yes.

Q    Even though you may amend ten months later, you're still talking about the snapshot of the day the case was filed?

30

A     I would agree with that.

Q     Okay.  So, the property held for another person, it says there was none, that on the day of filing this bankruptcy National Gold Exchange was not holding or did not have possession of property that belonged to another person?

A     Yes.

Q     Okay.  And that information was provided to you by somebody affiliated or worked for or had the authority from National Gold Exchange?

A     Correct.

Q     Okay.  Are you aware of whether or not there has been -- if Alan Yaffe has resigned or given up or sold his interest in National Gold Exchange?

A     I do not know.

Q     Okay.  So right now, based on these, he was the president of the corporation?

A     Yeah.  Correct.

Q     At the time of filing.  But you're not aware of whether or not there has been any resignation?

A     Correct.

MR. DECAILLY:  I think that's all of the questions that I have.

MS. BURNETTE:  Thank you.  Would anyone else like to ask questions?

31

MR. DECAILLY:  It's a comfortable seat.

MS. BURNETTE:  Sir, why don't you go ahead and come forward, while they decide who's going to go next.

MR. PAULES:  Again, my name's Greg Paules. I'm here for Scott Standafer of American Rare Coin.

Good afternoon.  It's the first time I've ever been on the other side with Mr. Hyman here.

**E X A M I N A T I O N**

BY MR. PAULES:

Q    Actually, my client had gotten two checks that were stop payment on.  What I'd like to try to find out is, I think you alluded to some account that you had some information on.  You mentioned a Colonial Bank that this gentleman brought up and then I believe Sovereign Bank.

Do you know how many different accounts the Debtor might have had with Sovereign Bank account?

A    Yeah.  In this Statement of Financial Affairs I believe there was a listing, it's Exhibit B.

MR. DECAILLY:  Do you have the Schedules?

MR. PAULES:  No, I don't.

MR. DECAILLY:  Would you like to use mine?

MR. PAULES:  I'd be very grateful.  Thank you.

*THE WITNESS:*  The answer to the question,

32

19(d).

MR. PAULES:  19?

THE WITNESS:  (d), where it says, "Books, records and financial statements" --

MR. PAULES:  Yes, I have to look upside down here.

THE WITNESS:  -- parens (d).  There should be -- yeah, right here.  These.  There you go.

BY MR. PAULES:

Q    These are all the different financial institutions that they've had accounts in?

A    Correct.  And I'm looking at the exhibit to -- it's called Exhibit B.

MS. BURNETTE:  Well, let's read 19(d), because I think there's a miscommunication.

You're asking how many bank accounts the Debtor had, not who they necessarily provided financial statements to; right?

MR. PAULES:  Correct.  I was really asking --

MS. BURNETTE:  Right.  So, you --

MR. PAULES:  -- how many different bank accounts they had with Sovereign Bank.

MS. BURNETTE:  Right.  You probably want to look at Schedule B, which is not in the Statement of Financial Affairs --

33

MR. PAULES:  Okay.

MS. BURNETTE:  -- which is further back, the other direction, of those documents.  Back -- no, one more page, turn back.  No, the other.  Right. There you go.

MR. PAULES:  Operating account, deposit accounts, so I guess there are two accounts.

BY MR. PAULES:

Q    If I were to show you copies of the checks, can you determine if that's the operating account?

A    Right off the top of my head, I could not. Once again, there's a bank statement from Sovereign that I could -- I guess by process of elimination, if it's --

Q    Okay.  Well, how about this:  Would you have knowledge of who was authorized to sign on the account that my client got to two bad checks from?

A    I don't know who was the authorized signers on these accounts.

Q    Can you get that for me?

A    I believe I can.

Q    All right.  And can I take it a step further. I would actually ask if someone could identify the two signatures.  It appears that these checks, at least what my client had, required two people to sign them.

So (a) I'd be asking who is authorized to sign

34

on the account, and (b) who the two particular signatures are on each of those stop-payment checks.

MR. McINTYRE:  If you want to follow up with my office, you know, we probably would be in a position to provide you with that information. Since the Debtor no longer has counsel at the end of this meeting, and Mr. Hyman is just appearing on the Debtor's behalf for this meeting only, I'm Rich McIntyre, I represent Mr. Yaffe, Mark Yaffe and Phoenix Gold.  I'm sure he'd be happy to cooperate. But Mr. Hyman's not really in a role to provide any post --

MR. PAULES:  May I get your card so that I could communicate with you?

MR. McINTYRE:  I'm embarrassed I didn't provide one.  But if you give me your e-mail address, I'll send you an e-mail from my phone and it will have my contact info --

MR. PAULES:  Okay.

MR. McINTYRE:  -- if that would be acceptable.

MR. PAULES:  And do you want those copies?

MR. McINTYRE:  Yeah.  If that's okay, yeah. But if you tell me your e-mail address, I'll shoot you an e-mail now and I'll follow up with you.

Do you have a card or something?  I'll shoot

35

you an e-mail right now so you won't leave without my information.

MR. PAULES:  That's really all I have.  I'm just trying to –

MS. BURNETTE:  Okay.

MR. PAULES:  -- see from a different angle.

MS. BURNETTE:  Could I see the checks, please --

MR. McINTYRE:  Yes, of course.

MS. BURNETTE:  -- that we've been talking about?

I see one of the checks is for $56,694, dated June 9th, 2009.  And the other is, again, to American Rare Coins for $33,654, dated June 9, 2009.

THE WITNESS:  Yes.

MR. CRAWFORD:  Can you tell us which account, which bank that is --

MS. BURNETTE:  Sovereign Bank.

MR. CRAWFORD:  Okay.

MS. BURNETTE:  I believe those were from Sovereign Bank; right?

MR. PAULES:  Yes, ma'am.

MS. BURNETTE:  I believe that's what you said.

MR. McINTYRE:  Do you mind if I take those so

36

I can follow up with the checks?

MR. PAULES: No, sir.

MS. BURNETTE: Okay. Do we have someone else who wants to ask questions?

MR. EATON: I'll ask a few. I'm sure that others are going to have some.

How are you doing, Mr. Hyman?

THE WITNESS: Fine.

MR. EATON: John Eaton on behalf of the Trustee.

**E X A M I N A T I O N**

BY MR. EATON:

Q   A couple follow-up questions: You testified that there were certain records that Sovereign Bank had possession of, if I understood your testimony correctly. Do you know what records Sovereign Bank had when you were preparing the Schedules?

A   No. I was told that either Sovereign Bank or the Trustee had the majority of the accounting records.

Q   Okay. And what accounting records do you know that Sovereign had?

A   I don't know specifically what records they have versus the Trustee.

Q   Do you know whether Sovereign still has those records?

37

A    I do not know.

Q    You mentioned that Lynn Barnhardt assisted you in providing information with respect to the preparation of the Schedules.

A    Correct.

Q    Do you know what records Lynn Barnhardt had, from which you put together the Schedules?

A    The only record she had is what she provided to me.

Q    And what did she provide to you?

A    Well, copies of bank statements to substantiate balances, bank balances.  Also, she had an audited financial statement from the company's -- or the Debtor's CPA for the years 2007/2008 and, as I said, an appraisal for the music boxes.

Q    Do you know whether or not Lynn Barnhardt turned over copies of those records to the Trustee?

A    I do not know.

Q    Did you ever ask Lynn Barnhardt for additional records that you perhaps needed in order to complete the Schedules?

A    What we did is, you know, went down -- the Schedules were initially completed by her, then met with her out at the offices of Phoenix Gold, and went down every question to verify if it was marked "None," that

38

there was none, no records available.  And for any information that she did provide we asked for backup, if she could provide it.

Q   Were the Schedules already prepared when they were presented to you when you met at the offices?

A   In draft form.

Q   Did you make any changes to them after having met with Lynn Barnhardt and gone over the information?

A   I don't recall what specific -- some things might have been misclassified, or I don't recall if there was any actual, "let's mark out this number and put in a different number."

Q   Did you keep any copies of the drafts that had been prepared?

A   Yes.

Q   Okay.  And could we get copies of those drafts?

MR. McINTYRE:  They have -- they get the privilege.  So, yeah, the answer is yes.

THE WITNESS:  Yes.

BY MR. EATON:

Q   And who was present at the meeting in which you met Lynn Barnhardt to go over these Schedules?

A   It would have been Lynn Barnhardt and an associate of mine.

39

Q     And who is the associate of yours?

A     Rick Onderko.

Q     Was there anybody else present?

A     No.

Q     Were there any subsequent meetings?

A     No.

Q     Who made the changes to the Schedules after the meeting to put them in final form:  you or Ms. Barnhardt?

A     The final Schedules were actually from the draft form.  Once I determined that they were correct, then I turned them over to Mr. McIntyre and put them in the --

Q     I apologize if I asked that inartfully.  The question I guess, really is, you made -- discussed changes.  Who physically made the changes to the document:  you or Ms. Barnhardt?

A     That would have probably been me.

Q     Okay.  You made them and then printed them up, signed them and then turned them over to Mr. McIntyre?

A     No.

Q     Okay.  How did it work?

A     No.  The Schedules were given in draft form, what I would call the final Schedules in draft form, and then they were given to Mr. McIntyre's office for

40

putting into the software system --

Q   I'm sorry.  So, Mr. McIntyre then finalized them and gave them to you and you then signed them?

A   That is correct.

Q   Okay.  And when the final draft then was given to which you signed, did you have a follow-up meeting prior to signing with Ms. Barnhardt, or did you just sign them when they were provided to you?

A   I just signed them.

Q   Did you have any input from a woman by the name of Bev Sverker in preparing the Schedules?

A   No.

Q   Have you ever heard of that person's name before?

A   I have not.

Q   Did you ever ask for any access to computer records prior to signing the Schedules?

A   We were told that there were no records available.

Q   Who told you that?

A   Ms. Barnhardt.

Q   Do you recall specifically what she said?

A   I was told that the records were -- that the computer system was -- you couldn't gain access to it, basically.

41

Q    Let me ask you a couple questions about the Schedules.  There was a little bit of a discussion about the 8.9 -- no, I'm sorry -- the $9.8 million value of the antique music machines which is on Schedule B, line 5.

A    Uh-huh (affirmative.)

Q    I think you had testified that that particular number came from an appraisal that Sovereign Bank had?

A    I think I testified that was an appraisal.  I don't --

Q    No, no, I --

A    -- recall saying Sovereign had it.  Okay?

Q    I'm sorry.  Fair point.  But it was based upon an appraisal.

My question is:  Is the $9.8 million value for music boxes, music boxes that are owned by the Debtor and the Debtor alone?

A    That's what I was led to believe.

Q    So, just so we're clear.  $9.8 million on line 5 for music boxes are music boxes titled and owned by NGE?

MR. McINTYRE:  To be clear on that, since we assisted at that point, the bank, as a condition of one of the loans -- I think we talked about this earlier today -- required Mr. Yaffe -- Mark Yaffe

42

and Alan Yaffe to transfer over certain music boxes to the Debtor as part of the loan, a term note.  So when we're referring to those, we used the bank's appraisal and we use the -- the universal -- those music boxes would be the ones the bank required the Yaffes to transfer into National Gold Exchange.

MR. EATON:  And my point, though, is not regarding -- I'm not asking about the value of them.  I'm not asking about the lien amount.  I'm trying to find out if it's Mark Yaffe's music boxes or are these the Debtor's music boxes, specific ones that are referenced --

MR. McINTYRE:  The representation here is that those music boxes belong to the Debtor.

MR. EATON:  Okay.

MR. McINTYRE:  Because Mr. Yaffe concede -- both Alan, I think, and Shirley Yaffe and Mark Yaffe concede that as a byproduct of the bank transaction that was from 2007, they transferred those music boxes into the Debtor.

MR. EATON:  All right.  Thank you.

BY MR. EATON:

Q    On Question No. 30, the gold and silver coins, estimated between 16 and 20 million?

A    Yes.

43

Q    Do you know whether or not that number encompasses any coins that are located at NGC?

A    I don't know the answer to that, but I'm led to believe that, no.  NGC is the appraisal company.

Q    It's a grading company?

A    Right.

Q    Okay.

A    It's my understanding that this would be the estimated value of just the NGE, National Gold Exchange inventory.

Q    Okay.  And what do you understand, if at all, is the owner of coins that are located at NGC?

A    It's my understanding that NGC does not own any of those coins, that they merely -- they contract with third parties to appraise coins and they get them and they appraise them and send them back.

Q    I understand that NGC doesn't own them.  But the coins that are there, do you know who owns them?

A    No.

Q    You have no idea whether --

A    I didn't even go down that road as far as NGC is concerned.

Q    Did you have any discussions with Lynn Barnhardt about those coins?

A    The only thing I clarified was that none of

44

the coins in the possession of NGC were inventory of National Gold Exchange.

Q     And that was represented to you by Lynn Barnhardt?

A     Yes.

Q     Okay.  And did you go -- other than what Lynn Barnhardt told you, did you do any further investigation with respect to those coins?

A     No.

Q     Did you look at any documents to determine who owned those coins?

A     No.

Q     In these secured claims, Sovereign Bank, to Schedule D, I'm sure Mr. Crawford may go over this with you, the second item would be the amount of the secured claim, without deducting the value of the collateral for the music machines, and it says $2,160,000.  Do you know where that amount was derived?

A     I believe we have a statement to back that up. Or I have a statement here that was presented to me, it's dated July 31 -- or July 28 -- I'm sorry -- 2009, and gives a principal amount $2,160,000.

Q     So, that's the amount of a particular loan that's owed?

A     Correct.  And we were told that's for the

45

music machines.

Q    And do you know what specific music machines secures that claim?

A    To my knowledge, it's everything, the machines that are presented on Schedule B.

Q    All of those?

A    Correct.

Q    Are there any that are not encompassed within that particular secured claim?

A    I don't know the answer to that, but the statement is in the name of National Gold Exchange.

MS. BURNETTE:  Can I follow up on that?

MR. EATON:  Sure.  Go ahead.

MS. BURNETTE:  Well, why, if you believe the music machines are worth nine million eight hundred and eleven-plus dollars, why then, if Sovereign Bank's claim is only two million one hundred and sixty thousand dollars, do you say that it's totally unsecured?

THE WITNESS:  Well, it's my understanding that all these loans are cross-collateralized, that the inventory and the music machines are -- so, that --

MR. McINTYRE:  Do you want me to expand on that?

The loan that these machines specifically were

46

transferred to finalize was a $5 million term note, which was paid down to about $2 million.  And my understanding is there's cross-collateralization language.  And I think Mr. Crawford and the bank rep will tell you their contention is that, notwithstanding the fact that the note which those machines were designed to collateralize has been paid down to $2 million, their contention is that the remaining debt of the bank is collateralized by those music machines as well, pursuant to a cross-collateralization clause.

MS. BURNETTE:  So, we don't have equity --

MR. McINTYRE:  That would be the bank's contention.

MS. BURNETTE:  -- that's the bank's position that there's no equity in it, because the balance covers the $33,496,000?

MR. McINTYRE:  That's exactly right.

MR. EATON:  And then it would also be safe to assume, because in the preceding line item for Sovereign Bank for accounts receivable and inventory, it says the unsecured portion of the claim is the full 33 million.  I assume that's not correct?

MR. McINTYRE:  I think that when that was

47

filled out, it was filled out with the mindset that maybe there was no cross-collateralization.  I would be very surprised if they were not properly cross-collateralized, but that's something that you all will be looking at.

MR. EATON:  No, no.  I'm not talking about the music machines.  I'm actually talking about the accounts receivable and inventory.  The line item before that says the amount of the claim without deducting the value of collateral is 33,496,000.  And then it says, unsecured portion is 33,40 --

MR. McINTYRE:  It shouldn't say that.

MR. EATON:  That's --

MR. McINTYRE:  You know how Best Case works. You put in the numbers and it auto fills.  I wouldn't rely on that.

MR. EATON:  I have no further questions at this time.  Thank you.

MS. BURNETTE:  Okay.  Sir, please come have a seat.

MR. CRAWFORD:  Yes, ma'am.  Thank you.  Don Crawford on behalf of Sovereign Bank.

**E X A M I N A T I O N**

BY MR. CRAWFORD:

Q   How are you doing, Mr. Hyman?

48

A     Fine.  Thank you.

Q     Let me start and I'm sure these questions we've been over many times but let me go back over them and make sure I understand.

Who's paying you to be here today?

A     That would be Phoenix Gold Corporation.

Q     And so you've never received any payment from National Gold directly?

A     That is correct.

Q     No payments from Mark Yaffe directly?

A     Well, actually, the check I did receive was from Mark Yaffe, but a bank account had not been set up yet for -- at the time I was retained -- for Phoenix Corporation.  So, he was the only checkbook that was available to pay me.

Q     I understand.  When you met with Lynn Barnhardt to prepare the Schedules, what records did she bring with her to that meeting?

A     Essentially, it was -- we had, as I said, a draft of the Schedules and then we asked for backup and she provided whatever backup she could.

Q     So, I guess, when you went to meet with her, did she show you the Schedules and you would ask, what's the backup for this amount remaining in this account and she'd go through a big box and pull out a bank account,

49

or did she go back to her office and then send you backup later?

A    Oh, no, no.  All this was received at the time we met with her specifically to go over the Schedules.

Q    Did she tell you what other records she had for NGE, other than the ones presented to you at that meeting?

A    No.

Q    Did you ask for any additional records in her possession?

A    Once again, all we did was to go down and assist in the completion of the Statement of Financial Affairs and the Schedules.  So, we asked questions specific to the Schedules.

Q    But you didn't do anything to review NGE's records that Lynn Barnhardt that may have had that were not brought to this meeting?

A    Correct.

Q    And you didn't do anything to find out if Lynn Barnhardt had any other records that may assist you in completing the Schedules?

A    Well, once again, we asked if there was -- wherever there was a indication that none or a estimate, we did ask if there was any backup or any records, and the answer was, "No."

50

Q    What volume of records did she bring to the meeting when you discussed the Schedules?

A    It was -- we actually met at their office.

Q    At Phoenix Gold's offices?

A    Yes.

Q    Which they share with Independent Coin Grading; is that correct?

A    That's correct.

Q    Okay.  Did she bring a box full of records, a Redweld full of records, a file cabinet full of records? Can you give me some estimate?

A    There was just -- there was no rec -- I mean she was right there.  The records of the corporation, whatever she had were there, so we just asked for records.  Whatever she had, we went down the Schedules and whatever she had she -- we requested and she gave to us.

MR. CRAWFORD:  Okay.

MS. BURNETTE:  Let me ask a question.

MR. CRAWFORD:  Sure.

MS. BURNETTE:  So, Ms. Barnhardt actually never brought any records with her.  Phoenix Gold had these records and as you requested them, she obtained them from Phoenix Gold?  Is that --

THE WITNESS:  Well, once again, the -- Phoenix

51

Gold has one small location, as I said, out on Dale Mabry highway, and met at those offices of Phoenix Gold and -- so she had these records, these bank records were at the Phoenix Gold offices.

MS. BURNETTE:  All right.  So, you don't know if she brought records with her or if in fact she obtained them from Phoenix Gold at the time that you were going over the documents; do you know --

THE WITNESS:  She -- these bank records were in her possession, you know, in a file drawer.

MS. BURNETTE:  Located at Phoenix Gold?

THE WITNESS:  Correct.  Correct.

MS. BURNETTE:  Okay.

BY MR. CRAWFORD:

Q    So, there was a file drawer full of records at Phoenix Gold?

A    Well, I didn't go through the whole file drawer, but as I requested documents --

Q    I understand.

A    -- they were given to me.

Q    Just to clarify my question, because I think I asked it in a confusing fashion:  What was the volume of records that was available to Ms. Barnhardt when you were discussing the Schedules?

A    Once again, I don't know the volume.  I asked

52

for specific information.  It was provided.  So, I did not go and say, where are all the National Gold records and she pointed to ten boxes or a file drawer.

Q    Okay.

A    It was more just eliciting the specific information that was needed to verify information on the Schedules.

Q    Had she preselected the records that were shown to you?  Did she already have them sitting on the desk or did she have to go somewhere inside the Phoenix Gold offices and get them?

A    No.  We had requested records and they were readily available.

Q    By "readily available," do you mean -- if you asked her for a record, did she already have it sitting on the desk or did she have to turn around and reach in a file cabinet and take it out?

A    Well, we went over what was needed.  Then she went and got them.

Q    Okay.  Where did she go to get them?

A    Well, if you can -- the layout is you -- a somewhat secured area.  There's a table, something like this, and she sat on one side, we sat on the other, and we said we need -- we went over the Schedules --

Q    Right.

53

A    -- and anything that she said she had backup for, she went to another secured area and procured those documents and gave them to us.

Q    Did you ever to into that other secured area?

A    I had been in that secured area before.  Did not go in that secured area at that time.

Q    Okay.  So, you don't know what records may or may not have been in the secured area?

A    No.

Q    Do you know if those records have been turned over to the Trustee?

A    What records are you referring to?

Q    The records in the secured area where Ms. Barnhardt got the backup for the disclosure Schedules.

A    I don't know the answer to that.

MR. CRAWFORD:  Okay.

MR. EATON:  Don, if you don't mind me interrupting you for one second.

MR. CRAWFORD:  No, I don't mind at all, John.

MR. EATON:  To the extent --

MS. BURNETTE:  State your name, please.

MR. EATON:  John Eaton, again.

MR. McINTYRE:  I'm sending him an e-mail right now.

54

MR. EATON:  Thank you.

And just so the record's clear.  To the extent any such records existing were not turned over to the Trustee, and I know she turned over some records, please make sure that those are turned over immediately.

MR. McINTYRE:  I'm sending a request as we speak.

THE WITNESS:  Just for the record, your client did request some records and they were turned over.

MR. EATON:  No, no.  I know.  I'm just trying to make sure, based upon the questions, to make sure that these were in fact already turned over. I don't know.

BY MR. CRAWFORD:

Q   Did Ms. Barnhardt tell you why additional records weren't available so you could answer all the questions?

A   Well, in general, we were told that the records were either confiscated by your client, Sovereign, or were in the possession of the Trustee. And we didn't go beyond that.

Q   Would you have been surprised to hear they were across the street at NGE's facility, readily available through the Trustee to you or anyone else?

55

A    But once again, there were two Sheriff's cars there.  It's not -- you just don't go knocking on the door and they let you in.

Q    Okay.  So, the answer's "No"?

A    Correct.

Q    Okay.

MR. McINTYRE:  Well, there was a false premise in your question, that he could just waltz over next door and pick up the records.  So, his answer is -- that's a question that's incapable of being answered the way it was framed.

BY MR. CRAWFORD:

Q    Would you like to rephrase your answer based on that?

MR. McINTYRE:  I think he did.  He clarified by saying there was two Sheriff's cars there.  So, no.

MR. CRAWFORD:  Okay.

BY MR. CRAWFORD:

Q    Let me rephrase my question then.  Did anybody tell you that those records were available in the NGE facility?

A    I was just told that they were not.  Once again, they were in the possession of the bank or the Trustee.

56

Q    And you did nothing to independently attempt to verify the materials and information you were provided by Ms. Barnhardt?

A    I did some independent verification, and where I could I did, and where I couldn't I didn't.

Q    What did you do, other than review records that Ms. Barnhardt provided?

A    Can you elaborate on that question?  I don't quite understand what you mean.

Q    I just want to make sure that we're talking about the same thing.  Did you do anything to independently verify the information on the Schedules other than review the materials Ms. Barnhardt provided to you?

A    Once again, we requested if there was any information.  If there was, we reviewed it.  If it wasn't available then, of course, we could not verify it.

Q    Okay.  Before, you were asked some questions about coins of a company called NGC, if you recall.  And I believe your statement was that Ms. Barnhardt represented to you that none of the coins at NGC were the property of the Debtor; is that correct?

A    Okay.  So, I don't get messed up with my acronyms --

57

Q    I know.

A    -- is that the appraisal company we're talking about?  Just so I can --

Q    NGC is the appraisal company in Sarasota.

A    Okay.

Q    So, I'll just call them the "Sarasota grader" to keep them separated, if that's okay with you?

A    Okay.

Q    Okay.  So, I'll just ask my question again.

Previously, my understanding is you said that Lynn Barnhardt told you that none of the coins at the Sarasota grader belonged to the Debtor; is that correct?

A    Well, first of all, I wasn't aware there was a Sarasota grader.  The facility I'm referring to was located on North Dale Mabry in Tampa, with the facility I described, with the wall and a walk-through.

MR. McINTYRE:  He's talking about IGC.

THE WITNESS:  Oh, okay.  All right.  Well, then that's the reason I wanted to make sure I'm not --

MR. CRAWFORD:  Okay.  And that's why I wanted to make sure I was clear.

THE WITNESS:  So NGC, I don't know anything about.

MR. EATON:  Can I ask a question?

58

Does that mean that all of your responses to my questions -- this is John Eaton again speaking -- that all of my questions earlier, with respect to NGC, does not apply.  You were referring to IGC?

MR. McINTYRE:  They've been switched --

THE WITNESS:  I've got to be honest with you. I don't recall what questions you asked and what I answered about IGC versus NGC.

What I was responding to, though, is that I was not aware, until this very moment, that there was a Sarasota facility.  So, if you were referring to coins at the Sarasota facility, then probably my responses are incorrect because I was -- even though you might have said NGC, I guess I was referring to IGC.

MR. EATON:  Okay.  And thank you for that clarification.

THE WITNESS:  Okay.

BY MR. CRAWFORD:

Q   Okay.  So, the 16 to $20 million in gold and silver coins estimated in the Schedules, you don't know if that includes any coins that may still be at this Sarasota facility?

A   NGC?

Q   That is called NGC; that is correct.

59

A    I don't know.

MS. BURNETTE:  Okay.  Why don't you tell us what the acronyms mean, please, so it's on the record.

MR. CRAWFORD:  Sure.  Just for clarif --

MR. EATON:  It's actually in the Schedules.

MR. CRAWFORD:  NGC --

MR. EATON:  Numat --

MR. CRAWFORD:  -- is a company called Numismatic Guaranty Corporation.  They have an office in Sarasota, Florida.  They are an independent third-party grading company.  And what that means, in the coin trade coins are valued based upon a grade that is assigned by an independent third party, and NGC is one of a handful of independent third-party grading companies.

The other company that's been referred to --

MS. BURNETTE:  And they're independent because they're not owned by the Yaffes or --

MR. CRAWFORD:  They're not owned by -- NGC, as far as anyone knows, is not owned by any coin dealer.  They actually do grading services for coins.  They also rate and grade rare comic books.

MS. BURNETTE:  And so how are they connected

60

to the Debtor?

MR. CRAWFORD:  As an -- if you want to take it up, I'm happy to --

MS. BURNETTE:  If you know.

MR. CRAWFORD:  I will.  That's fine.

MS. BURNETTE:  Well, and you seem to be the man that knows.  He didn't even know it existed.

MR. CRAWFORD:  That's fine.  Numismatic Guaranty Corporation will come into possession of coins several ways.  One way would be if you were going to purchase a coin from the Debtor, you would say:  I want to buy this coin from you, but I only want to buy it if it has a certain grade or better.

And the Debtor would say:  Okay.  Well, we'll send it to NGC.  They will grade it.  If it grades out at the grade you require or better, then wire us the money and then NGC will send you the coin.

So, that's one way inventory of the Debtor may end up at NGC.

MS. BURNETTE:  And that is the independent --

MR. CRAWFORD:  That is the independent --

MS. BURNETTE:  -- grader --

MR. CRAWFORD:  -- third party --

MS. BURNETTE:  -- that they used?

MR. CRAWFORD:  Sometimes.  There are several

61

different graders.

MS. BURNETTE:  Okay.  And what is this other entity that's on Dale Mabry?

MR. EATON:  And that is an appraisal company, I believe, or another grader in which Mr. Yaffe does have an ownership interest.

MR. CRAWFORD:  It is a company called Independent Coin Graders.  Mr. Yaffe, based on our information that we have seen the public records of Florida, is the sole owner of that company, and they are also a grading company.

MS. BURNETTE:  And it's called Independent what?

MR. CRAWFORD:  Independent Coin Graders.  It also has a doing business as -- that is a doing business as that is also tied to a company called Florida Coin Graders.

MR. McINTYRE:  Ask him what books and records he reviewed in preparing his answers for today.

MR. CRAWFORD:  I reviewed the Florida Secretary of State website again and again and again.

And Independent Coin Graders also will show on the Secretary of State's web pages as an independent company.  So, there's some overlap

62

between those two that -- to say we don't fully understand.

MR. EATON:  And just so the record's clear.

NGC is listed at page 14 of Schedule F as a creditor.

MR. CRAWFORD:  Are they listed, full name?

MR. EATON:  No.  Just NGC.  Contingent, unliquidated, disputed, amount unknown.

MR. CRAWFORD:  Right.

MS. BURNETTE:  But NGC, to your knowledge, or to the Trustee's knowledge, has no relationship to Mr. Yaffe?

MR. EATON:  To the best of our knowledge, to date, that is correct.

MS. BURNETTE:  Okay.  And that's the Sarasota grader?

MR. EATON:  Correct.

MS. BURNETTE:  Okay.  Thank you for the explanation.,

THE WITNESS:  Thank you.

MR. EATON:  And the clarification.

MR. CRAW,FORD:  Glad I could help.

BY MR. CRAWFORD:

Q   Let me ask, and you may not know the answer to these questions based on what you told us about your

63

involvement.

Do you know if any accounts receivable owing to the Debtor have been collected by Phoenix Gold Corporation?

A    I don't know the answer to that.  But to my knowledge, no.

Q    Okay.  In your capacity as the financial advisor to Phoenix Gold, would you be able to answer that question?  Would you have access to information that would answer that question?

A    I probably would at some point, yes.

Q    Okay.  Do you have any knowledge about the relationship between the Debtor and a bank called First State Depository?

A    No knowledge.

Q    Do you have any knowledge of the Debtor's relationship with a company called A-Mark?

A    No.

Q    Do you have any knowledge of the Debtor's relationship with a company called Republic National Business Credit?

A    No.

Q    Do you have any knowledge about the Debtor's relationship with the Bank of Nova Scotia?

A    No.

64

Q    Do you have any knowledge about any loans that the Debtor has received from Bank of Nova Scotia, other than what's disclosed in the Schedules?

A    No.

Q    Do you have any knowledge about the Debtor's relationship with Gotham Bank?

A    No.

Q    Other than what's disclosed in the Schedules, do you have any knowledge about any loans between the Debtor and Gotham Bank?

A    No.

Q    Do you have any knowledge about NGE's relationship with Fortis Bank?

A    No.

Q    Other than what's disclosed in the Schedules, do you have any information about the loan -- any loans between the Debtor and Fortis Bank?

A    No.

Q    Do you have any knowledge about the Debtor's relationship with Fifth Third Bank, other than what's in the Schedules?

A    No.

Q    I'm sorry.  I don't want to make you have to go look through the Schedules.  Just tell me what you already said.  What we already know on the Schedules, I

65

don't want to waste your time with that.

Do you  have any knowledge about the Debtor's relationship with a company called Tudor Trust?

A     No.

Q     Do you have any knowledge about the Debtor's relationship to a company called Charles Gray, Inc.?

Q     Do you have any knowledge about the Debtor's relationship to a company called Rifkin Management?

A     No.

Q     Do you have any knowledge about the Debtor's relationship with a company called Eldorado Discount Gold?

A     No.

Q     Do you have any knowledge about the Debtor's relationship with a company called Gainesville Coins, Incorporated?

A     No.

Q     Do you know if any employees of Gainesville Coins, Incorporated are also -- or were also employed by the Debtor?

A     I do not know.

Q     Do you have any knowledge of the Debtor's relationship with a company called Buy Real Coins, LLC?

A     No.

Q     Do you know if any of the Debtor's inventory

66

is being offered for sale at *buyrealcoins.com*, which is the website maintained by Buy Real Coins, LLC?

A    I do not know.

Q    One other question about Phoenix Gold Corporation.  Do you know if Phoenix Gold Corporation has received any coins that the Debtor had loaned on consignment to any of its customers?

A    I do not know.

Q    Do you know if any inventory of the Debtor is currently in the possession of Phoenix Gold?

A    I don't know.

Q    Okay.  Do you have any knowledge at all about NGE's record-keeping policies and procedures?

A    No.

Q    Well, you saved yourself a page of questions.

A    Good.

Q    That's always helpful for us all.

And you have no knowledge at all about the Debtor's operations prior to the bankruptcy filing; is that correct?

A    Correct.

Q    Okay.  One final question:  What books or records, to your knowledge, were used by Lynn Barnhardt to prepare the Amended List of Creditors Holding 20 Largest Unsecured Claims?

67

A    There was a listing that she gave to me.  It looks like a -- some accounts payable run that was provided to me as part of my backup.

Q    Can we get a copy of that?

A    Certainly.

Q    You wouldn't have a copy here we could -- you don't have a spare copy here we could take with us? We'll have to just have you --

A    Yeah.

Q    -- e-mail one or something?

A    Yeah.

Q    Okay.  I'll give you my card.

A    Okay.

Q    So, if you wouldn't mind e-mailing us that.

MR. EATON:  And the Trustee would like a copy as well.

THE WITNESS:  Okay.

You want the whole A/P listing or the 20 largest creditors?

MR. CRAWFORD:  The whole A/P listing --

THE WITNESS:  Okay.

MR. CRAWFORD:  -- that you were provided as support for the 20 largest unsecured claims.

THE WITNESS:  Okay.

MS. BURNETTE:  Did you also use that for

68

support for the Schedule F?

THE WITNESS:  Yes.

BY MR. CRAWFORD:

Q    And you have no knowledge about -- do you have any knowledge regarding the employees of National Gold Exchange prior to the bankruptcy?

A    No.

Q    Do you have any knowledge regarding the participants in National Gold Exchange's 401(k) program prior to the bankruptcy?

A    No.

MR. McINTYRE:  Didn't you say "one more question" about ten questions ago?

MR. CRAWFORD:  I thought this was 20 questions.

I don't have anything else.

MS. BURNETTE:  Okay.  Do we have anyone else who has some questions?

MR. DECAILLY:  If nobody else is going to go, I have a few follow-ups, if I may.

MS. BURNETTE:  Mr. Farfante, you didn't have a chance.

MR. FARFANTE:  No, I don't.

MS. BURNETTE:  Okay.  Who else do we have? Let's see.  Mr. Snyder.

69

MR. SNYDER:  I think everything's been covered.  Thank you.

MS. BURNETTE:  Okay.

MR. CRAWFORD:  Actually, now that you mention it, I have a couple more -- I have one -- two questions, actually.

MS. BURNETTE:  Okay.  Well, why don't you come finish so the record's --

MR. CRAWFORD:  Sorry.

MR. BURNETTE:  -- easier that way.

BY MR. CRAWFORD:

Q    Are you aware if NGE has retained any criminal counsel as a result of the bankruptcy?

A    I do not know.

MR. CRAWFORD:  Okay.  All right.  Well, sorry, one question.

MS. BURNETTE:  Okay.

MR. McINTYRE:  You don't have to apologize for one question.

MS. BURNETTE:  Mr. DeCailly.

MR. DECAILLY:  Paul DeCailly, reappearing on behalf of Caligula.

**FURTHER EXAMINATION**

BY MR. DECAILLY:

Q    Sir, how many times have you been to the

70

Phoenix Gold location?

A    Twice.

Q    Okay.  And are there -- to your knowledge,
Phoenix Gold is operating?

A    Yes.

Q    Okay.  And does it have employees?

A    Yes.

Q    Okay.  And do you know what the phone number
is for Phoenix Gold?

A    I have a business card.  Would you like
me to --

Q    I would love a business card.

A    Well, I mean I can give you the number.  It's
my only business card, so I'd like to keep it.

Q    That's fine.

A    So, you want the phone number?

Q    The phone number.

A    813-963-2434.

Q    Okay.  And is there a website for Phoenix Gold
listed on the card?

A    No.

Q    Okay.  Can I look at the card?

A    You certainly can.

Q    I promise I'll give it back to you, and I
won't read whatever writing is on the back, if any.

71

You would agree with me there's several phone numbers on here?

A    Yes.

Q    Okay.  You read off the top one?

A    Well, let me look at it again.

Yes.

Q    Okay.  I'm going to go ahead and just put into the record the other two:  813-963-2542.

A    Can I just say something?  Some of Mr. Yaffe's personal home and cell phone --

Q    I'm not reading those.

A    -- appreciate it if you wouldn't put that in the record.

Q    No, no.  I'm not reading those.  Just some type -- I wouldn't.

A    Okay.

Q    And then 813-963-2624.  Okay.  Thank you.

And then I just want to go back to the music machines briefly.

Are you aware when National Gold Exchange was in operation, did they also deal in music machines?

A    I don't know.

Q    You don't know?

A    I don't know.

Q    Okay.  And have you ever been inside the

72

National Gold building that is in front of Phoenix, the Phoenix location?

A    I have not.

MR. DECAILLY:  Okay.  All right.  Nothing further.

MS. BURNETTE:  All right.  Mr. Hyman, you stated your position was financial advisor.

THE WITNESS:  Correct.

MS. BURNETTE:  Financial advisor to National Gold Exchange or financial advisor to Phoenix Gold?

THE WITNESS:  Well, probably to both.

MS. BURNETTE:  Okay.  Other than completing the Schedules and Statements in National Gold Exchange, do you anticipate having any other services for either the Debtor or Phoenix Gold?

THE WITNESS:  None for the Debtor.  With Phoenix Gold, yes.

MR. McINTYRE:  That's in the Plan, in the Disclosure Statement, as a continued role in that.

MS. BURNETTE:  Okay.  And so you will continue to be employed as a financial advisor for Phoenix Gold after today?

THE WITNESS:  That is correct.

MS. BURNETTE:  Okay.  I'm going to ask -- I know we have a Chapter 11 Trustee.  It's unusual

73

for us to have a Chapter 11 Trustee before the 341 meeting.

Mr. Luzinski, would you be willing to answer any questions that any of the parties might have as far as post-confirmation -- I mean postpetition operations?

MR. LUZINSKI:  I'm happy to do that.

MS. BURNETTE:  Does anybody have any questions of Mr. Luzinski?

MR. CRAWFORD:  It's my understanding there are no obligations to --

MR. EATON:  Yeah.  I was just about to --

MS. BURNETTE:  Well, what would --

MR. McINTYRE:  If there are any questions, it would have to be quick.

MR. EATON:  And it's a fair point, because it was the point I had just made to the Trustee, there have not been any post-conversion operations.

THE WITNESS:  And I was in the status conference this morning and Mr. Luzinski I think gave a very nice summary of what has transpired since he's been on the watch.  So, I think there's quite a good record in the court file.

MS. BURNETTE:  Okay.  And I assume everybody was there except me?

74

THE WITNESS:  Yes.

MS. BURNETTE:  Okay.  All right.  I am not going to conclude the meeting.  I'm going to leave the meeting open because I feel like there are significant questions that haven't been answered yet.  And to the extent anyone determines that we need those questions answered, we may need to take action to have Mr. Yaffe appear so he can explain what went on prepetition and he can maybe explain the basis for the numbers that were provided to Mr. Hyman for preparation of the Schedules and Statements.

So, with that, then, the meeting will be continued to an open date, and we're done for today.

(Whereupon, at 2:54 p.m., the proceedings adjourned to an open date in the future.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA      )

COUNTY OF PASCO       )


          I, GRETCHEN L. SCHULTZ, being a Certified Court Reporter, hereby certify that I was authorized to and did report the foregoing deposition of LARRY HYMAN, and that the transcript is a true and complete record of my stenomask notes.

          I FURTHER CERTIFY THAT I am not a relative, employee, attorney or counsel of any of the parties hereto, nor am I financially interested in the matter.

          DONE AND SIGNED THIS 24th day of September, 2009, in the City of Holiday, County of Pasco, State of Florida.




                         _____
                         GRETCHEN L. SCHULTZ
                         Certified Court Reporter
                         Commission Expires:  12/20/09
                         Commission No:  DD496376