**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

- - - - - - - - - - - - - - - x
IN RE:                         :
                               :
NATIONAL GOLD EXCHANGE, INC.   :   Case No. 09-15972-8W1
                               :
          Debtor               :        Chapter 11
                               :
- - - - - - - - - - - - - - - x

Sam M. Gibbons
U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
Held February 10, 2010

**TRANSCRIPT OF HEARING**

1-Amended Motion for Rehearing to Reconsider, Alter or
Amend Order Granting Caligula Corp.'s Motion for 2004
Exam, etc. by Mark & Christel Yaffe (Doc. #305);
Joinder by Alan & Shirley Yaffe (Doc. #307); 2-Renewed
Motion for Relief From Stay by Sovereign Bank
(Doc. #319); 3-Motion to Estimate Claim #1 for Voting
Purposes by Caligula Corp. (Doc. #325)

**BEFORE THE HONORABLE MICHAEL G. WILLIAMSON
United States Bankruptcy Judge**

*PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.*

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

## A P P E A R A N C E S

| | |
|---|---|
| For Cal Staggers<br>(Phone appearance) | STEVEN M. BERMAN, Esquire<br>Shumaker Loop & Kendrick<br>101 E. Kennedy Blvd.<br>Suite 2800<br>Tampa, Florida 33602-5150<br>813-229-7600<br>sberman@slk-law.com |
| For the Chapter 11<br>Trustee, Joe Luzinski<br>(Phone appearance) | JOHN D. EATON, Esquire<br>Berger Singerman PA<br>350 E. Las Olas Blvd.<br>Suite 1000<br>Fort Lauderdale, Florida 33301<br>954-712-5123<br>jeaton@bergersingerman.com |
| For Randall Greene<br>(Phone appearance) | JENNIFER K. BIRMINGHAM, Esq.<br>Alvarez Sambol Winthrop & Madson<br>100 S. Orange Avenue<br>Suite 200<br>Orlando, Florida 32801<br>407-210-2796<br>jkb@aswmpa.com |
| As the Chapter 11<br>Trustee, Joe Luzinski<br>(Phone appearance) | JOSEPH LUZINSKI<br>200 S. Biscayne Blvd<br>Suite 1818<br>Miami, Florida 33131<br>305-374-2717<br>jluzinski@dsi.biz |
| For Creditor A-Mark<br>Precious Metals<br>(Phone appearance) | MINDY MORA, Esquire<br>Bilzin Sumberg Baena<br>Price & Axelrod<br>200 S. Biscayne Blvd.<br>Suite 2500<br>Miami, Florida 33131-5340<br>305-374-7580<br>mmora@bilzin.com |

**A P P E A R A N C E S**
(Continued)

For the Debtor            RICHARD J. MCINTYRE, Esquire
                          McIntyre Panzarella Thanasides
                          6943 E. Fowler Ave.
                          Tampa, Florida 33617-1714
                          813-899-6059
                          Rich@mcintyrefirm.com

                          DANIEL L. SAXE, Esquire
                          Saady & Saxe P.A.
                          205 Crystal Grove Blvd.
                          Lutz, Florida 33548-6452
                          813-909-8855
                          saadyandsaxe@saadyandsaxe.com

For Alan and              ROBERTA COLTON, Esquire
Shirley Yaffe             Trenam Kemker
                          P.O. Box 1102
                          Tampa, Florida 33601-1102
                          813-223-7474
                          racolton@trenam.com

For Sovereign Bank        ROBERT A. SORIANO, Esquire
                          DANIELLE S. KEMP, Esquire
                          Greenberg Traurig, PA
                          625 E. Twiggs Street
                          Suite 100
                          Tampa, Florida 33602-3925
                          813-318-5700
                          sorianor@gtlaw.com
                          kempd@gtlaw.com

For the Austrian Mint     PATRICK M. MOSLEY, Esquire
                          Hill, Ward & Henderson
                          101 E. Kennedy Blvd.
                          Suite 3700
                          Tampa, Florida 33602
                          813-221-3900
                          pmosley@hwhlaw.com

**A P P E A R A N C E S**
(Continued)

For Caligula            PAUL DECAILLY, Esquire
Corporation             DeCailly, PLC
                        3111 W. Martin Luther King Blvd.
                        Suite 100
                        Tampa, Florida 33607-6232
                        813-286-2909
                        pdecailly@pdlaw.net


For Republic            DARREN D. FARFANTE, Esquire
National Business       Fowler White Boggs Banker PA
Credit                  PO Box 1438
                        Tampa, Florida 33601-1438
                        813-228-7411
                        dfarfante@fowlerwhite.com


For the U.S. Trustee    J. STEVEN WILKES, Esquire
                        U.S. TRUSTEE'S OFFICE
                        Timberlake Annex
                        501 E. Polk Street
                        Suite 1200
                        Tampa, Florida 33602
                        813-228-2000

**REPORTER'S NOTES**
In compliance with FRBP 9037, court redaction policy:
Social security numbers, account numbers, dates of birth,
and names of minor children have been redacted.

Quotation marks used herein are for readability purposes
and may not reflect actual quoted materials or
statements.

**P R O C E E D I N G S**

(Whereupon, the proceedings commenced at 11:21 a.m.)

THE COURTROOM DEPUTY:  (Placing calls for telephonic appearances.)  This is Marti calling from Judge Williamson's courtroom.  I'm calling the National Gold Exchange case, Case No. 09-15972.

THE COURT:  Okay, very well.  Let me take appearances from those appearing by phone.

MR. BERMAN:  Good morning, Steve Berman appearing on behalf of Cal Staggers.

THE COURT:  Okay, Mr. Berman.  Thank you.

MR. EATON:  Good morning, Your Honor. John Eaton on behalf of the Trustee, Joe Luzinski.

THE COURT:  Okay, Mr. Eaton.  Thank you.

MS. BIRMINGHAM:  And good morning Your Honor.  Jennifer Birmingham on behalf of Randall Greene.

THE COURT:  Okay, Ms. Birmingham.  Thank you.

MS. MORA:  Good morning, Your Honor.  This is Mindy Mora on behalf of A-Mark Precious Metals, Incorporated.

THE COURT:  Okay, Ms. Mora .  Thank you.

MR. LUZINSKI:  And, Judge, this is Joseph

Luzinski, the Trustee.

THE COURT:  Okay, thank you, Mr. Luzinski.
And in the courtroom?

MR. MCINTYRE:  Richard McIntyre and Dan
Saxe for the Debtor, Your Honor, and with us today
is also Mark Yaffe, the principal of Phoenix Gold.

THE COURT:  Okay.  Thank you, Mr. McIntyre
and Mr. Saxe.

MS. COLTON:  Good morning, Your Honor.
Roberta Colton for Alan and Shirley Yaffe.

THE COURT:  Okay, Ms. Colton.

MR. MOSLEY:  Good morning, Your Honor.
Patrick Mosley on behalf of the Austrian Mint.

THE COURT:  Okay, Mr. Mosley, thank you.

MR. SORIANO:  Good morning, Your Honor.
Robert Soriano and Danielle Kemp for Sovereign Bank.

THE COURT:  Thank you, Mr. Soriano.

MR. DECAILLY:  Good morning, Your Honor.
Paul DeCailly appearing on behalf of unsecured
creditor, Caligula Corporation.

THE COURT:  Okay, Mr. DeCailly, thank you.

MR. FARFANTE:  Good morning, Your Honor.
Darren Farfante on behalf of Republic National
Business Credit.

THE COURT:  Okay, Mr. Farfante.

MR. WILKES:  Good morning, Your Honor. J. Steven Wilkes on behalf of the United States Trustee.

THE COURT:  Okay, thank you, Mr. Wilkes. Okay, very well, we have a relatively short calendar, three items.  Let's see, who wants to be the MC here?  I guess nobody.  Okay, I'll just do them in order.

Amended motion for rehearing.  That was filed -- I think Mr. McIntyre, you filed that, I believe.

MR. MCINTYRE:  Yes, Your Honor.  Your Honor, I don't know if you've had a chance -- and I'm assuming you probably have -- to review the motion.

THE COURT:  I did.

MR. MCINTYRE:  You're familiar with the District Court order --

THE COURT:  I am.

MR. MCINTYRE:  -- enjoining Mr. Paul Bilzerian from directing the activities of Caligula. You're familiar that the Circuit Court here in Hillsborough County had stayed the litigation pre-bankruptcy pending some discovery to determine whether or not Paul Bilzerian was violating the

order and Caligula was in contempt by moving forward through his direction.

That discovery was not produced.  This case followed.  What we would like to do is simply have -- require Caligula to respond to that discovery as a threshold matter because, as you've seen, Caligula has been a very active creditor in this case.  And, you know, without casting aspersions, there's -- you know, we would raise questions as to their motivations.

If they are prohibited under the DC order from moving forward with this claim and they're in violation of the order, that's something that the Court, I think, not only should consider, but it should impact what they can do in the case. Obviously concerned with their rights to due process, I get that, but at the same time, to the extent that -- you know, this is obviously a case that has a rich history between the parties, and it seems to me that issue needs to be brought to a head -- should have been brought to a head earlier in the State Court litigation and just needs to be addressed, and can be done so quickly.

My suggestion would be, allow the discovery to be responded to.  You know, force them

to respond to the discovery quickly --

THE COURT:  That's the discovery that was pending in front of Judge Silver's court.

MR. MCINTYRE:  That's correct, Your Honor. Mr. Saxe had propounded that discovery.  Require them to respond, even possibly if you want to, shorten the deadlines.  Have a quick evidentiary hearing to determine whether or not there is actually a violation of the order.  And I guess there's no -- there's no moving -- no procedural vehicle right now for that, I suppose.  We have a reconsideration on the 2004.  I guess it could be done in the context of the 2004 motion.

THE COURT:  Right.

MR. MCINTYRE:  If you like, we could file a motion, but it would seem to me there should be an evidentiary -- a quick evidentiary hearing to determine whether or not Caligula is moving in violation of the contempt order -- or the order from the DC court.

And then from there, the remainder of their participation in this case can be determined, so that we can deal with our objection to the claim, their motion to estimate the claim.  And given the procedural posture of the case, which we can get to

next if you like, I don't believe that will cause any prejudice or hardship upon Caligula as a potential creditor, given the timing of things.

If you like, I can move to that issue very briefly, just to elaborate.

THE COURT:  And the issue being the claim?

MR. MCINTYRE:  The timing of the confirmation of this case --

THE COURT:  Okay.

MR. MCINTYRE:  -- which would implicate the objection to their claim and the estimation of their claim for plan purposes.

THE COURT:  Okay, what is the timing?

MR. MCINTYRE:  We filed -- you know that we filed a motion to extend time to file the plan and disclosure statement.  That was granted, and we filed timely the plan and disclosure statement. There are a lot of moving parts.  It's like a Rubik's cube; every time you turn it something changes on the other panels.

But that said, I think we -- I think we're moving to the point where I believe we can successfully confirm this plan.  I believe we'll have the vote of the unsecureds.  I don't want to say that we'll have the vote of the bank.  And Mr.

Soriano, I'm sure, will say that the bank is not supportive of our position at this time, but at the same time I believe there's a level of cooperation, and the bank hasn't taken a stab in the heart yet at the plan and I think that -- I think we'll be able to reach some form of resolution.

It may not be a -- it may not be a deal. It may be as simple that they don't oppose confirmation, but I think that's where we'll end up being at the end of the day.

I think the same may be true of our interaction with the Trustee. I think everyone will be less than satisfied with the plan. When I say "everybody," I think the unsecureds again will vote. I don't think the Trustee and the bank will be thrilled but I think they would be in a position where they would have to say it's better than the alternative.

Mr. Yaffe has been producing, Mr. Hyman has been auditing everything Mr. Yaffe's been doing, and he has made a lot of money with a loan from his father that provided some capital to his Phoenix Gold business. And Mr. Hyman I think will be in a good position to testify at confirmation as to the viability of Phoenix Gold in the plan to pay

everybody back over the projected timeframe.

So with that said, what I think the timing would be, if the Court sees it the same way, I think it makes sense to have a hearing on the disclosure statement.  And I spoke with Mr. Eaton this morning. They have some concerns with the disclosure statement, some nits as he described them, and understandably so.

I'd like to -- you know, I think it makes sense to vet those through a disclosure statement hearing, even though that's traditionally not how we like to proceed.

THE COURT:  Right.

MR. MCINTYRE:  But have them vetted so we don't get to confirmation and then have a technical issue with disclosure that stops confirmation of an otherwise favorable plan that's supported by the unsecured creditors.

THE COURT:  Has the -- do we have a hearing scheduled on confirmation?

MR. MCINTYRE:  Yeah, I believe our combined hearing for confirmation and disclosure statement approval is the 3rd -- I believe it's the 3rd of March, which under the timing -- under the rules just doesn't work because I believe this Court

has to enter an order conditionally approving our amended plan and disclosure statement because they changed materially the deal.

And so as a result, my belief is there's no way that the hearing can go forward on the 3rd. I mean, it could go forward but we won't get the plan and disclosure statement out in time, and the balloting and the notice periods would have to be --

THE COURT:  Right.

MR. MCINTYRE:  -- would have to be shortened.

THE COURT:  Could the March 3rd time be used for the disclosure statement hearing if we decide to do that?

MR. MCINTYRE:  I think that would be perfect.  I think that'd be perfect, Your Honor. and given that, it could also, if you have the time -- I don't know if you're crammed on that day.  I think the March 3rd date could also be used for a one-hour evidentiary hearing on the involvement of Mr. Bilzerian, Paul Bilzerian, in Caligula for the purposes of figuring out how you're going to deal with the DC contempt order.

THE COURT:  Okay, very well.

MR. MCINTYRE:  Thank you, Your Honor.

THE COURT:  Let's see, Ms. Colton, did you want to be heard at this point?  I know you filed a joinder.

MS. COLTON:  Yes, Your Honor.  I would just add one other thing.  There's really two -- two alternatives.  One is to make the decision here, and the other would be for Caligula to actually apply to the District Court for permission -- I think it's more than an injunction -- that they could ask for clarification as well.

THE COURT:  Or to do a two-step --

MS. COLTON:  Yes.

THE COURT:  -- process to determine whether that's needed, and then go to the District Court.  Sure.

MR. MCINTYRE:  Your Honor, if I may, on that front, I've spoken with Mr. Saxe at length about the concept of using the District Court up there.  And the only thing he has said, with all due respect to that Court, is that everything is very slow.  They're very, very -- they're loaded up there.  And I would be concerned that the whole due process issue may be slowed down by going there.

Certainly don't have any opposition to it. Happy to do it.

THE COURT:  I understand.

MR. MCINTYRE:  Just concerned about the timing.

THE COURT:  No, I understand the issue. Okay.  Okay, very well.  Mr. DeCailly.

MR. DECAILLY:  Your Honor, I'd like to back up a little bit and just address, first of all, it's a little unclear as to who's bring this Rule 60 motion and what standing they have to actually bring it.

But it is a motion for reconsideration or a motion for rehearing under Rule 60, as applied by, I believe, Rule 9024, and so they have to meet some thresholds before they actually even get to the point of the Court attempting to even rule on the motion.

The first threshold is, was it timely? And I'm reading from a case from the District Court here in the Middle District of Florida, Harduvel v. General Dynamics Corporation, it's 801 F.Supp. 597 from 1992, and it indicates that Rule 60(b) sets forth a two-part test of timeliness.  The first is within a year, and the second is whether or not it was reasonable.  And just because it's not -- just because it's brought within a year does not

necessarily make it reasonable.

In this case, they brought a motion pursuant to an order that was entered in 2001 that they, in the State Court, were aware of and actually invoked and filed some papers.

So I would contend that, first of all, this motion is not timely at all. The Debtor or -- again, it appears the Debtor is bringing this despite the fact that it's not the Chapter 11 Trustee bringing it. But it appears that the parties bringing it were well aware off it long before even the hearing on our motion that the Court set for the 2004 meetings. So I do not believe that it's timely.

Second of all, it is brought pursuant to, I believe, allegations of fraud. And I have another case here, In re Fulks, 343 B.R. 701, from the Middle District Bankruptcy Court, a Judge Paskay decision, where he considers how the Court would consider a motion based upon -- with allegations of fraud, what the standard is.

And Judge Paskay, citing Black's Law Dictionary, cites to it should -- in order to bring a motion for relief from judgment pursuant to fraud, they have to demonstrate actionable fraud, and it

must appear that the Defendant made a material representation that it was false when it was made and knew it was false.

Okay, that has not been shown here as well.  They claim in their motion that the case was stayed pending the discovery.  Well, at first, if you look at the back of the hearing -- at the back of the motion -- of the hearing transcript that they attach, Judge Silver definitely stated and then also indicated that he wanted to hold a hearing on pending motions to quash subpoenas, which I believe are the discovery -- outstanding discovery devices that were used in the lower court.

Now, those subpoenas are not directed towards Caligula Corporation.  They're directed towards two attorneys, Mr. Hammer and Mr. Bleakley.  They had filed motions to quash the subpoenas.  They had discussed it at a July 21st hearing, a half an hour hearing on those issues.

But by virtue of filing this action, this Chapter 11, and not removing that case, whatever happened down there, it was stayed prior to this, and now is stayed due to the bankruptcy, Your Honor.

And what they're asking you to do is handcuff Caligula for discovery directed at third

parties that has not been complied with.  And that is certainly not fair.

And I'm here today, I wasn't even aware that the Court -- and I appreciate the Court doing it, but placing our motion to determine our claim as well.  I wasn't aware that that was on for this morning, but I'm fine with going forward on it.

THE COURT:  It wasn't noticed.  You mean the motion to estimate claims?

MR. DECAILLY:  Right.

THE COURT:  Whenever something gets filed at the last minute, we put it on and put "not noticed."  The idea is, you know, if everyone's in agreement I'll deal with it.  If there's an issue, I just like to have it out there.

MR. DECAILLY:  I was hoping that it was going to -- that it would be put on, but I didn't see any ECF entry --

THE COURT:  No.

MR. DECAILLY:  -- so I did not -- but obviously I just filed it, it's still fresh in my mind, so I'm prepared to --

THE COURT:  No, I'm --

MR. DECAILLY:  -- go forward with that.

THE COURT:  -- probably not going to deal

with that on the merits.  It's just there and we need to talk about how we deal with it.

MR. DECAILLY:  But on this issue, Caligula filed a motion for 2004 examinations.  I don't believe there's anything in that motion that indicates that they want to investigate anything that is claim specific.

They want what everybody should want, which is the information we should have gotten or been able to get through the filing of the schedules, which is not there, and what we should have been able to get at the meeting of creditors, which really didn't happen, as the Debtor did not appear at the meeting of creditors.  Somebody else for Phoenix Gold Corporation appeared at the meeting of creditors and had limited information.

Your Honor, furthermore, even though their motion doesn't address it, but it appears now that it's been teed up for a decision is, is while they bring a motion for rehearing to stop the 2004 examinations, they immediately after that create a contested matter, for which we're entitled to discovery under 9014, by filing an objection to our claim.

So I was of the opinion and -- but at the

request of Mr. McIntyre and others, that we waited till today. But, I mean, upon filing of that objection to claim, I could have set deposition dates on that.

And I believe if the Court recalls when we were here on the motion for the examinations, the Court had indicated that as far as the timing goes that 2004 examination might be combined up with depositions pursuant to an objection to the plan or disclosure statement which would also create contested matters.

That's what the Court decided. They filed their motion almost 20 days -- for rehearing, 20 days after the Court entered the order on our motion. So in sum, Your Honor, their motion is untimely because it's not reasonable for them to wait 20 days. They haven't actually demonstrated any particular reason for the motion. They haven't articulated any reasons under 60(b) why the Court should even be rehearing this issue, and we should be allowed to go forward with our 2004 examination, Your Honor. And with that, I'll take any questions from the Court or --

THE COURT: No, that's helpful, thank you. Any response?

MR. MCINTYRE:  Brief response, Your Honor. The methodology through which we brought this to the Court is one of several that could have been used. This isn't just a rehearing of a motion that's positively adjudicated the right of Caligula to pursue its claim in this proceeding.

The Court has its inherent power, obviously as the Court knows, to enforce different issues in the courtroom, and if there's a pending stay in another court that prohibits Caligula from moving forward, I don't think anyone would take the position that that was actually litigated in connection with at 2004 motion.

And so, Your Honor, I think that while it's a good argument in terms of coming up with something at the end of the day, they've got to deal with the stay.  And if there's a stay, and the District Court in DC prohibited them from moving forward with the claim against Caligula -- I'm sorry, against National Gold, they need to deal with that.  And I think this Court can deal with that in any variety of ways.  It just has to be addressed.

It's a threshold issue.  Judge Silver saw it the same way.  Judge Silver created a methodology which was stopped by the filing of this case.  That

just -- that process needs to go its course.  And so I just -- I think the Rule 60 issue misses the mark because there has been no adjudication of whether or not participation of Caligula in this case is a violation of the District Court's order and requires the permission of the District Court to go forward.  Thank you, Your Honor.

THE COURT:  Okay.

MR. DECAILLY:  Your Honor, I want to just clarify.  I don't believe the District Court mandated that there be a special hearing on whether or not Caligula is controlled by Paul Bilzerian.

THE COURT:  No, I -- the District Court did not.

MR. DECAILLY:  Right.

THE COURT:  No question about that.  There were some references to it that this could be -- it was belts and suspenders.  There was enough there for the District Court to deal with what was before the District Court.

MR. DECAILLY:  Right.

THE COURT:  And by the way, there may be this Caligula problem here too, but it wasn't essential to the ruling because it didn't need to get to the Caligula issue.

MR. DECAILLY:  And there was a -- actually a modification of the order they attached.  There was a motion for reconsideration filed, and there was a new order that modified that order.

Unfortunately, I was unable to get a copy of it actually effectively sent to me by Mr. Hammer, who receives those; I do not.

THE COURT:  But that wasn't -- it didn't bear on this issue, though, did it?

MR. DECAILLY:  It somewhat did.  The first order directed Mr. Hammer -- it seemed to direct him to withdraw from Caligula represent -- representing Caligula.  And the District Court came back and said, "No, you don't have to withdraw from Caligula."

THE COURT:  I gotcha, okay.

MR. DECAILLY:  There's a whole bunch of other stuff, but as far as Caligula is concerned, I believe that is the only issue regarding Caligula with that order.

THE COURT:  Okay, thank you.  Okay, very well, the Court has before it an amended motion by Mark Yaffe and Christel Yaffe for rehearing to reconsider the entry by this Court of an order granting a motion for 2004 exam.  That order was

entered on January 6th, and that was following a hearing which had been held on December 2nd on the motion filed by Caligula under 2004 on November 23rd.

My recollection is that I considered the 2004 motion relatively routinely. And as I generally allow 2004 exams liberally for the benefit of creditors, I granted the motion. And I don't recall any strong opposition at the time.

Since then, it appears that on -- that there were issues that related to the 2004 exam and Caligula's status that were not touched on at the December 2nd hearing, and which may impact the right of Caligula to proceed in this case. And those relate to what transpired prior to this bankruptcy case being filed on July 24th, 2009.

Specifically, in April of 2009, Judge Bernard C. Silver, of the Hillsborough Circuit Court, had entered an order in the Hillsborough County litigation initiated by Caligula against National Gold, staying proceedings in that lawsuit pending discovery on whether Caligula was acting as an agent, servant, employee, attorney or entity in active concert or participation with Paul Bilzerian, such as to bring it within the scope of Judge

Lamberth's July 19, 2001 injunction order, as well as Judge Lamberth's September 19, 2008 order to show cause.

It appears that that discovery had not been concluded, and the filing of this bankruptcy case stayed further proceedings in front of Judge Silver.

We're now before this Court essentially attempting to raise the same issues that were unresolved in the case in front of Judge Silver.

In considering the motion, I do first consider whether the motion for rehearing was properly filed and timely and proper in its scope. Rule 60(b) provides the Court with a great amount of discretion, and it's my practice generally that in cases where I enter routine orders, such as a 2004 exam, I liberally grant rehearing so that if there are objections that should have been more fully considered at the time of entry of the order, that I give the parties an opportunity to present those on the merits. That, in itself, is a reason that justifies reconsideration under Rule 60(b)(6).

And the second principal that is in play here is this Court's concern that matters that are proceeding under the auspices of the Bankruptcy

Court and enjoy somewhat of a degree of insulation from other courts, both because of the automatic stay and because of the perception of other courts that let the Bankruptcy Court do whatever it does, that what we're doing here is in derogation of a Federal District Court injunction and the proceedings of our sister court in Hillsborough County that had these very issues before it.

Those issues weren't resolved. And I'm very concerned that matters proceed here with some important issues that go to standing or to the ability to prosecute a claim by a significant party, Caligula, without completing what Judge Silver started and what this bankruptcy case prevented from being concluded.

And accordingly, I think it is appropriate to conclude what Judge Silver started so that we know what the answer to that question is. That question being whether Caligula's action or assertions that were made in the State Court litigation which in turn form the basis for their claim in this Court -- or would form the basis -- whether they violated the District Court injunction.

And it may be that this would be a simple matter of going back to the District Court and

asking for permission to proceed or it may be that these allegations are nothing more than allegations. And the whole idea that Mr. Bilzerian is somehow calling the shots here or somehow violating Judge Lamberth's order or just simply there's no facts to support it. But I just don't know because the discovery was not allowed to be com -- or did not conclude in the case in front of Judge Silver.

So based on that, I will enter an order vacating the 2004 exam orders pending a further hearing on the motion for 2004. And prior to concluding a hearing on that motion, I will allow discovery to go forward consistent with Judge Silver's order so that we can come back here at a hearing on the 2004 motion and consider whether or not Caligula needs to go to the District Court and get permission to prosecute this claim or can proceed without leave of that Court.

And for those reasons I'll grant the motion. I'll look to Mr. McIntyre for a form of order for the reasons stated orally in open court.

Maybe we could use -- I don't know if the March 3rd time is going to be too soon to consider this on the merits. Frankly, I don't know if we have enough time to consider it then anyway.

THE COURTROOM DEPUTY:  I think we have this case just -- that's the only thing we have set at 1:30, I think, Judge.

THE COURT:  At 1:30?  Well, then that's a real good time then.  Now, Mr. Saxe, since you were involved in the State Court, what would be involved in this discovery?

MR. SAXE:  Thank you, Your Honor.  What was pending discovery-wise in State Court were limited discovery paper requests for documents that were submitted to Caligula which were never responded to.  And there were two subpoenas, as Mr. DeCailly properly indicated, one to Mr. Hammer, who was representing Caligula, and the other to Mr. Blakeley, who was representing Caligula, restricted to communications between themselves and Mr. Bilzerian, who we claim was controlling everything.

Those are the three discrete pieces of discovery that were out here.  Our plan was to obtain the documents and then conduct depositions of, at a minimum, Bilzerian family members. At least Adam and Dan Bilzerian, who have been identified to us as officers of the company, Paul Bilzerian, for obvious reasons, and possibly his wife Terri Steffen, who originally filed Caligula

back in 2005.  That's our plan.

The discovery has already been propounded. I could certainly recast it under the caption of this court and resubmit it to Mr. DeCailly.  I don't if he's even seen it yet.  And the speed with which this is completed would, I think, be an issue for Mr. DeCailly to address, because we've already drafted the discovery; it's done.  The only other thing I would require would be depositions.

THE COURT:  Okay.  So what would be -- from your perspective, what would be an ideal timeline?  Let's say starting with when you recast and file your discovery request in the context of the motion for 2004, which is the umbrella that we'll be proceeding under in the Federal Rules of Procedure, which are analogous to the State Rules.

MR. SAXE:  Your Honor, once we receive the responses, and assuming there's no problem with them, I'll be prepared to go forward in depositions within ten days --

THE COURT:  Okay.

MR. SAXE:  -- of that date.

THE COURT:  So what you're suggesting is that you could, say, by Friday get the discovery recast in appropriate form and delivered to Mr.

DeCailly. That would be the 12th, I think. And I'm just thinking out loud here, Mr. DeCailly. I want to get your input on this but I want to give you something to shoot at in terms of what's practical.

So it'd be February 12th. And then X-amount of days to respond to the request for production. What is your request on that?

MR. SAXE: Typically, the rule, as I understand, would provide for 30 days. If they could get it to me quicker than that, then I would be able to set depositions quicker than --

THE COURT: Okay. Well, you've got to ask. Give me a number.

MR. SAXE: Ten days, Your Honor.

THE COURT: Okay. I'm not going to negotiate with myself here. You've got to suggest something and then Mr. DeCailly can respond. So you want ten days to respond to written discovery.

MR. SAXE: Correct, Your Honor.

THE COURT: And then 20 days to arrange dates for dis -- you know, to try to do the depositions, something in that timeframe?

MR. SAXE: Yes, that would work, Your Honor.

THE COURT: Okay. Okay, Mr. DeCailly,

what are your thoughts here on -- given my ruling? And I realize it's not the ruling you were --

MR. DECAILLY:  Again, Your Honor, like I stated, as far as -- based on what Mr. Saxe said, the only obligation of Caligula is to answer some requests to produce documents.  I can't speak for --

THE COURT:  That's fair.

MR. DECAILLY:  -- any of the other stuff.

THE COURT:  That's a good answer actually.

MR. DECAILLY:  I mean, I think that -- I haven't seen them.

THE COURT:  Right.

MR. DECAILLY:  I would hope -- or at least a response to it obviously is different than the actual production of the documents.

THE COURT:  Okay.

MR. DECAILLY:  I mean, a response can usually be done in a fairly quick manner, I believe.

THE COURT:  Well, let's go with the ten days.  I routinely shorten discovery to ten days in Bankruptcy Court because everything goes faster here.  I mean, that's just the world we live in.  We don't have 30 days to do things because things move quicker.  Although, you know, I'm happy to slow the case down but there's a lot of other pressures that

are pushing this case forward, so let's -- and your point is well-taken. That is you don't represent anybody but Caligula in front of this Court in this case.

MR. DECAILLY: Right.

THE COURT: And that's -- and so, Mr. Saxe, you'll have to deal with that. You may have to reissue subpoenas. You're now in Federal Court and you can deal with that appropriately. And then we'll deal with responding parties as we'll deal with them.

So you're free to -- you can do -- you don't need to -- there's no request for production to a non-party so it would be a subpoena for documents. And you could subpoena for deposition and documents all at the same time. Maybe do them at different -- for different dates. And Mr. DeCailly, I'll shorten his discovery time to ten days after he's served with your request for production, and we'll see where we are. Yes, Mr. McIntyre?

MR. MCINTYRE: You want to just reset this hearing for the 3rd, Your Honor. It seems like that should be perfect timing. We should have the responses to the discovery by then. We should know

if there's problems, and you could deal with discovery issues.  If there are responses, for whatever reason, or objections, you could resolve objections and keep things moving quickly, and maybe set the trial at that point in time.

THE COURT:  Okay.  When you say reset this hearing, you mean the motion for rehearing or do a pre --

MR. MCINTYRE:  The motion for rehearing actually has been disposed of but I suppose the --

THE COURT:  How about a preliminary hearing or status conference on the motion for 2004 exam, basically like a pretrial.

MR. DECAILLY:  Your Honor, I think that -- I think there's no delusion here.  I think there's going to be some discovery issues raised.

THE COURT:  Sure.

MR. DECAILLY:  Probably not from my end, but they've listed a lofty list of individuals to try to haul in for depositions and subpoenas, so I think the Court might want to block out the rest of the afternoon.

THE COURT:  Okay, well I've already -- I will do that.

MR. DECAILLY:  So -- but, yeah, that would

be a good day to, I believe, deal with the issues --

THE COURT: Okay, good.

MR. DECAILLY: -- that are brought forth.

THE COURT: Thank you, Mr. DeCailly. That was helpful. Okay, so get me -- in the order granting the motion for rehearing, just to recap, I'm vacating the order granting the 2004 exams. We're going to set that motion for 2004 down for a preliminary hearing on March 3rd at 1:30.

Provide also that if there are any motions directed to discovery they'll be scheduled to be heard on that same date and time, that the -- to the extent that the Debtor or any party in interest will be propounding discovery pursuant to Judge -- as contemplated by Judge Silver's order, that that discovery be initially propounded, at least just a request for production, by this Friday.

That the request for production to parties be shortened from 30 days to ten days. And the party may also propound such other discovery to non-parties as may be appropriate. And then we'll get those -- get all that in process. Then hopefully any objections can be asserted and we can deal with them at that March 3rd hearing.

And if there's any other practical

provision that you need to put in there -- please, Mr. Wilkes -- just consult with Mr. DeCailly and Ms. Colton.

MR. MCINTYRE: I actually have one that I would suggest, Your Honor, not to interrupt Mr. Wilkes.

THE COURT: Yes.

MR. MCINTYRE: To the extent that any -- maybe we could put in the order that to the extent that any non-party wishes to object to the subpoena or seek relief with regard to having to appear at a deposition, perhaps we could put in a deadline for them to -- shorten the time for them to do it, maybe five business days from receipt of the subpoena.

THE COURT: I think that -- I don't see that that would be a problem. I mean, I think the parties are going to know whether they're going to object or not. It doesn't take a long time to make that decision.

MR. MCINTYRE: Very good, Your Honor.

THE COURT: So let's make it for five days. Yes, Mr. Wilkes.

MR. WILKES: The only addition to the order would be an actual finding by the Court that this 2004 motion is a contested matter.

THE COURT:  Yes.

MR. WILKES:  Normally a 2004 is a 9013.

THE COURT:  Absolutely.  That's a good point.  That is a very good point.  Let's go ahead and find that all of the provisions of Rule 9014 shall apply to the conduct of the 2004 exam.  I hadn't thought about that.  It's a --

MR. DECAILLY:  Except for Caligula can't do any discovery the other way.

THE COURT:  Well, not on the merits of Caligula's claim.  Maybe you could -- I mean, I don't know that there's any issue about Judge Lamberth having entered an order or Judge Silver having entered an order.  And I think what Judge Silver contemplated was that the discovery would be limited to the Bilzerian tie-in to Caligula. I don't -- so I'm not --

MR. DECAILLY:  I'm just trying to clarify if we're allowed to file anything or not, Your Honor.  I mean --

THE COURT:  Well, if --

MR. DECAILLY:  I mean, we now have three contested -- we're going to have four contested matters involving Caligula --

THE COURT:  Right.

MR. DECAILLY: -- and it appears that we can't issue any subpoenas, we can't do any depositions, we can't do any requests to admit --

THE COURT: Well, not until we conclude the process that Judge Silver started. And I think what he had in mind, at least the way I read his order, is that we need to resolve this threshold issue first, and then we can decide who can assert what.

Obviously there's an overlay here in that you've got a claim in the Bankruptcy Court, but it's -- you know, the claim is -- and the bottom line is no different than your lawsuit in the State Court. I mean, they're going to -- they've objected to the claim, we're going to have a trial. It'll probably be the identical trial that you would have had in State Court.

And it was in that context that Judge Silver raised the concern about even being able to prosecute the claim. And so, I mean, I have the same -- in deference to him, but also adopting his logic, I have the same concerns. We need to get to the bottom line.

At that point, we'll see, you know, what discovery can be had on the underlying merits. But

until your status -- "your" being your client's -- status as a creditor is clarified, then we don't know what standing you have if you're not a creditor because you can't -- well, if you can't prosecute your creditor status, then we don't know what you can do.  So let's get that done first.

So to answer your question, I think it flows from Judge Silver's order that we proceed first on these injunction issues, and then we'll see where we go from there.

MR. MCINTYRE:  You want me to put that in the order, Your Honor, that the other contested matters involving Caligula are stayed as to discovery pending your resolution of the 2004 motion?

THE COURT:  Yes, I think that clarifies what Mr. DeCailly's question was seeking an answer for, and that's a fair question and that, I think, is the appropriate answer.  Okay?

Very well, I think that concludes the first matter.  The second is the motion for relief from stay filed by Sovereign, a renewed motion.

MR. SORIANO:  Yes, thank you, Your Honor. Your Honor, it's been about seven months since Sovereign obtained its writ of replevin a while back

and pretty much the same amount of time since this case has been pending.  And I'm going to take a little different view, as you might expect, from Mr. McIntyre's blue sky about the plan.

I mean, from the bank's perspective, there's been insufficient progress on the plan since we've had the mediation in November.  And the plan that was filed with the Court contains numerous provisions that we haven't agreed to and they're unacceptable to us.

In addition, Mr. Yaffe's financial disclosures in connection with the plan and an independent investigation by Sovereign have increased our concerns about where the case is headed.  Like, for example, if you've looked at the disclosure statement at all, there's approximately $1.9 million that's been paid to unsecured creditors outside the plan by Phoenix Gold.

Mr. Yaffe -- this is not in the disclosure statement, but Mr. Yaffe has apparently pledged personal assets and at least possibly assets of the estate, since the case has been pending.

The bank has noted that 2.4 to 3.3 million dollars went through his money market account post-petition from an individual who had represented to

the bank that his sole source of income was from NGE.

So we're not really optimistic right now about a plan being confirmed.  And no matter what we've talked about in connection with a plan, in connection with settlements, there's been no dispute among the parties -- the principal parties being, I'll say, the Trustee, Chapter 11 Trustee and Mr. Yaffe -- that Sovereign would be permitted to liquidate coins that are not in dispute right now, among other parties, and the music boxes.

There are issues maybe about methodology, but I don't think anybody's ever -- as the talks have progressed -- contested the fact.  And I understand they're not going to contest it today, that the bank should at least for now be allowed to go forward and liquidate those items of its collateral.

So that's what this motion is addressed to, the music boxes and the undisputed coins.  There are other disputes on the coins and we'll probably be resolving some of these fairly quickly and a couple of the others might take a little longer.

THE COURT:  Okay, well let me --

MR. SORIANO:  So that is what our relief

that we're requesting today.

THE COURT:  Right.  Well, let's see if there's -- what opposition, if any, there is to the undisputed coins and the music boxes.

MR. MCINTYRE:  Your Honor, we actually advised the bank -- sort of caught a gratuitous beating there, and which may have been necessary given the status of the case, but we've agreed as to the coins.  Fine, stay relief is fine.  Liquidate them.  We'd like to assist you.  If you accept our help, great.  If not, that's fine.  As to the music boxes, same thing.

I want to make it clear, there has been no pledge of the assets of the estate, and I've actually brought the information for Mr. Soriano today and I meant to tell him ahead of time before the hearing but it escaped me to give him that information.

But there has been no double pledge of assets of the estate.  I don't think there's anything unusual about Mr. Yaffe being in a situation trying to raise money to create and fund and capitalize Phoenix Gold so that he can get everybody paid back.  That's what he's done, that's what he's doing, and he's actually been paying

creditors to allow Phoenix Gold to move forward.

All that will be fully disclosed.  We have provided -- you know, Mr. Hyman is auditing all that.  Mr. Hyman's been made available to the bank and to the Trustee and will continue to be made available, and will be available at the -- you know, it will be a big piece of our confirmation process to show the Court that Phoenix Gold has made a lot of money and it's used that money to repay creditors to get things moving forward so that it can confirm its plan.

So I think, you know, we're in total agreement with an order lifting the stay as to the undisputed coins and as to the music boxes.

THE COURT:  Okay.  Let me ask you, Mr. Soriano, is there any -- included within the, quote, undisputed coins, are there any coins of Mr. Payne or Gene Sanders, et cetera?

MR. SORIANO:  I mean, those are the coins that we consider disputed for now.

THE COURT:  Okay.

MR. SORIANO:  I mean, anybody who's filed an objection that has not been resolved -- and I don't think any of them have been resolved yet -- we will not liquidate those coins.

THE COURT:  Okay.

MR. SORIANO:  And I think they've all been adequately identified so --

THE COURT:  Okay.  So you're just doing the stuff that no one has taken any issue on.

MR. SORIANO:  Correct.

THE COURT:  Okay.  Does anyone else have any -- so to answer the objecting parties' points, any order on this should make it clear that any of the objecting parties' coins would not be liquidated at this point subject to further order of the Court.

MR. SORIANO:  Correct.

THE COURT:  Okay.  Mr. Farfante?

MR. FARFANTE:  Your Honor, the only concern -- not with the music boxes but with the coins -- our client, Republic National Business Credit, has asserted a large property notice claim.

There's been an itemized list that was prepared by Sovereign's examination team, and the Trustee used for the coin inspection, that we took advantage of.  We itemized on that list the coins that we were inspecting.

So I think there is a mechanism and an itemized list in place that could provide a little bit more clarity as to which coins are contested or

disputed or undisputed --

THE COURT:  Okay.  Well, if you --

MR. FARFANTE:  -- and we just are concerned that something gets wrapped up into one pile that's not truly undisputed.

THE COURT:  Okay.  Well, why don't you work with Mr. Soriano on a provision in the order that if there's any -- that, you know, some mechanism by which you can provide him a list of things that -- of coins that you think you've got an interest in or --

MR. FARFANTE:  And we have done that already in the process.

MR. SORIANO:  Right.  That's why I've said I don't think it's an issue --

THE COURT:  Oh.

MR. SORIANO:  -- because we know what are in dispute now.

THE COURT:  Okay, so it's not an issue.

MR. FARFANTE:  Hopefully not.  Just if we can agree -- when we provide the information, if we can agree on what is undisputed --

THE COURT:  Okay, if there's any dispute --

MR. FARFANTE:  I just wanted to raise the

issue now.

THE COURT:  Put in there that -- in the order that if there is any dispute, the Court will --

MR. SORIANO:  Sure.

THE COURT:  I'll be open for business.

MR. FARFANTE:  Okay.

THE COURT:  I'll have a special --

MR. EATON:  Your Honor, this is John Eaton.  If I may be heard, Your Honor?

THE COURT:  You may.

MR. EATON:  Your Honor, we spoke to Mr. McIntyre and to Mr. Soriano.  The Trustee does not have any objection to the motion that the Sovereign Bank had filed.

We too, on behalf of the Trustee and myself, have concerns about where this case is at, where it's headed, how it's been dragging along, and the fact that there has in fact, from my perspective, been no real progress since the mediation to push this towards getting a consensual plan.

That is part of the reason why we don't oppose the relief that's being sought by the bank and the particular coins and the music boxes, which

I think need to be clarified and made sure we know exactly which ones are contemplated to be liquidated under the plan.

But I know that Mr. McIntyre spoke earlier about having a continuance of the confirmation hearing because of where we are at, and I just want to make sure that we get an opportunity to address that point, Your Honor, because I'm not so sure that we have as favorable a view as Mr. McIntyre does or as the Court for where the case is.

And I think we're of the belief that things need to get controlled quickly because we're in an administratively insolvent case that is continuing to drag out, and I think that we need to address some of those issues today, Your Honor.

THE COURT: Okay. And on the -- anyone else want to be heard on the motion for relief from stay?

MR. BERMAN: Your Honor, this is Steve Berman, if I may.

THE COURT: Okay.

MR. BERMAN: If I can suggest that in the order granting relief from stay that Mr. Soriano include a listing of the notices of claimed ownership that have been filed, with docket numbers,

and that way there won't be any confusion about what's being sold and what's not being sold.

THE COURT: Okay. Mr. Soriano, any objection?

MR. SORIANO: No problem. I'll put it in the order that these are the ones that are disputed, identified in these various objections and --

THE COURT: Okay.

MR. SORIANO: Yes, I have no problem with that.

THE COURT: Okay. Include Mr. Berman in your circulation list, and anybody else that --

MR. BERMAN: Thank you, Your Honor.

MS. MORA: Your Honor, this is Mindy Mora. I'd just ask that Mr. Soriano include me in his circulation list as well.

THE COURT: Okay, very well. Anyone that wants to be included in the circulation list, just e-mail Mr. Soriano and you can get a copy of the order, make your comments known and incorporated.

Okay, very well. Then I believe that concludes the two matters that were noticed. We'll get to the bigger picture scheduling issue here in a moment.

On the motion to estimate the Caligula

claim, I think the appropriate thing to do on that was go ahead and set that down for March 3rd for a preliminary hearing, just to keep it on a calendar. The idea is that we're not going to be able to deal with that on the merits at that time, but we do have to get to it at some point.

And the reason I say not get to it on the merits is because I can anticipate we're going to be still dealing with the issues relating to the District Court injunction. But it'll be there and we'll deal with it as well as we can, given where we are on the other matter.

THE COURTROOM DEPUTY: Do you just want us to do a notice of hearing on that?

THE COURT: We'll just do a notice of hearing for March 3rd.

MR. DECAILLY: Your Honor, as a point of clarification, since in this particular thing there seems to be issues with who files what, I've already began to draft, obviously, an objection to the plan and disclosure statement in anticipation of this Court's possibly setting it down for a confirmation hearing, as well as some other motions.

Are we prohibited from filing anything, or may we file and just have it so they're out there

properly noticed to all the parties, as a lot of them everybody's entitled to, and the Court can do with them what --

THE COURT:  Right.

MR. DECAILLY:  -- it wants after --

THE COURT:  Yeah, my inclination -- and I'll hear from parties on this -- is that because the bankruptcy case proceeds differently from State Court litigation -- and that is we have a main case and then we have all these contested matters that are flying around it, each of which itself is a lawsuit of sorts -- that while we're adjudicating one of these satellites rotating around the main case, and that is the District Court injunction issue, we have a main case going on in which substantive rights are being affected, such that if Caligula ends up being a major creditor in this case -- and I'm sure Mr. DeCailly will argue that they will -- it wouldn't be fair to allow them to be prejudiced from at least asserting their position on the main case issues.

So my inclination is, in response to that point, is to include something in the order, that Mr. McIntyre is going to draft, to the effect that pending a conclusion of the issues to be resolved in

connection with the District Court injunction that's however defined, that Caligula may still appear and be heard and assert positions in matters relating to the case in general.

MR. DECAILLY:  Okay.  Thank you, Your Honor.

THE COURT:  And then, I mean, I may consider, in the context of something you raised, a defense that you don't have standing, but at least -- I mean, at least you can raise it and then we'll deal with it.

MR. DECAILLY:  Right, I just --

THE COURT:  That's fine.

MR. DECAILLY:  I want to keep going forward as well --

THE COURT:  No, no, that --

MR. DECAILLY:  -- because I certainly don't want to stop confirmation just because we haven't determined a million dollar claim for an unsecured creditor here.

THE COURT:  That's a fair point.

MR. DECAILLY:  Thank you, Your Honor.

THE COURT:  Okay.  Let's get to the bigger issues now that -- where we are is we have a combined hearing on final approval of disclosure

statement and confirmation of plan scheduled for March 3rd, I believe.  That's no longer workable.

It's been suggested that possibly we use the March 3rd date for a disclosure statement hearing, at the conclusion of which we can set a confirmation hearing, and to keep the process going along that track.  Mr. Eaton what are your thoughts on that?

MR. EATON:  Your Honor, as I started to allude to earlier, our concerns are that this case has now dragged out much farther than I think anyone had anticipated when this process began, when we had initially thought we were going to have a confirmation hearing on November 18th.  The Court put it out till March.

I think I had indicated in one of those earlier hearings that I was concerned about it being put out so far in an administratively insolvent case.  And now assuming a disclosure statement was approved or would be approved on March 3rd, we're now talking about putting the case out to sometime, I would imagine, in April.

I think that the Court, if it's going to give the plan proponent the opportunity to do this and to stretch it out further, that there's a price

to pay.  And I think that there needs to be put some hard money put up by that March 3rd date that would be required to confirm a plan.  Not just waiting to get to confirmation and then, under the plan, which I think contemplates an effective date of June, waiting for that time to have the money up.  And the disclosure statement and plan that's currently of record has to be changed.

I did speak to Mr. McIntyre earlier today and advised him that there are several nits that there are, but there are also bigger issues about, for example, what the Trustee has agreed to and what the bank has agreed to, which are not in fact true, but are currently in the plan and disclosure statement that is out there.

So from our perspective and the Trustee's perspective, we have grave concerns about whether or not this can get confirmed.  And obviously we would welcome the thoughts of the creditors because ultimately it's going to be their interests that are going to be impacted.  And I think that prior to that disclosure statement hearing, we'll be able to flesh out whether in fact Mr. McIntyre is correct that the creditors are on board with it.

But if the Court is going to give them

this opportunity and give them a chance to push it out more, I think that at a minimum they've got to be able to be in a position by that March 3rd date to put up the money necessary to at a minimum take care of the Chapter 11 administrative expenses in this case and perhaps even more that are going to be required towards confirmation.

THE COURT:  Okay, thank you.  Mr. Soriano?

MR. SORIANO:  Yeah, I think Mr. Eaton makes a very good point, and I feel -- I feel for him.  I mean, in a lot of ways, the bank's been asked to fund certain things, and it's funded some of them, but not too many of them, and frankly it doesn't really want to.

They really shouldn't be required to be dragged along on this process unnecessarily when the case is, on its face anyway, administratively insolvent.

I could go ahead and file a motion to convert the case, which we could hear on March 3 simultaneously with the disclosure statement, if Your Honor thinks the concerns are significant enough, which I think they will be, then maybe consider conversion at that point in time.

That would relieve the Chapter 11 Trustee.

It may end up being where we're going anyway. Frankly, I think it is. And it wouldn't -- I mean, it would still be within this jurisdiction. Your Honor has a lot of information; we can still proceed in various ways, but that would be a way to not drag this thing along too much.

And if what you hear on the 3rd, you know, convinces you that there is not much of a chance of this case going forward, Your Honor could convert it at that time. Rather than doing it sua sponte.

The parties are all here. The primary parties are here today, understand what's going on. So no one will be prejudiced, if I represent that I will file a motion to convert. I'll keep it simple. I'm not going to make it a big deal. But it would be before you and it would be an option available to you.

THE COURT: Well, I mean, I don't have a problem with your filing such a motion and along the lines you've indicated. My view on the case, just very preliminarily, is that, sure, this could be in a Chapter 7 and the Debtor and the Yaffes could still work out a deal with the Chapter 7 Trustee and do it in the context of a motion to compromise controversy and be a sub rosa plan of sorts and, you

know, in the context of a 7.

And that might be -- you know, that has some attraction.  It's streamlined.  You don't have to worry about things like creditor voting -- creditor votes and the like.  And you can do a -- in some sense, you can do more on a motion to approve a compromise than you can under a confirmation order because the discretion of the Court is -- I wasn't involved in Winn-Dixie obviously, but I've read a little bit about the compromise that was done there, which essentially accomplished things that the plan probably could have.

So, I mean, that's an option.  And it's a prac -- it could be a practical option.  But I don't think at this point -- you know, I'm not ready today to call -- to say that that's the right option.

You've got a lot of players in place.  It would involved reshuffling.  You know, Mr. Eaton and Mr. Luzinski are out, and they're necessarily going to be probably more expensive than a Chapter 7 Trustee.  So that's an issue.

But they're up to speed.  They're players in this.  It would be good to keep them on board and try to play out the current scenario to see if we

can come up with something.

I don't think that at the end of the day -- you know, global warfare with the Yaffes, at the end of the day that produces a result that may be worse than the settlement, at enormous expense and a huge amount of time spent.

I don't think that's the best alternative, because that's -- the option of not getting a compromise of some sort, is litigation which will go on for years and very uncertain as to outcome and very expensive.

So I'd like to keep things on track.  We can keep that option open.  If you want to file a motion to convert, just -- it's always out there as an option but it doesn't hurt to go ahead and have it as a contested matter.

MR. SORIANO:  Well, again, I'm doing it, to some extent so that if what you hear on the 3rd convinces you that it can't go forward -- I mean, again, because you're right.  Mr. Luzinski and Mr. Eaton are valuable but they're also expensive and there's no money right now to pay them.

THE COURT:  Right.

MR. SORIANO:  Now, I mean, if you're looking at the bank who has gotten pretty well hosed

in this situation, to be honest -- I mean, we certainly wouldn't want to be surcharged.  We would fight that vigorously, so I hope that wouldn't be, well, the card that we've been playing here to keep this thing going.  And it's not fair to them.

And as I said, the plan that's been filed, by the way, has a provision that they're going to start paying RNBC on Monday.  I don't know if that's really happening.

They've paid $1.9 million to unsecured creditors of this state outside the plan, which of course they're free to do, but that's an awful lot of money.  And you've got to wonder where it came from.  So there are a lot of concerns.

And part of it is, yeah, I understand, Your Honor, and frankly when we went to the mediation, there were certain aspects to it that seemed reasonable because of the various things that you said.

All those things are true, but when you start seeing -- when you start looking behind the scenes and seeing certain things that take place that make you become very concerned, there's just a safety element.  And at some point in time, it's just too much to ask of people to trust in certain

situations. And this does require that to some extent.

So anyway, I just don't want to prolong the agony. And, again, they want to get paid. I understand the Trustee and his counsel do want to get paid for doing this and maybe --

MR. EATON: And, Your Honor, it's not just an issue relating to making sure that we get paid and the Trustee and other administrative expense claimants get paid. It's also to get what's best for creditors.

And I hope that this opportunity that would befall us on March 3rd with respect to a disclosure statement would provide an opportunity for creditors to come forward and say, "Yeah, we are on board with this plan," as Mr. McIntyre says.

If he can get it confirmed, that is great. We have been pushing to try to get that done. We've been pushing since the mediation and we have -- it's almost as if there was a brick wall on trying to get a deal done.

And I hope that Mr. Yaffe is able to do that because I don't think that World War III is the best course of action. We're just trying to be practical in making sure that it doesn't continue

to drag out with no progress, from our perspective, being made towards getting that deal done.

THE COURT:  Okay.  Mr. Eaton, is there anything that the Court could do by way of an order to assist the process?  For example, should I order the parties to meet and confer in person at some date -- sometime before that here in Tampa to try to, you know, break the final log jams?

Obviously, I'm not party to those negotiations, and appropriately so, so I don't know exactly, you know, how I can help, but is there anything that you can think of?

MR. EATON:  Your Honor, if the Court were to order the parties again to mediation -- and I haven't had a chance to speak to Mr. Luzinski, and I may -- and obviously we're in different rooms right now -- I don't think that there would be a problem with that.

Again, we have tried to get the parties to speak on business terms, and there's been a logjam with respect to one party wanting something before they be willing to discuss business terms.  I want that process to play out.  I want that to happen.

And I certainly personally, as counsel to the Trustee, don't have a problem with it, and if

Mr. Luzinski has a different view, he's certainly able to articulate it.  If the Court were to require that before the mediation, that's -- before the March 3rd hearing, that's fine.

THE COURT:  Okay.  Mr. McIntyre?

MR. MCINTYRE:  Your Honor, we actually have reached out to the bank and suggested -- the mediation was not concluded.

THE COURT:  Right.

MR. MCINTYRE:  It was stopped so that certain things could happen.  Those things have happened.  I think it would make perfect sense to reconvene and conclude the mediation.  We made progress when everyone was there.  Where we don't make progress is where everyone is a different location.

THE COURT:  Okay.

MR. MCINTYRE:  And one thing I'd also like to say -- I know it's a late hour, so I'll be very quick.  You hear a lot about there's no progress, there's nothing along those lines.  There's only one real relevant fact that I can see with regard to this plan is, can Mr. Yaffe make enough money through Phoenix Gold to pay everybody?

And the thing you haven't been -- well,

you heard, but in a different context, is he has made since August approximately $1.9 million, backed up by Mr. Hyman.  So we actually have a Chapter 11, Chapter 7 Trustee who's been watching meticulously at how the money is being made.

And, if anything, the additional time, I think, has put us in a position to be able to overcome the feasibility issues, which would have been very difficult to overcome with a three-month track record, rather than the track record we'll now be able to show at time of confirmation.

I don't want to prolong this hearing with a back and forth because it's really late and we have another hearing after this that we have to deal with.

But let's just get to the 3rd, do the disclosure statement hearing hopefully, and we'll ask a lot of players to show up, and hopefully you'll hear a lot of the unsecureds say this is what they want.

THE COURT:  Okay.

MR. EATON:  And, Your Honor, I would also raise the issue that I had articulated earlier, which is if we're going to be at a point where this case is going to go forward towards confirmation,

then I think there ought to be a requirement of the plan proponent putting up the money necessary to take care of the Chapter 11 admins, to continue to go down that route to try and get a plan confirmed.

THE COURT:  Okay.  No, I understand. Mr. Soriano?

MR. SORIANO:  I just want to say, I think my client -- but I think, you know, we'd be willing to sit down and meet before the hearing.  And maybe if we just met the day before the hearing, frankly, because I don't think -- I don't want to have them make two trips when they could actually be here.

But, again, Mr. Mc -- and I don't want to keep going back and forth.  But Mr. McIntyre says he's made $1.9 million to pay unsecureds.  We've seen at least $2.4 million go through his personal money market account early in the case, and there haven't been a whole lot of the receivables that we have that have been collected.  And we were supposed to have a lot more.  So there's a lot of questions raised.

For the sake of Mr. Eaton, and I do want to say he has worked very hard to push this process forward.  A lot of the resistance has come from us, but we wanted to get financial information before we

would sit down and discuss business terms.

And having received the financial information, it raised some troublesome questions for us, so --

THE COURT:  Let's do this.  I will, on my own motion, order the parties to continue the mediation process.  I believe it was Judge Delano that was the mediator, and I'll direct Mr. McIntyre to contact -- or the appropriate party.  Mr. McIntyre you can take the lead on that.  Contact Judge Delano's chambers, get some mutually agreeable dates and times.  The day before obviously has got some advantages.

I'll also require, if there's any financial information that's reasonably requested by any party of any other party, meaning from the Yaffes as to this new business, that that be provided prior to the mediation proceeding.  And I'll direct the parties to resume the mediation process prior to the hearing on March 3rd.

I'm not going to at this point order any deposit in a vacuum.  That's a mediation issue and that's on the table and we're only three weeks away from that, so negotiate that and let's hope --

THE COURTROOM DEPUTY:  Are we going to

change it to a disclosure statement hearing?

THE COURT: We'll go ahead and continue -- we'll leave it as a -- let's change it to a disclosure statement hearing, and then we'll play it by ear basically.

MR. MCINTYRE: You want an order on your --

MR. EATON: Your Honor, two points. Is there a deadline by which objections to the disclosure statement should be filed? And then secondly, with respect to the mediation -- continued mediation -- I understand the practicality of having a mediation the day before the hearing.

If the mediation is scheduled the day before the hearing, my hope would be that the parties could at least participate in at least a telephone conference to try to make some progress so we're not just trying to scramble at the last minute to do a deal.

THE COURT: I don't follow what the -- what's the telephone conference and --

MR. EATON: I would like -- my hope would be that we could try to at least require the parties to telephonically meet to try to flesh out some issues ahead of time so we're not just struggling at

the last minute.  That's part of the problem I think where we are at now, is that everything kind of drags when people wait till the last minute.

I'd be amenable to having a call with Mr. McIntyre and Mr. Soriano and even getting the respective clients on the phone to see if we can hammer out some issues prior to sitting down face to face, if in fact the last day that we can do it is a day before the hearing.

THE COURT:  Oh, okay.  You're talking about a pre-mediation conference call?

MR. EATON:  Yes, Your Honor.

THE COURT:  Okay, and that's a good suggestion.  I think we can do that.  Let's -- I'll direct Mr. McIntyre to set up a conference call in advance of the mediation for the parties to outline the issues, information requested, basically the matters that need to be resolved or submitted to mediation.

And then you'll have your mediation.  And you don't have to do it the day before but that is a little bit late in the sense that you've got to go right to a hearing.  And on the other hand, things settle on the courthouse steps so, you know, maybe that's a good date.

THE COURTROOM DEPUTY:  Well, Judge Delano may already have hearings.

THE COURT:  And Judge Delano may already have hearings.

MR. EATON:  Exactly.

THE COURT:  So I appreciate her involvement, and I know she put in a fair amount of time, but I think she probably would be willing to help out in that process.

Okay, is there -- I think that concludes at least --

MR. EATON:  I'm sorry, Your Honor, the order, a deadline to file objections to a disclosure statement?

THE COURT:  Oh.  Let's do that up and to immediately prior to the disclosure statement hearing.  And make it -- well, let's say 5:00 o'clock the day before.  If you're in the mediation you need to get it done a little bit before.

The reason I'm saying it so late is that, you know, it's like when people get up at a disclosure statement hearing and just make objections, the Debtor says, "Well, fine, fine, fine, fine, we'll put it in," and that's probably what's going to happen here.

So, you know, whatever you can think of, raise all the way to the last minute, and let's give Mr. McIntyre at least some sleep time to work on it before the hearing and then he can respond and probably is going to say, "Fine, fine, fine."

You know, I mean, I can't imagine there's something -- you know, within reason, that people are going to want that Mr. McIntyre and his client aren't going to be willing to do.  So we'll leave that pretty open.

MR. MCINTYRE:  So Your Honor, we'll do a written order for you to sign on your own motion that --

THE COURT:  On the mediation as a separate -- let's keep that short.  And then you've got the order granting your motion for rehearing.

MR. MCINTYRE:  All right.  But then another one on the disclosure statement?

THE COURT:  Let's do a separate -- yeah, good point.  Let's do a separate one on that.

MR. MCINTYRE:  Okay.

THE COURT:  That rescheduling the -- cancelling the currently scheduled hearing on confirmation, the combined hearing, scheduling for that same date and time a hearing on disclosure

statement providing for objections to be made by

5:00 -- in writing filed with the court and served,

to be received by all of the major parties by

5:00 p.m. the day before.

MR. MCINTYRE:  Okay.

THE COURT:  I think that'll do it.

Anything else that flows from that that you need to

-- look at the last order.

MR. MCINTYRE:  Very good, Your Honor.

Thank you.

THE COURT:  Okay.  Is there anything else

that we can cover on the National Gold case?

(No response.)

THE COURT:  Okay, very well.  Thank you,

this hearing is concluded.

MR. SORIANO:  Thank you, Your Honor.

MR. MCINTYRE:  Thank you, Your Honor.

MR. EATON:  Thank you, Your Honor, for

letting us appear by telephone.

MR. DECAILLY:  Thank you, Your Honor.

THE COURT:  Certainly.

(Whereupon, the proceedings concluded

at 12:31 p.m.)

**C E R T I F I C A T E**

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, CHERYL CULVER, Certified Court Reporter, Notary Public, and Administrative Office of U.S. Courts Approved Transcriber, hereby certify that the foregoing proceedings were transcribed from the digitally recorded hearing provided by the court.

I FURTHER CERTIFY that the foregoing transcript constitutes the official record of said proceedings prepared to the best degree possible based on the quality of the recording, phone appearances, speaker proximity to microphones, completeness of speaker identification logs, without benefit of exhibits, and given the expedited and/or technical nature of the proceedings.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of counsel involved in the matter, nor do I have any interest in the outcome.

THIS CERTIFICATION is limited to originals and official copies of transcripts bearing the reporter's original signature in blue ink and official seals.  Circulation of transcripts to anyone other than the ordering parties is not authorized, and official copies are intended to be purchased directly from the reporter.

SIGNED AND SEALED this 26th day of February, 2010, in Tampa, Florida.


_Cheryl Culver_

Cheryl Culver, CCR, B-1281
Certified Court Reporter
State of Florida Notary Public